047272/21061/JNR/JCS

# UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS, EAST ST. LOUIS DIVISION

JIMMIE DALE MILLER,

Plaintiff,

v.

WEXFORD HEALTH SOURCES, INC., DIRECTOR CENTRAL MANAGEMENT SERVICES, LAURA PITTMAN, DINA PAUL, LORIE CUNNINGHAM, MR. WELLS, JANE DOE #1, JANE DOE #2, JANE DOE #3, JANE DOE #4, JANE DOE #5, NURSE DEWEESE, NURSE FUSON, NURSE WARD, NURSE YANCY, NURSE SWINSON, NURSE FOSTER, C/O WILSON, ROB JEFFRIES, STEVE MEEKS, DR. JULIANA CHAN, AND UNIVERSITY OF ILLINOIS CHICAGO,

Defendants.

No. 20-cv-446

Hon. Nancy J. Rosenstengel

## ANSWER TO PLAINTIFF'S AMENDED COMPLAINT WITH AFFIRMATIVE DEFENSES

NOW COMES the Defendants, DR. DINA PAUL, DR. LYNN PITTMAN, AND WEXFORD HEALTH SOURCES, INC., by their attorneys, CASSIDAY SCHADE LLP, and hereby submit their Answer and Affirmative Defenses to Plaintiff's Amended Complaint, stating as follows:

## NATURE OF THE ACTION

1. At the times alleged in this First Amended Complaint Plaintiff was incarcerated at correction facilities operated and managed by the Illinois Department of Corrections ("IDOC"). Plaintiff brings this action under § 1 of the Civil Rights Act of 1871, as codified at 42 U.S.C. §

1983, to recover damages for injuries incurred as a result of policies, acts and omissions of the Defendants which deprived Plaintiff of adequate medical care while Plaintiff was in the custody of the IDOC. Specifically, and as more fully described in this First Amended Complaint, Defendants unlawfully deprived and excluded Plaintiff from adequate and necessary medical care for Hepatitis C, Type 2 Diabetes and dental injuries, and further deprived Plaintiff of a reasonable and adequate supply of his prescribed medications upon his release from IDOC custody. Plaintiff further seeks an award of his reasonable attorney's fees pursuant to 42 U.S.C. § 1988(b).

ANSWER: Defendants admit Plaintiff was incarcerated in the Illinois Department of Corrections ("IDOC"). Defendants admit Plaintiff brings this action under 42 U.S.C. §1983, alleging he was deprived adequate medical care while in IDOC but deny such claim is warranted. Defendants admit Plaintiff seeks an award of attorney's fees but denies such award is warranted. Defendants deny the remaining allegations contained in Paragraph 1.

2. Plaintiff alleges that the Defendants' policies, acts and omissions constituted deliberate indifference to Plaintiff's objectively serious medical needs, in violation of his rights under the Eighth Amendment of the United States Constitution.

ANSWER: Defendants admit Plaintiff makes the stated allegations but deny that such allegations are warranted. Defendants deny they were deliberately indifferent to any serious medical need of Plaintiff. Defendants deny they violated Plaintiff's constitutional rights.

3. At the time Plaintiff filed the Complaint in this action he was in the custody of the IDOC and in his Complaint he sought both monetary damages and injunctive relief. Plaintiff has now been released from the custody of the IDOC. In this First Amended Complaint Plaintiff therefor seeks only monetary damages for the injuries caused to him by the wrongful and unconstitutional acts described herein.

ANSWER: Defendants admit Plaintiff was incarcerated in the IDOC at the time he filed the Complaint and has now been released. Defendants admit the First Amended Complaint seeks only monetary damages but deny such damages are warranted. Defendants deny they committed any wrongful or unconstitutional act. Defendants deny that they committed any act that caused injury to Plaintiff.

**JURISDICTION AND VENUE**

4. This action arises under the United States Constitution and seeks damages as provided under 42 U.S.C. § 1983.

ANSWER: Defendants admit Plaintiff purports to bring a claim under 42 U.S.C. §1983 but denies such claim is warranted. Defendants deny they violated Plaintiff's constitutional rights and deny Plaintiff is entitled to any relief.

5. This Court has subject matter jurisdiction over the claims alleged in this First Amended Complaint pursuant to 28 U.S.C. § 1331.

ANSWER: Defendants admit the allegations of Paragraph 5.

6. Venue for this action is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the subject claims occurred in this judicial district.

ANSWER: Defendants admit the allegations of Paragraph 6.

7. Plaintiff has exhausted administrative remedies reasonably available to him prior to bringing this § 1983 civil rights claim in accordance with the Prison Litigation Reform Act, 42 U.S.C. § 1997(e)(a).

ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 7 and therefore deny the same.

**THE PARTIES**

8. Plaintiff is a citizen of the United States who currently resides in Chicago, Illinois. On or about June 16, 2016, Plaintiff was incarcerated at the IDOC Stateville Correctional Center ("Stateville CC"). Plaintiff was transferred to the IDOC Pinckneyville Correctional Center ("Pinckneyville CC") on or about September 1, 2016. Plaintiff was transferred to the IDOC Lawrence Correctional Center ("Lawrence CC") in or about February 2019. Plaintiff was released from Lawrence CC, and from IDOC custody, on or about June 22, 2020.

ANSWER: Defendants admit Plaintiff was in Lawrence Correctional Center from February 2019 to June 2020. Defendants deny that the time periods related to Stateville Correctional Center or Pinckneyville Correctional Center are properly before the Court in this case. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 8 and therefore deny the same.

9. Defendant Wexford Health Sources, Inc. ("Wexford") is a Pennsylvania corporation and is and at all relevant times has been a third-party contractor retained by IDOC to provide medical and health services to the state corrections institutions and facilities within the State of Illinois, including Stateville CC, Pinckneyville CC and Lawrence CC. Defendant Wexford employs doctors, nurses and other medical personnel who provide medical and health services to inmates at IDOC facilities. In its capacity as a contractor to the IDOC, Defendant Wexford promulgated rules, regulations, policies, and procedures for medical screening, medical treatment, and overall medical care of inmates incarcerated in the IDOC. Defendant Wexford's policies were implemented by and through its directors, managers and employees, including its Medical Advisory Committee and certain Defendants named herein, who were responsible for the medical care of inmates in the IDOC. In its capacity as a contractor to the State of Illinois, through the IDOC, Defendant Wexford was, in all matters described in this First Amended Complaint, acting under color of state law.

ANSWER: Defendants admit Wexford Health Sources, Inc. is a corporation that provides medical services in certain facilities in Illinois, including Stateville, Pinckneyville and Lawrence Correctional Centers pursuant to contract with the IDOC but deny Wexford is a Pennsylvania corporation. Wexford admits it employees some of the nurses, doctors, and other medical personnel who provide medical services to inmates in those facilities. Defendants deny that Wexford's services in Stateville or Pinckneyville are properly raised in this suit. Defendants deny the remaining allegations contained in Paragraph 9.

10. Defendant Dr. Steve Meeks ("Meeks") is currently and was at relevant times the Chief of Health Services (sometimes referred to as Medical Director) ("Medical Director") for IDOC and is sued in his individual capacity. Upon information and belief, Defendant Meeks became the Medical Director for IDOC on November 1, 2016. As Medical Director of IDOC Defendant Meeks is and was responsible for ensuring that IDOC healthcare policies, directives, and protocols are medically appropriate and properly implemented at all facilities and for updating and creating administrative directives, clinic, and health guidelines, including those that relate to care for the health and medical issues described herein. Defendant Meeks directly participated in the formulation, review, revision, amendment and implementation of the policies, procedures and protocols described in this First Amended Complaint, with knowledge regarding the deficiencies of those policies, procedures and protocols and with knowledge that those medically deficient policies, procedures and protocols would deprive IDOC inmates, including Plaintiff, of medically necessary treatments contrary to accepted medical standards. In all his actions described in this First Amended Complaint, Defendant Meeks was acting under color of state law and in the course of his employment.

