5442-339

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JIMMIE DALE MILLER,<br><br>Plaintiff,<br><br>v.<br><br><br>DINA PAUL, et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No.: 20-cv-00446-NJR |

**DEFENDANT JULIANA CHAN'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

NOW COMES Defendant, JULIANA CHAN, by and through her attorney, Keith B. Hill of HEYL, ROYSTER, VOELKER & ALLEN, P.C., and submits her Memorandum of Law in Support of her Motion for Summary Judgment.

## I. INTRODUCTION

Plaintiff, Jimmie Dale Miller, a former Illinois inmate, brings this civil rights action pursuant to 42 U.S.C. § 1983 for deprivations of his constitutional rights while he was incarcerated at Lawrence Correctional Center ("Lawrence")[1].

In his Complaint, Plaintiff alleges, *inter alia*, that Juliana Chan violated his rights under the Eighth Amendment by denying him treatment for his hepatitis C (Count 1).

Summary judgment should be granted in favor of Juliana Chan because her conduct did not cause the alleged delay in treating Plaintiff for his hepatitis C, she was not deliberately

[1] Plaintiff filed two earlier civil rights actions, alleging, *inter alia*, that medical providers violated his rights under the Eighth Amendment by ignoring his hepatitis while he was incarcerated at the Northern Reception Center ("NRC") of Stateville Correctional Center (NDIL Case. No. 17-cv-05609) and Pinckneyville Correctional Center (SDIL Case No. 17-cv-859-MAB). In both cases, the district courts granted summary judgment in favor of defendants. On August 31, 2022, the Seventh Circuit affirmed the district court in Plaintiff's Pinckneyville case. *Miller v. Wexford*, 2022 WL 3928519 (7th Cir. 2022). On May 2, 2024, Plaintiff filed a notice of appeal in his NRC case.

indifferent to Plaintiff's serious medical needs, Plaintiff has no verifying medical evidence that any delay in treating his hepatitis C had any detrimental impact on his condition, and any delay in Plaintiff treating for hepatitis C was caused by Plaintiff's conduct.

## II. STATEMENT OF MATERIAL FACTS

### A. The UIC Liver Telemedicine Clinic.

1. At all times relevant, the Illinois Department of Corrections ("IDOC") had an Interagency Agreement with the University of Illinois – Chicago ("UIC") to direct treatment of hepatitis C patients via a telemedicine system. (Exh. 1, Miller000435).

2. At all times relevant, the primary care physicians at IDOC facilities were responsible for appropriate screening and initial work-ups for all hepatitis C positive patients to determine eligibility for treatment. (Exh. 1, Miller000435).

3. At all times relevant, the decision to treat and refer a patient to the UIC Liver Telemedicine Clinic was the sole responsibility of the IDOC providers at each IDOC facility. (Exh. 1, Miller000435).

4. At all times relevant, the UIC specialists determined the specific regimen for patients found ready for hepatitis C treatment. (Exh. 1, Miller000435).

5. At all times relevant, various physicians worked in the UIC Liver Telemedicine Clinic, including non-defendants Dr. Mahesh Patel and Dr. Jeremy Young. (Exh. 3, Chan Dep. at 20-21).

6. Dr. Patel is board-certified in Internal Medicine and Infectious Diseases. (https://hospital.uillinois.edu/find-a-doctor/mahesh-c-patel).

7. Dr. Young is board-certified in Internal Medicine and Infectious Diseases. (https://wexnermedical.osu.edu/find-a-doctor/jeremy-young-md-17295).

8. At all times relevant, Juliana Chan also worked in the UIC Liver Telemedicine Clinic. (Exh. 3, Chan Dep. at 18-21).

9. Chan is a clinical pharmacist; she is not a physician. (Exh. 3, Chan Dep. at 9, 217).

10. Over the years, IDOC had a series of guidelines related to the treatment of hepatitis C patients. (Exh. 3, Chan Dep. at 59).

11. Chan testified that her personal involvement in the guidelines was limited to updating the guidelines when new medications were approved. (Exh. 3, Chan Dep. at 57-58, 61-62).

12. Chan testified that who to treat in the UIC Liver Telemedicine Clinic was outside her purview. (Exh. 3, Chan Dep. at 58).

13. Chan testified that IDOC did not discuss with her who to treat or who would be eligible to treat in the UIC Liver Telemedicine Clinic. (Exh. 3, Chan Dep. at 58).

**1. The Initial Work-Up.**

14. Per the January 2019 Hepatitis C Guideline, the initial work-up process included ruling out absolute exclusion criteria for hepatitis C treatment.

Per the January 2019 Hepatitis C Guideline, absolute exclusion criteria included:

> …
> (ii) Inadequate LOS – TWELVE (12) months from arrival to parent facility if tested positive on screen.
> (v) Unstable medical and psychiatric conditions (ie, have suicidal or homicidal ideations, elevated A1c, abnormal TSH levels).
> …

(Exh. 1, Miller000436).

15. Per the January 2019 Hepatitis C Guideline, the initial work-up process also included obtaining the following laboratory tests and imaging: Fibroscan[2], HCV genotype, and ANA. (Exh. 1, Miller000436-38).

16. Per the January 2019 Hepatitis C Guideline, if a FibroScan result is F3 and F4[3] then the initial work-up process also included obtaining an ultrasound of the liver to rule out hepatrocellular carcinoma and splenomegaly. (Exh. 1, Miller000436).

17. Per the January 2019 Hepatitis C Guideline, if the ultrasound of the liver result showed splenomegaly then the initial work-up process also included obtaining an esophagogastroduodenoscopy ("EGD") to rule out esophageal and gastric varices. (Exh. 1, Miller000436).

18. Per the January 2019 Hepatitis C Guideline, for candidates with FibroScan results of 2 or greater, the initial work-up process also included vaccination against hepatitis A and B where clinically appropriate. (Exh. 1, Miller0000437).

19. If the hepatitis A antibody is not detected then candidates were to be vaccinated. (Exh. 1, Miller0000437).

20. If hepatitis B immunity is not detected then candidates were to be vaccinated. (Exh. 1, Miller0000437).

21. The January 2019 Hepatitis C Guideline states that primary care physicians at IDOC facilities must confirm that candidates do not have acute or chronic HBV or are immune

---

[2] FibroScan is a special ultrasound technology that measures liver stiffness (hardness) and fatty changes in the liver. https://www.mskcc.org/cancer-care/patient-education/understanding-your-fibroscan-results.

[3] F0: no fibrosis. F1: portal fibrosis without septa. F2: portal fibrosis with few septa. F3: numerous septa without cirrhosis. F4: cirrhosis. https://radiopaedia.org/articles/metavir-score-1?lang=us.

because there are documented cases of hepatitis B virus reactivation which lead to death after initiating direct-acting antiviral hepatitis C therapy. (Exh. 1, Miller0000437).

