**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JIMMIE DALE MILLER,<br><br>Plaintiff,<br><br>vs.<br><br>WEXFORD HEALTH SOURCE, INC.; LOUIS SHICKER, former Medical Director of Illinois Department of Corrections, individually; STEVE MEEKS, Medical Director of Illinois Department of Corrections, individually; MICHAEL DEMPSEY, former Interim Medical Director of Illinois Department of Corrections, individually; DR. DINA PAUL, individually; DR. LYNN PITTMAN, individually; DR. JULIANA CHAN, individually; LORI CUNNINGHAM, individually; and THOMAS WELSH, individually,<br><br>Defendants. | No. 3:20-cv-00446-NJR<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF'S MEMORANDUM**
**<u>IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

Sean M. Sullivan
Adrian Riordan
MOHAN GROBLE SCOLARO, P.C.
55 West Monroe Street, Suite 1600
Chicago, IL 60603
Phone: (312) 422-9999
Fax: (312) 422-5371
ssullivan@mohangroble.com
ariordan@mohangroble.com
*Counsel for Plaintiff*

**TABLE OF CONTENTS**

RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS ........ 4

Parties and Witnesses ........ 4

Plaintiff ........ 4

Defendant Wexford ........ 5

Defendant Dr. Paul ........ 6

Wexford Medical Witnesses ........ 7

Defendant Dr. Chan ........ 9

Dr. Patel ........ 9

IDOC Medical Directors ........ 9

Additional Material Facts ........ 10

The Chronic Care Clinics ........ 10

Wexford's Illinois Medical Guidelines ........ 10

Hepatitis C ........ 12

HCV Treatment ........ 15

National HCV Guidelines ........ 17

IDOC's HCV Treatment Guidelines ........ 19

A1c as Exclusion Criteria in IDOC HCV Guidelines Prior to 2017 ........ 20

A1c as Exclusion Criteria in IDOC Guidelines in 2017, 2018 and 2019 ........ 21

Knowledge Concerning the Increased Risk to HCV Patients with Diabetes ........ 25

The Monitor ........ 25

Medical Basis for A1c Absolute Exclusion ........ 28

Wexford's Global Medical Guidelines ........ 30

UIC's HCV Telemedicine Guidelines ........ 31

Plaintiff's HCV and Diabetes ........ 33

Denial of HCV Treatment to Plaintiff ........ 34

Plaintiff's Complaints ........ 40

Dr. Paul's Testimony in Miller I ........ 40

Plaintiff's HCV Treatment After Release ........ 42

ARGUMENT ........ 43

I. APPLICABLE STANDARDS ........ 43

A. The Eighth Amendment Standard ........ 44

B. The *Monell* Standard ........ 46

II. PLAINTIFF'S RIGHT TO JUDGMENT AS A MATTER OF LAW ........ 48

A. Plaintiff Has Established the Objective Element – A Serious Medical Need ........ 48

B. Plaintiff Has Established the Subjective Element – Deliberate Indifference ........ 49

CONCLUSION ........ 60

CERTIFICATE OF SERVICE ........ 62

Plaintiff Jimmie Dale Miller, by his attorneys, Sean M. Sullivan, Adrian Riordan and Mohan Groble Scolaro, P.C., submits this Memorandum of Law in support of his Motion for Summary Judgment as to Liability on Count I of his First Amended Complaint.[1]

## RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

### Parties and Witnesses

#### Plaintiff

1. At the times alleged in the First Amended Complaint, Plaintiff was incarcerated at correction facilities operated and managed by the Illinois Department of Corrections ("IDOC"). (Wexford/Paul Answer to First Amended Complaint ("Wexford/Paul Answer"), Doc. 143, ¶ 1; IDOC Defendants' Answer to First Amended Complaint ("IDOC Answer"), Doc. 141, ¶ 1).

2. On or about June 16, 2016, Plaintiff was incarcerated at the IDOC Stateville Correctional Center ("Stateville CC"). Plaintiff was transferred to the IDOC Pinckneyville Correctional Center ("Pinckneyville CC") on or about September 1, 2016. Plaintiff was transferred to the IDOC Lawrence Correctional Center ("Lawrence CC") in or about February 2019. Plaintiff was released from Lawrence CC, and from IDOC custody, on or about June 22, 2020. (Wexford/Paul Answer, Doc. 143, ¶ 8; IDOC Answer, Doc. 141, ¶ 8; Ex. 1, Miller Dep., at 7, 19).[2]

---

[1] Count I for deliberate indifference is the only remaining Count in the First Amended Complaint (Doc. 108) after Plaintiff voluntarily dismissed his claim against Dr. Lynn Pittman (Doc. 279) and reached a settlement with Dr. Louis Shicker, Dr. Steve Meeks, Dr. Michael Dempsey, Lori Cunningham and Thomas Walsh (Doc. 283).

[2] "Ex.___" refers to the exhibits attached to the Declaration of Sean M. Sullivan.

**Defendant Wexford**

3. Defendant Wexford Health Sources, Inc. ("Wexford") is a third-party contractor retained by IDOC to provide medical and health services to the state corrections institutions and facilities within the State of Illinois, including Stateville CC, Pinckneyville CC and Lawrence CC. (Wexford/Paul Answer, Doc. 143, ¶9; Ex. 16, Plaintiff's Deposition Exhibit ("PX") 51, Wexford/IDOC Contract (excerpt)).

4. Defendant Wexford employs doctors, nurses and other medical personnel who provide medical and health services to inmates at IDOC facilities. (Wexford/Paul Answer, Doc. 143, ¶ 9). Wexford medical personnel attended IDOC Health Services Quarterly meetings. (Ex. 2, Matticks Dep., at 22-23).

5. Wexford maintained a Medical Advisory Committee made up of senior members of its medical management team, including corporate medical directors and regional medical directors, which established policies and procedures as references for Wexford medical providers to follow with respect to specific disease categories. (Ex. 2, Matticks Dep., at 11-12, 15-16; Ex. 3, Matticks (*Barrow*) Dep., at 45). Ex. 4, Fisher Dep., at 31-32). The Medical Advisory Committee reviews current literature and available information in creating Wexford's medical guidelines. (Ex. 2, Matticks Dep., at 11-12). Most of the drafting of the Wexford policies and procedures is done by Wexford corporate level physicians. (Ex. 2, Matticks Dep., at 15-16).

6. Wexford's practices vary under different contracts if there are things a specific state requires them to do. (Ex. 4, Fisher Dep., at 26). Under most of Wexford's contracts, it has agreed to follow guidelines that its client has provided. (Ex. 4, Fisher Dep., at 200-01; Ex. 5, Fisher (*Nance*) Testimony, at 265-66; Ex. 6, Paul Dep., at 22-23; Ex. 7, Fisher (*Stafford*) Dep., at 92). Application

of the Wexford client's treatment protocols is typically not up for negotiation. (Ex. 7, Fisher (*Stafford*) Dep., at 168-69). Dr. Fisher testified that (as of 2018) Wexford had no business outside of corrections clients. (*Id*. at 92-93). Dr. Fisher testified that if Wexford wants to obtain a corrections contract it needs to agree to what the client is asking for. (*Id*. at 168-69).

7. Wexford's policy governing its medical providers was that they were required to follow the IDOC-provided guidelines (Ex. 2, Matticks Dep., at 42) "absent a medical contraindication." (Ex. 5, Fisher (*Nance*) Testimony, at 267).

8. If there is a conflict between the Wexford policies and procedures and the IDOC policies and procedures, Wexford deems that the IDOC policies and procedures control. (Ex. 3, Matticks (*Barrow*) Dep., at 47; Ex. 2, Matticks Dep., at 19; Ex. 17, PX52, Wexford Illinois Medical Guidelines, at Preface (filed under seal)).

9. Any substantive change to the Wexford Medical Guidelines must be approved by the Wexford Medical Advisory Committee. (Ex. 4, Fisher Dep., at 35, 186-87, 189-90).

**Defendant Dr. Paul**

10. Defendant Dr. Dina Paul ("Dr. Paul") is a doctor employed by Defendant Wexford as Chronic Disease and Case Management Director. Dr. Paul conducts chronic care telemedicine patient visits and medical record reviews for IDOC inmates, including inmates diagnosed with Hepatitis C Virus ("HCV"). (Wexford/Paul Answer, ECF 143, ¶ 13; Ex. 18, PX62, Dr. Paul CV, at 1; Ex. 6, Paul Dep., at 9).

11. On average, Dr. Paul directs the care of 3,000 to 4,000 correctional HCV patients per year. (Ex. 18, PX62, at 1; Ex. 6, Paul Dep., at 19-20). Dr. Paul is the only doctor at the Wexford corporate office that directs the care of HCV patients. (Ex. 6, Paul Dep., at 20). Dr. Paul is the

primary Wexford resource for HCV. (Ex. 2, Matticks Dep., at 16-17).

12. Dr. Paul gave depositions in the lawsuit entitled *Jimmie Miller v. John Baldwin, et al.*, No. 3:17-cv-00859 (S.D. Ill.) ("*Miller I*") on February 10, 2020 (Ex. 8, PX63), and the lawsuit entitled *Michael Insco v. Wexford Health Sources, Inc*., *et al.*, No. 2:19-cv-00612 (S.D. W.V.) ("*Insco*") on May 12, 2021 (Ex. 9, PX64), and acknowledged giving truthful answers in those depositions. (Ex. 6, Paul Dep., at 10-12). Dr. Paul also gave a deposition in the lawsuit entitled *James Handy v. Wexford Health Sources, Inc., et al.*, No. 2:20-cv-02280 (C.D. Ill.) ("*Handy*") on May 10, 2022 (Ex. 10).

13. Dr. Paul has developed and implemented guidelines, policies, and procedures for Wexford clients concerning chronic medical conditions in the correctional setting, including HCV. (Ex. 18, PX62, at 1; Ex. 6, Paul Dep., at 12-13). Dr. Paul has given presentations at the IDOC Health Services Quarterly Meetings. (Ex. 6, Paul Dep., at 24-27). Dr. Paul is an expert at managing and treating patients with HCV. (Ex. 8, Paul (*Miller I*) Dep., at 19-20).

14. Dr. Paul is a member of the Wexford Medical Advisory Committee. (Ex. 6, Paul Dep., at 21-22).

**Wexford Medical Witnesses**

15. Dr. Roderick Matticks ("Dr. Matticks") is the Wexford Regional Medical Director for Illinois. (Ex. 2, Matticks Dep., at 6). Dr. Matticks gave depositions in *Miller I* and the lawsuit entitled *Ronald Barrow v. Wexford Health Sources, Inc*., *et al.*, No. 3:14-cv-941 (S.D. Ill.) ("*Barrow*") as Wexford's corporate representative and provided truthful answers in those depositions. (Ex. 2, Matticks Dep., at 8; Ex. 11, Matticks (*Miller I*) Dep., at 9; Ex. 3, Matticks (*Barrow*) Dep., at 11).

16. Dr. Matticks' responsibilities include training of staff and oversight of clinical activities at each IDOC site in his region. (Ex. 11, Matticks (*Miller I*) Dep., at 10-11). Dr. Matticks is a member of the Wexford Medical Advisory Committee. (Ex. 2, Matticks Dep., at 9-11).

17. Dr. Neil Fisher is Wexford's Assistant Chief Medical Officer and Corporate Medical Director for Clinical and Pharmacy. (Ex. 5, Fisher (*Nance*) Testimony, at 233 (JDM 009238)). Dr. Fisher gave a deposition in the case entitled *Michael Ray Stafford v. Robert E. Carter, Jr., et al.*, No. 1:17-CV-289 (S.D. Ind.) ("*Stafford*") and testified at trial in the case entitled *Ellean Nance v. Wexford Health Sources, Inc.*, No. 3:16-CV-875 (S.D. Ill.) ("*Nance*"). Dr. Fisher gave truthful answers in the *Stafford* and *Nance* cases. (Ex. 4, Fisher Dep., at 12-18). In *Stafford*, Dr. Fisher was presented as an expert witness related to corrections and HCV, and he did research prior to his testimony. (Ex. 4, Fisher Dep., at 122).

18. Dr. Fisher has knowledge about HCV and has written articles and given lectures about taking care of patients with HCV in a correctional setting. (Ex. 4, Fisher Dep., at 50; Ex. 5, Fisher (*Nance*) Testimony, at 332 (JDM 009237)). In November 2017, Dr. Fisher gave a presentation to the National Commission on Correctional Healthcare ("NCCHC") concerning HCV. (Ex. 7, Fisher (*Stafford*) Dep., at 20, 29).

19. Dr. Fisher has knowledge regarding the development of protocols for the treatment of HCV. (Ex. 5, Fisher Dep., at 50-51).

20. Dr. Fisher is a member of the Wexford Medical Advisory Committee. (Ex. 5, Fisher Dep., at 25).

**Defendant Dr. Chan**

21. Defendant Dr. Juliana Chan ("Dr. Chan") is a Doctor of Pharmacy employed by non-party University of Illinois at Chicago ("UIC") as a Clinical Associate Professor of Medicine. (Chan Answer to First Amended Complaint ("Chan Answer"), Doc. 135, ¶15; Ex. 19, PX1, Chan CV, at 1; Ex. 12, Chan Dep., at 7-9).

22. In 2002, Dr. Chan established the first pharmacist-managed clinic for HCV at UIC. (Ex. 12, Chan Dep., at 15). In 2010, Dr. Chan was part of the team at UIC that started a telemedicine HCV program for IDOC inmates. (Ex. 12, Chan Dep., at 18; Ex. 15, Shicker Dep., at 28). The intent of the IDOC telemedicine program was to provide patient-specific care and recommendations for each IDOC inmate. (Ex. 12, Chan Dep., at 45).

