047272/21061/JNR/JCS

# UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JIMMIE DALE MILLER,<br><br>Plaintiff,<br><br>v.<br><br>WEXFORD HEALTH SOURCES, INC., DIRECTOR CENTRAL MANAGEMENT SERVICES, LAURA PITTMAN, DINA PAUL, LORIE CUNNINGHAM, MR. WELLS, JANE DOE #1, JANE DOE #2, JANE DOE #3, JANE DOE #4, JANE DOE #5, NURSE FUSON, NURSE SWINSON, NURSE FOSTER, C/O WILSON, ROB JEFFRIES, STEVE MEEKS, DR. JULIANA CHAN, AND UNIVERSITY OF ILLINOIS CHICAGO,<br><br>Defendants. | No. 20-cv-446<br><br>Nancy J. Rosenstengel |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

NOW COME the Defendants, DR. DINA PAUL, and WEXFORD HEALTH SOURCES, INC., by and through their attorneys, CASSIDAY SCHADE LLP, and pursuant to Federal Rule of Civil Procedure 56, hereby submit their Memorandum in Support of Motion for Summary Judgment, stating as follows:

## INTRODUCTION

Plaintiff Jimmie Miller ("Plaintiff") was diagnosed with hepatitis C in 2014, prior to his incarceration in the Illinois Department of Corrections ("IDOC"). He now alleges Defendants violated his right to freedom from cruel and unusual punishment under the United States Constitution because his hepatitis C was not treated while he was incarcerated at Lawrence Correctional Center ("Lawrence) in 2019 and 2020. Specifically, Plaintiff alleges the IDOC Hepatitis C Guidelines unconstitutionally excluded him from treatment because of his

uncontrolled diabetes. While Plaintiff alleges Defendant Wexford, the medical vendor for IDOC, bears responsibility for his exclusion from treatment, this allegation is directly refuted by the undisputed evidence. Treatment of hepatitis C is excluded from the care Wexford provides under its IDOC contract, with an express carve out for hepatitis C treatment to be provided pursuant to an interagency agreement between IDOC and the University of Illinois – Chicago ("UIC"), allowing IDOC to take advantage of discounted drug pricing under a federal regulatory scheme for certain approved providers.

The IDOC Hepatitis C Guideline that excludes those with elevated A1C was created by IDOC in consultation with infectious diseases experts from UIC. This is not a Wexford policy, Wexford was not involved in developing or revising the IDOC Hepatitis C Guidelines and Wexford is contractually obligated to apply them. These facts cannot support a claim of deliberate indifference against Wexford.

Similarly, Dr. Paul is a provider employed by Wexford who was involved in completing the workup of Plaintiff in relation to his hepatitis C, limited to determining whether he fit the criteria for referral to UIC under the IDOC Hepatitis C Guideline. Despite Plaintiff's extremely elevated A1C and his admission that he refused his prescribed insulin that could have controlled his blood sugar levels, Dr. Paul continued to monitor Plaintiff and order testing so that Plaintiff would be ready for referral to UIC if he became eligible. Dr. Paul reached out to UIC to see if Plaintiff could be referred despite his elevated A1C and was told Plaintiff needed to have his diabetes controlled prior to referral. Nothing about Dr. Paul's actions was in any way indifferent to Plaintiff's condition. To the extent Plaintiffs' rights were violated, it was not the fault of Dr. Paul.

Finally, Plaintiff's hepatitis C has since been successfully treated. Plaintiff has no evidence that his condition worsened or that his treatment outcome was impacted by the passage of time while Plaintiff was at Lawrence in 2019 and 2020. There is no question of fact that would allow Plaintiff to succeed on a claim against either Wexford or Dr. Paul. Both are entitled to judgment as a matter of law.

**UNDISPUTED MATERIAL FACTS**

1. Plaintiff Jimmie Dale Miller ("Plaintiff") was incarcerated in the Illinois Department of Corrections ("IDOC") at Lawrence Correctional Center ("Lawrence") from February 2019 to June 22, 2020. [Plaintiff's Amended Complaint, Doc. 108, ¶8].

2. The claims in this case arise out of Plaintiff's time in Lawrence. [Deposition of Plaintiff Jimmie Dale Miller, attached hereto as Exhibit A, 7:4-11].

3. Wexford Health Sources, Inc. ("Wexford") is the medical vendor contracted to provide medical services in IDOC. [Deposition of Dr. Shicker, attached hereto as Exhibit F, 18:19-20].

4. Dr. Lynn Pittman is a physician and was employed by Wexford Health Sources, Inc. ("Wexford") as the Medical Director at Lawrence from February 1, 2019, through July 19, 2020. [Deposition of Dr. Lynn Pittman, attached hereto as Exhibit B, 6:19-8:14].

5. Dr. Dina Paul is a physician employed by Wexford. [Deposition of Dr. Dina Paul, attached hereto as Exhibit C, 17:7-17].

6. Dr. Fisher is a physician employed by Wexford as the Assistant Chief Medical Officer and Corporate Director for Quality and Pharmacy. [Deposition of Dr. Neal Fisher, attached hereto as Exhibit D, 19:1-4].

7. Dr. Roderick Matticks is a physician and served as a Regional Medical Director for Wexford in Illinois in 2019 and 2020. [Deposition of Dr. Roderick Matticks, attached hereto as Exhibit E, 6:11-17; 8:16-24].

8. Dr. Louis Shicker is a physician who was the Medical Director for the Illinois Department of Corrections from November 2009 to 2016. [Ex. F, Dep. of Dr. Schicker, 10:12-21; 12:11-17].

9. Dr. Steve Meeks is a physician who served as Chief of Health Services (Medical Director) for IDOC from November 1, 2016, to March 27, 2020. [Deposition of Dr. Meeks, attached hereto as Exhibit G, 7:7-22; 10:12-18; 13:3-8].

