5442-339

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JIMMIE DALE MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 20-cv-00446-NJR |
| | ) | |
| | ) | |
| DINA PAUL, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT JULIANA CHAN'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

NOW COMES Defendant, JULIANA CHAN, by and through her attorney, Keith B. Hill of HEYL, ROYSTER, VOELKER & ALLEN, P.C., and submits her Brief in Opposition to Plaintiff's Motion for Summary Judgment (Docs. 293, 294).

## I. INTRODUCTION

The parties – Plaintiff, Chan, Dr. Dina Paul, and Wexford Health Sources, Inc. - have filed cross motions for summary judgment and supporting memoranda. (Docs. 291, 292, 293, 294, 298, 299). This brief is presented in opposition to Plaintiff's motion for summary judgment against Chan. For the reasons stated in Chan's motion for summary judgment (Docs. 291, 292) and herein, Plaintiff's motion for summary judgment against Chan should be denied, and Chan's motion for summary judgment should be granted.

## II. RESPONSE TO STATEMENT OF MATERIAL FACTS

1-4. Admitted.

5-9. Immaterial[1].

10-22. Admitted.

23. Not supported by the record citation. Dr. Matticks testified that he recalls meeting Chan at one of the quarterly meetings. (Doc. 295-2 at 30). He did not testify that Chan attended more than one quarterly meeting. Immaterial.

24-29. Admitted.

30-35. Immaterial.

36. Not supported by the record in part. The cited record does not support that "HCV is a disease that adversely affects the functioning of the liver." Dr. Meeks testified that hepatitis C *can* cause "fibrosis or scarring" of the liver, and "*can* cause damage to the liver." (294-14 at 44) (emphasis added). Dr. Fisher elaborated. Dr. Fisher testified: "A small amount of scar tissue in the liver does *not* affect the liver's function. It's a large organ. Certainly when you have extensive fibrosis, which leads to cirrhosis where there's extensive scarring in the liver, the impairment of the liver at that time will cause clear issues with the body." (Doc. 295-7 at 68) (emphasis added). Admitted as to remaining part.

37. Not supported by the record in part. The cited article was published in 2014, and relied on references published in 2011 and 2003. (Doc. 295-21 at 2). Chan's testimony was based on the 2014 article. Dr. Paul testified in 2021 that: "In the prison system, we have an exponentially higher number of patients with hepatitis C. In the outside world, its like 1.2 percent. In prisons, it's 35 percent." It is not known what population Dr. Paul means by "prison

[1] Plaintiff filed a single motion for summary judgment with a single statement of material facts directed against Chan, Dr. Paul, and Wexford. (Docs. 293, 294). Some of Plaintiff's "facts" are not material to Plaintiff's motion against Chan.

system." Dr. Paul gave an "educated guess" of "around "6- or 7,000, perhaps." (Doc. 295-6 at 228).

38. Not supported by the record in part. The article, published in 2014, states there are 7 genotypes. (Doc. 295-21 at 3). Admitted as to remaining part.

39-40. Admitted.

41. Not supported by the record in part. Drs. Meeks and Fisher did not testify that chronic HCV is a "serious medical condition." (Doc. 295-14 at 44); (Doc. 295-7 at 67). Admitted as to the remaining part.

42. Not supported by the record. The cited record does not support the purported facts, including that "cirrhosis" is a life-threatening condition. Additionally, Dr. Fisher testified: "At the end stages of the very advanced fibrosis is when the liver stops functioning correctly." (Doc. 295-7 at 68). Dr. Fisher also testified that: "With Hepatitis C you need to have a level of cirrhosis before the risk of [liver cancer] is significant." (Doc. 295-7 at 69). Immaterial because Plaintiff has no evidence that his hepatitis C advanced to a level where he would have any symptoms let alone a life-threatening condition or increased risk of liver cancer.

43. Admitted with the caveat that Dr. Fisher testified that the majority of patients with chronic hepatitis C have no symptoms. (Doc. 295-7 at 72). Immaterial because Plaintiff has no evidence that his symptoms were caused by hepatitis C.

44. Not supported by the record. Dr. Fisher was testifying about "modifiable factors" related to the progression of hepatitis C, i.e. "things that a patient can do that can influence their disease and progression of the disease." He testified that "… those who are obese progress much more quickly. Insulin resistance tends to come with obesity that makes a difference." (Doc. 295-7 at 145-46).