ANSWER: Defendants admit Dr. Steve Meeks was the Chief of Health Services for IDOC in the past. Defendants deny Dr. Meeks is currently the Chief of Health Services. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 10 and therefore deny the same.

11. Defendant Dr. Michael Dempsey ("Dempsey") was the Interim Medical Director of IDOC during relevant times and is sued in his individual capacity. Upon information and

belief, Defendant Dempsey was the Interim Medical Director of IDOC from June 15, 2016 until November 1, 2016. As Interim Medical Director of IDOC Defendant Dempsey was responsible for ensuring that IDOC healthcare policies, directives, and protocols are medically appropriate and properly implemented at all facilities and for updating and creating administrative directives, clinic, and health guidelines, including those that relate to care for the health and medical issues described herein. Defendant Dempsey directly participated in the formulation, review, revision, amendment and implementation of the policies, procedures and protocols described in this First Amended Complaint, with knowledge regarding the deficiencies of those policies, procedures and protocols and with knowledge that those medically deficient policies, procedures and protocols would deprive IDOC inmates, including Plaintiff, of medically necessary treatments contrary to accepted medical standards. In all his actions described in this First Amended Complaint, Defendant Dempsey was acting under color of state law and in the course of his employment.

ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 11 and therefore deny the same.

12. Defendant Dr. Louis Shicker ("Shicker") was the Medical Director for IDOC during relevant times and is sued in his individual capacity. Upon information and belief, Defendant Shicker was the Medical Director for IDOC from 2010 until June 15, 2016. As Medical Director of IDOC Defendant Shicker was responsible for ensuring that IDOC healthcare policies, directives, and protocols are medically appropriate and properly implemented at all facilities and for updating and creating administrative directives, clinic, and health guidelines, including those that relate to care for the health and medical issues described herein. Defendant Shicker directly participated in the formulation, review, revision, amendment and implementation of the policies, procedures and protocols described in this First Amended Complaint, with knowledge regarding the deficiencies of those policies, procedures and protocols and with knowledge that those medically deficient policies, procedures and protocols would deprive IDOC inmates, including Plaintiff, of medically necessary treatments contrary to accepted medical standards. In all his actions described in this First Amended Complaint, Defendant Shicker was acting under color of state law and in the course of his employment.

ANSWER: Defendants admit Dr. Shicker was formerly IDOC Medical Director but lack knowledge of the specific referenced dates. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 12 and therefore denies the same.

13. Defendant Dr. Dina Paul ("Paul") is a doctor employed by Defendant Wexford as Chronic Disease and Case Management Director and is sued in her individual capacity. Defendant Paul conducts chronic care telemedicine patient visits and medical record reviews for IDOC inmates including patients diagnosed with Hepatitis C. Defendant Paul has no patients outside IDOC and departments of corrections in the State of Indiana and the State of West Virginia. In all her actions described in this First Amended Complaint, Defendant Paul was acting under color of state law and in the course of her employment.

ANSWER: Defendants admit Dr. Dina Paul is a doctor employed by Wexford as Chronic Disease and Case Management Director and Telemedicine Physician. Defendants admit Dr. Paul conducts telemedicine patient visits and some medical record reviews for certain IDOC inmates, including those patients diagnosed with Hepatitis C and referred by the on-site physician. Defendants admit Dr. Paul's actions in providing telemedicine services to inmates was in the course of her employment. Defendants deny the remaining allegations contained in Paragraph 13.

14. Defendant Dr. Laura Pittman ("Pittman") is a doctor employed by Defendant Wexford as Medical Director at the IDOC Lawrence CC and is sued in her individual capacity. As Medical Director at Lawrence CC, Defendant Pittman was responsible for the provision of medical care to IDOC inmates, including medical screening, providing medication prescriptions, ordering medical treatments and referral to specialists for treatments for specific medical conditions. In all her actions described in this First Amended Complaint, Defendant Pittman was acting under color of state law and in the course of her employment.

ANSWER: Defendants deny that Dr. Laura Pittman was employed by Defendant Wexford as Medical Director at Lawrence. Defendants admit that Dr. Lynn Pittman was a doctor employed

by Wexford as Medical Director at Lawrence Correctional Center. Defendants deny she is currently so employed. Defendants admit, as Medical Director, Dr. Pittman provided primary care services to inmates at Lawrence. Defendants admit Dr. Pittman's actions in providing such medical care was done in the course of her employment. Defendants deny the remaining allegations contained in Paragraph 14.

15. Defendant Dr. Juliana Chan ("Chan") is a doctor employed by non-party University of Illinois at Chicago ("UIC") as Clinical Associate Professor of Medicine and is sued in her individual capacity. Defendant Chan as a contractor to IDOC and/or in the course of her employment with UIC as a contractor to IDOC, directly participated in the formulation, review, revision, amendment and implementation of the policies, procedures and protocols described in this Amended Complaint, with knowledge regarding the deficiencies of those policies, procedures and protocols and with knowledge that those medically deficient policies, procedures and protocols would deprive IDOC inmates of medically necessary treatments contrary to accepted medical standards. In all her actions described in this First Amended Complaint, Defendant Chan was acting under color of state law and in the course of her employment.

ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 15 and therefore deny the same.

16. Defendant Lori Cunningham ("Cunningham") is a nurse employed by Defendant Wexford as Director of Nursing and Site Administrator at the IDOC Lawrence CC and is sued in her individual capacity. As Director of Nursing and Site Administrator at Lawrence CC, Defendant Cunningham supervises the nursing staff and trains the staff on institutional and administrative directives and is responsible for ensuring that the medical staff provides necessary medical care and support to inmates. In all her actions described in this First Amended Complaint, Defendant Cunningham was acting under color of state law and in the course of her employment.

ANSWER: Defendants deny Lori Cunningham is or was during the relevant time period a nurse employed by Wexford. Defendants lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 16 and therefor deny the same.

17. Defendant Correctional Officer Doe ("Doe") is a correctional officer at the Lawrence CC and is sued in his individual capacity. Plaintiff does not yet know Defendant Doe's name or employee or badge number. Plaintiff will substitute the specific individual correctional officer for Defendant Doe upon determining the correctional officer's name through discovery.

ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 17 and therefore deny the same.

18. Plaintiff states that other persons are or may be responsible for policies, procedures, protocols, acts and omissions causing injury to Plaintiff as described in this First

Amended Complaint, including but not limited to employees of IDOC, UIC and Defendant Wexford, and including persons named as defendants in the original Complaint but not named in this First Amended Complaint. Plaintiff does not yet know the names of those persons and/or has not yet been permitted discovery to determine facts giving rise to claims against those persons. Upon allowance of reasonable discovery Plaintiff will seek further amendment to assert claims against such additional persons as are warranted under the facts and governing law.

ANSWER: Defendants deny they any policy, procedure, protocol, acts or omissions of Defendants caused injury to Plaintiff. Defendants deny Plaintiff is entitled to any relief. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation that other persons may be responsible for causing Plaintiff's alleged injuries.