**2. The Referral Process.**

22. Per the January 2019 Hepatitis C Guideline, once the initial work-up process was completed, the referral process required IDOC providers to forward to the UIC Liver Telemedicine Clinic the following: a) all lab work collected; b) completed "Review of System Check List;" c) completed "UIC IDOC Telemedicine Clinic Hepatitis Risk Factor" form; and d) completed Appointment & Registration Form and fax with the required medical records to the UIC Liver Telemedicine Clinic. (Exh. 1, Miller000438).

23. Chan testified that prior to the January 2019 Hepatitis C Guideline, IDOC providers did not always forward the required documents for a referral to the UIC Liver Telemedicine Clinic. (Exh. 3, Chan Dep. at 169-170).

24. Chan testified that this caused appointments to be filled by patients who could not be treated yet. (Exh. 3, Chan Dep. at 169-170).

25. Chan explained that the January 2019 Hepatitis C Guideline "more directly laid out [to IDOC providers that] 'when you refer, you have to provide all these things to us.'" (Exh. 3, Chan Dep. at 170).

**B. Plaintiff's pre-incarceration relevant medical history.**

26. Prior to the period of incarceration that underlies this case, Plaintiff had type 2 diabetes and hepatitis C. (Exh. 4, Pl. Dep. at 46, 54).

27. On February 25, 2015, Plaintiff had an office visit at Heartland Health Outreach in Chicago, Illinois ("Heartland") on a referral for treatment for hepatitis C. The provider charted that Plaintiff was diagnosed in November 2014. (Exh. 5, JDM 001099-001106).

28. On March 25, 2015, Plaintiff had an office visit at Heartland. His APRI[4] score was 0.825 (Exh. 5, JDM 001053-58).

29. On June 8, 2015, Plaintiff had a FibroScan, which appears to have been interpreted to show stage 2 fibrosis (F2). (Exh. 5, JDM 001107-10).

30. On June 25, 2015, Plaintiff had an office visit at Heartland. He complained of pain on his left side. (Exh. 5, JDM 001059-63).

## C. Plaintiff's post-incarceration relevant medical history.

### 1. Pinckneyville Correctional Center.

31. Plaintiff entered IDOC custody on June 16, 2016, and he was sent to NRC of Stateville Correctional Center. (Doc. 108 ¶ 8).

32. On or about September 1, 2016, Plaintiff transferred to Pinckneyville Correctional Center. (Doc. 108 ¶ 8).

33. On September 21, 2016, Plaintiff was seen in the hepatitis C chronic clinic. His APRI score was 0.71. (Exh. 6, JDM 001615).

34. On April 30, 2017, Plaintiff was seen in the hepatitis C chronic clinic. His APRI score was 0.8. (Exh. 6, JDM 001623).

35. On August 26, 2017, Plaintiff was seen in the hepatitis C chronic clinic. His APRI score was 0.517. (Exh. 6, JDM 001628).

36. The provider charted that Plaintiff was not a candidate for treatment. (Exh. 6, JDM 001628).

[4] The AST to Platelet Ratio Index ("APRI") is an index that correlates with liver biopsy findings of fibrosis and cirrhosis. https://reference.medscape.com/calculator/327/apri-ast-to-platelet-ratio-index.

37. On August 23, 2018, Plaintiff was seen in the hepatitis C chronic clinic. His APRI score was 0.4. (Exh. 6, JDM 001328).

38. The provider charted that Plaintiff was not a candidate for treatment. (Exh. 6, JDM 001328).

39. On December 28, 2018, Plaintiff was seen in the hepatitis C chronic clinic. His APRI score was 0.3. (Exh. 6, JDM 001331).

40. The provider charted that Plaintiff was not a candidate for treatment. (Exh. 6, JDM 001331).

**2. Lawrence Correctional Center.**

41. Plaintiff was incarcerated at Lawrence from February 2019 to June 22, 2020. (Doc. 108 ¶ 8).

42. On Intake Chart Review at Lawrence, a nurse identified that Plaintiff had hepatitis C and diabetes, and scheduled him to be seen in the diabetes chronic clinic in April 2019, and in the hepatitis C chronic clinic in June 2019. (Exh. 6, JDM 001211).

43. On February 20, 2019, Plaintiff saw Dr. Lynn Pittman for complaints of blood sugar greater than 300, and pain with weight bearing from a recent fracture of his right ankle. Dr. Pittman's assessment was that Plaintiff had: 1) type 2 diabetes – "uncontrolled," and 2) a right ankle fracture. Dr. Pittman's plan was for Plaintiff to be scheduled in the hepatitis C clinic for evaluation. (Exh. 6, JDM 001213).

44. Dr. Pittman gave Plaintiff a list of foods and drinks to avoid (milk, cheese, chocolate, tea, coffee, pop, Kool-Aid, beef, pork, pasta, potatoes and bread), and a list of foods and drinks to eat and drink. (Exh. 4, Pl. Dep. at 70-71).

45. Dr. Pittman also recommended that he purchase Vitamin C from commissary, and take it twice daily. (Pl. Dep at 71).

46. Plaintiff understood that A1C is a measure of blood sugar control. (Exh. 4, Pl. Dep. at 80).

47. Dr. Pittman talked to Plaintiff about using insulin to lower his A1C. (Exh. 4, Pl. Dep. at 83).

48. Plaintiff admits that he refused insulin on multiple occasions. (Exh. 4, Pl. Dep. at 83).

49. On February 22, 2019, Plaintiff refused regular insulin. (Exh. 6, JDM 001484).

50. On March 5 2019 and March 8, 2019, Plaintiff refused to have his blood sugar checked, and morning insulin. (Exh. 6, JDM 001488-89).

51. On March 5, 2019, Plaintiff refused regular insulin. (Exh. 6, JDM 001490).

52. On March 28, 2019, Plaintiff's blood sugar was 350 (Reference Range: 65-110), and his A1C was 9.8 (Reference Rane: <5.7). (Exh. 6, JDM 001441-43).

53. On April 22, 2019, Plaintiff was seen in diabetes chronic clinic. (Exh. 6, JDM 001333-34).

54. On April 23, 2019, Plaintiff's blood sugar was 403, and was given an injection of 10 units of regular insulin. (Exh. 6, JDM 001222).

55. On May 10, 2019, Plaintiff had high blood sugar. (Exh. 6, JDM 001223).

56. On May 12, 2019, Plaintiff had high blood sugar. (Exh. 6, JDM 001223).

57. Dr. Pittman gave a telephone order to give Plaintiff 70/30 insulin and regular insulin, and recheck his blood sugar in one hour. (Exh. 6, JDM 001223).