23. Dr. Chan attended IDOC Health Services Quarterly meetings. (Ex. 2, Matticks Dep., at 29).

**Dr. Patel**

24. Dr. Mahesh Patel ("Dr. Patel") is an infectious disease doctor employed by UIC who worked with Dr. Chan on the UIC telemedicine team for IDOC HCV patients. (Ex. 13, Patel Dep., at 8-9).[3]

**IDOC Medical Directors**

25. Dr. Steve Meeks ("Dr. Meeks") was the Chief of Medical Services ("Medical Director") for IDOC from November 1, 2016 to March 27, 2020. (Ex. 14, Meeks Dep., at 10; IDOC

---

[3] On June 6, 2023, Plaintiff moved for leave to file a Second Amended Complaint to add Dr. Patel as a defendant (among other things). (Doc. 216). The Court denied the motion on June 27, 2023. (Doc. 227). Dr. Patel therefore is a non-party.

Answer, Doc. 141, ¶ 10; Ex. 20, PX40, Meeks Declaration, ¶1). As Medical Director of IDOC, Dr. Meeks was responsible for overseeing all health-related services for the IDOC, contract monitoring of contracted vendors, and updating policies and procedures. (Ex. 20, PX40, ¶2; Ex. 14, Meeks Dep., at 52-53). Dr. Meeks was succeeded as IDOC Medical Director by Dr. Steven Bowman. (Ex. 14, Meeks Dep., at 36).

26. Dr. Louis Shicker ("Dr. Shicker") was the Medical Director for IDOC from 2009 until June 15, 2016. (IDOC Answer, Doc. 141, ¶ 12).

## **Additional Material Facts**

### The Chronic Care Clinics

27. Individuals in the IDOC chronic care clinics that Dr. Paul runs are under her medical care as the chronic disease physician for Wexford. Those patients should receive "community standard of care." (Ex. 9, Paul (*Insco*) Dep., at 24-25).

28. Dr. Paul testified that "[i]t's my job to follow the national guidelines of medical care" and "I have a responsibility to provide medical care to the best of my ability with the most updated national guidelines. That's my job, and it should mimic the standard of care in the community." (Ex. 9, Paul (*Insco*) Dep., at 80-81).

29. The standard of care should apply even in different environments. (Ex. 7, Fisher (*Stafford*) Dep., at 99). A clinician should treat according to the patient's individual circumstances. (Ex. 7, Fisher (*Stafford*) Dep., at 100).

### Wexford's Illinois Medical Guidelines

30. The Wexford Medical Advisory Committee reviewed and approved "Medical Guidelines – Region: Illinois" (the "Wexford Illinois Guidelines") to govern Wexford's medical

services for IDOC patients. The Wexford Illinois Guidelines do not contain a section concerning HCV. (Ex. 17, PX52, at Table of Contents (filed under seal); Ex. 4, Fisher Dep., at 25-26).

31. The Preface to the Wexford Illinois Guidelines states: "This manual is intended to serve as a reference tool for clinicians practicing medicine in the jails and prisons served by Wexford Health Sources, Inc. This manual contains clinical pathways, treatment protocols, and algorithms designed to promote a standard level of quality and care at Wexford Health sites." (Ex. 17, PX52, at Preface (filed under seal); Ex. 4, Fisher Dep., at 63).

32. The Preface also states that "if there are any conflicts between these guidelines and client-specific policies, administrative directives or institutional directives, then the respective client-specific policies, administrative directives or institutional directive language is controlling to resolve such conflict." (Ex. 17, PX52, at Preface (filed under seal); Ex. 4, Fisher Dep., at 63-64).

33. The above statement has been part of every Wexford Medical Guideline since the revision date of 8/26/15. (Ex. 4, Fisher Dep., at 64-65).

34. The Preface has been agreed upon by the Wexford Medical Advisory Committee. (Ex. 4, Fisher Dep., at 68). Dr. Fisher testified at the *Nance* trial that Wexford tries to instill the philosophy contained in the Preface in its practitioners. (Ex. 4, Fisher Dep., at 68-69; Ex. 5, Fisher (*Nance*) Testimony, at 345 (JDM 009350)). Dr. Fisher testified in his deposition in this case that he does not agree that Wexford's intent is for its practitioners to apply the principles set forth in the Preface. (Ex. 4, Fisher Dep., at 70-71).

35. The Wexford site medical director decides what constitutes adequate healthcare services under the Illinois/Wexford contract. (Ex. 3, Matticks (*Barrow*) Dep., at 13-14).

**Hepatitis C**

36. HCV is a disease that adversely affects the functioning of the liver. (Ex. 14, Meeks Dep., at 43). While HCV infection can resolve spontaneously from the acute phase in some cases, most persons infected with HCV develop chronic infection. (Ex. 21, PX2, *Hepatitis C*, Chan, J., Disease-a-Month 60 (2014) at 201, 202; Ex. 12, Chan Dep., at 22-24).

37. The HCV incident rate among the incarcerated population is much higher than in the general population. (Ex. 21, PX2, at 201; Ex. 12, Chan Dep., at 24; Ex. 9, Paul (*Insco*) Dep., at 76-77). Dr. Paul estimates that at any given time the number of IDOC HCV patients is around 7,000. (Ex. 8, Paul Dep., at 227).

38. There are six genotypes of HCV and genotype 1 is the most prevalent in the United States. Categorizing by genotype is a tool used in assessing the most effective treatment protocol for a particular patient and to determine the likelihood of response to antiviral therapy. (Ex. 21, PX2, at 202, 203; Ex. 12, Chan Dep., at 27).

39. Mr. Miller's HCV genotype was determined (after his release from IDOC custody) to be type 1. (Ex. 22, Access Community Health Records (excerpts), at JDM 001943).

40. According to a fact sheet prepared by Dr. Shicker and IDOC in connection with testimony before the Hepatitis C Task Force of the Illinois Department of Public Health on September 17, 2014 ("2014 IDOC Fact Sheet"), 80% of people infected with HCV will develop chronic HCV infections. (Ex. 23, Louis Shicker, Medical Director for the Illinois Department of Corrections, *Hepatitis C and the IDOC – Fact Sheet*, Illinois Department of Corrections (Sep. 17, 2014), at JDM 014346; See Ex. 21, PX2, at 202).

41. Persons infected with chronic HCV suffer from a serious medical condition. They can develop fibrosis, which is scarring of liver tissue that damages the structure of their livers. (Ex. 14, Meeks Dep., at 43; Ex. 7, Fisher (*Stafford*) Dep., at 66).

42. Such persons are at an increased risk of developing cirrhosis, a life-threatening condition whereby the functioning of the liver is reduced by extensive liver scarring associated with the advanced progression of fibrosis, as well as hepatocellular carcinoma ("HCC"). (Ex. 21, PX 2 at 201, 202; Ex. 12, Chan Dep., at 23, 29; Ex. 23, 2014 IDOC Fact Sheet, at JDM 014346; Ex. 14, Meeks Dep., at 43-44; Ex. 7, Fisher (*Stafford*) Dep., at 67-70; Chan Answer, Doc. 135, ¶ 33).

43. Persons with HCV may have no symptoms until they are at the end stages of the disease and serious liver complications arise (Ex. 7, Fisher (*Stafford*) Dep., at 71, 116-17), but may have symptoms including fatigue, abdominal pain, and joint pain. (Ex. 7, Fisher (*Stafford*) Dep., at 72-73). HCV can progress without outward signs. (Ex. 7, Fisher (*Stafford*) Dep., at 117).

44. There are factors that can increase the rate of progression of fibrosis in HCV patients including insulin resistance (diabetes and prediabetes). (Ex. 4, Fisher Dep., at 120-21; Ex. 7, Fisher (*Stafford*) Dep., at 144-45).

45. Liver scarring severity is classified by a METAVIR fibrosis score ("Fibrosis Score"), which is measured on a scale of F0 to F4. During the relevant period the Fibrosis Score was commonly determined by a FibroScan which measures the stiffness or scarring of the liver. (Ex. 12, Chan Dep., at 29; Ex. 6, Paul Dep., at 74, 77; Ex. 8, Paul (*Miller I*) Dep., at 33-34).

46. In a paper authored by Dr. Chan, Fibrosis Scores are described as: F0 = no fibrosis; F1 = mild fibrosis; F2 = moderate fibrosis; F3 = severe fibrosis; and F4 = cirrhosis. (*See* Ex. 21, PX2, at Table 2; Ex. 12, Chan Dep., at 29). Alternative descriptions are: F0 = no fibrosis; F1 =

fibrous portal expansion; F2 = rare bridges or septae; F3 = numerous bridges or septae; and F4 = cirrhosis. (*Id.*). Determining the patient's Fibrosis Score is important. (Ex. 7, Fisher (*Stafford*) Dep., at 119).

47. Cirrhosis is an advanced scarring of the liver that can result from progression of HCV infection. (Ex. 6, Paul Dep., at 73; Ex. 7, Fisher (*Stafford*) Dep., at 114).

48. The progression of fibrosis does not occur at the same rate in all persons and the progression is not linear. In addition, the presence of other diseases may affect the rate of progression of fibrosis. (Ex. 21, PX2, at 202; Ex. 12, Chan Dep., at 26; Wexford/Paul Answer, Doc. 143, ¶ 32). For example, the presence of insulin resistance/diabetes is a predictor of accelerated liver fibrosis progression. (Ex. 7, Fisher (*Stafford*) Dep., at 144-45; Ex. 4, Fisher Dep., at 120-21).

49. The 2014 IDOC Fact Sheet states that persons with a Fibrosis Score of F3 or above are most in need of treatment and that persons with type 2 diabetes should also be considered secondarily for priority HCV treatment. (Ex. 23, 2014 IDOC Fact Sheet, at JDM 014347).

50. Persons with HCV are at an increased risk of developing liver cancer. (Ex. 21, PX2 at 201, 202; Ex. 12, Chan Dep., at 23, 29; Ex. 23, 2014 IDOC Fact Sheet, at JDM 014346). For persons with HCV who develop cirrhosis, approximately 5% per year will develop HCC. (Ex. 10, Paul (*Handy*) Dep., at 74-75).

51. According to the 2014 IDOC Fact Sheet, "~25% of those [individuals infected with HCV] will go on to have significant liver disease – ultimately cirrhosis (liver failure) and increased incidence of hepatocellular carcinoma [liver cancer]." Liver transplantation is the principle long term treatment for patients with advanced cases of cirrhosis and/or liver cancer, and according to the

2014 IDOC Fact Sheet "[HCV] is the number one reason for requiring liver transplantation." (Ex. 23, 2014 IDOC Fact Sheet, at JDM 014346).

52. According to the United States Centers for Disease Control and Prevention, "annual hepatitis C-related mortality in 2013 surpassed the total combined number of deaths from 60 other infectious diseases reported to CDC, including HIV, pneumococcal disease, and tuberculosis."[4]

**HCV Treatment**

53. The goal of HCV treatment is to eradicate the HCV infection to prevent the progression and development of liver complications including cirrhosis, HCC and end-stage liver disease, by achieving a sustained virologic response ("SVR") such that HCV is undetectable at both the end of the treatment and 6 months after the end of the treatment (more recently reduced to 3 months). Achieving SVR is considered to be effectively a cure for HCV. (Ex. 12, Chan Dep., at 30-31; Ex. 21, PX2, at 203, 204).

54. For persons with HCV, benefits associated with achieving SVR include a decrease in liver inflammation, a reduction in the rate of liver fibrosis, a higher than 70% reduction in the risk of liver cancer, a 90% reduction in the risk of liver-related mortality and liver transplantation, as well as a substantially improved quality of life. (See Ex. 7, Fisher (*Stafford*) Dep., at 108; Ex. 24, PX29, 2018 FBOP Guidelines, at 8; Ex. 25, PX31A, 2015 AASLD/IDSA HCV Guidance, at 935).

55. Cirrhotic patients who achieve SVR are not free of liver complications; thus, it is important to initiate HCV treatment early. (Ex. 21, PX2, at 204; Ex. 12, Chan Dep., at 31-32; Ex. 4, Fisher Dep., at 54). HCV treatment does not repair liver scarring. (Ex. 8, Paul (*Miller I*) Dep., at 67).

---

4 *See*, https://www.cdc.gov/media/releases/2016/p0504-hepc-mortality.html.

56. Achieving SVR corresponds to long-term clearance of the HC virus in 99% of patients. (Ex. 4, Fisher Dep., at 53). There are clear benefits to treatment even for patients without cirrhosis. (Ex. 4, Fisher Dep., at 55). HCV antiviral drugs do not work as well later in the course of the disease. (Ex. 4, Fisher Dep., at 55).

57. In the 1990s, the United States Food and Drug Administration ("FDA") approved the use of Ribavirin, an anti-viral drug, for use in combination with interferon to treat HCV. With this drug combination, the standard length of time for treating genotype 1 HCV was 48 weeks. The presence of interferon caused severe side effects in patients, such as depression, flu-like symptoms and anemia. The rate of achieving SVR using Ribavirin and interferon for HCV genotype 1 was 42% to 52%. (*See* Ex. 21, PX2, at 204-07; Ex. 12, Chan Dep., at 32-40; Ex. 4, Fisher Dep., at 132-33).