10. The IDOC Medical Director's duties included overseeing the contract with the vendor contracted to provide medical services for IDOC and creating policies related to healthcare services. [Ex. F, Dep. of Dr. Shicker, 15:21-16].

11. Dr. Juliana Chan is a Doctor of Pharmacy employed at the University of Illinois – Chicago ("UIC") and working in the IDOC telemedicine clinic. [Deposition of Dr. Chan, attached hereto as Exhibit H, 8:3-15, 9:2-10:18; 18:17-22]

12. Dr. Mahesh Patel is an infectious disease specialist at UIC. [Deposition of Dr. Patel, attached hereto as Exhibit I, 7:22-8:19].

13. Dr. Patel has worked at UIC since 2010 and sees patients incarcerated in IDOC through the UIC Hepatitis C telemedicine clinic. [Ex. I, Dep. of Dr. Patel, 9:4-10:12].

**IDOC HEPATITIS C GUIDELINES**

14. Hepatitis C is a viral infection that causes inflammation to the liver and can lead to fibrosis of the liver and potentially cirrhosis (scarring of the liver). [Ex. F, Dep. of Dr.

Shicker, 22:1-4]; [Ex. G, Dep. of Dr. Meeks, 42:11-15; 44:18-21]; [Ex. H, Dep. of Dr. Chan, 29:23-24].

15. In 2010, the IDOC implemented a telemedicine program at UIC for treatment of inmates with hepatitis C. [Ex. F, Dep. of Dr. Shicker, 28:10-15; 16-23] [Ex. H, Dep. of Dr. Chan, 18:17-22; 25:23-2].

16. The UIC telemedicine program evaluates patients with hepatitis C using infectious disease specialists. [Ex. F, Dep. of Dr. Shicker, 41:16-22]; [Ex. E, Dep. of Dr. Matticks, 17:6-13].

17. Dr. Shicker worked with the infectious disease experts at UIC to develop guidelines for provision of hepatitis C treatment for IDOC inmates. [Ex. F, Dep. of Dr. Shicker, 31:24-32:21; 40:20-23; 61:5-14]; [Ex. G, Dep. of Dr. Meeks, 26:1-5].

18. The guidelines for treatment of IDOC inmates with hepatitis C are IDOC guidelines, not prepared by Wexford. [Ex. F, Dep. of Dr. Shicker, 36:3-20]; [Ex. C, Dep. of Dr. Paul, 37:8-11]; [Ex. D, Dep. of Dr. Fisher, 155:3-16; 211:3-17].

19. The IDOC Hepatitis C Guidelines were revised over time. [Ex. F, Dep. of Dr. Shicker, 33:15-21; 34:6-16]; [Ex. H, Dep. of Dr. Chan, 61:13-62:21].

20. IDOC worked with the infectious disease specialists at UIC on the revisions to the hepatitis C guidelines. [Ex. F, Dep. of Dr. Shicker, 69:5-70:6]; [Ex. G, Dep. of Dr. Meeks, 26:9-17; 27:11-20]; [Ex. H, Dep. of Dr. Chan, 65:21-67:2; 71:4-18; 72:12-23] [Ex. D, Dep. of Dr. Fisher, 115:2-24].

21. The contract between Wexford and the IDOC expressly provides that treatment of patients with hepatitis C is done by UIC through an interagency agreement. [Ex. G, Dep. of Dr. Fisher, 84:3-85:8].

22. Wexford has no policy separate from the IDOC Hepatitis C Guideline for care and treatment of hepatitis C in Illinois because use of the IDOC Hepatitis C Guideline is set by contract. [Ex. D, Dep. of Dr. Fisher, 200:22-201:9; 210:14-22; 215:1-13]; [Wexford Responses to Request for Admission, attached hereto as Exhibit O, p. 2]; [Wexford – IDOC Contract, excerpts attached hereto as Exhibit P, p. 38-40, Bates 265-267].

23. The 340B program is a drug-pricing program through the federal government where a qualifying entity, typically a hospital, university or rural healthcare center, get a discount on hepatitis C medications. [Ex. C, Dep. of Dr. Paul, 218:17-219:24].

24. Part of the reason for implementing the telemedicine client with UIC is to receive the 340B pricing through UIC. [Ex. F, Dep. of Dr. Shicker, 31:24-32:21].

25. Under the 340B pricing program, the hepatitis C medications have to come from a UIC pharmacy. [Ex. F, Dep. of Dr. Shicker, 47:19-48:2].

26. The 340B program provides a reduction in the cost of the hepatitis C treatment for IDOC. [Ex. F, Dep. of Dr. Shicker, 83:14-84:14].

27. In order to meet the criteria for the 340B pricing, IDOC had to have an affiliation with UIC, with the UIC physicians being the ones prescribing the medicine, seeing the patients, and the medication had to come from the UIC pharmacy. [Ex. F, Dep. of Dr. Shicker, 84:16-85:4]; [Ex. C, Dep. of Dr. Paul, 220:1-12].

28. Under the 340B agreement, no other providers other than those at UIC can provide hepatitis C treatment. [Ex. C, Dep. of Dr. Paul, 179:4-11].

29. In the UIC telemedicine clinic, patients were seen by infectious disease specialists from UIC. [Ex. F, Dep. of Dr. Shicker, 31:8-23; 45:23-46:2].

30. The UIC specialists made decisions regarding whether a patient was eligible for hepatitis C treatment based on the IDOC hepatitis C guidelines. [Ex. F, Dep. of Dr. Shicker, 46:3-9]; [Ex. H, Dep. of Dr. Chan, 150:9-24].