45. Not supported by the record. There are numerous scoring systems for measuring the degree of scaring or fibrosis. (Doc. 294-21 at 4). The Metavir scoring system is among them. *Id*. Chan testified that a FibroScan measures "stiffness" of the liver. (Doc. 295-12 at 30).

46. Not supported by the record. Chan testified that she had students and a resident write the article. (Doc. 295-12 at 23). The article does not describe fibrosis scores. It lists in a table four of the most common scoring systems then-available. (Doc. 295-21 at 4).

47. Admitted.

48. Not supported by the record. The cited record does not support that "progression is not linear." The cited record also does not support that "other diseases may affect the rate of progression." The article states that co-infection with HIV or hepatitis B virus are factors increasing disease progression. (Doc. 295-21 at 3). Chan agreed with the article. (Doc. 295-12 at 27). The Wexford defendants admitted that "comorbidities may affect the rate of progression of fibrosis." (Doc. 143 at 17). Dr. Fisher was testifying about "modifiable factors" related to the progression of hepatitis C, i.e. "things that a patient can do that can influence their disease and progression of the disease." He testified that "… those who are obese progress much more quickly. Insulin resistance tends to come with obesity that makes a difference." (Doc. 295-7 at 145-46).

49. Not supported by the record. The fact sheet lists four groups, including those with "greater levels of fibrosis (Grade 3 or 4)," as the "groups that most need treatment." The fact sheet lists seven groups, including those with type 2 diabetes, as "other groups to consider for secondary priority." (Doc. 295-23 at 3).

50. Not supported by the record in part. The fact sheet states that about 25% of those with chronic hepatitis C will go on to have significant liver disease – ultimately cirrhosis (liver

failure) and increased incidence of liver cancer. (Doc. 295-23 at 2). Admitted as to the remaining part.

51. Not supported by the record in part. The cited record does not support that "Liver transplantation is the principle long term treatment for patients with advanced cases of cirrhosis and/or liver cancer." Admitted as to the remaining part.

52. Admitted.

53. Admitted except the article states that a patient who achieves SVR is considered to be "virologically cured."

54. Admitted.

55. Immaterial. Plaintiff has no evidence that he has any symptoms or "liver complications" caused by his hepatitis C. Plaintiff also has no evidence that Chan's conduct worsened his liver scaring.

56-60. Immaterial.

61-63. Admitted as to content of FBOP guidelines. Immaterial.

64-65. Admitted as to content of AASLD guidelines. Immaterial.

66. Admitted.

67. Not supported by the record in part. The cited record does not support that "Chan began working with IDOC to create the IDOC HCV Guidelines in 2010 when the IDOC telemedicine program was initiated." Chan testified that when UIC became involved in about June 2010, Dr. Shicker "presented" the guidelines to Dr. Scott Cutler (a then-UIC physician). (Doc. 295-12 at 122-23). Chan testified that she first became aware of the guidelines when Dr. Natasha Walzer (a then-UIC physician) showed her the guidelines, and told her that they were going to follow them. (Doc. 295-12 at 124). Admitted to the remaining part.

68. Not supported by the record. See response to paragraph 67. Chan testified that primarily the IDOC protocols were updated when the IDOC medical director contacted UIC. (Doc. 295-12 at 63). The IDOC medical director provided the topics or purpose of the revisions that needed to be looked at. (Doc. 295-12 at 66). Chan testified that her personal involvement in the guidelines was limited to updating the guidelines when new medications were approved. (Doc. 295-12 at 58-59, 62-63, 100-101, 108). Chan testified that who to treat in the UIC Liver Telemedicine Clinic was outside her purview. (Doc. 295-12 at 59). Chan testified that IDOC did not discuss with her who to treat or who would be eligible to treat in the UIC Liver Telemedicine Clinic. (Doc. 295-12 at 59).

69-70. Admitted.

71. Admitted with the caveat that Chan's role in the guidelines was limited as described above. And that Chan was working with two physicians who were board-certified in Infectious Diseases.