**PLAINTIFF'S RIGHT TO ADEQUATE MEDICAL CARE**

19. The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. Failure to properly treat inmates with serious medical conditions, including by unreasonably delaying or denying treatment, serves no penological purpose and instead inflicts pain and suffering in violation of the Constitution. Prison officials therefore have a constitutional obligation to provide adequate medical care.

ANSWER: Defendants admit the Eighth Amendment prohibits cruel and unusual punishment. Defendants deny the remaining allegations as an incomplete and inaccurate statement of law.

20. Deliberate indifference to serious medical needs of an inmate constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution. An inmate need not establish that a prison official actually intended harm to befall the prisoner from the failure to provide adequate care, only that the official knew of a substantial risk of harm to the prisoner and disregarded the risk.

ANSWER: Defendants admit generally that deliberate indifference to serious medical need violates the Eighth Amendment. Defendants deny the remaining allegations as an incomplete and inaccurate statement of law.

21. A medical professional acting in his or her professional capacity may be found to have displayed deliberate indifference if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the professional actually did not base the decision on such a judgment.

ANSWER: Defendants deny the allegations contained in Paragraph 21 as an incomplete and inaccurate statement of law.

22. Inmate medical care decisions must be fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm and the efficacy of available treatments.

ANSWER: Defendants admit decisions related to inmate medical care must be based on professional judgment, which may or may not include the listed factors. Defendants deny the remaining allegations contained in paragraph 22 as an incomplete and inaccurate statement of law.

23. Prison officials and medical professionals may utilize carefully crafted protocols to ensure the system-wide maintenance of proper standards of care, but such protocols must ensure that prison officials and medical professionals fulfill their responsibility to provide constitutionally adequate care to each individual inmate with reference to his or her particularized medical need. Prison officials therefore must specifically determine that application of the protocol results in adequate medical care for each individual inmate.

ANSWER: Defendants admit medical professionals may utilize protocols to assist in providing medical services to inmates. Defendants deny the remaining allegations contained in paragraph 23 as an incomplete and inaccurate statement of law.

24. The failure to consider the individual inmate's condition in making treatment decisions is conduct that demonstrates that a medical professional did not exercise proper medical judgment. Categorically excluding inmates from treatment based on factors of convenience or otherwise not based on medical principles constitutes deliberate indifference to the inmate's medical needs.

ANSWER: Defendants deny that medical protocols for providing treatment to inmates are "based on factors of convenience or otherwise not based on medical principles." Defendants deny the remaining allegations contained in paragraph 24 as an incomplete and inaccurate statement of law.

25. An inmate's medical condition need not be life-threatening to be sufficiently serious such that denial of treatment violates the Eighth Amendment. An inmate has a constitutional right to appropriate treatment for a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.

ANSWER: Defendants deny the allegations contained in Paragraph 25 as an incomplete and inaccurate statement of law.

26. The Eighth Amendment protects an inmate not only from deliberate indifference to his or her current serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to future health.

ANSWER: Defendants deny the allegations contained in Paragraph 26 as an incomplete and inaccurate statement of law.

27. The Eighth Amendment further requires that the state provide a released inmate who is receiving and continues to require medication with a supply sufficient to ensure that the inmate has that medication available during the period of time reasonably necessary to permit consultation with a doctor and obtain a new supply. Failure to provide medication sufficient to cover this transitional period amounts to a deliberate disregard of the inmate's medical care.

ANSWER: Defendants deny the allegations contained in Paragraph 27 as an incomplete and inaccurate statement of law.

## FACTUAL ALLEGATIONS

### *Hepatitis C*

28. Plaintiff's claims arise in large part from the systematic denial of adequate and constitutionally required medical care for Hepatitis C. The IDOC, UIC, Defendant Wexford and the individual Defendants know, and have known for many years, that the policies and practices concerning the assessment and treatment of Hepatitis C in the IDOC inmate population are deficient and constitute inadequate medical care for a wide-spread, serious and life-threatening disease. IDOC, UIC and Defendants have known of the deficiencies in medical care based on well-recognized medical training and literature as well as from various grievances, individual lawsuits, class action lawsuits and consent decrees brought by or on behalf of IDOC inmates, including many actions in which Defendants were specifically named as parties.

ANSWER: Defendants admit Plaintiff alleges denial of adequate medical care for Hepatitis C but deny such allegations are warranted. To the extent the remaining allegations of Paragraph 28 are directed at Defendants, they are denied. Defendants lack knowledge or information

sufficient to form a belief as to the allegations directed at other defendants and therefore deny the same.

29. Hepatitis C is a disease caused by the Hepatitis C virus ("HCV") that adversely affects the functioning of the liver. There are six genotypes of HCV and genotype 1 is the most prevalent in the United States. HCV is transmitted by blood-to-blood contact, such as during tattooing or intravenous drug use. While HCV infection can resolve spontaneously from the acute phase in some cases, most persons infected with HCV develop chronic infection. According to a fact sheet prepared by Defendant Shicker and IDOC in connection with testimony before the Hepatitis C Task Force of the Illinois Department of Public Health on September 17, 2014 ("2014 IDOC Fact Sheet"), 80% of people infected with HCV will develop chronic HCV infections.[1]

ANSWER: Defendants admit that HCV can adversely affect the functioning of the liver but deny that occurs in all patients. Defendants admit HCV is transmitted through contact with an exposed person's blood. Defendant admits the referenced document contains only what is stated therein. Defendants deny the remaining allegations contained in Paragraph 29.

30. Persons infected with chronic HCV suffer from a serious medical condition. They can develop fibrosis, which is scarring of liver tissue that damages the structure of their livers. Such persons are at an increased risk of developing cirrhosis, a life-threatening condition whereby the functioning of the liver is reduced by extensive liver scarring associated with the advanced progression of fibrosis.

ANSWER: Defendants admit that individuals with HCV can develop fibrosis, which is scarring of liver tissue. Defendants admit that cirrhosis is a late stage scarring of the liver which can be

caused by a number of conditions. Defendants deny the remaining allegations contained in Paragraph 30.

31. Liver scarring severity is classified by the METAVIR fibrosis score ("Fibrosis Score"), which is measured on a scale of F0 to F4. Fibrosis Scores of F0 to F1 are described as mild fibrosis and reflect no liver damage up to very mild liver damage. A Fibrosis Score of F2 is described as significant fibrosis and reflects that liver scarring has built up around the blood supply to the liver. A Fibrosis Score of F3 is described as severe fibrosis and reflects that scars around different blood vessels in the liver are joined but liver function is unaffected. A Fibrosis Score of F4 is described as cirrhosis and reflects that scarring is building up in the tissues of the liver and its function is impaired.[2]

ANSWER: Defendants admit liver scarring is classified on the METAVIR scoring system, on a scale of F0 to F4. Defendants deny that the explanations of the Fibrosis Scores contained in Paragraph 31 are complete and accurate.

32. The progression of fibrosis does not occur at the same rate in all persons and the progression is not linear. In addition, the presence of other diseases may affect the rate of progression of fibrosis. For example, the presence of Type 2 Diabetes is a predictor of accelerated liver fibrosis progression. In fact, the 2014 IDOC Fact Sheet states that persons with a Fibrosis Score of F3 or above are most in need of treatment and that persons with Type 2 Diabetes should also be considered secondarily for priority HCV treatment.

ANSWER: Defendants admit that the progression of fibrosis, if any, does not occur at the same rate in all persons. Defendants admit co-morbidities may affect the rate of progression of fibrosis. Defendants admit the referenced 2014 IDOC Fact Sheet contains only what is stated therein. Defendants deny the remaining allegations contained in Paragraph 32.