58. On May 12, 2019, when a nurse was checking Plaintiff's blood sugar, Plaintiff told the nurse: "This is a waste of my time." Plaintiff's blood sugar was 588. Plaintiff accepted the previously ordered insulin but refused any further treatment. (Exh. 6, JDM 001223, 001492).

59. On May 13, 2019, Plaintiff saw Dr. Pittman with complaints of fatigue and malaise with blood sugar of 300-500. Plaintiff admitted to only one insulin injection daily. Dr. Pittman's assessment included type 2 diabetes – "uncontrolled." (Exh. 6, JDM 001222).

60. On May 17, 2019, Plaintiff saw Dr. Pittman. Dr. Pittman charted that Plaintiff's blood sugar had improved. Dr. Pittman's assessment and plan was for Plaintiff to continue 70/30 insulin twice a day, and Metformin 850 mg twice a day. Plaintiff was also to increase his exercise to 4 days a week. (Exh. 6, JDM 001226).

61. On May 24, 2019, Plaintiff's blood sugar was 220. (Exh. 6, JDM 001444).

62. On June 4, 2019, Plaintiff's A1C was 13.7. (Exh. 6, JDM 001446).

63. On June 13, 2019, Plaintiff was scheduled for the hepatitis C telemedicine chronic clinic with Dr. Dina Paul but Plaintiff refused to attend telemedicine. (Exh. 6, JDM 001232, 001494).

64. On June 20, 2019, Plaintiff saw Dr. Pittman. Plaintiff claimed he was unaware he was refusing the hepatitis C clinic; he thought he was refusing mental health or tele-psych. (Exh. 6, JDM 001233).

65. Plaintiff's blood sugar was 100-300 but was averaging at 200. Plaintiff was still drinking Kool-Aid. (Exh. 6, JDM 001233).

66. Dr. Pittman's assessment was type 2 diabetes – "uncontrolled." She charted that Plaintiff's A1C had increased from 9.8 to 13.7. (Exh. 6, JDM 001233).

67. On August 8, 2019, Plaintiff was seen in the diabetes chronic clinic. (Exh. 6, JDM 001335-36).

68. On August 8, 2019, Plaintiff refused regular insulin. (Exh. 6, JDM 001497).

69. On August 20, 2019, Plaintiff's blood sugar was 224. (Exh. 6, JDM 001448-49).

70. On August 22, 2019, Plaintiff saw Dr. Paul in the hepatitis C telemedicine chronic clinic. (Exh. 6, JDM 001337).

71. Dr. Paul charted that Plaintiff had a "[h]istory of DM [diabetes] with chronically poor control." She also charted that Plaintiff's APRI score was 0.40, and his A1C was 13.7. (Exh. 6, JDM 001337).

72. Dr. Paul reviewed Plaintiff's labs and found that his APRI score was low and his liver function was intact. (Exh. 6, JDM 001337).

73. Dr. Paul's plan was for Plaintiff to have a FibroScan, and to have labs drawn for hepatitis B surface antigen, hepatitis B surface antibody, and hepatitis A antibody. (Exh. 6, JDM 001337).

74. On August 26, 2019, Plaintiff tested positive for hepatis A antibody, negative for hepatitis B surface antibody, and negative for hepatitis B surface antigen. The lab tests showed that Plaintiff was not considered to have an immunity to the hepatitis B virus. (Exh. 6, JDM 001450).

75. On September 25, 2019, Plaintiff saw Dr. Pittman with a complaint of left flank pain. Dr. Pittman's assessment was lumbar pain, hemorrhoids, essential hypertension, and type 2 diabetes. Dr. Pittman's plan included changing Plaintiff's insulin. (Exh. 6, JDM 001236).

76. No doctor has told Plaintiff that the pain on his left side was attributable to his hepatitis C. (Exh. 4, Pl. Dep. at 153-54).

77. On October 2, 2019, October 7, 2019, and October 20, 2019, Plaintiff refused to have his blood sugar checked, and morning insulin. (Exh. 6, JDM 001500-01).

78. On November 7, 2019, Plaintiff had a FibroScan. Plaintiff had a fibrosis score of F3. (Exh. 6, JDM 001419-20).

79. On November 20, 2019, Plaintiff's blood sugar was 126. (Exh. 6, JDM 001451-52).

80. On November 25, 2019, Plaintiff's blood sugar was 216. (Exh. 6, JDM 001453).

81. On December 4, 2019, Plaintiff was seen in the diabetes chronic clinic. (Exh. 6, JDM 001338). Plaintiff stated that sometimes he did not take Metformin because he was afraid it would bottom his sugar out. (Exh. 6, JDM 001338-39).

82. On December 5, 2019, Plaintiff's commissary order included: "Chips, SC & O" (3), "Chips, Whole Shabang" (3), "Drink Mix, Green Berry Rush" (3), "Cookies, Duplex" (2), "Cookies, Chocolate Chip" (2), "Candy, Chocolate Bar" (6) "Pastry, Iced Honey Buns" (10), and "Noodles, Beef Ramen" (47). (Exh. 4, Pl. Dep. at 88-89).

83. Plaintiff knew these were foods and drinks that Dr. Pittman said he should avoid. (Exh. 4, Pl. Dep. at 89).

84. Plaintiff admitted that even though Dr. Pittman instructed him to avoid eating sweets, pasta, and high sodium foods, he purchased noodles, honey buns, and cookies from commissary. (Exh. 4, Pl. Dep. at 90-91).

85. Plaintiff also admitted that even though Dr. Pittman recommended that he take Vitamin C, he never purchased Vitamin C from commissary. (Exh. 4, Pl. Dep. at 90).

86. On December 9, 2019, Plaintiff's A1C was 11.1. (Exh. 6, JDM 001454).

87. On December 12, 2019, Staci deWeese, a nurse at Lawrence, sent the following email to Juliana Chan:

> Hello Dr. Chan,
> I have a question to ask before Dr. Paul makes a referral. We recently have two offenders with F3/F4 fibroscans, however they are both DM with very high A1C. We know that in the past they will not be treated or considered until the A1C is below 7. With that being said do we still need to work them up with the labs and ultrasound and then send you new packet and let you tell us they do not qualify at this time?
> Thanks
> Nurse deWeese
> Lawrence CC

(Exh. 1, Miller000498-99).

88. On December 12, 2019, Chan sent the following response to deWeese's email:

> Hi Staci.
>
> You can continue to work up the patient but do not send them or the med records until they have normalize their A1c (or other issues).
>
> Thanks!
> Juliana

(Exh. 1, Miller000498-99).

89. Chan testified that she understood deWeese's email as a "general question referring back to the protocol." (Exh. 3, Chan Dep. at 208).