58. Direct acting antiviral drugs ("DAA") were subsequently approved for treatment of HCV, which continued to require administration in combination with interferon, with all the side effects associated with that drug. (*Id.*). DAA treatments without interferon generally involved a course of three to six months, achieved over 90% success rate, and had very few side effects. (Ex. 8, Paul (*Miller I*) Dep., at 13). Patients with cirrhosis have a decreased cure rate from DAA treatment and may need to stay on the treatment for a longer period of time. (Ex. 8, Paul (*Miller I*) Dep., at 65, 66).

59. By 2014, the FDA approved DAA treatments that did not require the use of interferon. The rate of SVR achieved with the new DAA drugs was approximately 90% with little to no side effects and with a substantially shortened treatment course. (Ex. 21, PX2, at 205-06 and Table 6; Ex. 12, Chan Dep., at 37-40; Ex. 7, Fisher (*Stafford*) Dep., at 140). Dr. Fisher testified

treatment in the correctional setting usually achieves higher cure rates compared to the community because compliance tends not to be an issue. (Ex. 7, Fisher (*Stafford*) Dep., at 140-41).

60. Development of direct-acting agent protocols that did not involve the use of interferon was a very important development in HCV treatment. (Ex. 4, Fisher Dep., at 55-56).

**National HCV Guidelines**

61. Throughout the relevant period, the Federal Bureau of Prisons ("FBOP") issued guidelines for the evaluation and management of chronic HCV. (Ex. 6, Paul Dep., at 81-82; Ex. 14, Meeks Dep., at 84-88; Ex. 26, PX28, May 2017 FBOP Guidelines; Ex. 24, PX29, August 2018 FBOP Guidelines). By at least May 2017, the FBOP guidelines listed elevated A1c (diabetes mellitus) as a second-level priority for treatment because it is a condition associated with a more rapid progression of fibrosis. (Ex. 6, Paul Dep., at 83-85; Ex. 24, PX29, at 8-9; Ex. 26, PX28, at 7-8).

62. The May 2017 FBOP guidelines contained the following paragraph explaining the reasons for its priority criteria for HCV treatment:

> Determining whether BOP priority criteria for treatment are met is an important part of the initial evaluation and ongoing management of inmates with chronic HCV infection. Although all patients with chronic HCV infection may benefit from treatment, certain cases are at higher risk for complications or disease progression and require more urgent consideration for treatment. The BOP has established priority criteria to ensure that those with the greatest need are identified and treated first. The BOP Medical Director will provide periodic guidance on specific strategies for implementing these priority levels.

(Ex. 26, PX28, at 7).

63. The August 2018 FBOP guidelines contained the following paragraph explaining the reasons for its priority criteria for HCV treatment:

> All sentenced inmates with chronic HCV infection are eligible for consideration of treatment. Certain cases are at higher risk for complications or disease progression and may require more urgent consideration for treatment. The BOP has established PRIORITY CRITERIA to ensure that inmates with the greatest need are identified and treated first.

(Ex. 24, PX29, at 8).

64. The American Association for the Study of Liver Diseases ("AASLD") and the Infectious Diseases Society of America ("IDSA") also issue guidelines for the testing, managing and treating of HCV. (Ex. 27, PX32, November 2018 AASLD/IDSA Guidelines; Ex. 4, Fisher Dep., at 107-08). Since at least 2018, the AASLD/IDSA guidelines recommend treatment "for all patients with chronic HCV infection, except those with a short life expectancy that cannot be remediated by HCV therapy, liver transplantation, or another directed therapy." (Ex. 27, PX32, at 1; Ex. 7, Fisher (*Stafford*) Dep., at 106).

65. Dr. Paul testified that when the standards from the FBOP and AASLD/IDSA conflict, "then I make my clinical judgment on what makes the most sense for incarcerated patients." (Ex. 9, Paul (*Insco*) Dep., at 81).

**IDOC's HCV Treatment Guidelines**

66. Since the 1990s, IDOC has promulgated certain guidelines, policies, procedures and protocols for the screening, monitoring and treatment of IDOC inmates with HCV (the "IDOC HCV Guidelines" or "Guidelines"). (Ex. 15, Shicker Dep., at 22-23).

67. Since approximately 2010 or 2011, IDOC has contracted with non-party UIC for UIC's medical professionals, including Dr. Chan, to direct treatment of IDOC inmates with HCV. (Ex. 12, Chan Dep., at 18; Ex. 28, UIC/IDOC Medical Program Agreement (JDM 012796-012833); Ex. 13, Patel Dep., at 12-13). Dr. Chan began working with IDOC to create the IDOC HCV Guidelines in 2010 when the IDOC telemedicine program was initiated. (Ex. 12, Chan Dep., at 120).

68. UIC medical professionals, including Dr. Chan, took the lead in preparing the IDOC HCV Guidelines. (Ex. 12, Chan Dep., at 60-61; Ex. 14, Meeks Dep., at 26, 28). Dr. Chan participated in drafting and revising the IDOC HCV Guidelines. (Ex. 12, Chan Dep., at 66-67). The UIC team, including Dr. Chan, revised the IDOC HCV Guidelines on various occasions at the request of IDOC to address issues raised in lawsuits concerning inmate access to HCV treatment and on other occasions UIC initiated changes or revisions to the IDOC Guidelines. (Ex. 12, Chan Dep., at 66-69; Ex. 14, Meeks Dep., at 26, 27, 28).

69. Wexford provides training to Wexford facility medical directors regarding the IDOC HCV guidelines. (Ex. 11, Matticks (*Miller I*) Dep., at 26-27).

70. Dr. Meeks testified that IDOC relied on the expertise of UIC. (Ex. 14, Meeks Dep., at 27).

71. Dr. Chan and UIC reviewed the AASLD and FBOP guidelines as part of revising the IDOC HCV Guidelines. (Ex. 12, Chan Dep., at 71, 73-74).

72. Dr. Paul reviewed the IDOC HCV Guidelines each time they were issued or revised. (Ex. 6, Paul Dep., at 36, 37; Ex. 10, Paul (*Handy*) Dep., at 11-12).

**A1c as Exclusion Criteria in IDOC HCV Guidelines Prior to 2017**

73. Dr. Chan participated in creating the March 2014 IDOC HCV Guidelines. (Ex. 29, PX16; Ex. 12, Chan Dep., at 131-33). The March 2014 IDOC HCV Guidelines listed "Uncontrolled diabetes (Hgb A1c > 7.5)" as an "Absolute Exclusion Criteria for Hepatitis C Treatment" and as a "contraindication" to HCV treatment for genotypes 1, 3, 4, 5 and 6 but not for genotype 2. (Ex. 29, PX16, at 2; Ex. 12, Chan Dep., at 134-35).

74. Elevated A1c is not a contraindication to HCV treatment, only to HCV treatment with interferon. (Ex. 12, Chan Dep., at 138-39; Ex. 6, Paul Dep., at 39-41, 47; Ex. 15, Shicker Dep., at 64-65).

75. Dr. Chan disagreed with the statement that A1c above 7.5 was a contraindication to HCV treatment in March 2014 but she did not express that to IDOC when she reviewed the March 2014 version of the IDOC HCV Guidelines. (Ex. 12, Chan Dep., at 141-42).

76. The March 2015 IDOC HCV Guidelines list "Uncontrolled diabetes (A1c > 7.5)" as an "Absolute Exclusion Criteria" and a "Contraindication" *only* for "patients receiving pegylated interferon (Genotypes 2-6)." Uncontrolled diabetes and/or elevated A1c are not listed as exclusion criteria or contraindications for genotype 1. (Ex. 30, PX17, at 2; Ex. 12, Chan Dep., at 143-45).

77. A Wexford clinician conducting HCV screening would not know whether a patient would or could receive interferon treatment to determine whether to exclude the patient from HCV treatment. (Ex. 6, Paul Dep., at 47-49).

78. Dr. Chan worked with IDOC and Dr. Patel regarding contraindications in the IDOC HCV Guidelines. (Ex. 12, Chan Dep., at 146-47).

79. Medical studies conducted prior to the relevant period suggested that HCV patients who also had type 2 diabetes were at risk for worse outcomes from their HCV than patients who did not have type 2 diabetes, including reduced rate of SVR, progression to fibrosis and cirrhosis, and higher risk for development of HCC. (See Ex. 31, PX4, at 1; Ex. 6, Paul Dep., at 51-56; Ex. 15, Shicker Dep., at 63; Ex. 32, 33 and 34).

**A1c as Exclusion Criteria in IDOC Guidelines in 2017, 2018 and 2019**

80. Dr. Patel testified that subsequent to 2015 he did not review, respond to or comment on proposed IDOC HCV Guideline revisions. (Ex. 13, Patel Dep., at 18-19, 21-22). Dr. Patel testified that he did not review the 2017 iteration of the IDOC HCV Guidelines. (Ex. 13, Patel Dep., at 49-50). Dr. Patel testified that prior to the January 2019 iteration he had never discussed the IDOC HCV Guidelines with Dr. Chan. (Ex. 13, Patel Dep., at 50-51).

81. However, Dr. Chan and Dr. Patel worked on revisions to the IDOC HCV Guidelines in May and June 2017. (Ex. 35, June 22, 2017, email from Dr. Chan to Dr. Patel with Word document attachment ("Chan Email") at JDM 015311; Ex. 36, June 27, 2017, email from Dr. Patel to Dr. Chan with Word document attachment ("Patel Email") at JDM 015309). As part of working on those revisions Dr. Chan consulted the guidelines of the AASLD, IDSA and FBOP. (Ex. 12, Chan Dep., at 147-48).

82. The proposed revised guidelines forwarded by Dr. Chan to Dr. Patel included a change under which "elevated A1c" became an across-the-board absolute exclusion criteria for all

genotypes without regard to the contemplated drug therapy – whether interferon-based or interferon-free. (Ex. 35, Chan Email Word document attachment, at 3; Ex. 12, Chan Dep., at 152-53).

83. The proposed revised guidelines forwarded by Dr. Chan to Dr. Patel included a new statement that they were "in line with the recommendations of ~~AASLD and IDSA~~the Federal Bureau of Prison Clinical Guidance" and cited the May 2017 FBOP guidelines. (Ex. 35, Chan Email Word document attachment, at 1).

84. The proposed 2017 modifications removed elevated A1c from the list of contraindications because interferon was no longer part of common HCV treatment protocols. (Ex. 12, Chan Dep., at 155).

85. Dr. Patel made additional modifications to the proposed guidelines received from Dr. Chan, including a comment/question as to whether the absolute exclusions should be "more or less specific", but he did not make any changes to the absolute A1c exclusion. (Ex. 36, Patel Email Word document attachment, at 3). Dr. Patel forwarded his and Dr. Chan's proposed revisions to Dr. Meeks. (Ex. 36, Patel Email).

86. Dr. Chan created a "Review of Systems Checklist" form to be used in implementing the revised 2017 IDOC Guidelines, which stated that if A1c is greater than 7 percent, "have patient see IDOC Physician before refer to UIC HCV Telemedicine Clinic. Do not send until the labs are within normal range." (Ex. 36, Chan Email Word document attachment, at 10; Ex. 37, PX18, at 000822; Ex. 12, Chan Dep., at 176-78).

87. This was the first time the IDOC Guidelines contained a Review of Systems Checklist that referenced A1c. (*See* Ex. 4, Paul Dep., at 49-51, 58-59).

88. Dr. Chan created the Review of Systems Checklist to inform IDOC providers what IDOC was directing them to do in the Guidelines. (Ex. 12, Chan Dep., at 178-79).

89. Dr. Chan inserted the A1c level of 7 percent in the Review of Systems Checklist, whereas the text of the Guidelines did not define "elevated A1c." (Ex. 12, Chan Dep., at 178).

90. Under the revised guidelines provided to IDOC by Dr. Chan and Dr. Patel, IDOC inmates with elevated A1c would be absolutely excluded from receiving HCV treatment even if they had Fibrosis Scores of F3 or F4 and/or had cirrhosis. (Ex. 12, Chan Dep., at 156-57; Ex. 6, Paul Dep., at 64-66).

91. IDOC implemented the revised guidelines in or about December 2017. (Ex. 37, PX18; Ex. 12, Chan Dep., at 147; Ex. 14, Meeks Dep., at 70-71). Dr. Paul reviewed the December IDOC HCV Guidelines at the time they were implemented. (Ex. 6, Paul Dep., at 60).

92. The October 2018 IDOC HCV Guidelines maintained the absolute exclusion from treatment for inmates with elevated A1c and retained the Review of Systems Checklist instruction not to refer inmates with A1c above 7. (Ex. 38, PX19, at Bates 000829, 000836; Ex. 12, Chan Dep., at 164-65).

93. The October 2018 IDOC HCV Guidelines included "confirmed cirrhosis or have clinical findings with cirrhosis" as priority level 1 for treatment, and Fibrosis Score of F3 or F4 as priority level 2. (Ex. 38, PX19, at Bates 000830-31).

94. The January 2019 IDOC HCV Guidelines maintained the absolute exclusion from treatment for inmates with elevated A1c and the Review of Systems Checklist instruction not to refer inmates with A1c above 7. (Ex. 39, PX20, at 000436, 000443; Ex. 12, Chan Dep., at 166, 173-74; Ex. 14, Meeks Dep., at 101-02).

95. The January 2019 Guidelines also listed inmates with cirrhosis or clinical findings with cirrhosis as priority level 1, and inmates with Fibrosis Scores of F3 and F4 as priority level 2. (Ex. 39, PX20, at 000437-38; Ex. 12, Chan Dep., at 175).

96. The absolute exclusion for inmates with elevated A1c would preclude the inmate from obtaining a FibroScan. (Ex. 6, Paul Dep., at 90).