31. The role of Wexford staff in treating inmates with hepatitis C was to gather information and refer individuals to UIC in accordance with the IDOC Hepatitis C Guidelines. [Ex. E, Dep. of Dr. Matticks, 17:6-19:12; 40:3-41:2].

32. Wexford staff were required to follow the IDOC Hepatitis C guideline in screening patients and making referrals to UIC. [Ex. C, Dep. of Dr. Paul, 175:12-20]; [Ex. F, Dep. of Dr. Shicker, 50:14-51:1] [Ex. I, Dep. of Dr. Patel, 68:7-9].

33. While Plaintiff was in Lawrence, the applicable version of the IDOC Hepatitis C Guideline was dated January 2019. [Plaintiff's Amended Complaint, Doc. 108, ¶8] with [Ex. H, Dep. of Dr. Chan, 167:12-168:3; 243:16-20]; [2019 IDOC Hepatitis C Guidelines, attached hereto as Exhibit J].

34. The face of the 2019 IDOC Hepatitis C Guideline states "the IDOC has an interagency agreement with the University of Illinois, UIC, to direct treatment of hep C patients by telemedicine." [Ex. C, Dep. of Dr. Paul, 178:2-8]; [Ex. J, 2019 IDOC Hepatitis C Guideline].

35. The 2019 IDOC Hepatitis C Guideline included an exclusion for patients with an elevated A1C. [Ex. C, Dep. of Dr. Paul, 88:24-89:15]; [Ex. J, 2019 IDOC Hepatitis C Guidelines].

36. A1C is a marker calculated from a three-month average of a person's blood sugar. [Ex. B, Pittman Dep, 34:24-35:9].

37. The 2019 IDOC Hepatitis C Guideline instructs that patients with an AIC greater than 7 should not be sent to UIC. [Ex. C, Dep. of Dr. Paul, 91:18-24; 188:8-18]; [Ex. J, 2019 IDOC Hepatitis C Guidelines, p. 9] [Ex. H, Dep. of Dr. Chan, 173:13-21; 176:15-177:20].

38. The exclusion based on elevated A1C is not a permanent exclusion because the individual could become eligible if he later reduced his A1C to below 7. [Ex. C, Dep. of Dr. Paul, 209:21-12].

39. Dr. Chan communicated the decision about which patients would be scheduled to see the provider after a referral is made to UIC. [Ex. C, Dep. of Dr. Paul, 104:7-18].

40. Dr. Chan followed the IDOC Hepatitis C Guidelines. [Ex. H, Dep. of Dr. Chan, 106:16-18; 114:23-115:11].

**PLAINTIFF'S MEDICAL COURSE AT LAWRENCE**

41. Dr. Pittman first saw Plaintiff at Lawrence on February 20, 2019. [Ex. B, Dep. of Dr. Pittman, 28:17-18:5].

42. On February 20, 2019, Dr. Pittman noted Plaintiff was positive for hepatitis C and referred him for a hepatitis clinic evaluation by Dr. Paul. [Ex. B, Dep. of Dr. Pittman, 29:6-30:8]; [Medical records, attached hereto as Exhibit L, p. 10, Bates 54].

43. On February 20, 2019, Dr. Pittman noted Plaintiff had uncontrolled Type 2 Diabetes. [Ex. B, Dep. of Dr. Pittman, 29:6-30:8]; [Ex. L, Med. Records, p. 10, Bates 54].

44. On February 20, 2019, Plaintiff's blood sugar was greater than 300. [Ex. B, Dep. of Dr. Pittman, 29:6-30:8].

45. Dr. Pittman explained to Plaintiff that taking insulin as prescribed was an important component of decreasing his A1C. [Ex. A, Dep. of Plaintiff, 83:5-16].

46. On multiple occasions while at Lawrence Plaintiff refused to take his prescribed insulin. [Ex. A, Dep. of Plaintiff, 83:17-19; 87:22-88:4]; [Ex. B, Dep. of Dr. Pittman, 32:16-33:9].

47. Plaintiff refused his insulin and further diabetes monitoring on May 12, 2019. [Ex. A, Dep. of Plaintiff, 85:12-25] [Refusal forms, attached hereto as Exhibit N, Bates 353].

48. Dr. Pittman advised Plaintiff to avoid foods high in sugar to assist in controlling his A1C. [Ex. A, Dep. of Plaintiff, 69:24-71:11; 88:5-14]; [Ex. B, Dep. of Dr. Pittman, 34:6-18].

49. Plaintiff's commissary records indicate he purchased cookies, honey buns, and ramen noodles on more than one occasion. [Ex. A, Dep. of Plaintiff, 88:5-91:4;] [Commissary records, attached hereto as Exhibit M, Bates 496-500].

50. Dr. Paul saw patients in IDOC via telemedicine in her role of providing the facility-level work up related to hepatitis C for certain IDOC facilities, including Lawrence. [Ex. C, Dep. of Dr. Paul, 97:2-13].

51. Plaintiff saw Dr. Paul via telemedicine for the first time on August 22, 2019. [Ex. A, Dep. of Plaintiff, 78:16-24]; [Ex. C, Dep. of Dr. Paul, 109:16-110:17]; [Compilation of Dr. Paul records, attached hereto as Exhibit K, p. 7, Wexford Bates 459].

52. On August 22, 2019, Plaintiff reported he had been diagnosed with hepatitis C in 2014 when he was not incarcerated. [Ex. C, Dep. of Dr. Paul, 110:22-111:2]; [Ex. K, Dr. Paul records, p. 7, Wexford Bates 459].

53. On August 22, 2019, Dr. Paul noted lab reports from June 4, 2019, which showed Plaintiff had an A1C of 13.7. [Ex. C, Dep. of Dr. Paul, 111:3-6]; [Ex. K, Dr. Paul records, p. 7, Wexford Bates 459].