72. Admitted.

73. Not supported by the record in part. Chan did not testify that she "participated in creating" the March 2014 guideline. She testified that she participated in "drafting and reviewing" them. (Doc. 295-12 at 132-33). More importantly, she elaborated that she added two new drugs that were approved – sofosbuvir and ledipasvir. (Doc. 295-12 at 133-34). Admitted to the remaining part.

74. Not supported by the record in part. Chan testified "it really depends on how uncontrolled their A1c is." (Doc. 295-12 at 139-40). She also testified that she would have to defer to an endocrinologist. (Doc. 295-12 at 141, 154-55).

75-80. Immaterial.

81. Not supported by the record. Plaintiff has no evidence of who proposed or formulated the revisions. Chan's June 22, 2017 email is to Dr. Young and Dr. Patel (physicians who are board-certified in Infectious Diseases) with a carbon copy to Dr. Meeks. Significantly, in her email, she asks them to "review, comment, and edit" the guideline. She tells them that once they approve the guideline then she will finalize the changes.

82. Admitted with the caveat the Plaintiff has no evidence of who proposed or formulated this revision.

83. Admitted with the caveat the Plaintiff has no evidence of who proposed or formulated this revision.

84. Admitted with the caveat the Chan testified "probably."

85. Admitted.

86. Not supported by the record. Chan was testifying about the 2019 guideline not the 2017 guideline, and she also testified "probably."

87. Not supported by the record.

88. Not supported by the record. Chan was testifying about the 2019 guideline not the 2017 guideline, and she also testified "probably."

89. Not supported by the record. Chan was testifying about the 2019 guideline not the 2017 guideline, and she also testified "probably."

90. Not supported by the record in part. It is more accurate to say that "under the revised guidelines reviewed, edited, and approved by Drs. Young and Patel …" Admitted to the remaining part.

91. Admitted.

92. Admitted except that The Review of Systems Check List states "If yes, please have patient see IDOC Physician before refer to UIC HCV Telemedicine Clinic. Do not send pt until the labs are within normal range."

93. Admitted except that the guideline places "FibroScan results = F3 or F4" in "Priority level 2a for HCV treatment." (Emphasis added).

94. Admitted except that The Review of Systems Check List states "If yes, please have patient see IDOC Physician before refer to UIC HCV Telemedicine Clinic. Do not send pt until the labs are within normal range."

95. Admitted except that the guideline lists inmates with "Confirmed cirrhosis or having clinical findings with cirrhosis (ex: esophageal varicies)" as "Priority level 1 for HCV treatment," and place "FibroScan results = F3 or F4" in "Priority level 2a for HCV treatment." (Emphasis added).

96. Admitted that Dr. Paul so testified regarding her interpretation of the guideline. But that is not how she actually applied them. It is an undisputed fact that on August 8, 2019, Dr. Paul ordered a FibroScan for Plaintiff despite Plaintiff having an A1c of 13.7. (Doc. 292 SMF ¶¶ 67-73).

97-100. Admitted.

101. Immaterial. Chan testified that she has never encountered or reviewed the referenced article. (Doc. 295-12 at 53). And when asked if she agreed with some of the article's findings, she answered that she could not answer. (Doc. 295-12 at 53-54).

102. Not supported by the record in part. The 2017 and 2018 FBOP Guidelines list "Diabetes mellitus" under priority level 2. They do not mention "elevated A1c." "Elevated A1c,"

as the phrase is used in this case, is not the same as the condition "Diabetes mellitus." A person can have DM but not have A1c over 7%.

103. Admitted that Dr. Paul so testified regarding her interpretation of the FBOP guidelines, the article, and the IDOC guideline.

104-105. Admitted.

106. Admitted with the caveat the Dr. Raba stated "[he] would like to contact Dr. Ramesh Patel of UIC ID Telehealth …."

107. Not supported by the record in part. Dr. Meeks testified that "the monitors" had concerns related to the number of patients being treated. Dr. Meeks did not testify that Dr. Raba, specifically, had this concern. Significantly, the August 6, 2020 Lippert report does not identify a cause of the perceived low rates of treatment. Indeed, it states that "The Quality Improvement committee should investigate whether systemic barriers to treatment exist." Admitted to the remaining part.