33. Persons with HCV are at an increased risk of developing liver cancer, which has one of the highest mortality rates of any cancer. According to the 2014 IDOC Fact Sheet, "~25% of those [individuals infected with HCV] will go on to have significant liver disease – ultimately cirrhosis (liver failure) and increased incidence of hepatocellular carcinoma [liver cancer]." Liver transplantation is the principle long term treatment for patients with advanced cases of cirrhosis and/or liver cancer, and according to the 2014 IDOC Fact Sheet "[HCV] is the number one reason for requiring liver transplantation."

ANSWER: Defendants admit the referenced 2014 IDOC Fact Sheet contains only what is stated therein. Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 33 and therefore deny the same.

34. According to the United States Centers for Disease Control and Prevention, "annual hepatitis C-related mortality in 2013 surpassed the total combined number of deaths from 60 other infectious diseases reported to CDC, including HIV, pneumococcal disease, and tuberculosis."[3]

ANSWER: Defendants admit the referenced document contains only what is stated therein. Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 34 and therefore deny the same.

***HCV Treatment***

35. There are no vaccines to prevent HCV infection. The only options are infection prevention or treatment. The goal of HCV treatment is to achieve a sustained virologic response ("SVR") such that HCV is undetectable at both the end of the treatment and 6 months after the end of the treatment. Achieving SVR is considered to be effectively a cure for HCV.

ANSWER: Defendants admit there is no vaccine to prevent HCV infection. Defendants deny there is one universal goal for HCV treatment. Defendants deny the remaining allegations contained in Paragraph 35.

36. For persons with HCV, benefits associated with achieving SVR include a decrease in liver inflammation, a reduction in the rate of liver fibrosis, a higher than 70% reduction in the risk of liver cancer, a 90% reduction in the risk of liver-related mortality and liver transplantation, as well as a substantially improved quality of life.

ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the accuracy of the reported statistics, and therefore deny the same.

37. In their guidelines for treating HCV, the American Association for the Study of Liver Diseases ("AASLD") and the Infectious Diseases Society of America ("IDSA") recommend treatment "for all patients with chronic HCV infection, except those with a short life expectancy that cannot be remediated by HCV therapy, liver transplantation, or another directed therapy."

ANSWER: Defendants lack knowledge or information sufficient to form a belief as to what these organizations recommend, and therefore deny the same.

38. In 1998, the United States Food and Drug Administration ("FDA") approved the use of Ribavirin, an anti-viral drug, for use in combination with Interferon to treat HCV. The standard length of time for treating genotype 1 HCV with this drug combination was 48 weeks. The presence of Interferon caused severe side effects in patients, such as depression, flu-like symptoms and anemia. The rate of achieving SVR using Ribavirin and Interferon for HCV genotype 1 was 42% to 52%.

ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 and therefore deny the same.

39. Direct acting antiviral drugs ("DAA") were subsequently approved for treatment of HCV genotype 1, which continued to require administration in combination with Interferon, with all of the side effects associated with that drug.

ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 and therefore deny the same.

40. On October 10, 2014, the FDA approved the first DAA that did not require the use of Interferon. The rate of SVR achieved with the new DAA drugs was approximately 95% with little to no side effects and with a substantially shortened treatment course. The 2014 IDOC Fact Sheet acknowledged the imminent approval of those new HCV treatments: "With new drugs coming at the end of this year we expect to update our guidelines in the beginning of next year."

ANSWER: Defendants admit the referenced 2014 IDOC Fact Sheet states only what is contained therein. Defendants lack knowledge or information sufficient to form a belief as tot the truth of the remaining allegations in Paragraph 40 and therefore deny the same.

***IDOC's HCV Treatment Guidelines***

41. Since approximately 1999, IDOC has promulgated certain guidelines, policies, procedures and protocols for the screening, monitoring and treatment of IDOC inmates with HCV (the "IDOC HCV Guidelines" or "Guidelines"). Since in or about 2011, IDOC has contracted with non-party UIC for UIC's medical professionals, including at relevant times described herein Defendant Chan, to direct treatment of IDOC inmates with HCV.

ANSWER: Defendants admit IDOC has promulgated guidelines for screening and treatment of IDOC inmates with HCV. Defendants admit UIC has contracted with UIC in providing HCV treatment to IDOC inmates. Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 41 and therefore denies the same.

42. Upon information and belief, at relevant times described herein UIC medical professionals including Defendant Chan have directed and/or participated in drafting, revising, implementing and/or enforcing the IDOC HVC Guidelines. Upon information and belief, at relevant times described herein Defendant Wexford and its medical professionals, including Defendant Paul, Defendant Pittman and Defendant Cunningham, have directed and/or participated in drafting, revising, implementing and/or enforcing the IDOC HVC Guidelines.

ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the allegations as to UIC medical professionals and therefore deny the same. Defendants deny the remaining allegations contained in Paragraph 42.

43. The IDOC HCV Guidelines purport to be based upon and "follow the latest recommendations" regarding HCV treatment as promulgated by AASLD, IDSA and the Federal Bureau of Prisons ("FBOP"). In fact, the IDOC HCV Guidelines do not adhere to those sources and are not based on medical judgments or principles but instead are based on administrative convenience and/or on IDOC's desire to reduce the number of IDOC inmates who receive appropriate treatment for chronic HCV infections.

ANSWER: Defendants deny the allegations contained in Paragraph 43.

44. The January 2019 IDOC HCV Guidelines state that "[a]lthough nearly all patients with chronic HCV infection are candidates for DAA therapies, there is more urgency to treat certain patients first." Those Guidelines thus state that they adopt a "prioritization approach." The IDOC HCV Guidelines, however, do not prioritize treatment based on proper medical considerations.

ANSWER: Defendants admit the 2019 IDOC HCV Guidelines prioritize individuals for treatment based on highest risk for complication or liver disease progression. Defendants deny the remaining allegations contained in Paragraph 44.

45. As one example relevant to Plaintiff's claims, the January 2019 IDOC HCV Guidelines establish "elevated A1c" as an "absolute exclusion criteria for hepatitis C treatment." The Guidelines do not identify elevated A1c as a "contraindication[] to HCV therapy" (which it lists separately) but only as a fact upon which IDOC will deny treatment to an inmate. Upon information and belief, prior iterations of the IDOC HCV Guidelines utilized elevated A1c as a basis for refusing HCV treatment in a similar manner.

ANSWER: Defendants deny the allegations contained in Paragraph 45.

46. There is no medical reason that a person with elevated A1c cannot or should not receive appropriate DAA drug therapy for HCV infection.

ANSWER: Defendants deny the allegations contained in Paragraph 46.

47. Defendant Paul has admitted that HCV antiviral drug therapy can be used on patients with "uncontrolled diabetes." Defendant Paul further admitted that AASLD guidelines recommend that all patients with HCV receive treatment and that where prioritization is necessary priority should be given to "patients who have more advanced disease than for patients that do not."

ANSWER: Defendants admit Defendant Dr. Paul made these statements in a deposition on February 10, 2020 but deny that the referenced testimony is a full and complete recitation of her testimony.

48. To the extent that prior iterations of the FBOP HCV guidelines may have included Diabetes as a contraindication to HCV treatment, that was only with respect to treatment therapies that included Interferon. Drug therapies in use during the relevant times described in this First Amended Complaint do not include Interferon. The August 2018 FBOP guidelines, upon which the January 2019 IDOC HCV Guidelines are purportedly based, do not include any exclusion criteria or contraindication based on the patient's Diabetes or A1c status. Instead, the FBOP guidelines establish Diabetes as an "intermediate priority" factor for HCV treatment.