90. Regarding her December 12, 2019 email exchange with DeWeese, Chan testified:

> … I don't know what patient this is. This is just a general question asked, you know, we have - - hey, we have these two offenders. It was just a hypothetical question of what would you do. So I could have easily said refer back to the protocol and - - that's basically what that means. It's just looking at the protocol and I'm giving them the answer. This is not patient-specific.
> …
>
> I would say that that's a generic patient. That could be anyone in the world. That's not - - it's just a general question.
>
> …

> It’s a hypothetical. I don’t relate that to any patient.
>
> …
>
> There’s not enough information to say that’s a patient. I was just saying if I have this scenario what would you do, and it’s just based on what the protocol says. We’re just following that. If you give me a specific name and we look up labs, then I can tell you more.

(Exh. 3, Chan Dep. at 211-212).

91. On December 12, 2019, Plaintiff saw Dr. Paul in the hepatitis C telemedicine chronic clinic. (Exh. 6, JDM 001340).

92. Dr. Paul charted that Plaintiff complained of trouble controlling his diabetes in prison. She also charted that nursing staff relayed that Plaintiff was frequently non-compliant with getting his NPH scheduled insulin injections. (Exh. 6, JDM 001340).

93. Dr. Paul also charted that Plaintiff’s APRI score was 0.46, and his A1C was 11.1. (Exh. 6, JDM 001340).

Dr. Paul also charted the following:

> Per the January 25, 2019 IDOC/OHS HCV guidelines, patient’s poor diabetic control (above) precludes his review for HCV antiviral therapy. Email correspondence from Dr. Juliana Chan sent today states that patients with HbA1c > 7.0% should not be referred to be seen by UIC Liver Clinic/Telemedicine. These guidelines require HBA1c to be less than 7.0% to be considered for HCV antiviral therapy. The IDOC/OHS HCV guidelines stipulation for HbA1c requirement was detailed to the patient. Follow up per plan.

(Exh. 6, JDM 001340).

94. Dr. Paul’s plan was for labs (HCV Genotype, and ANA), a liver and spleen ultrasound, and for Plaintiff to follow-up in the hepatitis C chronic clinic in 6 months. (Exh. 6, JDM 001340).

95. On December 17, 2019, Plaintiff had a hepatitis C genotype test, and an ANA test. (Exh. 6, JDM 001455-1458).

96. On December 29, 2019, Plaintiff refused insulin. (Exh. 6, JDM 001511).

97. On January 3, 2020, Plaintiff's commissary order included: "Noodles, Beef Ramen" (24), "Cookies, Chocolate Chip" (2), "Cookies, Duplex" (2), and "Candy, Peppermints" (1). (Exh. 4, Pl. Dep. at 89).

98. On January 16, 2020, Plaintiff had a liver and spleen ultrasound that showed mild cirrhosis. (Exh. 6, JDM 001421).

99. On January 20, 2020, Plaintiff's blood sugar was 69, and his A1C was 9.0. (Exh. 6, JDM 001459-61).

100. On February 6, 2020, Dr. Paul reviewed Plaintiff's labs and his ultrasound report. (Exh. 2, Wexford Bates #000667).

101. Dr. Paul's plan was for the site to email Chan regarding Plaintiff detailing the information about Plaintiff's prior labs and FibroScan, and asking if she would want Plaintiff formally referred to the UIC Liver Telemedicine Clinic. (Exh. 2, Wexford Bates #000667).

102. Dr. Paul also ordered an esophagogastroduodenoscopy ("EGD") test to screen for varicies. (Exh. 2, Wexford Bates #000667-68).

103. On February 11, 2020, Heather Ellison, a nurse at Lawrence, sent Chan the following email:

> Dr. Chan,
>
> I am sending you the information listed in the 'prior studies' section of the progress notes on [redacted] and MILLER K79113 as requested by Dr. Paul. Do you want these pts formally referred to UIC Liver Clinic/Telemedicine to be evaluated for antiviral therapy at this time?

(Exh. 1, Miller000454-55).

104. Chan testified that she did not consider Plaintiff's A1C to be "high in terms of needing to be corrected before getting hep C treatment." (Exh. 3, Chan Dep. at 226).

105. Chan explained that Plaintiff's A1C had improved from 13% (6/14/19) to 11% (12/9/19) to 9% (1/20/20). (Exh. 3, Chan Dep. at 226).

106. Chan testified that the trend and Plaintiff's most recent A1C level showed that Plaintiff's A1C was "becoming more under control." (Exh. 3, Chan Dep. at 226).

107. On February 12, 2020, Chan sent the following response to Ellison's email:

> Yes please, please send the needed documents to get these patients evaluated.
> Can you in the meantime please have the doctors at Lawrence evaluate and treat their Diabetes and get their A1c better controlled, below 8.
> Thanks!
> Juliana

(Exh. 1, Miller000454-55).

108. Chan testified that if IDOC had referred Plaintiff to the UIC Liver Telemedicine Clinic at this time then Plaintiff would have been evaluated. (Exh. 3, Chan Dep. at 229).

109. Chan testified that IDOC never sent the documents for Plaintiff to be referred to the UIC Liver Telemedicine Clinic. (Exh. 3, Chan Dep. at 231).

110. On February 20, 2020, Ellison emailed Dr. Paul, stating that she had ordered for Plaintiff to start the hepatitis B vaccine in November, however he had only received one dose on December 23, 2020; and asking if Dr. Paul wanted to start the vaccine series over. (Exh. 2, Wexford Bates #000564).

111. On February 20, 2020, Plaintiff's blood sugar was 128. (Exh. 6, JDM 001462-63).

112. On February 23, 2020, Plaintiff refused to have his blood sugar checked because it hurts his finger. (Exh. 6, JDM 001253).

113. On February 29, 2020, Plaintiff refused to have his blood sugar checked, insulin. (Exh. 6, JDM 001526-27).

114. On March 20, 2020, Plaintiff tested positive for hepatitis B surface antibody, and positive for hepatis C antibody. The lab tests showed that Plaintiff was considered to have an immunity to the hepatitis B virus. (Exh. 6, JDM 001464).

115. On April 6, 2020, Plaintiff was seen in the diabetes chronic clinic. (Exh. 6, JDM 001341).

116. On May 7, 2020, Plaintiff's commissary order included: "Noodles, Chili Ramen" (10), "Chips, Plain Potato" (6), "Pastry, Iced Honey Buns" (10), "Cakes, Swiss Rolls" (2), and "Candy, Peppermints" (1). (Exh. 4, Pl. Dep. at 89-90).

117. On May 27, 2020, Plaintiff's A1C was 10.2. (Exh. 6, JDM 001465-66).

118. On May 28, 2020, Ellison resent her February 11, 2020 email to Chan (without Chan's February 12, 2020 response) with the following additional message:

> Just checking on if you want these two offenders referred or not?