97. The January 2019 IDOC HCV Guidelines provide that "the primary care physicians at the IDOC sites are responsible for appropriate screening and initial workup for all hepatitis C-positive patients to determine eligibility of treatment." (Ex. 39, PX20, at 000435; Ex. 4, Fisher Dep., at 160-61).

98. Under Wexford's contract with IDOC, and under the January 2019 IDOC HCV Guidelines, it was the responsibility of Wexford clinicians to determine whether a patient is eligible for HCV treatment, and Wexford contractually agreed to follow the IDOC Guidelines in making that determination. (Ex. 4, Fisher Dep., at 214-15; Ex. 39, PX20, at 000435).

99. Dr. Paul reviewed the IDOC HCV Guidelines each time they were promulgated. (Ex. 6, Paul Dep., at 35-37; Ex. 8, Paul (*Miller I*) Dep., at 47; Ex. 10, Paul (*Handy*) Dep., at 11-12). Dr. Paul regularly reviewed the then-existing guidelines from AASLD/IDSA and FBOP in evaluating the IDOC HCV Guidelines. (Ex. 6, Paul Dep., at 61-62). Dr. Paul believes that if a Wexford client's HCV guidelines varied from those organizational guidelines, she would be able to spot the differences or inconsistencies. (Ex. 6, Paul Dep., at 62-63).

**Knowledge Concerning the Increased Risk to HCV Patients with Diabetes**

100. In September 2014, Dr. Shicker gave a presentation at the quarterly meeting stating that "DM (insulin resistant)" was a "high priority" for HCV treatment according to AASLD/IDSA standards. (Ex. 40, September 2014 Meeting Outline, at 7th unnumbered page).

101. Medical literature suggested that diabetes is a co-morbidity indicating that treatment should be provided earlier rather than later, and that treating HCV can help diabetes. (Ex. 15, Shicker Dep., at 80-81; Ex. 31, PX4, *Diabetes and hepatitis C: a two-way association*, Hammerstad, S., *et al.*, Frontiers in Endocrinology, Sep. 2015; Ex. 32, 33 and 34).

102. The 2017 and 2018 FBOP Guidelines identified diabetes mellitus (elevated A1c) as a second-level priority for HCV treatment because it is a condition associated with more rapid progression of fibrosis. (Ex. 26, PX28, at 7-8; Ex. 6, Paul Dep., at 83-84; Ex. 24, PX29, at 8-9; Ex. 15, Meeks Dep., at 85-90).

103. The FBOP priority is consistent with medical literature suggesting that HCV patients with diabetes are at risk for worse outcomes, including more rapid progression of fibrosis. (Ex. 6, Paul Dep., at 84-85). The absolute exclusion for elevated A1c contained in the January 2019 IDOC HCV Guidelines is inconsistent with the then-existing FBOP Guidelines. (Ex. 6, Paul Dep., at 85). Dr. Paul regularly reviewed medical literature concerning HCV and would have been familiar with the concept of worse HCV outcomes for diabetic patients at the time it was being discussed in the literature. (Ex. 6, Paul Dep., at 51-56).

**The Monitor**

104. In 2019, IDOC entered into a Consent Decree in the case entitled *Don Lippert, et al. v. John Baldwin, et al.*, No. 10-cv-4603 (N.D. Ill.) ("*Lippert*") – a putative class action in which

IDOC inmates alleged they had been denied their constitutional right to adequate medical care – and the court entered the Consent Decree on May 5, 2019. (Ex. 41, Consent Decree (*Lippert* Doc. 1238), at 1). The Consent Decree provided for appointment of a monitor to, among other things, evaluate IDOC's compliance with the Consent Decree. (Ex. 41, Consent Decree (*Lippert* Doc. 1238), at 19-20). On March 29, 2019, the court in *Lippert* appointed Dr. Jack Raba ("Monitor" or "Dr. Raba") "as Monitor to perform the duties and have the rights and responsibilities set forth in the Consent Decree." (Ex. 42, Order (*Lippert* Doc 1108); Ex. 14, Meeks Dep., at 34-35).

105. Dr. Meeks interacted with Dr. Raba toward the end of his tenure as IDOC Medical Director, concerning recommended changes to the IDOC health services program for IDOC inmates. (Ex. 14, Meeks Dep., at 35-36, 39).

106. On July 14, 2020, Dr. Raba communicated to IDOC that he would like to contact UIC "to start a discussion about Hepatitis C treatment." (Ex. 43, July 14 email from Dr. Raba to Kelly Presley (IDOC)).

107. Dr. Raba was concerned about the number of patients receiving HCV treatment. (Ex. 14, Meeks Dep., at 62). In a Monitor's Report dated August 6, 2020, Dr. Raba reported to the court in *Lippert* that:

> In June 2019 a quality improvement audit found that 1785 patients were being followed in the IDOC hepatitis C clinic; 22 (1.2%) were undergoing treatment, 40 (2.2%) had completed treatment, and 337 (18.9%) were deemed ineligible for treatment. A December 2019 follow up audit found 1712 patients were being followed in hepatitis C clinic. Only 12 (0.7%) were undergoing treatment; 89 (5.2%) were awaiting treatment; 46 (2.6%) had completed treatment; and 347 (20.3%) were denied treatment based on not qualifying. Ninety seven percent of 1656 patients with hepatitis C were not on treatment. There was no discussion in the analysis of results of the audit about these extremely low rates of treatment.

(Ex. 44, August 6, 2020 Health Care Monitor 2nd Report (*Lippert* Doc. 1335) (excerpt), at 125 (JDM 011571)).

108. In August and September 2020, Dr. Chan and Dr. Patel drafted proposed changes to the January 2019 IDOC HCV Guidelines, including changes to the A1c element of the January 2019 IDOC HCV Guidelines, in response to Dr. Raba's requests. (Ex. 12, Chan Dep., at 181-83, 185, 186-89; Ex. 45, Emails between Dr. Raba, Dr. Chan and Dr. Patel).

109. Dr. Raba had requested that A1c not be included in the list of absolute exclusions. (Ex. 12, Chan Dep., at 193-95).

110. On September 29, 2020, Dr. Raba sent an email to Dr. Chan and Dr. Patel stating:

> Thank you for sharing with us the revised September 2020 Hepatitis C Guidelines which will help streamline the access to treatment for Hep C patients housed in the IDOC. We have noted a few additional, relatively minor, modifications that would clarify some aspects of the Guidelines. Once you have a chance to review the attached recommended changes, we will schedule a follow-up call to discuss these recommended changes.

(Ex. 46, September 29, 2020, email from Dr. Raba to Dr. Chan and Dr. Patel, with attachment (JDM 015378)).

111. Dr. Raba included a memo of proposed additional modifications which included the statements that:

- Pursuant to a recent conference call with OHS/Monitors, UIC Telehealth (Dr. M. Patel, Juliana Chan) modified the January 2019 HCV Guidelines for referral of HCV patients in the IDOC to UIC Telehealth program.

- The revised guidelines (September 2020) replaced or eliminated a number of exclusion criteria that were deemed to be clinically needless barriers (active alcoholism within past months, active IVDU within past 6 months, active illicit drug use within past 6 months, unable to commit to alcohol/drug abstinence long term, others) to the access to HCV treatment for the IDOC incarcerated population.

(Ex. 46, September 29, 2020, email attachment, at JDM 015392).

112. IDOC issued the revised Guidelines in January 2021 and reissued them in March after Wexford corrected certain mistakes. (Ex. 4, Fisher Dep., at 100-03). The March 2021 IDOC HCV Guidelines removed "elevated A1c" as an example of unstable medical conditions that was an absolute exclusion criteria. (Ex. 47, PX21, at 3; Ex. 12, Chan Dep., at 192-93; Ex. 6, Paul Dep., at 100).

113. The March 2021 IDOC HCV Guidelines changed the A1c "abnormal values" figure in the Review of Systems Checklist from 7 percent to 10.5 percent and removed the statement "do not send pt until the labs are in the normal range." (Ex. 47, PX21, at 10; Ex. 12, Chan Dep., at 199-201).

114. There is nothing in the March 2021 IDOC HCV Guidelines that requires elevated A1c to be addressed and corrected before an inmate is referred for HCV treatment. (Ex. 12, Chan Dep., at 201-02).

**Medical Basis for A1c Absolute Exclusion**

115. The IDOC HCV Guidelines purport to be based upon and "follow the latest recommendations" regarding HCV treatment as promulgated by AASLD, IDSA and the FBOP. (*See e.g.* Ex. 39, PX20, at 000435).

116. There is no medical reason that a person with elevated A1c cannot or should not receive appropriate DAA drug therapy for HCV infection. (Ex. 12, Chan Dep., at 54, 119; Ex. 6, Paul Dep., at 68; Ex. 15, Shicker Dep., at 89).

117. Dr. Paul testified that there is no medical reason that patients with elevated A1c or uncontrolled diabetes could not receive interferon-free HCV treatment, and that interferon-free

treatments were available as early as 2014. (Ex. 6, Paul Dep., at 40-41, 68; Ex. 8, Paul (*Miller I*) Dep., at 70). Using elevated A1c as an exclusionary factor for HCV treatment is not medically based. (Ex. 6, Paul Dep., at 70). Dr. Paul testified that HCV antiviral drug therapy can be used on patients with "uncontrolled diabetes." (Ex. 8, Paul (*Miller I*) Dep., at 70).

118. Dr. Shicker testified that the IDOC HCV Guidelines should be evidence-based and that he does not know of "any kind of evidence-based scientific reason" that elevated A1c should be an exclusion for HCV treatment. (Ex. 15, Shicker Dep., at 61, 89). Dr. Shicker testified that the IDOC HCV Guidelines were patient-specific "except for those exclusion criteria." (Ex. 15, Shicker Dep., at 66-67).

119. Dr. Meeks testified that medical care for IDOC patients should be evidence-based, and patient centered. (Ex. 14, Meeks Dep., at 57). Dr. Meeks does not have the expertise to determine whether there was a medical reason for designating elevated A1c as an absolute exclusion criteria for HCV treatment. He relied on the expertise of UIC. (Ex. 14, Meeks Dep., at 66-67, 79).

120. Dr. Meeks did not know the reason for including elevated A1c as an absolute exclusion criteria for HCV treatment. (Ex. 14, Meeks Dep., at 73). Dr. Meeks assumed the absolute exclusion for elevated A1c was based on a medical reason because he did not think an expert would insert that exclusion in the guidelines for no reason. (Ex. 14, Meeks Dep., at 95-96, 111-12).

121. If Dr. Meeks knew there was no medical reason that a patient with elevated A1c could not safely receive interferon-free HCV treatment he would not want elevated A1c to be an exclusion criteria in the IDOC HCV Guidelines. (Ex. 14, Meeks Dep., at 114-15).

122. Dr. Chan knew that there is no medical reason that patients with elevated A1c or uncontrolled diabetes could not receive interferon-free HCV treatment during the relevant period,

and that interferon-free treatments were available as early as 2014. (Ex. 12, Chan Dep., at 54, 119, 135). The need to treat a patient's elevated A1c is not a contraindication to interferon-free HCV treatment. (Ex. 12, Chan Dep., at 139, 142; Ex. 13, Patel Dep., at 33).

123. Dr. Chan believes the cost-benefit of providing HCV treatment weighs against providing treatment to inmates with "uncontrolled diabetes" because they will not survive anyway, and she considers A1c of 10 or greater to be uncontrolled diabetes. She considers A1c of 9 to be "fine" for receiving HCV treatment. (Ex. 12, Chan Dep., at 118-19).

124. All defendants knew, throughout the times at issue, that there was no medical reason that patients with elevated A1c 48or uncontrolled diabetes could not receive HCV treatment. (Ex. 6, Paul Dep., at 68; Ex. 4, Fisher Dep., at 118-20; Ex. 12, Chan Dep., at 54, 119, 135).

**Wexford's Global Medical Guidelines**

125. Wexford has Global Medical Guidelines that they use for some clients. (Ex. 4, Fisher Dep., at 26; Ex. 6, Paul Dep., at 28-29; Ex. 48, Wexford Response to Request for Admissions). Dr. Paul has participated in writing portions of the Wexford Global Medical Guidelines. (Ex. 6, Paul Dep., at 30). The Wexford Global Medical Guidelines are based on the current national guidelines for a particular disease. (Ex. 6, Paul Dep., at 33).

126. The Wexford Global Medical Guidelines included HCV treatment guidelines. (Ex. 4, Fisher Dep., at 184). Dr. Fisher and Dr. Paul participated in drafting the HCV section of the Wexford Global Medical Procedures. (*Id*. at 186-87). The Wexford Medical Advisory Committee approved the HCV section of the Wexford Global Medical Procedures. (*Id*. at 187-88).

127. Wexford utilized the FBOP and AASLD guidelines as well as the applicable standard of care in promulgating its treatment policies. (Ex. 7, Fisher (*Stafford*) Dep., at 92).

128. Wexford did not include any exclusion for patients with elevated A1c or diabetes in the HCV section of the Wexford Global Medical Guidelines. (*See e.g.* Ex. 49, Wexford Global HCV Guidelines (2019) (filed under seal); Ex. 4, Fisher Dep., at 191-92).

129. In the event of a conflict between Wexford's Global Medical Guidelines and the guidelines provided by IDOC, Wexford follows IDOC's guidelines. (Ex. 2, Matticks Dep., at 19; Ex. 7, Fisher (*Stafford*) Dep., at 92).

130. Dr. Paul understood that she was required to follow the IDOC HCV Guidelines because IDOC was Wexford's client. (Ex. 8, Paul (*Miller I*) Dep., at 47).