54. Dr. Paul explained to Plaintiff that he needed to lower his A1C in order to qualify for Hep C treatment while in IDOC. [Ex. A, Dep. of Plaintiff, 80:1-12].

55. Despite Plaintiff's elevated A1C, Dr. Paul continued to do the work-up of Plaintiff and order tests in accordance with the IDOC Hepatitis C Guidelines. [Ex. C, Dep. of Dr. Paul, 194:16-23].

56. On August 22, 2019, Dr. Paul noted lab reports showed Plaintiff's liver function was normal. [Ex. C, Dep. of Dr. Paul, 112:13-24].

57. On August 22, 2019, Dr. Paul ordered a FibroScan on Plaintiff. [Ex. A, Dep. of Plaintiff, 79:1-12]; [Ex. C, Dep. of Dr. Paul, 117:22-118:2]; [Ex. K, Dr. Paul records, p. 7-8, Wexford Bates 459; Bates IDOC 159].

58. A FibroScan is a specialized type of ultrasound that measures scarring in the liver and rates it on a scale of 0 to 4. [Ex. C, Dep. of Dr. Paul, 77:10-17].

59. A FibroScan score of F3 or F4 would trigger a referral to UIC under the 2019 IDOC Hepatitis C Guidelines. [Ex. C, Dep. of Dr. Paul, 114:22-115:19]; [Ex. J, 2019 IDOC Hepatitis C Guideline]

60. The FibroScan ordered by Dr. Paul was completed on November 7, 2019, and showed a score of F3. [Ex. C, Dep. of Dr. Paul, 117:23-118:11]; [Ex. K, Dr. Paul records, p. 9, Wexford Bates 459; Bates IDOC 286].

61. AST is a liver enzyme. [Ex. C, Dep. of Dr. Paul, 191:15-21].

62. Labs taken November 25, 2019, show Plaintiff's AST left was 42, which is normal or just slightly above normal. [Ex. C, Dep. of Dr. Paul, 192:4-20].

63. Dr. Paul saw Plaintiff again on December 12, 2019. [Ex. C, Dep. of Dr. Paul, 139:19-140:2]; [Ex. K, Dr. Paul records, p. 11, Wexford Bates 462].

64. On December 12, 2019, Plaintiff complained of left-side flank pain, which was not indicative of a liver issue as the liver is on the right side. [Ex. C, Dep. of Dr. Paul, 140:9-23]; [Ex. K, Dr. Paul records, p. 11, Wexford Bates 462].

65. On December 12, 2019, Dr. Paul noted Plaintiff's lab results from December 9, 2019, which showed an A1C of 11.1. [Ex. C, Dep. of Dr. Paul, 141:5-10]; [Ex. K, Dr. Paul records, p. 11, Wexford Bates 462].

66. The 2019 IDOC Hepatitis C Guidelines call for a liver and spleen ultrasound if the patient has an F3 Fibroscan score. [Ex. C, Dep. of Dr. Paul, 142:16-20]; [Ex. J, 2019 IDOC Hepatitis C Guidelines].

67. On December 12, 2019, Dr. Paul ordered additional labs and a liver and spleen ultrasound. [Ex. C, Dep. of Dr. Paul, 142:8-15]; [Ex. K, Dr. Paul records, p. 11, Wexford Bates 462].

68. Dr. Paul noted on December 12, 2019 "Per the January 25, 2019, IDOC guideline, patient's poor diabetic control precludes his review for HCV antiviral therapy." [Ex. C, Dep. of Dr. Paul, 143:23-144:14]; [Ex. K, Dr. Paul records, p. 11, Wexford Bates 462].

69. Dr. Paul asked a nurse to contact UIC with regard to Plaintiff. Specifically, on December 12, 2019, the nurse emailed Dr. Chan, copying Dr. Paul and said:

> Hello Dr. Chan. I have a question to ask before Dr. Paul makes a referral. We recently have two offenders with F3/F4 FibroScans. However, they are both DM with very high A1C. We know in the past, they will not be treated or considered until their A1C is below 7. With that being said, do we still need to work them up with the labs and ultrasound and then send you a new packet and let you tell us they do not qualify at this time?

[Ex. C, Dep. of Dr. Paul, 145:3-147:17]; [Ex. K, Dr. Paul records, p. 12, Bates MILLER000498].

70. Dr. Chan responded to the December 12, 2019, email, based on the 2019 IDOC Hepatitis C Guidelines, stating "You can continue to work up the patient, but do not send them or the med records until they have normalized their A1C or other issues." [Ex. C, Dep. of Dr. Paul, 145:3-147:17]; [Ex. H, Dep. of Dr. Chan, 208:12-210:7]; [Ex. K, Dr. Paul records, p. 12, Bates MILLER000498].

71. The liver and spleen ultrasound on Plaintiff was completed on January 16, 2020, and the results showed mild cirrhosis with no focal intrahepatic mass lesions. [[Ex. C, Dep. of Dr. Paul, 150:4-23]; [Ex. K, Dr. Paul records, p. 16, Bates IDOC 288].

72. On February 6, 2020, Dr. Paul ordered an EGD on Plaintiff, pursuant to the 2019 IDOC Hepatitis C Guidelines. [Ex. C, Dep. of Dr. Paul, 154:6-21]; [Ex. K, Dr. Paul records, p. 23, Bates Wexford 453].

73. Dr. Paul again asked a nurse to email Dr. Chan. The nurse sent an email on February 11, 2020, stating "Dr. Chan, I'm sending you the information listed in the prior studies section of the progress notes on [redacted] and Miller, as requested by Dr. Paul. Do you want these patients formally referred to UIC liver clinic telemedicine to be evaluated for antiviral therapy at this time?" [Ex. C, Dep. of Dr. Paul, 158:7-159:6]; [Ex. K, Dr. Paul records, p. 20-21, Bates Wexford 450-51].