108. Not supported by the record in part. Chan testified that she was present for one telephone conference call with the court-appointed monitors, the IDOC Medical Director, Dr. Patel (UIC), and possibly Dr. Paul (Wexford), where the monitors directed changes to the guideline, including increasing the abnormal lab value for A1c, and she and Dr. Patel made those changes. Admitted to the remaining part.

109. Not supported by the record in part. Chan testified that the "monitors" directed UIC to remove "elevated A1c" as an example of an unstable medical condition. She also testified that the monitors directed that in the Review of Systems Check List the abnormal laboratory value for A1c be increased. Admitted to the remaining part.

110. Not supported by the record in part. Dr. Raba's email was directed to "Dr. Patel/Ms. Chan," with four others, including Dr. Bowman, carbon-copied. Admitted to the remaining part.

111-113. Admitted.

114. Admitted with the caveat the Chan also testified that the monitors agreed that if a patient has abnormal A1c (above 10.5%) then it should be taken care of first before the liver disease. (Doc. 295-12 at 189).

115. Admitted.

116. Not supported by the record in part. Over defense counsel's foundation objection, Chan testified "it really depends on how uncontrolled their A1c is" She further testified that "if it's high, and it looks like they're going to have complications associated with the diabetes, then they should have the diabetes treated first before their liver disease." (Doc. 295-12 at 140). She also testified that she would have to defer to an endocrinologist. (Doc. 295-12 at 141, 154-55). Although Chan is not a medical doctor, her response is consistent with the Lippert monitors' changes to the guideline, which state that patients with A1c above 10.5 should see an IDOC physician before they are referred to the liver clinic. Dr. Paul testified there was no medical reason a person "could not." In the cited record, she was not asked whether a patient "should not." In the cited record (Doc. 295-15 at 90), Dr. Shicker referred back to his earlier testimony that "people who's diabetes were out of control often were patients who were noncompliant with their diabetes regiments and perhaps weren't good candidates for [] a treatment that required a lot [] of adherence and compliance with the treatment." (Doc. 295-15 at 58-59). This is consistent with the FBOP regulations which state an inmate should demonstrate a willingness

and an ability to adhere to a rigorous treatment regimen. (Doc. 295-15 at 68). Admitted to the remaining part.

117. Not supported by the record in part. Dr. Paul did not testify that using elevated A1c as an exclusionary factor for HCV treatment is not medically based. (Doc. 295-6 at 71). Admitted to the remaining part.

118-121. Admitted.

122. Not supported by the record in part. Over defense counsel's foundation objection, Chan testified "it really depends on how uncontrolled their A1c is" She further testified that "if it's high, and it looks like they're going to have complications associated with the diabetes, then they should have the diabetes treated first before their liver disease." (Doc. 295-12 at 140). She also testified that she would have to defer to an endocrinologist. (Doc. 295-12 at 141, 154-55). Although Chan agreed that it is not a contraindication, she testified that "if you're a good provider or healthcare practitioner, they would all see that [the need to treat diabetes first]." *Id*. Although Chan is not a medical doctor, her response is consistent with the Lippert monitors' changes to the guideline, which state that patients with A1c above 10.5 should see an IDOC physician before they are referred to the liver clinic.

123. Not supported by the record. Over defense counsel's foundation objection, Chan testified "[a patient with uncontrolled diabetes] could go into a diabetic coma. They could have kidney problems. That's going to hurt them first before their liver disease will expire the patient. So it's like risk benefit; what is going to get the patient first before - - and then you prioritize your list of what needs to be dealt with first." (Doc. 295-12 at 117). Chan testified that in her hypothetical, she would consider uncontrolled diabetes to be "Ten, 11, 12 A1Cs." She testified

that "it depends where your baseline is, but I think 9 is okay." (Doc. 295-12 at 119-20). Chan also testified that she would have to defer to an endocrinologist. (Doc. 295-12 at 140-41).

124. Not supported by the record in part. See responses to paragraphs 116, 117, 122, 123.

125-130. Immaterial.

131. Immaterial. Regarding origin of UIC guidelines, see Doc. 295-12 at 76-77. Chan testified that Dr. Young prepared the 2016 UIC guidelines, she did not work with him on it, and he did not consult with her. (Doc. 295-12 at 80, 82).

132-134. Immaterial.