ANSWER: Defendants admit interferon is no longer used in treatment of hepatitis C. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 48 and therefore deny the same.

49. Upon information and belief, medical studies conducted prior to the adoption of the January 2019 IDOC HCV Guidelines established or suggested that treatment and cure of HCV with appropriate DAA drug therapies reduced the insulin needs of patients who also had Type 2 Diabetes.

ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 49 and therefore deny the same.

50. In addition to precluding necessary treatment, the 2019 IDOC HCV Guidelines used "elevated A1c" as an exclusionary factor to deny HCV inmates a fibroscan. Thus, while claiming to prioritize inmates based on medical need, the Guidelines in fact used a non-medical exclusion to avoid providing the very fibroscan testing that would identify the inmates with the most progressed disease.

ANSWER: Defendants deny the allegations contained in Paragraph 50.

51. Defendants knew that the IDOC HCV Guidelines were not based on proper medical facts or analysis and did not comport with accepted standards of care for the treatment of HCV. Defendants knew that applying the Guidelines to inmates with HCV, including Plaintiff, would result in depriving inmates of reasonable and necessary care and would result in injury to inmates who were denied such care.

ANSWER: Defendants deny the allegations contained in Paragraph 51.

52. Defendants knew that inmates denied HCV treatment on the basis of the above medically-deficient Guidelines would be subjected to an unreasonable and substantial risk of harm and disregarded that risk when they designed and implemented the Guidelines, including the policy of denying HCV treatment and denying fibroscan testing on the basis of elevated A1c.

Defendants exhibited deliberate indifference to a serious medical condition, refused to exercise independent medical judgment regarding the care of inmates under their care and/or prevented other medical professionals administering medical care to inmates at IDOC from exercising their own medical judgment when treating HCV.

ANSWER: Defendants deny the allegations contained in Paragraph 52.

53. In addition to participating in the formulation of the deficient IDOC HCV Guidelines, Defendant Wexford formulated and implemented its own policies under which Wexford employees, including its medical professionals such as the individual Defendants named in this First Amended Complaint, were directed or encouraged to disregard their own medical training and judgment in the assessment and treatment of IDOC HCV patients and instead to implement the deficient Guidelines promulgated by Wexford's "client" – IDOC. In formulating and implementing that policy Defendant Wexford acted with deliberate disregard of the medical needs of the IDOC HCV patients under the care of Defendant Wexford's medical professionals.

ANSWER: Defendants deny the allegations contained in Paragraph 53.

***Plaintiff's HCV and Diabetes***

54. Plaintiff was diagnosed with HCV in 2014 and thus was HCV positive upon his incarceration with IDOC in June 2016. Plaintiff underwent a fibroscan on June 11, 2015, upon referral from his primary care physician at that time. Plaintiff's Fibrosis Score at that time, one year before his June 2016 incarceration with IDOC, was F2 – described in the report as moderate liver scarring.

ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54 and therefore deny the same.

55. Plaintiff's HCV positive status was documented by IDOC upon his incarceration including in an Offender Medical History dated June 16, 2016. Plaintiff was knowledgeable concerning the Fibrosis Score scale and that his score of F2 could and likely would progress if he

did not receive treatment. Plaintiff informed the Defendants that he had a Fibrosis Score of F2 in 2015 and reiterated that progressed state of his HCV as part of his requests and demands for treatment. Plaintiff's HCV positive status and his requests for Fibrosis Score testing and HCV treatment were further documented repeatedly in his inmate medical file and in grievance forms from the time of his incarceration to the time of his release in June 2020, including, but not limited to, the occasions and matters specifically described in this First Amended Complaint. Upon information and belief, Defendants also received copies of Plaintiff's 2015 fibroscan report in or around May 2019 as part of discovery in a civil rights lawsuit Plaintiff filed against Defendant Wexford and others.

ANSWER: Defendants admit Plaintiff's HCV positive status is reflected in Plaintiff's IDOC medical records. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 55 and therefore deny the same.

56. Plaintiff had likewise been diagnosed with Type 2 Diabetes prior to his incarceration with IDOC in June 2016. Plaintiff's Type 2 Diabetes was documented by IDOC upon his incarceration including on an Offender Medical History dated June 16, 2016. Plaintiff's Type 2 Diabetes diagnosis and his requests for effective Diabetes treatment were further documented repeatedly in his inmate medical file and in grievance forms from the time of his incarceration to the time of his release in June 2020, including, but not limited to, the occasions and matters specifically described in this First Amended Complaint.

ANSWER: Defendants admit Plaintiff has been diagnosed with Type 2 Diabetes and Plaintiff's medical records reflect multiple instances of Plaintiff's refusal of treatment for the same. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 56 and therefore deny the same.

57. During the period from his incarceration in June 2016 through February 2019, Plaintiff made numerous complaints to IDOC and its medical professionals, including employees of Defendant Wexford, that he was HCV positive and was not receiving treatment and had not been provided a fibroscan to determine the extent of the progression of his disease. During that same period Plaintiff made numerous complaints to IDOC and its medical professionals, including employees of Defendant Wexford, that he needed and was not receiving a medical diet to help control his Type 2 Diabetes and lower his A1c level.

ANSWER: Defendants state Plaintiff's medical care during the time-period of June 2016 to February 2019 is the subject of other lawsuits and not properly brought before this Court. Defendants admit Plaintiff made complaints but deny the merit of such complaints. Defendants deny the remaining allegations contained in Paragraph 57.

58. In February 2019 Plaintiff was transferred from Pinckneyville CC to Lawrence CC. On February 20, 2019, Defendant Pittman conducted a medical examination of Plaintiff. At that time Plaintiff advised Defendant Pittman that Plaintiff was not receiving any treatment for his HCV and had not been evaluated by IDOC HCV specialists. Defendant Pittman referred Plaintiff to be seen by Defendant Paul via telemedicine but did not take any steps to ensure that Plaintiff saw Defendant Paul in a timely manner. As a result, Plaintiff was not scheduled to see Defendant Paul until June 13, 2019 – nearly four months later.

ANSWER: Defendants admit that Plaintiff transferred to Lawrence Correctional Center in February 2019. Defendants also admit Plaintiff was seen by Dr. Pittman on February 20, 2019 for complaints related to an ankle fracture. Defendants admit Dr. Pittman referred Plaintiff for a Hep C clinic evaluation. Defendants deny the remaining allegations contained in Paragraph 58.

59. At the February 20, 2019 appointment Plaintiff also informed Defendant Pittman that he was not receiving a medical diet to assist in control of his Diabetes and A1c levels. Defendant Pittman entered a "Therapeutic Diet Order" for Plaintiff to receive a "Low Cholesterol/Low Fat" diet and a "Low Concentrated Sweets/HS Snack" but did not order a "Hepatic" diet which was also available on the Therapeutic Diet Order form. Moreover, on May 15, 2019 Defendant Pittman removed the "Low Cholesterol/Low Fat" diet order (leaving only the "Low Concentrated Sweets" snack order). Defendant Pittman never again ordered the "Low Cholesterol/Low Fat" diet and never ordered a "Hepatic" diet or any diet designed to significantly reduce Plaintiff's A1c level.

ANSWER: Defendants admit that Dr. Pittman entered Therapeutic Diet Orders and admit the associated documents state what is contained thereon. Defendants deny the remaining allegations in Paragraph 59.