(Exh. 1, Miller000456-59).

119. Chan testified that she reviewed Plaintiff's laboratory results, and saw that Plaintiff's A1c went back up to 10.2. (Exh. 3, Chan Dep. at 231).

120. On May 28, 2020, Chan sent the following response to Ellison's email:

> Hello Heather,
> [redacted]
>
> As for Mr. Miller, Jimmy, please have his A1c in the 7 to low 8's before sending him to UIC Liver telemed.
>
> Thanks!
> Juliana

(Exh. 1, Miller000456-59).

121. Chan testified that her response was based on the January 2019 Hepatitis C Guideline. Exh. 3, Chan Dep. at 238).

122. Chan could not testify that that if Plaintiff would had been evaluated by the UIC Liver Telemedicine Clinic at this time, then Plaintiff would have been treated. (Exh. 3, Chan Dep. at 239).

123. She explained that "… It would depend on the entire patient information that we would get when we would see him. And then his out date, if he is leaving and doesn't have enough time, he would not be receiving therapy. …." (Exh. 3, Chan Dep. at 239).

124. Chan testified that a patient needs at least three months to complete the entire course of treatment. (Exh. 3, Chan Dep. at 246).

125. Chan testified that if the UIC Liver Telemedicine Clinic first evaluated Plaintiff in May 2020, then it would not have provided treatment to Plaintiff because Plaintiff would not have been able to complete treatment before his out date in June 2020. (Exh. 3, Chan Dep. at 246).

126. On June 2, 2020, Plaintiff's commissary order included: "Chips, SC & O" (6), "Noodles, Beef Ramen" (15), "Pastry, Iced Honey Buns" (10), and "Cakes, Swiss Rolls" (2). (Pl's Dep. at 90).

127. On June 11, 2020, Plaintiff's commissary order included: "Chips, Plain Potato" (6) and "Pastry, Iced Honey Buns" (9). (Pl's Dep. at 90).

128. On June 18, 2020, Plaintiff saw Dr. Paul in the hepatitis C telemedicine chronic clinic. (Exh. 2, Wexford Bates #000464).

129. Dr. Paul charted that Plaintiff would not respond to her questions or gave one word answers. (Exh. 2, Wexford Bates #000464).

130. Dr. Paul charted that an EGD had been ordered per "IDOC/OHS guidelines" on February 6, 2020 but had not been done due to COVID-19 precautions. (Exh. 2, Wexford Bates #000464).

131. Dr. Chan testified that per the January 2019 Hepatitis C Guideline, if a EGD was deemed appropriate for Plaintiff, then she would have expected that result to be among the required medical records and other documents forwarded to UIC Liver Telemedicine Clinic as part of the referral process. (Exh. 3, Chan Dep. at 243).

132. Dr. Paul also charted that Plaintiff's APRI score was 0.45, and his A1C was 10.2. (Exh. 2, Wexford Bates #000464).

133. Plaintiff was released from prison on June 22, 2020. (Doc. 108 ¶ 8).

**D. Plaintiff's post-incarceration relevant medical history.**

134. On October 13, 2020, Plaintiff initiated hepatitis C treatment at Access Community Health Network Brandon Primary Care in Chicago, IL. (Exh., 7, JDM 002029-46).

135. Plaintiff signed a "Hepatitis C Patient Commitment Letter" wherein Plaintiff committed to attending all his scheduled medical appointments and to obtain refill prescriptions every 14-28 days from the start of the medical regimen until its completion. (Exh. 7, JDM 002516).

136. On December 23, 2020, Plaintiff had an ultrasound of his abdomen and an ultrasound elastography of his abdomen. The ultrasound findings correlated with "mild to moderate fibrosis (METAVIR F2-F3)." (Exh. 7, JDM 002546-47).

137. Plaintiff completed 12 weeks of Epclusa in February 2021. (Exh. 7, JDM 002334).

138. On May 10, 2021, Plaintiff was advised that he was cured from hepatitis C. (Exh. 7, JDM 002360).

139. Plaintiff has not been on insulin or Metformin since he was released from prison.[5] (Exh. 4, Pl. Dep. at 107-08).

140. No doctor has told Plaintiff that his hepatitis C worsened while he was in Lawrence between February 2019 and June 2020. (Exh. 4, Pl. Dep. at 116).

## III. ARGUMENT

The Supreme Court has declared that a prison official's "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) *quoting Gregg v. Georgia*, 428 U.S. 153, 1973 (1976). In order to prevail on such a claim, a plaintiff must first show that his condition was "objectively, sufficiently serious" and secondly, that the "prison officials acted with sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotations omitted). With respect to the objective component of this inquiry, "[a] 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Foelker v. Outagamie County*, 394 F.3d 510, 512-13 (7th Cir. 2005).

To establish deliberate indifference, a prisoner also must show that, subjectively, "prison officials acted with a sufficiently culpable state of mind." *Greeno*, 414 F.3d at 653 (citations and quotations omitted). "The inflection of suffering on prisoners can be found to violate the Eighth

[5] In his deposition, Plaintiff initially lied about treating for his diabetes, but, after speaking with his attorney, admitted to his deception on the record. This Court found that Plaintiff deliberately lied, and sanctioned him by ordering him to pay Defendants' reasonable costs and attorneys' fees associated with defense counsels' participation in the deposition and in filing a motion for sanctions. (Doc. 176).

Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even "recklessness," as that term is used in tort cases, is not enough, *Id* at 653. Put another way, a plaintiff must demonstrate that a prison official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists;" that official actually drew the inference, and then disregarded this risk. *Greeno*, 414 F.3d at 653 (internal quotations omitted). While a series of negligent acts can evince a prison official's awareness of an inmate's exposure to a serious risk, "showing deliberate indifference through a pattern of neglect entails a heavy burden." *Zentmyer v. Kendall County*, 220 F.3d 805, 811 (7th Cir. 200) *quoting Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 591 (7th Cir. 1999).

Inmates are not entitled to demand specific treatment or even "to the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("Under the Eighth Amendment, [an inmate] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). Moreover, "[m]ere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient." *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). *See also Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). At bottom, demonstrating deliberate indifference requires inmates to clear a high threshold. *Dunigan ex rel. Nyman*, 165 F. 3d at 590.

**A. Chan's conduct did not cause the alleged delay in treating Plaintiff for his hepatitis C.**

Summary judgment should be granted in favor of Chan and against Plaintiff because Chan's conduct was not the cause of the alleged delay in treating Plaintiff for his hepatitis C. Putting aside the issue of the guideline's A1c exclusion, the undisputed facts show that parts of the initial work-up to refer a patient to the UIC Liver Telemedicine Clinic, as required by the

guideline, were not completed in time for treatment or were never completed prior to Plaintiff's release from prison in June 2020.