**UIC's HCV Telemedicine Guidelines**

131. UIC adopted and maintained its own "Hepatitis C (HCV) Illinois Department of Corrections Telemedicine Guideline" for treatment of IDOC patients, with versions created in 2016, 2019 and 2021. (Exs. 50, 51 and 52, PX12, 12A and 13; Ex. 12, Chan Dep., at 74-80, 99, 108).

132. Dr. Patel testified that he did not prepare the 2016 or 2019 UIC Guidelines and only saw them in passing prior to becoming the director of the telemedicine program in August 2019. (Ex. 13, Patel Dep., at 33-36). Dr. Chan testified that she did not know of the existence of the 2016 UIC Guidelines until she was asked to update them in 2019. (Ex. 12, Chan Dep., at 79-80).

133. However, Dr. Patel emailed a copy of the 2016 UIC Guidelines to Dr. Meeks, with a cc to Dr. Chan, on December 3, 2016, with a note stating, "as promised during our recent conversation." (Ex. 53, Patel email to Meeks, JDM 015331 (attachment not bate stamped)).

134. UIC did not include any exclusion for patients with elevated A1c or diabetes in the UIC Guidelines. (*See* Ex. 50, PX12; Ex. 51, PX12A; Ex. 52, PX13; Ex. 12, Chan Dep., at 89-90, 97; Ex. 13, Patel Dep., at 42-43).

135. Dr. Chan participated in creating/revising of the 2019 UIC HCV Guidelines. (Ex. 12, Chan Dep., at 99-100). The UIC guidelines contained a priority list for HCV treatment in which the highest priority included inmates with "confirmed cirrhosis or have clinical findings with cirrhosis." (Ex. 50, PX12; Ex. 51, PX12A; Ex. 52, PX13; Ex. 12, Chan Dep., at 92-94, 99-100). The 2019 UIC Guidelines contained a level 2 priority category for inmates with Fibrosis Scores of F3 or F4. (Ex. 51, PX12A; Ex. 12, Chan Dep., at 101).

136. Dr. Chan did not follow the UIC Guidelines in providing HCV treatment to IDOC inmates, but instead applied the IDOC HCV Guidelines including the absolute exclusion for elevated A1c. (Ex. 12, Chan Dep., at 106).

137. Dr. Paul and Wexford did not follow the Wexford Global Medical Guidelines in providing HCV treatment to IDOC inmates, but instead applied the IDOC HCV Guidelines including the absolute exclusion for elevated A1c. (See Ex. 10, Paul (*Handy*) Dep., at 10-11, 85).

138. Wexford followed the guidelines provided by its clients without regard to whether those medical guidelines met the applicable standard of medical care. (Ex. 7, Fisher (*Stafford*) Dep., at 92). Dr. Paul testified that the IDOC HCV Guidelines "was rigid for us." (Ex. 10, Paul (*Handy*) Dep., at 67-68). Dr. Paul testified that in ordering specific tests for inmates, she was following the IDOC HCV Guidelines and Dr. Chan's directives rather than her own clinical judgment. (Ex. 10, Paul (*Handy*) Dep., at 73, 81).

139. Wexford does not have a way of determining how many IDOC patients were denied HCV treatment because of the A1c exclusion. (Ex. 4, Fisher Dep., at 217-18; Ex. 6, Paul Dep., at 226).

**Plaintiff's HCV and Diabetes**

140. Plaintiff was diagnosed with HCV in 2014 and thus was HCV positive upon his incarceration with IDOC in June 2016. (Ex. 1, Miller Dep., at 54-55). Plaintiff underwent a FibroScan on June 11, 2015, upon referral from his primary care physician at that time. (Ex. 1, Miller Dep., at 55-56; Ex. 55, PX85, FibroScan Report (JDM 003903 and Miller RRCC (NR) 0038)). Plaintiff's Fibrosis Score at that time, one year before his June 2016 incarceration with IDOC, was F2 – described in the report as moderate liver scarring. (Ex. 55, PX85, Fibroscan Report).

141. Plaintiff's HCV positive status was documented by IDOC upon his incarceration. (*See* Ex. 56, Miller HCV Clinic Notes).

142. Plaintiff's HCV positive status and his requests for Fibrosis Score testing and HCV treatment were further documented repeatedly in his inmate medical file and in grievance forms. (*See e.g.* Ex. 54).

143. Defendants Wexford and Paul also received copies of Plaintiff's 2015 FibroScan report in or around May 2019 as part of discovery in a civil rights lawsuit Plaintiff filed against Defendant Wexford and others (*Miller I*). (Ex. 57, PX86, *Miller I* Wexford Supplemental Disclosures, at 3; Ex. 6, Paul Dep., at 130-32).

144. Plaintiff had likewise been diagnosed with type 2 diabetes prior to his incarceration with IDOC in June 2016. (Ex. 1, Miller Dep., at 46-47). Plaintiff's Type 2 Diabetes was documented by IDOC upon his incarceration. (*See* Ex. 54).

145. Plaintiff's type 2 diabetes diagnosis and his requests for effective diabetes treatment were further documented repeatedly in his inmate medical file and in grievance forms. (*See* Ex. 54).

146. In February 2019 Plaintiff was transferred from Pinckneyville CC to Lawrence CC. On February 20, 2019, the Wexford Medical Director at Lawrence CC, Dr. Lynn Pittman, conducted a medical examination of Plaintiff. (Ex. 1, Miller Dep., at 56-57).

147. Dr. Pittman referred Plaintiff to be seen by Dr. Paul *via* telemedicine. (Ex. 1, Miller Dep., at 58, 60).

**Denial of HCV Treatment to Plaintiff**

148. On August 22, 2019, Plaintiff had a telemedicine appointment with Dr. Paul concerning his HCV. At that time, Dr. Paul referred Plaintiff for a FibroScan. (Ex. 1, Miller Dep., at 78-79; Ex. 6, Paul Dep., at 109-114; Ex. 58, PX66, Progress Note). As the "Rationale for Referral" Dr. Paul stated: "REQUIRED IDOC/OHS HCV GUIDELINES." (Ex. 59, PX67, Fibroscan Order).

149. The IDOC HCV Guidelines provided that patients with confirmed HCV should have a FibroScan "unless they have absolute exclusion criteria." (Ex. 8, Paul (*Miller I*) Dep., at 35, 48).

150. Blood work taken on June 4, 2019, showed Plaintiff's A1c level to be 13.7%. (Ex. 58, PX66, Progress Note). Defendant Paul documented in her notes on August 22, 2019, that:

> Above labs were reviewed which showed low APRI and intact liver function. Fibroscan testing is indicated. If the fibroscan fibrosis score meets IDOC/OHS HCV guideline treatment criteria, the patient will be referred to be seen by UIC Liver Clinic/Telemedicine to be evaluated for HCV therapy.

(*Id.*).

151. Dr. Paul told Plaintiff that in order to be even considered for HCV treatment his A1c had to be lowered. (Ex. 1, Miller Dep., at 70, 79-80; Ex. 8, Paul (*Miller I*) Dep., at 72, 73). Dr. Paul disagreed with the absolute exclusion criteria for elevated A1c. (Ex. 8, Paul (*Miller I*) Dep., at 73, 91-92, 93-94). There is no evidence that Dr. Paul told Plaintiff that the criteria that excluded him

from HCV treatment was not medically based. In August 2019, Plaintiff was pursuing a lawsuit (*Miller I*) related to denial of medical care while at Pinckneyville CC, in which he sought a judgment compelling IDOC and Wexford "to immediately treat Plaintiff for Hepatitis C." (Ex. 70, Nineth Amended Complaint (*Miller I* Doc. 183), at 13).

152. Dr. Paul testified that if Plaintiff's Fibrosis Score was F3 or above he would be eligible for referral to HCV treatment. (Ex. 6, Paul Dep., at 115).

153. Plaintiff's FibroScan revealed a Fibrosis Score of F3 – reflecting severe fibrosis. (Ex. 60, PX 68, Fibroscan Report; Ex. 6, Paul Dep., at 118, Ex. 8, Paul (*Miller I*) Dep., at 44, 63-64). Plaintiff's FibroScan revealed that his Fibrosis Score had progressed from an F2 to an F3 within approximately four years. (Ex. 4, Paul Dep., at 133-34; Ex. 55, PX85, Fibroscan Report; Ex. 60, PX68, Fibroscan Report). HCV can advance significantly in that period. (Ex. 8, Paul (*Miller I*) Dep., at 43).

154. Blood work taken on December 9, 2019, showed Plaintiff's A1c level to be 11.1%, which was lower than his level in June 2019. (Ex. 61, PX71, Progress Note).

155. On December 12, 2019, Plaintiff had a telehealth visit with Dr. Paul. (Ex. 61, PX71, Progress Note; Ex. 6, Paul Dep., at 139-40). On December 12, 2019, Dr. Paul consulted with Dr. Chan concerning referral of IDOC patients with F3 and F4 Fibrosis Scores and high A1c to Dr. Chan for HCV treatment. (Ex. 12, Chan Dep., at 207-09).

156. Nurse Staci DeWeese, at the direction of Dr. Paul, wrote in an email to Dr. Chan:

> Hello Dr. Chan,
>
> I have a question to ask before Dr. Paul makes a referral. We recently have two offenders with F3/F4 fibroscans, however they are both DM with very high A1C. We know that in the past they will not be treated or considered until the A1C is below 7. With that being

> said do we still need to work them up with the labs and ultrasound and then send you new packet and let you tell us they do not qualify at this time?

(Ex. 62, PX72, at MILLER000498; Ex. 12, Chan Dep., at 207-08; Ex. 6, Paul Dep., at 145-47).

157. Dr. Chan responded that Dr. Paul should not refer those patients:

> Hi Staci.
>
> You can continue to work up the patient but do not send them or the med records until they have normalize[d] their A1c (or other issues).

(Ex. 62, PX72, at MILLER000498; Ex. 12, Chan Dep., at 208).

158. Dr. Paul documented in her notes on December 12, 2019, that:

> Per the January 25, 2019 IDOC/OHS HCV guidelines, patient's poor diabetic control . . . precludes his review for HCV antiviral therapy. Email correspondence from Dr. Juliana Chan sent today states that patients with HbA1c >7.0% should not be referred to be seen by UIC Liver Clinic/Telemedicine. These guidelines require HbA1c to be less than 7.0% to be considered for HCV antiviral therapy.

(Ex. 61, PX71; Ex. 6, Paul Dep., at 143-44).

159. Dr. Paul understood that Dr. Chan's direction not to send the subject inmates to UIC was based on the A1c exclusion in the January 2019 IDOC HCV Guidelines. (Ex. 6, Paul Dep., at 147-48). Dr. Paul understood that Wexford's policy was that she was required to follow Dr. Chan's instructions and the IDOC HCV Guidelines. (Ex. 6, Paul Dep., at 147-48, 179; Ex. 8, Paul (*Miller I*) Dep., at 73; *see* Ex. 2, Matticks Dep., at 42).

160. Dr. Chan instructed Dr. Paul not to refer the unnamed F3 and F4 patients (one of which was Plaintiff) because of the absolute exclusion criteria in the January 2019 IDOC HCV Guidelines. (Ex. 12, Chan Dep., at 209-10).

161. Dr. Chan knew that Fibrosis Scores of F3 and F4 are indicia of advancing liver disease. (Ex. 12, Chan Dep., at 217). Dr. Chan knew there was no medical reason that UIC could not provide HCV treatment to the referenced inmates at the same time the IDOC medical provider was providing treatment for their elevated A1c. (Ex. 12, Chan Dep., at 220-21).

162. If Plaintiff had been referred to UIC in December 2019 or January 2020, he would have been able to complete HCV treatment before his release in June 2020. (Ex. 12, Chan Dep., at 246-47; Ex. 6, Paul Dep., at 184-85).

163. Dr. Paul did not refer Plaintiff to UIC because of the IDOC Guidelines, and because of the Wexford corporate policy that required her to follow the IDOC Guidelines. (Ex. 6, Paul Dep., at 147-48).

164. Dr. Paul informed Plaintiff that he could not receive HCV treatment because his A1c level was too high. (Ex. 61, PX71; Ex. 6, Paul Dep., at 144). There is no evidence that Dr. Paul informed Plaintiff that the A1c exclusion was without a medical basis or that medical literature and FBOP guidelines suggested he should be given priority for treatment.

165. Dr. Paul did, however, refer Plaintiff for a liver/spleen ultrasound to look for advanced liver disease. (Ex. 63, PX73, Ultrasound Order; Ex. 6, Paul Dep., at 142-43). Plaintiff underwent a liver/spleen ultrasound on January 16, 2020. The "findings" of the ultrasound report state: "The liver demonstrates mild heterogeneous echotexture and mild nodular contour. This is consistent with mild cirrhosis." (Ex. 64, PX74, Ultrasound Report; Ex. 6, Paul Dep., at 150-51).

166. Dr. Paul testified that "you have cirrhosis or you don't. Mild cirrhosis is cirrhosis." (Ex. 6, Paul Dep., at 197).

167. Upon review of the liver/spleen ultrasound report, Dr. Paul referred Plaintiff for an EGD endoscopic screening for the presence of esophageal varices. As the "Rationale for Referral" Defendant Paul stated: "HCV. CIRRHOSIS." (Ex. 65, PX78, EGD Order; Ex. 6, Paul Dep., at 75, 154-55).

168. According to the AASLD, "the rupture of esophageal varices (EVs) remains a common and severe complication of cirrhosis with a mortality rate still reaching 20%. Screening for EVs is crucial because it provides the ability to reduce the risk of a first bleeding episode."[5]

169. Wexford approved the referral through its Utilization Management process. The authorization form stated: "EGD screen for varices approved by Dr. Paul. Patient with HCV Cirrhosis. Required per IDOC/OHS HCV guidelines." (Ex. 66, PX80; Ex. 6, Paul Dep., at 157).