74. Plaintiff's lab results from January 20, 2020, showed an A1C of 9. [Ex. H, Dep. of Dr. Chan, 225:21-24].

75. Dr. Chan responded and said "Yes, please. Please send the needed documents to get these patients evaluated. Can you in the meantime please have their doctors at Lawrence evaluate and treat their diabetes and get their A1C better controlled, below 8." [Ex. C, Dep. of Dr. Paul, 160:22-161:6]; [Ex. K, Dr. Paul records, p. 1, Bates MILLER000454].

76. The nurse again emailed Dr. Chan on May 28, 2020, saying "just checking on if you want these two offenders referred or not." [Ex. C, Dep. of Dr. Paul, 164:24-17]; [Ex. K, Dr. Paul records, p. 20-21, Bates Wexford 450-51].

77. Dr. Chan responded to the May 28, 2020, email, stating in relevant part, "as for Mr. Miller, Jimmie, please have his A1C in the 7 to low 8s before sending him to the UIC liver telemed." [Ex. C, Dep. of Dr. Paul, 165:19-166:10]; [Ex. K, Dr. Paul records, p. 20-21, Bates Wexford 450-51].

78. Plaintiff's A1C was 10.2 on May 27, 2020. [Ex. C, Dep. of Dr. Paul, 207:5-8]; [Ex. H, Dep. of Dr. Chan, 231:4-17]; [Ex. K, Dr. Paul records, p. 24, Bates Wexford 464].

79. Dr. Paul saw Plaintiff again on June 18, 2020, at which time she noted "attempts to discuss follow-up after prison were unsuccessful. [Ex. C, Dep. of Dr. Paul, 170:13-24]; [Ex. K, Dr. Paul records, p. 24, Bates Wexford 464].

80. Plaintiff was released from IDOC on June 22, 2020. [Ex. A, Dep. of Plaintiff, 7:4-11].

81. Plaintiff has no evidence that his hepatitis C worsened between February 2019 and June 2020. [Ex. A, Deposition of Plaintiff, 115:10-116:13].

82. Since his release from IDOC, Plaintiff successfully completed hepatitis C treatment. [Ex. A, Dep. of Plaintiff, 113:7-114:8].

## ARGUMENT

### I. Summary Judgment Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment, the Court must look beyond the

pleadings and assess the proof to determine whether there is a genuine need for a trial. If Defendants meet their burden in showing there is no evidence to support Plaintiff's claim, Plaintiff must demonstrate by affidavit, depositions, answers to interrogatories, and admissions on file, there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986). In determining and evaluating a motion for summary judgment, the Court views the evidence in the light most favorable to the opposing party and draws all justifiable inferences in his favor. A mere scintilla of evidence supporting Plaintiff's position cannot create a genuine issue of material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Summary judgment is proper if the pleadings, answers to interrogatories, depositions, and admissions, along with affidavits, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether there are any genuine issues of material fact, the court must draw all inferences in the light most favorable to the non-movant. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002). Yet not every conceivable inference must be drawn, only reasonable inferences. *Bartman v. Allis-Chalmers Corp.*, 799 F.2d 311, 312-13 (7th Cir.1986). Moreover, "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (holding that the "[r]espondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction…").

## II. Plaintiff Has No Evidence of Fault by Wexford.

Plaintiff's claim rests on the allegation that he was improperly denied treatment of his hepatitis C while in Lawrence. Specifically, he alleges treatment was denied based on a provision under the IDOC Hepatitis C Guidelines that excluded individuals with an elevated A1C, meaning uncontrolled diabetes. [Doc. 108, Am. Comp., ¶60-72]. As to Wexford, Plaintiff claims Wexford and its medical professionals "directed and/or participated in drafting, revising, implementing and/or enforcing" the IDOC Hepatitis C Guidelines. [Doc. 108, Am. Comp., ¶42]. The undisputed evidence shows this is false. [Undisputed Material Facts ("UMF"), ¶15-18, 20-21].

The Seventh Circuit has held that private companies that act under color of law can be liable pursuant to *Monell*, 436 U.S. at 691-92. To establish municipal liability under *Monell*, a plaintiff must prove three things. First is the existence of an unconstitutional policy. This can be done by showing either: (a) an express policy that, when enforced, causes a constitutional deprivation; (b) a widespread practice that, although not authorized by written law or express policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (c) that the constitutional injury was caused by a person with final decision policymaking authority. *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019).

Second is that the municipality is culpable, which means the municipality's policymakers were deliberately indifferent to a known or obvious risk that a policy or custom would lead to constitutional violations. *Board of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407 (1997); *see also*, *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214 (7th Cir. 2021) (noting "the plaintiff must show that 'the policy or custom demonstrates municipal fault,' *i.e.*, deliberate indifference").

Third, the municipality's policy must "directly cause[] a deprivation of federal rights." *Brown*, 520 U.S. at 415. The municipality's own actions must be the "moving force" behind plaintiff's injuries. *Id.* at 404. Plaintiff must have evidence sufficient to support a jury finding that a municipal action was "the 'moving force' behind the federal-rights violation." *First Midwest Bank ex rel. LaPorta v. City of Chi.*, 988 F.3d 978, 986 (7th Cir. 2021), quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997); *Dean*, 18 F.4th at 235. This "rigorous causation standard" requires "a 'direct causal link' between the challenged municipal action and the violation of [the plaintiff's] constitutional rights." *LaPorta*, 988 F.3d at 987, quoting *Brown*, 520 U.S. at 404; *see also, Dean*, 18 F.4th at 235.