135. Not supported by the record in part. Chan testified that her involvement was limited to updating medications. (Doc. 295-12 at 100-01). The February 2019 UIC guidelines contain a "Priority level 2a" for Fibroscan results of F3 or F4. Admitted to the remaining part.

136. Not supported by the record in part. In the cited record, Chan did not testify that she did not follow the UIC guidelines. Admitted to the remaining part.

137-139. Immaterial.

140-141. Admitted.

142-143. Immaterial.

144. Admitted.

145. Immaterial.

146. Admitted with the caveat that Dr. Pittman's examination of Plaintiff was targeted to his complaints.

147-148. Admitted.

149. Immaterial. Dr. Paul ordered a FibroScan for Plaintiff despite Plaintiff having an A1c of 13.7. (Doc. 292 SMF ¶¶ 67-73).

150. Admitted.

151-152. Immaterial.

153. Admitted with the caveat that Dr. Paul explained that these scans were read by different companies, and, statistically and sensitivity-wise, the middle of the scale (F2 and F3) is not as sensitive as the ends of the scale for the FibroScan. (Doc. 295-6 at 135-136). She also testified that it was not a big jump and she was not overly concerned. (Doc. 295-8 at 47). More significantly, Dr. Paul testified that, according to Plaintiff's labs from 2017 to 2020, Plaintiff's liver function was normal, and had not budged. (Doc. 296-8 at 45-46).

154. Admitted.

155. Not supported by the record in part. Dr. Paul did not consult with Chan. Nurse Staci deWeese sent Chan an email. (Doc. 292 SMF ¶ 87). Admitted to the remaining part.

156. Admitted.

157. Not supported by the record in part. Dr. Chan's email speaks for itself. Admitted to the remaining part.

158-159. Admitted.

160. Not supported by the record. Chan did not instruct Dr. Paul. She answered a nurse's general question. Chan did not know who the patients were or anything about them other than what was stated in the nurse's email. Chan gave a fuller explanation of her response than Plaintiff has indicated. *See* Doc. 292 SMF ¶¶ 89-90.

161. Not supported by the record.

162. Not supported by the record. Chan testified that F3 and F4 could be inaccurate "until you look at the whole picture from head to toe. So you can't just say, oh, you actually have F4 disease without looking at everything else." (Doc. 295-12 at 210). Chan did not testify that there was no medical reason why a patient cannot be treated for diabetes and hepatitis C. Over defense counsel's objection, Chan, who is not a medical doctor, testified "I don't believe so." Dr. Patel, who is board-certified in Infectious Diseases, testified it is important to ensure there is no interruptions in a patients' hepatitis C treatment and potential complications with uncontrolled diabetes could result in patients having to miss doses of treatment, which would be problematic. (Doc. 299-15 at 8-9, Patel Dep. at 32-33).

163. Admitted with the caveat that Chan was testifying about length of stay only. Chan was not commenting on whether Plaintiff satisfied other criteria for treatment.

164-165. Admitted.

166. Immaterial.

167-174. Admitted.

175. Not supported by the record in part. In one case (Handy), Dr. Paul asked Chan to accept a patient despite length of stay, and Chan said to send the patient but Chan did not say the clinic would treat the patient. Admitted to the remaining part.

176-177. Admitted.

178. Not supported by the record in part. It is an undisputed fact that on February 12, 2020, Chan told nurse Heather Ellison to send the documents to get Plaintiff evaluated but IDOC never sent the documents. (Doc. 292 SMF ¶¶ 103-108). Admitted to the remaining part.

179. Not supported by the record in part. There is no evidence that Dr. Paul ever communicated with Chan directly about Plaintiff. Chan only communicated with a nurse about

Plaintiff. It is an undisputed fact that on February 12, 2020, Chan told nurse Ellison to send the documents to get Plaintiff evaluated but IDOC never sent the documents. (Doc. 292 SMF ¶¶ 103-108). After nurse Ellison emailed Chan about Plaintiff again on May 28, 2020, Plaintiff's A1c had increased to 10.2, and Chan told Ellison that Plaintiff's A1c needed to be in the 7 to low 8s before sending him. (Doc. 292 SMF ¶¶ 118-121).