***Denial of HCV Treatment to Plaintiff***

60. On June 13, 2019, Plaintiff appeared for a medical appointment at Lawrence CC, but was told by an unknown nurse or correctional officer that the appointment (which was scheduled as an HCV appointment with Defendant Paul) was for a mental health appointment.

On the basis of that false information, Plaintiff declined the June 13, 2019 medical appointment. Defendant Pittman thereafter informed Plaintiff that his records showed he refused the HCV appointment. Plaintiff advised Defendant Pittman that he never refused an HCV appointment. Defendant Pittman thereafter referred Plaintiff for a new appointment with Defendant Paul. Defendant Pittman again took no steps to ensure that Plaintiff saw Defendant Paul in a timely manner. As a result, Plaintiff was not scheduled to see Defendant Paul until August 22, 2019 – more than two months after his original appointment and nearly six months after he was originally examined by Defendant Pittman.

ANSWER: Defendants admit that Plaintiff's medical records reflect Plaintiff was scheduled for HCV telemedicine clinic and refused the telemedicine appointment. Defendants admit Plaintiff was scheduled for a telemedicine appointment with Dr. Paul on August 22, 2019. Defendants deny the remaining allegations contained in Paragraph 60.

61. On August 22, 2019, Plaintiff had a telemedicine appointment with Defendant Paul concerning his HCV. At that time, Defendant Paul referred Plaintiff for a fibroscan – something Plaintiff had been demanding for over a year. As the "Rationale for Referral" Defendant Paul stated: "REQUIRED IDOC/OHS HCV GUIDELINES." Blood work taken on June 4, 2019 showed Plaintiff's A1c level to be 13.7%. Defendant Paul documented in her notes on August 22, 2019 that:

> Above labs were reviewed which showed low APRI and intact liver function. Fibroscan testing is indicated. If the fibroscan fibrosis score meets IDOC/OHS HCV guideline treatment criteria, the patient will be referred to be seen by UIC Liver Clinic/Telemedicine to be evaluated for HCV therapy.

ANSWER: Defendants admit Plaintiff had a telemedicine appointment with Dr. Paul concerning HCV on August 22, 2019. Defendants admit the referenced notes contains only what is stated thereon. Defendants deny the remaining allegations contained in Paragraph 61.

62. Notwithstanding that the fibroscan was required under the IDOC HCV Guidelines, and that Plaintiff's Fibrosis Score was already F2 when he was incarcerated in 2016, Defendant Paul marked on the referral form that the referral was not "urgent." As a result, Plaintiff's fibroscan was not conducted until November 7, 2019 – nearly three months after his telemedicine appointment with Defendant Paul and nearly nine months after he was originally examined by Defendant Pittman.

ANSWER: Defendants admit that, based on Plaintiff's lab results and overall presentation, the referral for the fibroscan was not marked urgent. Defendants admit a fibroscan was conducted on Plaintiff on November 7, 2019. Defendants deny the remaining allegations contained in paragraph 62.

63. Plaintiff's fibroscan revealed a Fibrosis Score of F3 – reflecting severe fibrosis. Plaintiff's fibroscan thus revealed that his Fibrosis Score had progressed from an F2 to an F3 within approximately four years. Blood work taken on December 9, 2019 showed Plaintiff's A1c level to be 11.1%. This was significantly lower than his level in June 2019.

ANSWER: Defendants admit the radiologist's reported impression noted a fibrosis score of F3 on November 7, 2019. Defendants admit that lab results for blood collected on December 9, 2019 showed an A1C of 11.1%. Defendants deny the remaining allegations contained in paragraph 63.

64. Upon information and belief, on December 12, 2019, Defendant Paul consulted with Defendant Chan concerning referral of Plaintiff to Defendant Chan for HCV treatment. Defendant Paul documented in her notes on December 12, 2019 that:

> Per the January 25, 2019 IDOC/OHS HCV guidelines, patient's poor diabetic control . . . precludes his review for HCV antiviral therapy. Email correspondence from Dr. Juliana Chan sent today states that patients with HbA1c >7.0% should not be referred to be seen by UIC Liver Clinic/Telemedicine. These guidelines require HbA1c to be less than 7.0% to be considered for HCV antiviral therapy.

ANSWER: Defendants admit the referenced note contains what is stated thereon. Defendants deny the remaining allegations contained in Paragraph 64.

65. Based on the consultation with Defendant Chan, and on the IDOC HCV Guidelines, Defendant Paul refused to refer Plaintiff for HCV treatment, notwithstanding that his Fibrosis Score of F3 placed him in the highest priority category under the Guidelines. Instead, Defendant Paul ordered that Plaintiff should follow up in the HCV clinic in six months and advised Plaintiff that he would be denied HCV treatment because of his elevated A1c level. Defendant Paul did not, however, provide any additional orders or referrals or treatment for the purpose of lowering Plaintiff's A1c level to remove that arbitrary and non-medical impediment to receiving necessary HCV treatment.

ANSWER: Defendants deny the allegations contained in Paragraph 65.

66. Defendant Paul informed Plaintiff that he could not receive HCV treatment because his A1c level was too high. Defendant Paul did not inform Plaintiff that the denial of treatment was based on an arbitrary factor that had no medical basis and that he in fact was

among the group that the IDOC HCV Guidelines and accepted medical literature identified as patients who should be given priority in receiving treatment.

ANSWER: Defendants admit Dr. Paul informed Plaintiff that his diabetes needed to be controlled for HCV antiviral therapy. Defendants deny the remaining allegations contained in Paragraph 66.

67. Defendant Paul did, however, refer Plaintiff for a liver/spleen ultrasound to look for advanced liver disease. Plaintiff underwent a liver/spleen ultrasound on January 16, 2020. The "findings" of the ultrasound report state: "The liver demonstrates mild heterogeneous echotexture and mild nodular contour. This is consistent with mild cirrhosis."

ANSWER: Defendants admit Dr. Paul referred Plaintiff for a liver/spleen ultrasound. Defendants admit the ultrasound was conducted on Plaintiff on January 16, 2020 and admit the referenced radiology note contains only what is stated thereon. Defendants deny the remaining allegations contained in Paragraph 67.

68. Upon review of the liver/spleen ultrasound report, Defendant Paul referred Plaintiff for endoscopic screening for the presence of esophageal varices. According to the AASLD, "the rupture of esophageal varices (EVs) remains a common and severe complication of cirrhosis with a mortality rate still reaching 20%. Screening for EVs is crucial because it provides the ability to reduce the risk of a first bleeding episode."[4] As the "Rationale for Referral" Defendant Paul stated: "HCV. CIRRHOSIS."

ANSWER: Defendants admit Dr. Paul referred Plaintiff for endoscopy and admit the referenced referral contains only what is stated thereon. Defendants lack knowledge or information

sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 68 and therefore deny the same.

69. Defendant Wexford approved the referral through its Utilization Management process. The authorization form stated: "EGD screen for varices approved by Dr. Paul. Patient with HCV Cirrhosis. Required per IDOC/OHS HCV guidelines."

ANSWER: Defendants admit the endoscopy was approved by Wexford and admits the referenced referral form contains only what is stated thereon.

70. Thus, Defendant Paul and Defendant Chan and Defendant Wexford denied Plaintiff necessary HCV treatment notwithstanding their knowledge that he had severe fibrosis which had significantly progressed from the last test before his incarceration, and that a liver/spleen ultrasound report had identified Plaintiff as having cirrhosis.

ANSWER: Defendants deny the allegations contained in Paragraph 70.