Per the guideline, before referring a patient to the UIC Liver Telemedicine Clinic, primary care physicians at IDOC facilities were mandated to confirm that candidates did not have acute or chronic hepatitis B or are immune because there are documented cases of hepatitis B virus reactivation which lead to death after initiating direct-acting antiviral hepatitis C therapy. ("Statement of Undisputed Facts" ("SUF") ¶¶ 18-21). Plaintiff was not found to have an immunity to the hepatitis B virus until March 20, 2020. (SUF ¶ 114). Chan testified that a patient needs at least three months to complete the entire course of treatment. (SUF ¶ 124). Plaintiff was released in June 2020. (SUF ¶ 133).

Per the guideline, if the ultrasound of the liver result showed splenomegaly then the initial work-up process also included obtaining an EGD to rule out esophageal and gastric varices. (SUF ¶ 17). *See Handy v. Illinois Department of Corrections*, 2023 WL 7158524, *7 (recognizing that an EGD was required to receive treatment under the guidelines). On June 18, 2020 – four days before Plaintiff's release - Dr. Paul charted that although an EGD had been ordered, it had not been done. (SUF ¶¶ 128, 130).

Chan testified that IDOC providers did not always forward the required documents for a referral to the UIC Liver Telemedicine Clinic, and this caused appointments to be filled by patients who could not be treated yet. (SUF ¶¶ 23, 24). Without his EGD results, and sufficient time to complete treatment, Plaintiff has no evidence that even if he was referred and evaluated by the UIC Liver Telemedicine Clinic, then he would have received treatment. *See Miller v. Wexford Health Source, Inc.*, 2024 WL 13763670, *9-10 (N.D.Ill.) (granting summary judgment

to physician at NRC where physician's decision not to treat Plaintiff's hepatitis C was because, in part, Plaintiff could not complete treatment before transitioning out of NRC).

**B. Chan was not deliberately indifferent to Plaintiff's serious medical needs.**

**1. Heather Ellison's February 11, 2020 email.**

Summary judgment should be granted in favor of Chan and against Plaintiff because Chan was not deliberately indifferent to Plaintiff's serious medical needs. The undisputed facts show that Chan did not have any personal involvement with Plaintiff until February 11, 2020 when nurse Ellison sent an email to Chan with Plaintiff's February 6, 2020 progress note attached. (SUF ¶ 103). Chan responded to nurse Ellison's email the next day. (SUF ¶ 107). In her response, Chan instructed nurse Ellison to "send the needed documents to get these patients evaluated." *Id*. Chan testified that IDOC never sent the documents for Plaintiff to be referred. (SUF ¶ 109). Chan also testified that if IDOC had referred Plaintiff to the UIC Liver Telemedicine Clinic at this time then Plaintiff would have been evaluated. (SUF ¶ 108).

Chan was not deliberately indifferent to Plaintiff's serious medical needs by not following-up with IDOC after nurse Ellison did not send the "needed documents to get [Plaintiff] evaluated."

In *Nance v. Pollion*, 2021 WL 857348 (S.D.Ill.), the plaintiff alleged that a nurse was deliberately indifferent to his serious medical needs for delaying in diagnosing his hepatitis B. *Id*. at *3. The plaintiff argued that by the time the nurse saw him in chronic clinic on December 11, 2023, there was a May 22, 2013 metabolic panel in which he had an AST level of 84. *Id*. The nurse argued that there was no evidence to suggest that she ever saw the May 22, 2013 test results and that she was not required to review the plaintiff's entire medical file at a chronic care appointment for asthma and hypertension. *Id*. at *4. In response, the plaintiff's expert testified

that it was appropriate to track down results that are not in a file or call the lab that produced them; he also testified that it was standard practice to review labs that were ordered. *Id*. In granting summary judgment in favor of the nurse, the Court found:

> [the nurse's] failure to seek out the May 22, 2013 test results could be used to demonstrate medical negligence, but it does not provide that she knew of a serious risk to Nance's health and deliberately disregarded it. Indeed, while [the plaintiff's expert] testified that it would have been appropriate for [the nurse] to track down the May 2013 results and review them before deciding what course of action to take, this testimony only shows how a reasonable medical professional should have acted in that situation. It does not "shed any light' into [the nurse's] state of mind. "In other words, [the plaintiff's expert's] testimony "reiterated[d] the standard for medical malpractice, which falls short of deliberate indifference."

*Id*. at *5. (Emphasis in original) (Citations omitted).

In this case, Plaintiff was not yet a patient of the UIC Liver Telemedicine Clinic so the degree of separation from Plaintiff and Chan was one degree greater than the plaintiff and the treating nurse in *Nance*, but that additional separation only strengthens Chan's argument. In this case, Plaintiff was IDOC's patient, IDOC's medical providers were Plaintiff's primary care providers, and IDOC had possession of Plaintiff's medical records. It was IDOC's responsibility to complete the initial work-up and refer patients to the UIC Liver Telemedicine Clinic. (SUF ¶ 2 ). Although IDOC sent Chan a one-page progress note about Plaintiff, Chan's knowledge of that note does not provide that she knew of a serious risk to Plaintiff's health and deliberately disregarded it. As Chan repeatedly testified in her deposition, the UIC Liver Telemedicine Clinic needed the "whole picture." (Exh. 3, Chan Dep. at 129, 130, 155-56, 209). She explained, as an example, a score of F3 on a FibroScan "could be inaccurate … until you look at the whole picture from head to toe." (Exh. 3, Chan Dep. at 209). This is why IDOC was required to complete the initial work-up before referring a patient, and to provide all the documentation with the referral. Unlike the plaintiff in *Nance*, in this case, Plaintiff does not have a retained expert to

opine about the appropriateness of Chan's conduct. But, even if he did, then that testimony could be used to demonstrate medical negligence, but it would fall short of showing deliberate indifference.

**2. Staci deWeese's December 12, 2019 email.**

Plaintiff's anticipated argument that nurse deWeese's December 12, 2019 email to Chan was a referral of Plaintiff to the UIC Liver Telemedicine Clinic, and Chan denied the referral is not well taken because Chan reasonably believed the email to be asking a general question about the guidelines, and not a referral of Plaintiff. (SUF ¶¶ 89, 90). Significantly, deWeese's email begins with the phrase "I have a question to ask." (SUF ¶ 87). It does not begin with the phrase "I am sending you a referral of a patient." *Id*. Nurse deWeese's email also does not identify any patient by name, and does not include any of the required documentation for a referral. *Id*.

Likewise, Chan's response to nurse deWeese's December 12, 2019 email was not a denial of a referral. (SUF ¶ 88). It was simply Chan's answer to nurse deWeese's general "question," and Chan's answer did nothing more than parrot the guideline. (SUF ¶¶ 89, 90). Nurse deWeese could have gotten the same answer if she looked at the guideline herself.