170. The standard of care is to obtain an EGD if a patient has cirrhosis. (Ex. 6, Paul Dep., at 195). There is no evidence that the EGD was performed before Plaintiff was released in June 2020.

171. On February 6, 2020, Dr. Paul prepared an Offender Outpatient Progress Note for Plaintiff, which listed his F3 Fibrosis Score and the ultrasound finding of "mild cirrhosis." Under "Plans" Dr. Paul entered:

> Site to email Dr. Juliana Chan regarding this patient – detailing to her the information listed in the 'prior studies' section of this progress note. Ask if she would want this patient formally referred to UIC Liver Clinic/Telemedicine to be evaluated for HCV antiviral therapy at this time. Cc Dr. Paul on the email correspondence.

(Ex. 67, PX81, Progress Note, at Bates #000452; Ex. 6 Paul Dep., at 166-68).

---

5 *See*, https://aasldpubs.onlinelibrary.wiley.com/doi/pdf/10.1002/cld.101

172. On February 11, 2020, at Dr. Paul's instruction, Nurse Heather Ellison emailed Dr. Chan with the lab results for Plaintiff and the other inmate referenced in the December 19, 2019, email exchange, including the liver/spleen ultrasound report for Plaintiff, and asked "[d]o you want these pts formally referred to UIC Liver Clinic/Telemedicine to be evaluated for antirviral therapy at this time?" (Ex. 67, PX81, at Bates #000451; Ex. 6, Paul Dep., at 158-60). The most recent A1c results for both inmates were 9%. (Ex. 67, PX81, at Bates #000451).

173. On February 12, 2020, Dr. Chan responded "[y]es please, please send the needed documents to get these patients evaluated. Can you in the meantime please have the doctors at Lawrence evaluate and treat their Diabetes and get their A1c better controlled, below 8." (Ex. 68, PX26, at JDM 003124). Dr. Chan's instruction was not in conformance with the January 2019 IDOC Guidelines. (Ex. 12, Chan Dep., at 299).

174. Dr. Paul did not take steps to refer Plaintiff for HCV treatment and testified "that's not a doctor thing to do." (Ex. 6, Paul Dep., at 161-62, 165).

175. Dr. Chan chose whether to follow the absolute exclusions in the IDOC HCV Guidelines in individual cases, including the length-of-stay exclusion. (Ex. 10, Paul (*Handy*) Dep., at 39-40, 42, 56-58, 88). Dr. Paul requested exceptions to the absolute exclusion criteria from Dr. Chan for some patients. (Ex. 10, Paul (*Handy*) Dep., at 56-57, 67, 87-88). There is no evidence that Dr. Paul requested an exception to the A1c absolute exclusion criteria for Plaintiff.

176. On May 28, 2020, Nurse Ellison emailed Dr. Chan asking, "if you want these two offenders referred or not?" (Ex. 67, PX81, at 000450). Dr. Chan responded that they should refer the other inmate (whose A1c was 8.5) but instructed as to Plaintiff "please have his A1c in the 7 to low

8's before sending him to UIC Liver telemed." (*Id.*). Dr. Chan testified that lab results showed that Plaintiff's A1c was measured at 10.2 on May 27, 2020. (Ex. 12, Chan Dep., at 230-31).

177. Dr. Paul conducted a telehealth HCV chronic care clinic appointment with Plaintiff on June 18, 2020. Dr. Paul had not seen Plaintiff since December 12, 2019. (Ex. 6, Paul Dep., at 170). Dr. Paul prepared an Offender Outpatient Progress Note for the June 18, 2020 appointment, which stated:

> Patient met HCV treatment criteria per the IDOC/OHS HCV guidelines, but treatment was not initiated due to his poorly controlled diabetes.

(Ex. 69, PX83, Progress Note; Ex. 6, Paul Dep., at 171).

178. The reason Dr. Paul did not refer Plaintiff for HCV treatment was the A1c absolute exclusion and Dr. Chan's instruction not to refer him until his A1c was normalized. (Ex. 6, Paul Dep., at 169-70).

179. Dr. Paul understood that Wexford's corporate policy required her to follow the January 2019 IDOC HCV Guideline. (Ex. 6, Paul Dep., at 175). The reason Dr. Chan instructed Dr. Paul not to refer Plaintiff for HCV treatment was his elevated A1c and the absolute exclusion in the January 2019 IDOC HCV Guidelines. (Ex. 12, Chan Dep., at 237-40; Ex. 6, Paul Dep., at 188).

**Plaintiff's Complaints**

180. Plaintiff informed all of the Defendants with whom he interacted that he was being denied treatment for his HCV because of his A1c. (*See e.g.* Ex. 54, Grievance Records).

**Dr. Paul's Testimony in Miller I**

181. In August 2017, while Plaintiff was located at the Pinckneyville CC, Plaintiff filed the *Miller I* lawsuit in this Court against Dr. Shicker, Dr. Meeks and Wexford, as well as other

individuals who are not defendants in this case, regarding lack of proper medical care. One of Plaintiff's claims was that he was being wrongfully denied treatment for HCV. (Ex. 1, Miller Dep., at 31; Ex. 70, Ninth Complaint (*Miller I* Doc. 183), ¶¶ 24, 27 and at p. 13).

182. Dr. Paul was not named as a defendant in *Miller I*. (Ex. 6, Paul Dep., at 127). In November 2019, while Plaintiff and Dr. Paul had a doctor-patient relationship, representatives of Wexford's legal or risk management department contacted Dr. Paul and requested or instructed her to act as Wexford's expert witness in *Miller I* "to testify regarding a lack of merit to Plaintiff's allegations." (Ex. 6, Paul Dep., at 121-24; Ex. 71, PX69, *Miller I* Wexford Third Supplemental Disclosures, at 3).

183. Plaintiff did not consent to Dr. Paul – his treating doctor – testifying against him as a retained expert in a case to which she was not a party. Plaintiff did not consent to Dr. Paul communicating with Wexford's lawyers regarding his medical care. (Ex. 6, Paul Dep., at 129-30).

184. On or about February 4, 2020, Dr. Paul received notice to give a deposition on February 10, 2020, as Wexford's expert witness in the *Miller I* lawsuit. (Ex. 72, PX75; Ex. 6, Paul Dep., at 151-52).

185. On February 5, 2020, Dr. Paul received the report of Plaintiff's liver/spleen ultrasound showing cirrhosis. (Ex. 73, PX77; Ex. 6, Paul Dep., at 153-54).

186. On February 6, 2020, Dr. Paul directed the Lawrence CC to contact and provide Dr. Chan with Plaintiff's lab results, and to "ask if she would want this patient formally referred to UIC Liver Clinic/Telemedicine to be evaluated for HCV antiviral therapy at this time." (Ex. 67, PX81, at Bates #000452; Ex. 6, Paul Dep., at 158-60).

187. On February 10, 2020, Dr. Paul gave a deposition in the *Miller I* lawsuit in which she testified that Plaintiff had received "adequate community standard treatment while he's been an inmate in the Illinois Department of Corrections." (Ex. 8, Paul (*Miller I*) Dep., at 96).

**Plaintiff's HCV Treatment After Release**

188. Plaintiff started treatment for his HCV approximately four months after he was released from IDOC and achieved SVR in May 2021. (Ex. 1, Miller Dep., at 113-14; Ex.22, Access Health Records (excerpt).

189. Plaintiff experienced pain prior to and while he was incarcerated at Lawrence CC, and the pain went away after he was treated for his HCV. (Ex. 1, Miller Dep., at 128-30).

190. Plaintiff submitted grievances in which he noted that he was being denied HCV treatment. *See Miller v. Baldwin*, No. 3:17-cv-00859-NJR-DGW, 2028 U.S. Dist. LEXIS 215088 *9 (S.D. Ill. July 13, 2018) ("Miller filed a grievance on May 7, 2017 that specifically lists complaints about his medical treatment …[.] It also states complaints regarding ongoing deliberate indifference to his Hepatitis C, Diabetes, eye glasses and mental health treatment."); Ex. 54, Grievance Records).

191. The cost of HCV treatment when DAA drugs first came out was $90,000 to $100,000 for a course of treatment, although the cost to IDOC was roughly 25% lower by working with UIC. (Ex. 15, Shicker Dep., at 83-84).

**ARGUMENT**

**I. APPLICABLE STANDARDS**

Plaintiff moves for summary judgment as to liability on his § 1983 Eighth Amendment claim against Dr. Chan, Dr. Paul, and Wexford, for deliberate indifference to his serious medical needs. Summary judgment must be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P 56(c); *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 673 (7th Cir. 2016). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of events. *Gekas v. Vasiliades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009); *Stafford v. Carter*, No. 1:17-cv-00289-JMS-MJD, 2018 U.S. Dist. LEXIS 155866, at *22 (S.D. Ind. Sep. 13, 2018).

The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014); *Stafford*, at *23. The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of operating Engineers, Local union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003); *Stafford*, at *23.

**A. The Eighth Amendment Standard**

Under the Eighth Amendment, prison officials are responsible for providing healthcare to incarcerated persons who cannot obtain healthcare on their own. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976); *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021). The Eighth Amendment prohibits deliberate indifference to prisoners' serious medical needs because it constitutes an "unnecessary and wanton infliction of pain." *Gamble*, 429 U.S. at 104; *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019). Section 1983 grants a private right of action against a "person" who acts under color of state law to deprive another of rights under federal law, including the Constitution. *Howell*, 987 F.3d at 653. Private companies and their employees can act under color of state law and thus can be liable under § 1983. *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014), citing *Wyatt v. Cole*, 504 U.S. 158, 161-62 (1992) and *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982). A business that contracts to provide medical care to prisoners undertakes "freely, and for consideration, responsibility for a specific portion of the state's overall [constitutional] obligation to provide medical care for incarcerated persons." *Shields*, 746 F.3d at 797, quoting *Rodriquez v. Plymouth Ambulance Service*, 577 F.3d 816, 822 (7th Cir. 2009).

To establish an Eighth Amendment violation arising out of inadequate medical treatment, a prisoner must prove "deliberate indifference to [his] serious medical needs." *Gamble*, 429 U.S. at 104. A successful deliberate indifference claim is comprised of both an objective and subjective element. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). To establish the objective element, the plaintiff must demonstrate that the deprivation he suffered was "sufficiently serious; that is, it must result in the denial of the minimal civilized measure of life's necessities." *Id.* quoting *Farmer v.*

*Brennan*, 511 U.S. 825, 834 (1994). In the medical care context, this objective element is satisfied when the plaintiff demonstrates that his medical need itself was sufficiently serious. *Roe*, 631 F.3d at 857. A medical need is sufficiently serious if the plaintiff's condition "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention." *Id.* quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *Roe*, 631 F.3d at 857; *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). "[T]he Eighth Amendment 'protects [an inmate] not only from deliberate indifference to his or her *current* serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to *future* health." *Roe*, 631 F.3d at 857, quoting *Board v. Farnham*, 394 F.3d 469, 479 (7th Cir. 2005).

To establish the subjective element, the plaintiff must demonstrate that prison officials acted with a "sufficiently culpable state of mind" to support liability under § 1983. *Roe*, 631 F.3d at 857; *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). Although negligence or inadvertence will not support a deliberate indifference claim, the plaintiff need not establish that prison officials actually intended harm to befall him from failure to provide adequate care. It is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk. *Roe*, 631 F.3d at 857; *Greeno*, 414 F. 3d at 653. A medical provider acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible did not actually base the decision on such a judgment. *Roe*, 631 F.3d at 857; *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008).

Inmate medical care decisions must be fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm and the efficacy of available treatments. *Roe*, 631 F.3d at 859. While it is permissible to consult a carefully crafted protocol to ensure the maintenance of legally and medically acceptable standards of care, in the prison context such protocols must ensure that prison officials fulfill their responsibility to provide constitutionally adequate care to each individual inmate with reference to his particularized medical need. Prison officials must make a determination that application of the protocols result in adequate medical care *in the individual case*. *Roe*, 631 F.3d at 860, citing *Johnson v. Wright*, 412 F.3d 398, 406 (2nd Cir. 2005) (jury could find defendants acted with deliberate indifference by reflexively applying NY DOC hepatitis C guidelines when they were on notice that the medically appropriate decision could be to depart from the guidelines in order to provide Ribavirin treatment). *See also Roe*, 831 F.3d at 859 ("Indeed, Dr. Elyea has not presented us with any case from any court in which a similar, *categorical* treatment policy has been upheld against a constitutional challenge." (emphasis in original)). The choice of an easier and less efficacious treatment can demonstrate that the actor displayed deliberate indifference rather than an exercise of professional judgment. *Gamble*, 429 U.S. at 104 n.10; *Roe*, 631 F.3d at 861.

**B. The *Monell* Standard**

Municipal governments and private companies can be sued under § 1983 for violation of constitutional rights but are not subject to respondeat superior liability for the acts of their employees. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 700-01 (1978); *Shields*, 746 F.3d at 786; *Howell*, 987 F.3d at 653-54; *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378-79 (7th Cir. 2017) ("[A] private corporation that has contracted to provide essential government services is subject to at

least the same rules that apply to public entities."). The critical question under *Monell* is whether a corporate policy or custom caused the harm, or if instead the harm resulted from the acts of the institution's agents. If institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability can arise. *Glisson*, 849 F.3d at 378-79, citing *L.A. County v. Humphries*, 562 U.S. 29 (2010).