Here, Plaintiff's claim is based on an express policy – the exclusion from hepatitis C treatment based on his uncontrolled diabetes. This is not a Wexford policy. The sole policy at issue is an IDOC policy. While Wexford is the contractual vendor to IDOC for the provision of medical care in IDOC facilities, the contract includes an express carve out related to providing treatment for hepatitis C. [UMF, ¶22]. Pursuant to Wexford's contract with IDOC, any treatment of those in IDOC custody for hepatitis C is to be done via a telemedicine clinic at UIC, taking advantage of a federal program allowing approved providers to offer hepatitis C treatments at a discounted price. [UMF, ¶22-28]. IDOC, not Wexford, has entered into an interagency agreement with UIC that resulted in the creation of the IDOC Hepatitis C Guideline. [UMF, ¶21-22]. IDOC puts out the Hepatitis C Guidelines and Wexford must follow it. [UMF, ¶31-32]. Wexford providers had no involvement in developing these guidelines and no substantive involvement in any of the subsequent revisions. [UMF, ¶17-20]. The Guideline sets up a collaborative process in which Wexford physicians do the clinical workup of patients with hepatitis C, and UIC infectious disease doctors then determine whether and with what to treat

eligible patients. [UMF, ¶31]. Under similar circumstances Courts have found contractual medical vendors cannot be liable for a policy the vendor did not draft and was contractually obligated to follow. *Baston v. Indiana State of*, No. 3:18-CV-791-JD-MGG, 2021 U.S. Dist. LEXIS 32876, at *9 (N.D. Ind. Feb. 23, 2021) (collecting cases).

Second, Plaintiff cannot raise a genuine issue of material fact that corporate policy makers were deliberately indifferent to the risks IDOC's AIC exclusion would lead to constitutional violations. *See Dean*, 18 F.4th at 235. Plaintiff will argue Wexford is liable for following the Hepatitis C Guidelines that he claims lack medical justification. However, IDOC specifically engaged specialists in the treatment of infectious disease in formulating the Guidelines. [UMF, ¶17-20]. Multiple Wexford providers testified they were aware of the involvement of infectious disease experts in drafting the IDOC Hepatitis C Guidelines and would defer to them on rationale for the provisions in the Guidelines. [Ex. D, Dep. of Fisher, 158:23-159:4]; [Ex. E, Dep. of Dr. Matticks, 27:11-28:8]; [Ex. C, Dep. of Dr. Paul, 189:17-190:19]. Defendants' reliance on the expertise of the specialists precludes a claim of deliberate indifference unless the advice of the specialists was blatantly inappropriate. *Donald v. Wexford,* 982 F.3d 451, 462-63 (7th Cir. 2020). There is no evidence that any advice of the specialist was blatantly inappropriate. In this context, Wexford could not be expected to be on notice that the policy or custom would lead to constitutional violations as necessary to sustain a claim under *Monell*. *Brown*, 520 U.S. at 407.

Finally, Plaintiff cannot show Wexford's actions were the moving force behind his alleged injury. There is no question of fact that the policy at issue was established by IDOC and Wexford had no authority under its contract to provide hepatitis C treatment. [UMF ¶21-22]. In order to take advance of the costs savings under the federal 340B regulations, only UIC

providers can prescribe hepatitis C treatment and the prescriptions must come from the UIC pharmacy. [UMF ¶23, 28]. Wexford was not responsible for preparing the Guidelines and cannot be the moving force behind any injury Plaintiff claims to have suffered from application of those Guidelines.

Notwithstanding, whose policy it is, Plaintiff has no evidence it is unreasonable. It is true that Plaintiff was evaluated in relation to his Hepatitis C and, as of November 2019, would have met the criteria for referral for evaluation by at the UIC telemedicine clinic but for his elevated A1C. [UMF, ¶59-60]. While Plaintiff was in Lawrence, the relevant version was the 2019 IDOC Hepatitis C Guidelines, which instructed the providers at the facility not to refer a patient to UIC if they have an A1C greater than 7. [UMF, ¶35, 37]. While at Lawrence, Plaintiff's A1C was regularly monitored and labs showed the following: 13.7 (June 4, 2019); 11.1 (December 9, 2019); 9 (January 20, 2020); and 10.2 (May 27, 2020). [UMF, ¶53, 65, 74, 78]. At no time during his stay at Lawrence was Plaintiff's A1C measured at a level that would be considered controlled.

As a threshold matter, applying the Guideline does not forever preclude treatment for hepatitis C on this basis. Rather, had Plaintiff gotten his A1C under control, he could have then been referred to UIC. [UMF, ¶38]. Despite Dr. Paul explaining to Plaintiff that his diabetes needed to be controlled in order to qualify for treatment under the IDOC Guidelines, Plaintiff's A1C was never within an acceptable range. [UMF, ¶53, 65, 74, 78]. Plaintiff's own actions with respect to management of his diabetes is discussed in Section III below.

In his Amended Complaint and throughout the course of discovery, Plaintiff has dived into the medical literature, and questioned witnesses on the standard of care related to hepatitis C. These would be relevant inquiries if Plaintiff alleged a claim for medical negligence – which

he did not. His claims sounds solely in violation of his constitutional rights. [Doc. 108, Count I]. The required showing for deliberate indifference is "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006), quoting *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir.1992). Showing mere negligence will not support a constitutional violation under the Eighth Amendment. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). "Even admitted medical malpractice is not sufficient to show that a doctor acted with deliberate indifference." *Petties v. Carter*, 795 F.3d 688, 691-92 (7th Cir. 2015).