180. Not supported by the record in part. There is no evidence that Plaintiff had any interactions with Chan. Immaterial to the remaining part.

181-185. Immaterial.

186. Admitted.

187. Immaterial.

188. Admitted.

189. Immaterial. Plaintiff admitted that no doctor told him that his pain was caused by his hepatitis C. (Doc. 295-1 at 155-56).

190-191. Immaterial.

## III. STATEMENT OF ADDITIONAL MATERIAL FACTS

Chan incorporates by reference her Statement of Facts from her Memorandum of Law in Support of Motion for Summary Judgment. (Doc. 292 at 2-19).

## IV. ARGUMENT

In Plaintiff's argument regarding Chan's knowledge and Chan's claimed "direct involvement in creating the A1c Exclusion," Plaintiff relies on purported facts that are not supported by the record. For the sake of brevity, Chan refers this Court to her response to Plaintiff's statement of undisputed facts. Chan also refers this Court to section III.B.4. of her Memorandum of Law in Support of Motion for Summary Judgment. (Doc. 292 at 25-28).

Plaintiff accuses Chan of "creating the A1c exclusion" in the 2017 guideline. But Plaintiff has no evidence of who proposed or formulated the revisions to the 2017 guideline. In support of his argument, Plaintiff relies on a June 22, 2017 email from Chan to Dr. Young and Dr. Patel with a carbon copy to Dr. Meeks (Doc. 296-10 at 2), and an attached draft of the 2017 guideline with tracked changes (Doc. 296-10 at 4-19). But the draft does not indicate who proposed or formulated the changes. (Doc. 296-10 at 4-19). And Chan's email says nothing about an A1c exclusion being added. (Doc. 296-10 at 2). Significantly, Chan's email is to Dr. Young and Dr. Patel (physicians then-at-UIC who are board-certified in Infectious Diseases) with a carbon copy to Dr. Meeks, and she asks them (Dr. Young and Dr. Patel) to "review, comment, and edit" the draft guideline. *Id*. And she tells them (Dr. Young and Dr. Patel) that once they (Dr. Young and Dr. Patel) approve the guideline then she will finalize the changes. *Id*.

Plaintiff argues that Chan created a "Review of Systems Checklist," which stated if A1c is greater than 7 percent then do not send until the labs are within normal range. But the checklist only summarizes the guideline, which included "elevated A1c" as an "unstable" medical condition that excluded patients from hepatitis C treatment. Chan testified that pages one through 4 of the guideline are summarized in table form in the checklist to make it easier for the providers. (Doc. 295-12 at 178-79). Chan testified that an A1c greater than 7 percent is outside of normal, i.e. is "elevated." (Doc. 295-12 at 179).

Plaintiff argues that the fact that the Lippert monitors required IDOC to remove the A1c exclusion from the March 2021 guideline confirms what Chan "freely admitted" - that the A1c exclusion was a "baseless and non-medical barrier" to hepatitis C treatment. Not true.

Chan did not "freely admit" that the guideline's A1c exclusion was a "baseless and non-medical barrier" to hepatitis C treatment. Over defense counsel's foundation objection, Chan

testified "it really depends on how uncontrolled their A1c is" She further testified that "if it's high, and it looks like they're going to have complications associated with the diabetes, then they should have the diabetes treated first before their liver disease." (Doc. 295-12 at 140). Chan explained:

> Having hepatitis C is not a death sentence. People could have hepatitis C for 10, 20, 30, 40 years. And they could be walking around with hepatitis C and not even know that they have it until they've been tested for it.
>
> So if you look at it in that perspective, and they never knew that they had it, but you have, like uncontrolled glucose levels or diabetes, that's going to hurt your heart, your eyes, your kidneys, to go into the hospital and never leave. That is more pressing to be dealt with first before a - - before hepatitis C.

(Doc. 295-12 at 156-157).