71. Plaintiff informed all of the Defendants with whom he interacted, including but not limited to Defendant Pittman, Defendant Cunningham, Defendant Paul and through them Defendant Wexford, that he was being denied necessary treatment for his HCV and Type 2 Diabetes and, further, that he was being denied HCV treatment because of his A1c status but was being denied any effective treatment to lower his A1c in order to "qualify" for treatment. Defendants continued to refuse to provide HCV treatment to Plaintiff up through the date of his release in June 2020. Plaintiff continues to suffer from HCV and has been unable to secure treatment upon his release.

ANSWER: Defendants deny Plaintiff was denied necessary treatment for his HCV. Defendants further deny Plaintiff was denied effective treatment to lower his A1c. Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations as to Plaintiff's treatment following his release and therefore deny the same.

72. Plaintiff pursued written grievances through the IDOC grievance system available at Lawrence CC. Those grievances were denied and Plaintiff pursued all appeals available through the grievance system. All of those appeals were denied or returned to him as moot or duplicative. Plaintiff therefore exhausted all available administrative remedies available to him for the Defendants' failure to provide adequate medical care for his HCV and Type 2 Diabetes.

ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 72 and therefore deny the same.

***Plaintiff's Dental Injury and Denial of Treatment***

73. On March 19, 2020, Plaintiff was involved in an altercation that resulted in serious damage to multiple teeth. Plaintiff's teeth were substantially loosened, including one tooth that was so loose as to be dangling. Plaintiff requested medical and dental care but was refused. Plaintiff thereafter had to personally pull the dangling tooth.

ANSWER: Defendants admit Plaintiff's records indicted he was involved in a fight with another inmate on March 19, 2020. Defendants deny Plaintiff was refused medical or dental care for injuries sustained in that fight. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 73 and therefore deny the same.

74. Plaintiff continued to request medical and dental care for his injured teeth. Upon information and belief, Defendant Pittman and Defendant Cunningham, as well as other IDOC personnel not yet identified, determined to deny Plaintiff medical and dental care for those injuries. Defendants continued to refuse to provide dental treatment to Plaintiff up through the date of his release in June 2020. Plaintiff continues to suffer from these dental injuries and has been unable to secure treatment upon his release.

ANSWER: Defendants deny the allegations contained in Paragraph 74.

75. Plaintiff pursued written grievances through the IDOC grievance system available at Lawrence CC. Those grievances were denied and Plaintiff pursued all appeals available through the grievance system. All of those appeals were denied or returned to him as moot or duplicative. Plaintiff therefore exhausted all available administrative remedies available to him for the Defendants' failure to provide adequate medical care for his dental injuries.

ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 75 and therefore deny the same.

***Plaintiff's Release Without His Medications***

76. Plaintiff was released from IDOC custody on June 22, 2020. Prior to Plaintiff's date, Defendant Pittman, Defendant Cunningham and certain medical personnel working under their supervision were responsible for conducting discharge planning. Defendants determined and recognized that healthcare planning upon discharge was "medically necessary" for Plaintiff.

ANSWER: Defendants admit Plaintiff was released on parole on June 22, 2020. Defendants deny the remaining allegations contained in paragraph 76.

77. At the time of his release, Plaintiff had been prescribed various medications to treat and control serious illnesses including, but not limited to, Type 2 Diabetes. Knowing that those medications were medically necessary for Plaintiff to be safely released from custody, Defendant Pittman and Defendant Cunningham failed to take any action to ensure that Plaintiff received or was afforded an opportunity to retreive a reasonable supply of his prescribed medications at the time of his release.

ANSWER: Defendants deny the allegations contained in Paragraph 77.

78. Defendant Doe accompanied Plaintiff to the exit of Lawrence CC on the day of his release. At that time, Plaintiff informed Defendant Doe that Plaintiff had not been given his prescription medications and that he needed to return to the medical unit to obtain his medications. Defendant Doe refused to allow Plaintiff to obtain his medications, and instead told Plaintiff that if he did not exit immediately, or if he tried to return to the medical unit, he would not be released.

ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 78 and therefore deny the same.

79. Upon information and belief, Defendant Pittman and Defendant Cunningham knew that Defendant Doe, or any correctional officer escorting Plaintiff to the exit, would prevent Plaintiff from returning to the medical unit for his medications.

ANSWER: Defendants deny the allegations as to Dr. Pittman and Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 79 and therefore deny the same.

80. Plaintiff suffered significant health impacts by virtue of being deprived of his prescription medications for a period of time after his release.

ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 80 and therefore deny the same.

81. Upon his release Plaintiff was no longer subject to the Lawrence CC or IDOC grievance procedure. Plaintiff therefore has no administrative remedy and is not required to exhaust any administrative remedy prior to asserting this claim.

ANSWER: The allegations contained in Paragraph 81 are legal conclusions to which no response is required. To the extent a response is deemed necessary, the allegations are denied.

**COUNT I – DELIBERATE INDIFFERENCE**

***(HCV and Type 2 Diabetes)***

82. Plaintiff incorporates the allegations contained in paragraphs 1 through 72 as and for paragraph 82.

ANSWER: Defendants incorporate and restate their responses to Paragraphs 1 through 72 herein.

83. As shown by the foregoing facts, Defendants Wexford, Paul, Pittman, Chan and Cunningham knew that Plaintiff suffered from a serious medical condition and knew that the IDOC HCV Guidelines, if applied as directed by the IDOC, would wrongfully deprive Plaintiff of adequate medical treatment.

ANSWER: Defendants deny the allegations as to themselves. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 83 and therefore deny the same.

84. Defendants Meeks, Dempsey and Shicker knew that the IDOC HCV Guidelines, including in particular the exclusion of treatment based on A1c levels, would deny IDOC inmates necessary HCV treatment on the basis of improper, non-medical factors. Those Defendants created, implemented and sustained the improper Guidelines with knowledge that in doing so they were depriving IDOC inmates of adequate and necessary medical care.

ANSWER: The allegations contained in Paragraph 84 are not directed to Defendants therefore no response is required. To the extent a response is deemed necessary, the allegations are denied.

85. All of the above Defendants knew that HCV is a serious medical condition, yet the Defendants intentionally failed and refused to provide any treatment that would address the serious medical needs of IDOC inmates infected with chronic HCV, including Plaintiff. Defendants knew that those actions and policies would inevitably result in IDOC inmates infected with chronic HCV, including Plaintiff, continuing to suffer from HCV, subjecting them to wanton and cruel further damage to their livers, and needlessly exposing them to a substantially increased risk of suffering potentially life-threatening consequences, including, but not limited to, cirrhosis, liver cancer, liver-related mortality, liver transplantation, and death in violation of the Eighth Amendment.

ANSWER: Defendants deny the allegations contained in Paragraph 85.

86. All of the above Defendants further knew that the policies adopted by IDOC and Defendant Wexford would prevent or discourage medical professionals, like Defendants Paul, Pittman and Cunningham, from exercising their own independent medical judgment to properly treat Plaintiff.

ANSWER: Defendants deny the allegations contained in Paragraph 86.

87. All of the above Defendants further knew of the substantial risk of serious harm, and actual harms, faced by Plaintiff and other IDOC inmates with chronic HCV. Yet Defendants disregarded those risks and harms by choosing not provide any treatment that would alleviate those risks and harms. Defendants have been deliberately indifferent to the substantial risk of harm to Plaintiff. By denying Plaintiff his medically needed treatment, Defendants have imposed punishment on Plaintiff far in excess of that authorized by law, contrary to the Eight Amendment.

ANSWER: Defendants deny the allegations contained in Paragraph 87.