Chan was not deliberately indifferent to Plaintiff's serious medical needs by not following-up further with IDOC after nurse deWeese's December 12, 2019 email. Nurse deWeese's December 12, 2019 email provided even less information than Ellison's February 11, 2020 email. As argued with Ellison's email, Chan's receipt of Nurse deWeese's email did not put her on notice of a serious risk to Plaintiff's health. Nurse deWeese's email did not even identify Plaintiff. As such, Chan's alleged failure to further follow-up with IDOC about deWeese's email does not show deliberate indifference.

Additionally, even if had been evaluated by the UIC Liver Telemedicine Clinic in December 2019, Plaintiff could not have begun hepatitis C treatment then because he had not been vaccinated for hepatitis B yet. (SUF ¶¶ 110, 114). Indeed, Plaintiff did not show the requisite immunity to the hepatitis B virus until March 20, 2020. (SUF ¶ 114).

**3. Heather Ellison's May 28, 2020 email.**

On May 28, 2020, nurse Ellison resent her February 11, 2020 email to Chan (without Chan's February 12, 2020 response) with the following additional message: "Just checking on if you want these two offenders referred or not?" (SUF ¶ 118). Chan testified that she reviewed Plaintiff's laboratory results, and saw that Plaintiff's A1C went back up to 10.2. (SUF ¶ 119). And so, Chan emailed nurse Ellison to "please have his A1c in the 7 to low 8's before sending him to UIC Liver telemed." (SUF ¶ 120).

This Court need not consider whether Chan's response showed deliberate indifference because it is undisputed that even if Plaintiff had been evaluated by the UIC Liver Telemedicine Clinic, then Plaintiff would not have been treated because he did not have his EGD results, and he did not have enough time remaining on his incarceration to complete therapy. (SUF ¶¶ 17, 124, 128, 130).

**4. Plaintiff has no evidence that Chan "created, implemented[,] and sustained" the guideline's A1C absolute exclusion with knowledge that doing so would deprive "IDOC inmates" of adequate medical care.**

In his First Amended Complaint, Plaintiff alleges that Chan and others "created, implemented[,] and sustained" the guideline's A1C absolute exclusion with knowledge that doing so would deprive "IDOC inmates" of adequate medical care. (Doc. 108 ¶ 84). As an initial matter, this Court need not consider this allegation because the undisputed facts show that when IDOC referred Plaintiff to the UIC Liver Telemedicine Clinic, Chan instructed IDOC to "please

send the needed documents to get [Plaintiff] evaluated." (SUF ¶¶ 103, 107). Additionally, putting aside the A1C exclusion, the undisputed facts show that parts of the initial work-up to refer a patient to the UIC Liver Telemedicine Clinic, as required by the guideline, were not completed in time for treatment or were never completed prior to Plaintiff's release from prison in June 2020. (SUF ¶¶ 17-21, 114, 124, 128, 130). Simply put, Plaintiff challenges a specific part of a guideline without any evidence that that specific part of the guideline was the cause of the delay in treatment for his hepatitis C.

Turning to the merits of Plaintiff's allegation, Plaintiff has no evidence that Chan "created, implemented[,] and sustained" the guideline's A1C absolute exclusion with knowledge that doing so would deprive "IDOC inmates" of adequate medical care. The undisputed facts show that Chan is a pharmacist; she is not a physician. (SUF ¶ 9). She testified that her personal involvement in the guidelines was limited to updating the guidelines when new medications were approved. (SUF ¶ 11) .She testified that who to treat was outside her purview. (SUF ¶ 12). She also testified that IDOC did not discuss with her who to treat or who would be eligible to treat. (SUF ¶ 13). *See Anduze v. Duncan*, 2017 WL 3288319, *4 (S.D.Ill.) (granting summary judgment where there was nothing in the record to establish defendant's personal involvement in implementing a policy or practice that resulted in an unconstitutional deprivation).

Additionally, Plaintiff has no evidence that Chan was aware of facts from which the inference could be drawn that a substantial risk of serious harm to Plaintiff existed; that Chan actually drew the inference, and then disregarded this risk. As a pharmacist, who twice in her deposition said she would defer to an endocrinologist in response to Plaintiff's counsel's questioning (Chan Dep at 140, 154), Chan was not aware that there was a substantial risk of

harm to Plaintiff by not treating his hepatitis C while his A1C was uncontrolled. The following exchange shows Chan's understanding as a pharmacist:

> Q. Okay. So then my next question is why is elevated A1C an absolute exclusion for hep C treatment?
> Mr. Hill: Object to foundation.
> A. It goes back to looking at the whole picture. If the patient has an abnormal, very high uncontrolled sugar levels, that should be taken care of first before you take care of their hepatitis C.
> Having hepatitis C is not a death sentence. People could have hepatitis C for 10, 20, 30, 40 years. And they could be walking around with hepatitis C and not even know that they have it until they've been tested for it.
> So if you look at it in that perspective, and they never knew that they had it, but you have, like uncontrolled glucose levels or diabetes, that's going to hurt your heart, your eyes, your kidneys, to go into the hospital and never leave. That is more pressing to be dealt with first before a - - before hepatitis C.

(Exh. 3, Chan Dep. at 155-56). Given that Chan is a pharmacist, and that she had the above understanding, this is not a circumstance where Chan confronted an obvious indifference and turned a blind eye. *See Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 485-86 (7th Cir. 2022) (citations omitted) ("As a general matter, a nurse can, and in-deed must, defer to a treating physician's instructions. However, that deference cannot be 'blind or unthinking.'"); *McCann v. Ogle Cnty.*, 909 F.3d 881, 887 (7th Cir. 2018) (citation omitted) (nurse was not deliberately indifferent by relying on doctor's determination of proper dosage of methadone, "especially when nothing about [doctor's] prescriptions or course of care more generally raised any obvious risks of harm for McCann").

Finally, Plaintiff has no evidence that normalizing his December 2019 A1C of 11.1 (SUF ¶ 86) before treating his hepatitis C was such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment. *See Petties v. Carter,* 836 F.2d 722, 729 (7th Cir. 2016) *see also Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998) ("A plaintiff can show that the

professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, no minimally competent professional would have so responded under those circumstances.”). Indeed, as suggested and approved by the court-appointed monitors, IDOC changed the March 2021 guideline to define “abnormal A1C” as 10.5 or greater. (Exh. 3, Chan Dep. at 200). IDOC also changed the action to be taken in response to an “abnormal A1C” to be to “have patient see IDOC Physician before refer to UIC HCV Telemedicine Clinic.” *Id*. This change is a recognition that there can be circumstances where controlling A1C may be more pressing than treating for hepatitis C.