A plaintiff can establish *Monell* liability by showing: (1) that the alleged unconstitutional action implements or executes an express institutional policy adopted and promulgated by that body's officers; (2) that the unconstitutional action occurred pursuant to an institutional custom even though such a custom has not received formal approval through the body's official decision making channels; or (3) that the unconstitutional action occurred pursuant to direction of an official whose edicts or acts may fairly be said to represent official policy. *Monell,* 436 U.S. at 690-91; *Howell*, 987 F.3d at 653; *Glisson*, 849 F.3d at 379. There is no bright line rule that establishes what constitutes a widespread custom or practice under *Monell*. *Wilson v. Cook County*, 742 F.3d 775, 780 (7th Cir. 2014). Such a custom may be established by evidence of policymaking officials' knowledge and acquiescence to the unconstitutional practice. *McNabola v. Chicago Transit Authority*, 10 F.3d 501, 511 (7th Cir. 1993). Sufficient evidence may include proof that the practice was so "long standing or widespread" that it would "support the inference that policy making officials 'must have known about it but failed to stop it.'" *Id*. (quoting *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991). *See also Broaddus v. Wexford Health Sources, Inc.*, No. 15-cv-1339, 2018 U.S. Dist. LEXIS 54706 *14, 2018 WL 1565603 (S.D. Ill. March 30, 2018). *Monell* does not articulate an exhaustive list of circumstances that can establish an official policy. The critical element is that the

unconstitutional act be shown to have been authorized or directed at the policymaking level. *Glisson*, 849 F.3d at 379.

An institutional decision to "do nothing" where inaction is likely to result in the violation of the constitutional rights of inmates with serious medical conditions can constitute deliberate indifference subjecting the institution to § 1983 liability. *See Glisson*, 849 F.3d at 382; *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction"); *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) ("[i]naction, too, can give rise to liability in some instances if it reflects 'a conscious decision not to take action'") (quoting *Glisson*); *Cohn v. Wexford Health Sources, Inc.*, No. 3:19-CV-00376-NJR, 2022 U.S. Dist. LEXIS 127089 *6, 2022 WL 2802304 (S.D. Ill. July 18, 2022) ("There is a disputed fact as to whether Wexford made a conscious policy choice not to implement a policy which resulted in Cohn's disruption of desperately needed medication.") (citing *Dean*).

## II. PLAINTIFF'S RIGHT TO JUDGMENT AS A MATTER OF LAW

### A. Plaintiff Has Established the Objective Element – A Serious Medical Need

There is no dispute that chronic HCV constitutes a serious medical condition, as reflected in numerous judicial decisions. *See Stafford v. Carter*, No. 1:17-cv-00289-JMS-MJD, 2018 U.S. Dist. LEXIS 155866, at *35 (S.D. Ind. Sep. 13, 2018); *Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1299 (N.D. Fla. 2017); *Parks v. Blanchette*, 144 F. Supp. 3d 282, 314 (D. Conn. 2015); *Hilton v. Wright*, 928 F. Supp. 2d 530, 547-48 (N.D. N.Y. 2013). The record in this case likewise establishes beyond dispute that HCV, a disease that adversely affects the functioning of the liver and puts patients at an increased risk of developing cirrhosis as well as HCC, is a serious medical condition that poses a

substantial risk of serious damage to the patient's current and future health if not treated. (*See* Plaintiff's Statement of Undisputed Material Facts ("PSOF") ¶¶ 36, 41, 42, 47, 50, 51, 52). It is undisputed that Plaintiff had HCV with a Fibrosis Score that progressed from F2 to F3 between 2014 and 2019. (PSOF ¶¶ 140-146, 153). It is undisputed that Plaintiff was denied treatment for his HCV while incarcerated based on the A1c absolute exclusion in the IDOC HCV Guidelines. (PSOF ¶¶ 148-179).

**B. Plaintiff Has Established the Subjective Element – Deliberate Indifference**

**(1) Dr. Chan**

The record establishes as a matter of law that Dr. Chan acted with deliberate indifference to IDOC patients in general, and Plaintiff in particular, by denying HCV treatment based on a medically unfounded A1c "absolute exclusion" which she herself approved and indeed inserted into the IDOC HCV Guidelines.

**(a) Dr. Chan's Knowledge**

Dr. Chan, through her education, training and experience, had knowledge of the serious risk that HCV poses to the patient's health, and of the importance, benefits and efficacy of available treatment options. (*See* PSOF ¶¶ 21-22, 36-38, 42, 45-46, 50, 53, 55). Dr. Chan was directly involved in developing, reviewing and revising the IDOC HCV Guidelines. (PSOF ¶¶ 67-68, 78). Dr. Chan knew there was no medical reason to exclude IDOC patients with elevated A1c or "uncontrolled diabetes" from HCV treatment. (PSOF ¶¶ 116-122, 124). Dr. Chan knew that the historical "contraindication" of diabetes was *only* for HCV treatment protocols that included interferon (PSOF ¶ 74, 76) and that interferon-free treatment protocols were widely available at least by 2014 – long before Plaintiff's incarceration and the implementation of the applicable IDOC HCV

Guidelines. (PSOF ¶¶ 57, 58-59). Even in 2014, Dr. Chan *disagreed* with the statement in the IDOC Guidelines that A1c above 7.5 was a contraindication for HCV treatment, but she *never* expressed that disagreement to IDOC. (PSOF ¶ 75).

Further, Dr. Chan had knowledge that the A1c absolute exclusion in the IDOC HCV Guidelines was contrary to guidance propounded by authoritative agencies. For example, throughout the relevant period the FBOP issued guidelines for the evaluation and management of chronic HCV (which Dr. Chan admitted she reviewed in conjunction with revising the IDOC Guidelines (PSOF ¶ 71)) and those FBOP guidelines did not contain any exclusion based on diabetes or A1c. (PSOF ¶¶ 61-63). UIC's own HCV guidelines pertaining to IDOC patients, which Dr. Chan revised in 2019 and was aware of in 2016 (PSOF ¶¶ 131, 133, 135), likewise did not contain any exclusion related to diabetes or A1c. (PSOF ¶ 134). Dr. Chan also had knowledge that excluding diabetic patients from HCV treatment exacerbated their health risks. At least by May 2017, the FBOP guidelines listed elevated A1c (diabetes mellitus) as a second-level *priority* for treatment because it is a condition associated with a more rapid progression of fibrosis. (PSOF ¶¶ 61, 102). The FBOP priority is consistent with medical literature published at the time suggesting that HCV patients with diabetes are at risk for worse outcomes, including more rapid progression of fibrosis and higher risk of development of cirrhosis and HCC, and that treating the patients' HCV can have a positive impact on their diabetes. (PSOF ¶¶ 79, 101, 103). As far back as 2014 diabetes was considered a "high priority" for HCV treatment according to AASLD/IDSA standards. (PSOF ¶ 100).

**(b) Dr. Chan's Direct Involvement in Creating the A1c Exclusion**

Knowing the risks and harm associated with HCV and the benefits of treatment, Dr. Chan nevertheless took affirmative steps to prevent inmates from receiving treatment. (*See* PSOF ¶¶ 80-

85, 86-89). Dr. Chan and Dr. Patel worked on revisions to the IDOC HCV Guidelines in May and June 2017, during which Dr. Chan consulted the guidelines of the AASLD, IDSA and FBOP. (PSOF ¶ 81). Dr. Chan forwarded proposed revised guidelines to Dr. Patel which included a change under which "elevated A1c" became an across-the-board absolute exclusion criteria for all genotypes without regard to the contemplated drug therapy – whether interferon-based or interferon-free. The proposed 2017 modifications removed elevated A1c from the list of contraindications, because interferon was no longer part of common HCV treatment protocols, but instead made it a blanket exclusion. (PSOF ¶ 82, 84). Dr. Chan created a "Review of Systems Checklist" form to be used in implementing the revised 2017 IDOC Guidelines, which stated that if A1c is greater than 7 percent, "have patient see IDOC Physician before refer to UIC HCV Telemedicine Clinic. Do not send until the labs are within normal range." (PSOF ¶¶ 86-89). Dr. Chan added that restrictive element to the revised guidelines even though she had known from at least 2014 that A1c above 7 percent, or indeed any level, was not a contraindication for HCV treatment. (PSOF ¶ 75).

The proposed revised Guidelines that Dr. Chan forwarded to Dr. Patel also included a new statement that they were "in line with" recommendations of the FBOP, but in fact the new A1c absolute exclusion was directly *contrary* to the FBOP guidelines which made diabetes a second-level priority for treatment. (PSOF ¶¶ 83, 103). Dr. Patel forwarded the proposed revised Guidelines to Dr. Meeks, and IDOC implemented the revised Guidelines in December 2017. (PSOF ¶¶ 85, 91).

Under the new Guidelines, IDOC inmates with elevated A1c would be absolutely excluded from receiving HCV treatment even if they had Fibrosis Scores of F3 or F4 and/or had cirrhosis. As written, the exclusion would prevent such inmates from receiving a FibroScan. (PSOF ¶¶ 90, 96).

The A1c absolute exclusion was carried over into the 2018 and 2019 IDOC HCV Guidelines, and thus was applied to deny Plaintiff treatment during the relevant period. (PSOF ¶¶ 91-95).

**(c) Dr. Chan's Arbitrary Enforcement of the A1c Exclusion**

Dr. Chan not only added the A1c absolute exclusion to the IDOC Guidelines, but she also took an active role in ensuring that the exclusion was enforced to deny inmates HCV treatment based on their A1c level, including inmates with documented severe fibrosis. (*See* PSOF ¶¶ 155-160). Thus, on December 12, 2019, Nurse DeWeese at Lawrence CC (at Dr. Paul's direction) contacted Dr. Chan and advised that "we recently have two offenders with F3/F4 fibroscans, however they are both DM with very high A1c." Nurse DeWeese stated, "[w]e know that in the past they will not be treated or considered until the A1c is below 7" and asked "do we still need to work them up with the labs and ultrasound and then send you [a] new packet and let you tell us they do not qualify at this time?" (PSOF ¶¶ 155-156). One of those unnamed inmates was Plaintiff. Dr. Chan knew that Fibrosis Scores of F3 and F4 are indicia of advancing liver disease (F4 is deemed cirrhosis according to Dr. Chan's own published paper) and that there was no medical reason that UIC could not provide HCV treatment at the same time the IDOC medical provider was providing treatment for elevated A1c. (PSOF ¶¶ 146, 161). Nevertheless, Dr. Chan responded to Nurse DeWeese that "[y]ou can continue to work up the patient but do not send them or the med records until they have normalize[d] their A1c." (PSOF ¶ 157, 160). Dr. Paul therefore did not refer Plaintiff or the other unnamed inmate for HCV treatment. (PSOF ¶¶ 158, 159).

Thereafter, Dr. Chan directed that Lawrence CC should not refer Plaintiff specifically to UIC for HCV treatment because of his A1c level, based on the A1c absolute exclusion in the IDOC HCV Guidelines. (PSOF ¶¶ 171-173, 176-179). On February 12, 2020, Lawrence CC sent relevant lab

results to Dr. Chan (which showed Plaintiff had a Fibrosis Score of F3 and cirrhosis) and asked her whether to refer Plaintiff and another inmate (both with A1c of 9) to UIC for evaluation for HCV treatment. (PSOF ¶ 172). Dr. Chan responded, "please send the needed documents to get these patients evaluated" but *also* said "please have the doctors at Lawrence evaluate and treat their Diabetes and get their A1c better controlled, below 8." (PSOF ¶173). Referring patients with A1c of 9 (or anything above 7) for HCV treatment was not in conformance with the January 2019 IDOC HCV Guidelines (*Id.*) and Lawrence CC did not refer either Plaintiff or the other inmate to UIC. (*See* PSOF ¶¶ 174, 176). On May 28, 2020, Lawrence CC again asked Dr. Chan whether she wanted Plaintiff, and the other inmate, referred to UIC for evaluation for HCV treatment. (PSOF ¶ 176). As to Plaintiff (whose most recent A1c level was 10.2), Dr. Chan responded, "please have his A1c in the 7 to low 8's before sending him to UIC Liver telemed." As to the other inmate (whose A1c was 8.5), Dr. Chan responded that Lawrence CC should refer him to UIC. (*Id.*).

Dr. Chan used a medically baseless exclusion of her own creation to deny HCV treatment to Plaintiff and other inmates. Further, she exercised a unilateral and arbitrary discretion to ignore or redefine the A1c level at which she would allow an inmate to be referred for treatment (7%, 9%, 7.5%, 10.2%, "7 to low 8's", "normalized"). The A1c exclusion, which had no basis in medicine, thus also had no valid application other than what Dr. Chan dictated at any given time. (*See* PSOF ¶ 123 (Dr. Chan believes cost benefit weighs against providing HCV treatment to inmates with "uncontrolled" A1c of 10, 11 or 12 because they are not going to survive anyway but A1c of 9 is okay for HCV treatment)). The fact that the *Lippert* Monitor eventually required IDOC to remove the A1c exclusion (as a "clinically needless barrier" to treatment) confirms what Dr. Chan freely admitted – that the A1c exclusion was a baseless and non-medical barrier to HCV treatment. (*See*

PSOF ¶¶ 109-112; *Nance v. Pollion*, No. 16-cv-875-NJR, 2020 U.S. Dist. LEXIS 52803 *14, 2020 WL 1472067 (S.D. Ill. March 26, 2020)).