Plaintiff will likely argue that the reasons for excluding someone from Hepatitis C treatment based on an elevated A1C are not applicable with the drug available by 2019. However, Dr. Patel, one of the infectious disease specialists from UIC, testified there are medical issues that should be a priority over the treatment of hepatitis C, including significantly uncontrolled diabetes. Specifically, he testified, "the morbidity from uncontrolled diabetes is more important to address in the short-term than chronic hepatitis C, given that chronic hepatitis C is an illness that takes about 20 years to manifest, if it does at all." [Ex. I, Dep. of Patel, 30:24-31:16]. According to Dr. Patel, it is important to ensure there are no interruptions in a patients' hepatitis C treatment and potential complications with uncontrolled diabetes could result in patients having to miss doses of treatment, which would be problematic. [Ex. I, Dep. of Patel, 32:6-33:2].

Dr. Shicker agreed the hepatitis C treatment regime requires a high degree of compliance with treatment. [Ex. F, Dep. of Dr. Shicker, 56:23-58:3]. He testified that people who have uncontrolled diabetes are often noncompliant with their diabetes treatment, causing concern for their ability or willingness to maintain strict compliance necessary for hepatitis C treatment. [Ex.

F, Dep. of Dr. Shicker, 56:23-58:3]. Dr. Chan expressed concerns about the systemic problems and overall health risks associated with chronically elevated A1Cs and indicated the focus should be on getting the blood sugar under control to protect against those risks before adding the hepatitis C treatment. [Ex. H, Dep. of Dr. Chan, p 139:19-140:17].

Notably, court monitors from a class action lawsuit regarding administration of healthcare generally in the IDOC discussed the IDOC Hepatitis C Guidelines and agreed that an elevated A1C should be addressed prior to the liver disease. [Ex. H, Dep. of Dr. Chan, p 188:2-15]. The subsequent version of the IDOC Hepatitis C Guidelines, which included input from the court monitors, continued to take elevated A1C into consideration. [Ex. H, Dep. of Dr. Chan, p 187:21-18; 193:4-194:22; 199:21-200:8].

While Plaintiff disagrees with the medical judgment of these providers, "mere disagreement with the course of the inmate's medical treatment does not constitute an Eighth Amendment claim of deliberate indifference" *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). Plaintiff cannot show that wanting his diabetes to be controlled prior to starting a hepatitis C treatment protocol was such a departure from medical judgment to constitute deliberate indifference. *Collins v. Seeman*, 462 F.3d 757, 762

## III. No Jury Could Find Dr. Paul Was Deliberately Indifferent.

Plaintiff alleges Defendants are liable under 42 U.S.C. §1983 for violating the Eighth Amendment. [Doc. 108, ¶1-2]. The Eighth Amendment prohibits punishments incompatible with "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958). Denial of care for a serious medical need amounts to denial of the minimal civilized measure of life's necessities. See *Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999), citing *Farmer*, 511 U.S. 834.

To establish an Eighth Amendment violation by a prison official for failure to provide adequate medical care, a prisoner "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 105-106 (1976). To prevail on an Eighth Amendment claim, a plaintiff must show that the responsible prison officials were deliberately indifferent to his serious medical needs. See *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 590 (7th Cir.1999). Deliberate indifference involves a two-part test. The plaintiff must show that (1) the medical condition was objectively serious, and (2) the state officials acted with deliberate indifference to his medical needs, which is a subjective standard. *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir.2000). The required showing for deliberate indifference is "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006), quoting *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir.1992). For any claim brought under §1983 the "plaintiff must demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct." *Carmody v. Board of Trustees of the University of Illinois*, 893 F.3d 397, 401 (7th Cir. 2018) (internal citations omitted). In other words, to prevail on his claim, Plaintiff must show that the named defendants had "personal involvement" in the alleged deprivation of rights. *Id.*

Here, Dr. Paul was the Wexford physician conducting the workup on patients from Lawrence to identify those who should be referred to UIC for evaluation by the UIC telehealth clinic. [UMF, ¶50-51]. She had no role in designing the IDOC Hepatitis C Guidelines. [Ex. C, Dep. of Dr. Paul, 88:14-23]. Despite Plaintiff's elevated A1C, Dr. Paul ordered the FibroScan ultrasound to identify any scarring of his liver, continued to monitor labs for liver function and changes in his A1C, and ordered a liver and spleen ultrasound. [UMF, ¶52-67]. Dr. Paul

ensured Plaintiff had the necessary tests required by UIC for evaluation for treatment so that, had his A1C improved, he could be referred. Nothing about Dr. Paul's handing of Plaintiff's care was anything close to approaching "a total unconcern for [Plaintiff's] welfare" necessary for a finding of deliberate indifference. *Duane*, 959 F.2d 673, 677 (7th Cir.1992).

As with Wexford, Plaintiff cannot show a causal connection between Dr. Paul's actions and the alleged deprivation necessary to sustain a claim under §1983. *Carmody*, 893 F.3d at 401. While continuing to complete the workup of Plaintiff, Dr. Paul had nurses reach out to UIC in December 2019 with Plaintiff's information, asking if he could be referred. [UMF, ¶69]. The response was to get the A1C normalized first. [UMF, ¶70]. In February 2020, Plaintiff's A1C was trending down and Dr. Paul again asked a nurse to send Plaintiff's information to UIC. [UMF, ¶73]. This time the response was to send the documents for evaluation, but in the meantime get his A1C below 8. [UMF, ¶75]. While it appears the nurse failed to send the documents, there is no evidence it would have mattered as Plaintiff's A1C did not continue to decrease, but instead went back up. [UMF, ¶77-78]. By May 2020, Plaintiff's A1C was back up to 10.2, and UIC requested that his A1C be in the 7 to low 8s before sending him to the telemed clinic. [UMF, ¶77-78].