.IDOC did not entirely remove A1c from the March 2021 guideline. Indeed, as suggested and approved by the court-appointed monitors, IDOC changed the March 2021 guideline to define "abnormal A1C" as 10.5 or greater. (Doc. 295-12 at 201). IDOC also changed the action to be taken in response to an "abnormal A1C" to be to "have patient see IDOC Physician before refer to UIC HCV Telemedicine Clinic." *Id*. This change is a recognition that there can be circumstances where controlling A1C may be more pressing than treating for hepatitis C.[2]

Contrary to Plaintiff's argument, Dr. Patel, an Infectious Disease physician at UIC, testified that there are medical issues that should be a priority over the treatment of hepatitis C, including significantly uncontrolled diabetes. Specifically, he testified, "the morbidity from uncontrolled diabetes is more important to address in the short-term than chronic hepatitis C, given that chronic hepatitis C is an illness that takes about 20 years to manifest, if it does at all."

---

[2] Under the March 2021 guideline – preferred by Plaintiff – Plaintiff would not have been automatically referred to the UIC Telemedicine Clinic on December 12, 2019 because his A1c was "abnormal" (11.1). (Doc. 292 SMF ¶ 86). Instead, Plaintiff would been required to be seen by an IDOC physician before referral, suggesting that the IDOC physician could have chosen to try to control Plaintiff's A1c before referring him

(Doc. 299-15 at 8, Patel Dep. at 30-31). According to Dr. Patel, it is important to ensure there are no interruptions in a patients' hepatitis C treatment and potential complications with uncontrolled diabetes could result in patients having to miss doses of treatment, which would be problematic[3]. (Doc. 299-15 at 8-9, Patel Dep. at 32-33).

Dr. Shicker agreed the hepatitis C treatment requires a high degree of compliance with treatment (Doc. 299-9 at 14-15, Shicker Dep. at 56-58). He testified that people who have uncontrolled diabetes are often noncompliant with their diabetes treatment, causing concern for their ability or willingness to maintain strict compliance necessary for hepatitis C treatment. (Doc. 299-9 at 14-15, Shicker Dep at 56-58). It is an undisputed fact that Plaintiff was noncompliant with his diabetes treatment, which is why his A1c was uncontrolled. *See* Doc. 292, section III.D.

Plaintiff's claim against Chan boils down to his disagreement with the medical judgment – reflected in the 2019 guideline – that patients with uncontrolled diabetes should have their A1c within normal limits before starting hepatitis C treatment. But mere disagreement with the course of the inmate's medical treatment does not constitute an Eighth Amendment claim of deliberate indifference. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). Plaintiff cannot show that the guideline's A1c exclusion was such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the decision was not based on judgment.

Plaintiff's motion for summary judgment fails to address the fact that on February 12, 2020, Chan instructed the prison to send the documents to get Plaintiff evaluated. (Doc. 292 at 22-24). Plaintiff's motion also fails to address the fact that, putting aside the issue of the

---

[3] Putting aside the fact that Plaintiff's work-up was incomplete, Dr. Patel's testimony suggests that even if Plaintiff had been referred to the UIC Telemedicine Clinic, he may not have been treated because of his uncontrolled diabetes.

guideline's A1c exclusion, parts of the initial work-up to refer a patient to the UIC Telemedicine Clinic, as required by the guideline, were not completed in time for treatment or were never completed prior to Plaintiff's release from prison in June 2020. (Doc. 292 at 20-22). Finally, Plaintiff's motion fails to address the fact that he refused treatments necessary to make him eligible for hepatitis C treatment (Doc. 292 at 30-31), and he has no verifying medical evidence that any delay in treating his hepatitis C had any detrimental impact on his condition (Doc. 292 at 28-30).

## V. CONCLUSION

For the reasons stated in her motion for summary judgment (Docs. 291, 292) and herein, Defendant, JULIANA CHAN, respectfully requests that this Court enter an order denying Plaintiff's motion for summary judgment against her, and granting her motion for summary judgment against Plaintiff.

JULIANA CHAN, Defendant,

BY: /s/ Keith B. Hill
HEYL, ROYSTER, VOELKER & ALLEN, P.C.
Keith B. Hill, ARDC #6277660

HEYL, ROYSTER, VOELKER & ALLEN, P.C.
Suite 100, Mark Twain Plaza III
105 West Vandalia
Edwardsville, Illinois 62025
Telephone 618.656.4646
Facsimile 309.420.0402
edwecf@heylroyster.com
khill@heylroyster.com

5442-339

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this **24th** day of **October, 2024**, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

/s/ Keith Hill
HEYL, ROYSTER, VOELKER & ALLEN, P.C.