WHEREFORE, Plaintiff prays for the entry of a judgment in his favor and against the above Defendants in an amount to be proven at trial as damages for the harm caused by the

unconstitutional acts described in this First Amended Complaint, for an award of all costs and attorneys' fees incurred on behalf of Plaintiff in this matter, and for such other and further relief as the Court deems warranted.

ANSWER: Defendants deny Plaintiff is entitled to judgment in his favor and deny Plaintiff is entitled to any relief.

**COUNT II – DELIBERATE INDIFFERENCE**

***(Dental Injury)***

88. Plaintiff incorporates the allegations contained in paragraphs 1 through 27 and 73 through 75 as and for paragraph 88.

ANSWER: Defendants incorporate and restate their responses to Paragraphs 1 through 27 and 73 through 75 herein.

89. As shown by the foregoing facts, Defendants Pittman and Cunningham knew that Plaintiff suffered from a serious medical condition, a dental injury, and knew that the refusal to treat the injury would wrongfully deprive Plaintiff of adequate medical treatment.

ANSWER: Dr. Pittman denies the allegations as to herself. Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 89 and therefore denies the same.

90. Yet each of the above Defendants intentionally failed and refused to provide any treatment that would address the Plaintiff's serious medical needs.

ANSWER: Dr. Pittman denies the allegations as to herself. Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 90 and therefore denies the same.

91. Each of the above Defendants further knew of the substantial risk of serious harm, and actual harms, faced by Plaintiff. Yet Defendants disregarded those risks and harms by choosing not provide any treatment that would alleviate those risks and harms. Defendants have been deliberately indifferent to the substantial risk of harm to Plaintiff. By denying Plaintiff his medically needed treatment, Defendants have imposed punishment on Plaintiff far in excess of that authorized by law, contrary to the Eight Amendment.

ANSWER: Dr. Pittman denies the allegations as to herself. Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 91 and therefore denies the same.

WHEREFORE, Plaintiff prays for the entry of a judgment in his favor and against the above Defendants in an amount to be proven at trial as damages for the harm caused by the unconstitutional acts described in this First Amended Complaint, for an award of all costs and attorneys' fees incurred on behalf of Plaintiff in this matter, and for such other and further relief as the Court deems warranted.

ANSWER: Defendants deny Plaintiff is entitled to judgement in his favor and deny Plaintiff is entitled to any relief.

**COUNT III – DELIBERATE INDIFFERENCE**

***(Denial of Prescribed Medications on Release)***

92. Plaintiff incorporates the allegations contained in paragraphs 1 through 72 and 78 through 81 as and for paragraph 92.

ANSWER: Defendants incorporate and restate their responses to Paragraphs 1 through 72 and 78 through 81 herein.

93. As shown by the foregoing facts, Defendants Pittman, Cunningham and Doe knew that Plaintiff suffered from serious medical conditions requiring prescription medications, and knew that the refusal to provide Plaintiff with a reasonable supply of his medications upon his release would wrongfully deprive Plaintiff of adequate medical treatment.

ANSWER: Dr. Pittman denies the allegations as to herself. Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 93 and therefore denies the same.

94. Yet each of the above Defendants intentionally failed and refused to provide those medications to Plaintiff upon his release, notwithstanding Plaintiff's specific requests for his medications and Defendants' knowledge that they were required to provide the medications to released inmates.

ANSWER: Dr. Pittman denies the allegations as to herself. Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 94 and therefore denies the same.

95. Each of the above Defendants further knew of the substantial risk of serious harm, and actual harms, faced by Plaintiff. Yet Defendants disregarded those risks and harms by choosing not to provide the medications that would alleviate those risks and harms. Defendants have been deliberately indifferent to the substantial risk of harm to Plaintiff. By denying Plaintiff his medically needed medications, Defendants have imposed punishment on Plaintiff far in excess of that authorized by law, contrary to the Eight Amendment.

ANSWER: Dr. Pittman denies the allegations as to herself. Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations contained in Paragraph 95 and therefore denies the same.

WHEREFORE, Plaintiff prays for the entry of a judgment in his favor and against the above Defendants in an amount to be proven at trial as damages for the harm caused by the unconstitutional acts described in this First Amended Complaint, for an award of all costs and attorneys' fees incurred on behalf of Plaintiff in this matter, and for such other and further relief as the Court deems warranted.

ANSWER: Defendants deny Plaintiff is entitled to judgement in his favor and deny Plaintiff is entitled to any relief.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims.

**DEFENDANTS DEMAND TRIAL BY JURY**

**AFFIRMATIVE DEFENSES**

1. At all times relevant herein, Defendants acted in good faith in the performance of their official duties and without violating Plaintiff's clearly established statutory or constitutional rights of which a reasonable person would have known. Defendants are therefore protected from suit by the doctrine of qualified immunity.[1]

2. At all times relevant herein, Defendants acted in good faith and in conformity with existing precedent. They are therefore entitled to good faith immunity from damages. *Janus v. Am. Fed'n. of State*, 942 F.3d 352 (7th Cir. 2019).

3. To the extent Plaintiff's claims for relief accrued more than two years prior to initiation of this case, they are barred by the applicable statute of limitations.

4. To the extent Plaintiff's allegations relate to time periods when Plaintiff was in Stateville Correctional Center or Pinckneyville Correctional Center, they are the subject of other lawsuits and are barred by *res judicata*.

5. At all times relevant herein, Defendants' duties were limited to those that were delegated to them by their employer and that their employer voluntarily undertook pursuant to its contract with the Illinois Department of Corrections.

**DEFENDANTS DEMANDS TRIAL BY JURY AS TO HIS AFFIRMATIVE DEFENSES**

[1] Defendants acknowledge in *Estate of Clark v. Walker*, 865 F.3d 544, 550-51 (7th Cir. 2017), the Seventh Circuit rejected qualified immunity for contractual government employees. Defendants assert this defense to preserve it for appeal.

WHEREFORE, for the above reasons, Defendants respectfully request this Honorable Court deny Plaintiff any relief in this matter and grant Defendants judgment as to all matters and any other relief deemed appropriate, including cost of suit.

Respectfully submitted,

CASSIDAY SCHADE LLP

By: /s/ Joy C. Syrcle
Attorneys for Defendants, DR. DINA PAUL, DR. LYNN PITTMAN, AND WEXFORD HEALTH SOURCES, INC.

Joy C. Syrcle
ARDC No. 6302066
CASSIDAY SCHADE LLP
3100 Montvale Drive
Springfield, IL 62704
(217) 572-1714
(217) 572-1613 (Fax)
jsyrcle@cassiday.com

**CERTIFICATE OF SERVICE**

I hereby certify that on July 19, 2021, I electronically filed the foregoing Answer to Plaintiff's Amended Complaint with Affirmative Defenses with the Clerk of the Court using the CM/ECF system. The electronic case filing system sent a "Notice of E-Filing" to the following:

Sean M. Sullivan
Daley Mohan Groble, P.C.
55 West Monroe Street, Suite 1600
Chicago, IL 60603

Keith B. Hill, Esq.
Ryan Kemper, Esq.
Heyl, Royster, Voelker & Allen, PC
105 West Vandalia, Suite 100
P.O. Box 467
Edwardsville, IL 62025

Tara M. Barnett
Assistant Attorney General
201 W. Pointe Drive, Suite 7
Belleville, IL 62226

Under penalties as provided by law pursuant to 735 ILCS 5/1-109, I certify that the statements set forth herein are true and correct.

/s/ Joy C. Syrcle

9881647 JSYRCLE;SPRESSLE