**C. Plaintiff has no verifying medical evidence that any delay in treating his hepatitis C had any detrimental impact on his condition.**

To establish that Chan was deliberately indifferent to his serious medical needs for delaying in treating his hepatitis C, Plaintiff has to present verifying medical evidence that the delay detrimentally affected him. *See Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996).

In Plaintiff’s civil rights action against providers at Pinckneyville, alleging, *inter alia*, that they violated his Eighth Amendment rights by ignoring his hepatitis, the Seventh Circuit affirmed the trial court’s order granting summary judgment because it was undisputed that upon Plaintiff’s arrival at the prison, his doctors enrolled him in a specialized clinic for hepatitis and followed the prison’s protocol. *Miller v. Wexford Health Sources, Inc.*, 2022 WL 3928519, *2 (7th Cir. 2022). Significantly, the Seventh Circuit also rejected Plaintiff’s argument that he did not receive the vaccines for hepatitis A and B as quickly as he would have preferred because, in part, Plaintiff had not furnished evidence, as he was required, that he was harmed by the delay. *Id*.

Plaintiff's action against Chan also suffers from a lack of verifying medical evidence that he was harmed by any delay in treating his hepatitis C. The undisputed facts show that Plaintiff had hepatitis C before his incarceration. (SUF ¶ 26). In March 2015, Plaintiff had an APRI score of 0.825, and in June 2015, he had a fibrosis score of F2. (SUF ¶¶ 28, 29). Over four years later, on August 22, 2019, Plaintiff was first seen in the hepatitis C telemedicine chronic clinic at Lawrence. (SUF ¶ 70). At that time, Plaintiff's APRI score was 0.4.[6] (SUF ¶ 71). Dr. Paul reviewed Plaintiff's labs and found that his APRI score was low and his liver function was intact. (SUF ¶ 72). On November 7, 2019, Plaintiff had a FibroScan with a fibrosis score of F3. (SUF ¶ 79). On December 12, 2019, Plaintiff's APRI score was 0.46. (SUF ¶ 87; Exh. 1, 00498-99). On June 18, 2020, Plaintiff's APRI score was 0.45. (SUF ¶ 132). On June 22, 2020, Plaintiff was released from prison. (SUF ¶ 133). On October 13, 2020, Plaintiff initiated hepatitis C treatment. (SUF ¶ 134). On December 23, 2020, Plaintiff had an ultrasound of his abdomen and an ultrasound elastography. (SUF ¶ 136). The ultrasound findings correlated with "mild to moderate fibrosis (METAVIR F2-F3)." *Id*. Plaintiff completed hepatitis C treatment in February 2021. (SUF ¶ 137). On May 10, 2021, Plaintiff was advised that he was cured from hepatis C. (SUF ¶ 138). Based on this evidence, no reasonable jury would find that the alleged six-month[7] delay in treating Plaintiff's hepatitis C caused any further damage to Plaintiff's liver or decreased his chances of receiving effective treatment. Plaintiff's fibrosis score remained stable between November 2019 and December 2020 (four months after Plaintiff's release), and Plaintiff was cured of hepatitis C.

[6] An APRI score of less than or equal to 0.5 indicates that the liver is either free of fibrosis or has minimal scarring. https://www.webmd.com/hepatitis/what-is-apri-score

[7] For the sake of argument, delay due to Chan's alleged conduct is from December 12, 2019 to June 22, 2020.

No doctor told Plaintiff that his hepatitis C worsened while he was in Lawrence between February 2019 and June 2020. (SUF ¶ 76). And Plaintiff has not disclosed any retained experts to opine that his condition was worsened by any delay in treatment. Summary judgment should be granted in favor of Chan and against Plaintiff because Plaintiff has no verifying medical evidence that any delay in treating his hepatitis C had any detrimental impact on his condition. *See Crouthes v. Zunker*, 2008 WL 5146682, *5 (W.D.Wis.) (granting summary judgment where the plaintiff presented no evidence that delay in treatment for his hepatitis C led to further damage to his liver or decreased his chances of receiving effective treatment); *Whitehead v. Mahone*, 2011 WL 324352, *7 (C.D.Ill.) (granting summary where there was no verifying medical evidence that any delay in diagnosing the plaintiff's hepatitis C had a detrimental impact on his condition); *Niksich v. Corizon Inc.*, 2019 WL 2076244, *11 (S.D.Ind.) (granting summary judgment where there was no evidence that the six-month delay in treating the plaintiff's hepatitis C exacerbated his condition or unnecessarily prolonged his pain); *Thomas v. Martija*, 2020 WL 3192856, *3 (N.D.Ill.) (granting summary judgment where the plaintiff offered no basis for finding that six-month delay in receipt of hepatitis B test results, or any delay in treatment for his condition caused any detriment to him); *Nance*, 2021 WL 857348, *6 (no reasonable jury would find that nurse's alleged six-month delay in testing the plaintiff for hepatitis B exacerbated his injury where even after the plaintiff's diagnosis, his physicians did not feel treatment was warranted).

### D. Any delay in Plaintiff treating for hepatitis C was caused by Plaintiff's conduct.

The undisputed facts show that while at Lawrence, Plaintiff refused to comply with blood sugar checks, his insulin regimen (SUF ¶¶ 47-51, 58-59, 68, 77, 81, 92, 96, 112, 113), and diet (SUF ¶¶ 44-46, 65, 82-85, 97, 116, 126, 127). Plaintiff's conduct caused his diabetes to be

consistently uncontrolled while he was at Lawrence.[8] Any delay in Plaintiff treating for hepatitis C because his diabetes was uncontrolled was caused by Plaintiff's conduct. *See Handy*, 2023 WL 7158524, *7 (granting summary judgment where an EGD test was prerequisite for hepatitis C treatment, and the plaintiff refused EGD tests).

## IV. CONCLUSION

Based on the foregoing, Defendant, JULIANA CHAN, respectfully requests that this Court enter an order granting summary judgment in her favor and against Plaintiff.

[8] Plaintiff's attitude about his diabetes has not changed since his release. At his deposition, he admitted that he had not been on insulin or Metformin since he was released from prison. (SUF ¶¶ 139).

JULIANA CHAN, Defendant,

BY: /s/ Keith B. Hill
HEYL, ROYSTER, VOELKER & ALLEN, P.C.
Keith B. Hill, ARDC #6277660

HEYL, ROYSTER, VOELKER & ALLEN, P.C.
Suite 100, Mark Twain Plaza III
105 West Vandalia
Edwardsville, Illinois 62025
Telephone 618.656.4646
Facsimile 309.420.0402
edwecf@heylroyster.com
khill@heylroyster.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this **23rd** day of **September, 2024**, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

/s/ Keith Hill
HEYL, ROYSTER, VOELKER & ALLEN, P.C.