Dr. Chan's conduct constitutes deliberate indifference to Plaintiff's serious medical needs. *See Roe*, 631 F.3d at 867 (affirming jury verdict against IDOC Medical Director for implementing policy that required inmate to have at least two years remaining on sentence to receive HCV treatment); *Gordon v. Schilling*, 937 F.3d 348, 359 (4th Cir. 2019) ("And Schilling's consistent failure to revise the Guidelines to remove the parole-eligibility exclusion constitutes personal involvement in the denial of HCV treatment for Gordon."); *McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004) (concluding that prison officials' personal involvement was sufficiently alleged where they were responsible for continuing and enforcing policies that denied HCV treatment).

**(2) Dr. Paul**

**(a) Dr. Paul's Knowledge**

Dr. Paul, through her education, training and experience, had knowledge of the serious risk that HCV poses to the patient's health, and of the importance, benefits and efficacy of available treatment options. (*See* PSOF ¶¶ 10-11, 13-14, 37, 45, 47, 50, 55, 58, 103). As Wexford's Chronic Disease and Case Management Director, Dr. Paul directs the care of 3,000 to 4,000 HCV patients per year. (PSOF ¶¶ 10-11). Dr. Paul describes herself as an expert at managing and treating patients with HCV and is Wexford's primary resource for HCV. (PSOF ¶P 11, 13). Dr. Paul has developed and implemented guidelines, policies and procedures for Wexford clients concerning HCV in the correctional setting. (PSOF ¶ 13). Like Dr. Chan, Dr. Paul knew there was no medical reason to exclude IDOC patients with elevated A1c or "uncontrolled diabetes" from HCV treatment. (PSOF ¶¶

117, 124). Dr. Paul knew that interferon-free treatment protocols were widely available at least by 2014). (*See* PSOF ¶¶ 57, 58).

Dr. Paul had knowledge that the A1c absolute exclusion in the IDOC HCV Guidelines was contrary to guidance propounded by the FBOP. (PSOF ¶¶ 61-63). Dr. Paul reviewed the IDOC Guidelines each time they were issued or revised, including the 2017 Guidelines that imposed the across-the-board A1c exclusion (PSOF ¶¶ 72, 91). Dr. Paul regularly reviewed the FBOP and AASLD/IDSA guidelines in evaluating patients and was able to recognize the differences and inconsistencies between those organizational guidelines and guidelines propounded by Wexford's correctional clients. (PSOF ¶ 99). Wexford's own Global Medical Guidelines for HCV, which were based on current national guidelines and the applicable standard of care, did not contain any exclusion related to diabetes or A1c. (PSOF ¶¶ 125-128). Dr. Paul, like Dr. Chan, had knowledge that excluding diabetic patients from HCV treatment exacerbated their health risks and that diabetic patients were at risk for worse outcomes from their HCV, as confirmed by the FBOP guidelines and medical literature. (*See* PSOF ¶¶ 61-63, 79, 100-103). Dr. Paul agreed she would have been aware of that concept at the time it was being discussed in medical literature because she regularly reviewed HCV literature. (PSOF ¶ 103).

**(b) Dr. Paul's Direct Involvement in Denying Treatment to Plaintiff**

Dr. Paul saw Plaintiff for the first time on August 22, 2019, at which time she referred him for a Fibroscan even though his A1c level made him ineligible for the scan under the IDOC Guidelines. (PSOF ¶¶ 96, 148-149). Under the 2019 IDOC HCV Guidelines, a Fibrosis Score of F3 would be a level 2 priority and clinical indications of cirrhosis would be a level 1 priority for treatment. (PSOF ¶¶ 95, 150, 152). In August 2019, Plaintiff was pursuing a lawsuit (*Miller I*)

related to denial of medical care while at Pinckneyville CC, in which he sought a judgment compelling IDOC and Wexford "to immediately treat Plaintiff for Hepatitis C." (PSOF ¶151). Dr. Paul informed Plaintiff that he would not be considered for HCV treatment unless his A1c was lower. Dr. Paul disagreed with the absolute exclusion criteria but did not tell Plaintiff that the A1c exclusion was medically baseless. (*Id.*).

Plaintiff's FibroScan showed a Fibrosis Score of F3, constituting a level 2 priority for treatment, but Dr. Paul did not refer Plaintiff to UIC, instead deferring to Dr. Chan and the medically baseless A1c exclusion. (PSOF ¶¶ 153, 155-159, 163). Dr. Paul again told Plaintiff he could not receive HCV treatment because his A1c level was too high. (PSOF ¶164). Dr. Paul referred Plaintiff for a liver/spleen ultrasound, which showed "consistent with mild cirrhosis." Dr. Paul thus had knowledge that Plaintiff had clinical indications of cirrhosis, constituting a level 1 priority for treatment. (PSOF ¶ 165-166). Dr. Paul again deferred to Dr. Chan as to whether to refer Plaintiff for treatment, because his A1c was still above the exclusion level. (PSOF ¶¶ 167, 171-174). Further, Dr. Paul testified as Wexford's expert witness in *Miller I* and claimed Plaintiff had received "adequate community standard treatment" while an IDOC inmate, even though she knew he had a Fibrosis Score of F3 and clinical indications of cirrhosis and was being denied HCV treatment based on an exclusionary criterion that she (and everyone but Plaintiff) knew was medically baseless. (*See* PSOF ¶¶ 171, 180-187). Plaintiff never received HCV treatment while an inmate of IDOC and Dr. Paul documented that the only reason he was denied treatment was the baseless absolute A1c exclusion in the IDOC HCV Guidelines. (PSOF 177).

**(c) Dr. Paul's Disregard for Applicable Standards**

IDOC patients in the HCV chronic care clinic are under Dr. Paul's medical care and should receive "community standard of care." (PSOF ¶ 27). Dr. Paul testified that "[i]t's my job to follow the national guidelines of medical care" and "I have a responsibility to provide medical care to the best of my ability with the most updated national guidelines. That's my job, and it should mimic the standard of care in the community." (PSOF ¶ 28). If standards conflict "then I make my clinical judgment on what makes the most sense for incarcerated patients." (PSOF ¶ 65). Unlike when balancing differences between FBOP and AASLD/IDSA guidelines, Dr. Paul treated the IDOC HCV Guidelines as "rigid" and followed those guidelines and Dr. Chan's instructions instead of following her own clinical judgment. (PSOF ¶ 138). Dr. Paul also ignored Wexford's own HCV guidelines, which did not exclude patients from treatment on the basis of A1c. (PSOF ¶137). Although Dr. Paul had requested exemptions from Dr. Chan for other absolute exclusion criteria, she never requested an exemption for Plaintiff from the baseless A1c absolute exclusion. (PSOF ¶ 175). Even when Dr. Chan gave a cryptic response about whether to refer patients with A1c of 9 percent (PSOF ¶ 173) she took no action to ensure that Plaintiff was referred for treatment. (PSOF ¶ 174).

Dr. Paul's conduct constituted deliberate indifference. *See Roe*, 631 F.3d at 860 (prison medical providers must determine that application of a protocol results in adequate medical care in the individual case); *Johnson*, 412 F.3d at 406 (reflexively applying a DOC guideline when on notice that the medically appropriate decision is to depart from the guideline can constitute deliberate indifference). Dr. Paul was Plaintiff's treating doctor. (PSOF ¶¶ 10, 27). When a person accepts employment with a private entity that contracts with the state, she understands that she is accepting the responsibility to perform her duties in conformity with the Constitution. *Rodriquez v. Plymouth*

*ambulance Serv.*, 577 F.3d 816, 827 (7th Cir. 2009). Once a medical practitioner has been summoned to examine and treat a prisoner, he or she is under a duty to exercise that degree of diligence, care and skill such as is ordinarily possessed by other members of the profession. *Jameson v. Desta*, 215 Cal. App. 4th 1144, 1145, 155 Cal. Rptr. 3d 755, 758 (2013). Dr. Paul is not excused from her constitutional obligations by Wexford' corporate policy to defer to IDOC's HCV Guidelines (thus ignoring Wexford's own guidelines). First, Dr. Paul is a member of the Wexford Medical Advisory Committee and thus shares responsibility for Wexford's own unconstitutional abdication of its medical responsibilities. Second, Dr. Paul had the ability to request an exception to the A1c exclusion but did not. Third, Dr. Paul affirmatively undermined Plaintiff's attempts to obtain HCV treatment by wrongly testifying that he was receiving proper medical care – in a lawsuit in which he sought to compel IDOC and Wexford to provide HCV treatment.

**(3) Wexford**

Wexford employs doctors and nurses to provide medical services to IDOC inmates. (PSOF ¶ 4). Wexford maintained a Medical Advisory Committee made up of senior members of its medical management team, including corporate medical directors and regional medical directors. (PSOF ¶ 5). At least two members of the Medical Advisory Committee, Dr. Paul and Dr. Fisher, are experts in HCV treatment and have developed policies and guidelines for the treatment of HCV. (PSOF ¶¶ 11, 13-14, 17-20). The Medical Advisory Committee reviewed current literature and available information in creating Wexford's medical guidelines and any substantive change to Wexford's policies was required to be approved by the Medical Advisory Committee. (PSOF ¶ 5, 9, 125-127). Wexford had no clients outside of corrections institutions, and to secure contracts it was Wexford's practice to accept its clients' treatment policies and guidelines instead of following national

standards or Wexford's own guidelines. (PSOF ¶¶ 6). Wexford's policy was that its medical employees were required to follow the IDOC guidelines, including the IDOC HCV Guidelines. (PSOF ¶¶ 7-8). Wexford's medical management knew that the standard of care should be the same for IDOC inmates as in the community and that a clinician should treat according to the patient's individual circumstances. (PSOF ¶¶ 27-29). Nevertheless, Wexford's policy, as determined by the Medical Advisory Committee, was that Wexford employees were required to follow client directives. (PSOF ¶¶ 30, 129-130). The Medical Advisory Committee approved the Preface to Wexford's Medical Guidelines which expressly stated that in the event of any conflict between Wexford's policies and the policies of its client, the client's directives control. (PSOF ¶¶ 31-34).

Because of Wexford's corporate policy to follow directives of its clients, Dr. Paul considered the IDOC HCV Guidelines to be "rigid" even though she knew the absolute A1c exclusion was medically baseless, was contrary to national standards and medical literature, and even though the exclusion would preclude HCV treatment for IDOC patients with Fibrosis Scores of F3 and F4 and with confirmed cirrhosis. (PSOF ¶¶ 90, 117). Dr. Paul understood that she was required to follow the IDOC HCV Guidelines because IDOC was Wexford's client. (PSOF ¶ 130). She further acknowledged that she declined to refer Plaintiff for HCV treatment because of the A1c exclusion in the IDOC HCV Guidelines. (PSOF ¶¶ 177-179).

The Constitution required that Wexford ensure that a well-recognized health risk for a defined class of prisoners under its care would not be deliberately left to happenstance. *Glisson*, 849 F.3d at 382. Wexford, through its Medical Advisory Committee, abdicated its responsibility for the medical care of incarcerated patients for the sake of obtaining and keeping its valuable contracts with IDOC and other corrections institutions. (PSOF ¶ 6). That is an Eighth Amendment violation. *See*

*e.g. Green v. Obsu*, No. ELH-19-2068, 2021 U.S. Dist. LEXIS 9593 *35, 2021 WL 165135 (D. Md. January 19, 2021) ("Courts have regularly found that where a corporate entity such as Wexford is alleged to maintain a policy sanctioning the denial of needed medical care as a result of financial considerations, the entity may be liable for a violation of an inmate's constitutional rights."); *Chimenti v. Wetzel*, No. 15-3333, 2018 U.S. Dist. LEXIS 115961 *27-28, 2018 WL 3388305 (E.D. Pa. July 12, 2018) (DOC prioritization of DAA treatment for inmates for non-medical reasons based on HCV protocol can constitute deliberate indifference). "[T]he Constitution is violated when [administrative and cost factors] are considered to the exclusion of reasonable medical judgment about inmate health." *Allah v. Thomas*, 679 F. App'x 216, 220 (3d Cir. 2017), quoting *Roe*, 631 F.3d at 863. Here, the evidence establishes that Wexford had actual knowledge that, by requiring its medical practioners to defer to its client's medically baseless A1c treatment exclusion, the constitutional rights of chronically ill inmates under Wexford's care would be violated and, in the face of that knowledge, it adopted a policy of turning a blind eye – that is, of deliberate indifference. *Glisson*, 849 F.3d at 382. "*Monell* requires no more." *Id*.

## **CONCLUSION**

Deliberate indifference to serious medical needs of prisoners is a violation of the Eighth Amendment subjecting defendants to liability under § 1983. Under the law discussed above, and based on the undisputed facts set forth herein, Plaintiff has established as a matter of law that defendants Dr. Chan, Dr. Paul and Wexford were deliberately indifferent to Plaintiff's medical needs, because they intentionally and unconstitutionally deprived him of treatment for HCV. Plaintiff is entitled to summary judgment on the issue of liability as to all three defendants.

Respectfully submitted,

JIMMIE DALE MILLER

By: /s/ Sean M. Sullivan
Sean M. Sullivan

Sean M. Sullivan
Adrian Riordan
MOHAN GROBLE SCOLARO, P.C.
55 West Monroe Street
Suite 1600
Chicago, IL 60603
Phone: (312) 422-9999
Fax: (312) 422-5371
ssullivan@daleymohan.com
ariordan@mohangroble.com

**CERTIFICATE OF SERVICE**

I, Sean M. Sullivan, an attorney, certify that I caused a true copy of the foregoing **Plaintiff's Memorandum in Support of Motion for Summary Judgment** to be served upon the attorneys of record via the Court's ECF filing system on September 23, 2024.

/s/ Sean M. Sullivan
Sean M. Sullivan