Plaintiff was aware that his A1C needed to be controlled before referral for hepatitis C treatment. Nonetheless, while at Lawrence, Plaintiff was ignoring the advice his providers, buying sweets from the commissary and refusing his insulin injections. [UMF, ¶45-49]. Compliance with his insulin could have controlled his A1C. [UMF, ¶45]. Plaintiff refused. Refusing necessary treatment defeats a claim of deliberate indifference. *Pinkston v. Madry*, 440 F.3d 879, 892 (7th Cir. 2006) (affirming summary judgment on deliberate indifference claim where inmate refused to cooperate with medical staff or accept the medical care provided to

him); *Scott v. Rector*, 2014 U.S. Dist. LEXIS 159149 *17-18 (S.D. Ill. Nov. 12, 2014) (summary judgment appropriate where inmate refused treatment); *Davis v. Wahl*, 596 Fed. Appx. 488, 490 (7th Cir. 2015) (non-precedential) (refusal of treatment undercuts assertion of harm on Eighth Amendment claim). He cannot refuse the treatment necessary to make him eligible for hepatitis C treatment then claim the hepatitis C treatment was wrongfully withheld.

To the extent the Court accepts Plaintiff argument that he was unconstitutionally denied treatment for his hepatitis C, it was not at the hands of Dr. Paul, precluding a claim against her. *Carmody*, 893 F.3d at 401. Plaintiff will argue Dr. Paul blindly followed the IDOC Hepatitis C Guidelines and, by doing so, abandoned her medical judgment. However, as the Northern District recently noted in response to a similar allegation against another Wexford provider, "there is no evidence that would permit a finding that [the Wexford provider] had the ability to ignore or bypass IDOC's guidelines and order hepatitis C antiviral treatment outside of the guidelines' parameters." *Morissette v. Wexford Health Sources, Inc.,* No. 19 C 4945, 2023 U.S. Dist. LEXIS 26798, at *8 (N.D. Ill. Feb. 17, 2023). No jury could find Dr. Paul was deliberately indifferent to Plaintiff's medical needs.

## IV. Plaintiff Has No Evidence of Harm Caused by Defendants.

Plaintiff's allegations against Defendants face another, fatal flaw as it concerns causation. Common-law rules of tort causation apply to § 1983 claims. *See Herzog v. Village of Winnetka*, 309 F.3d 1041, 1044 (7th Cir. 2002). To survive summary judgment, a plaintiff is "required to produce evidence that [he] sustained actual injury and that [his] injuries had a causal connection with the alleged [] violation." *Berman v. Young*, 291 F.3d 976, 982 (7th Cir. 2002). "Causation is an element of a claim under § 1983," and Plaintiff bears the burden to produce competent

evidence from which a reasonable jury could conclude the allegedly tortious conduct caused the complained-of injury. *Smith v. Buss*, 515 Fed. Appx. 599, 601 (7th Cir. 2012).

Plaintiff was released from IDOC in June 2020 and subsequently successfully completed hepatitis C treatment. [UMF, ¶80, 82]. Plaintiff has no evidence that his condition worsened during the 16 months he was in Lawrence. [UMF, ¶81]. Plaintiff disclosed no expert who would testify his treatment was less successful due to its timing or that he lost a chance at a better result. There is no evidence in the record suggesting Plaintiff's condition is any different than if had been treated for hepatitis C in 2019 or 2020 instead of after his release. As such, Defendants are entitled to judgment as a matter of law.

## **CONCLUSION**

There is no evidence that it violates the U.S. Constitution to require incarcerated patients to address uncontrolled diabetes prior to receiving hepatitis C treatment. Even if Plaintiff could establish such policy violated his constitutional rights, it was not at the hands of Wexford. Plaintiff cannot hold Wexford responsible for a policy IDOC established and required Wexford and its providers to follow pursuant to contract. Likewise, Dr. Paul's thorough attention to Plaintiff's workup for hepatitis C cannot support a claim for deliberate indifference when Plaintiff remained ineligible under the IDOC Hepatitis C Guidelines during his time at Lawrence and Dr. Paul had not authority to prescribe hepatitis C treatment. Finally, Plaintiff has no evidence that he was harmed by the IDOC Hepatitis C policy as he has since been successfully treated for his hepatitis C. There is no question of fact that would support a claim of deliberate indifference against either Dr. Paul or Wexford and Defendants are entitled to judgment in their favor.

WHEREFORE, for the above reasons, Defendants, DR. DINA PAUL, and WEXFORD HEALTH SOURCES, INC., respectfully requests this Honorable Court grant their Motion for Summary Judgment and grant such further relief as deemed appropriate.

Respectfully Submitted,

CASSIDAY SCHADE LLP

By: /s/ Joy C. Syrcle
One of the Attorneys for Defendants, DR. DINA PAUL, DR. LYNN PITTMAN, and WEXFORD HEALTH SOURCES, INC.

Joy C. Syrcle
6302066
CASSIDAY SCHADE LLP
2040 West Iles Avenue, Suite B
Springfield, IL 62704
(217) 572-1714
(217) 572-1613 (Fax)
jsyrcle@cassiday.com

**CERTIFICATE OF SERVICE**

I hereby certify that on September 19, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. The electronic case filing system sent a "Notice of E-Filing" to the following:

Keith B. Hill
Ryan Kemper
Heyl, Royster, Voelker & Allen, PC
105 West Vandalia
Suite 100
P.O. Box 467
Edwardsville, IL 62025
(618) 656-4646
(618) 656-7940 (Fax)
khill@heylroyster.com

Tara M. Barnett
Christine G. McClimans
Assistant Attorney General
201 West Pointe Dr. Suite 7
Swansea IL 62226
tara.barnett@ilag.gov

Sean M. Sullivan
Ah Hil Kim
Daley Mohan & Groble
55 W Monroe Suite 1600
Chicago IL 60603
(312) 422-5536
ssullivan@daleymohan.com

/s/ Joy C. Syrcle

12048198