**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JIMMIE DALE MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:20-cv-00446-NJR |
| | ) | |
| WEXFORD HEALTH SOURCE, INC.; LOUIS SHICKER, former Medical Director of Illinois Department of Corrections, individually; STEVE MEEKS, Medical Director of Illinois Department of Corrections, individually; MICHAEL DEMPSEY, former Interim Medical Director of Illinois Department of Corrections, individually; DR. DINA PAUL, individually; DR. LYNN PITTMAN, individually; DR. JULIANA CHAN, individually; LORI CUNNINGHAM, individually; and THOMAS WELSH, individually, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO**
**DR. JULIANA CHAN'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jimmie Dale Miller ("Mr. Miller") submits this response to defendant Juliana Chan's ("Dr. Chan") motion for summary judgment (Doc. 291 and 292). This Court should deny Dr. Chan's motion because the undisputed facts establish that she acted with deliberate indifference to the serious medical needs of Mr. Miller (and IDOC patients in general) by denying HCV treatment based on a medically unfounded A1c "absolute exclusion" which she herself approved and indeed inserted into the IDOC HCV Guidelines. For the reasons discussed below and in Mr. Miller's memorandum in support of his motion for summary judgment (Doc. 294), Dr. Chan's conduct prevented Mr. Miller from receiving treatment for his advanced HCV and subjects her to liability under § 1983.

## RESPONSE TO DR. CHAN'S STATEMENT OF MATERIAL FACTS

### A. The UIC Liver Telemedicine Clinic.

1. At all times relevant, the Illinois Department of Corrections ("IDOC") had an Interagency Agreement with the University of Illinois – Chicago ("UIC") to direct treatment of hepatitis C patients via a telemedicine system. (Exh. 1, Miller000435).

**ANSWER: Admitted.**

2. At all times relevant, the primary care physicians at IDOC facilities were responsible for appropriate screening and initial work-ups for all hepatitis C positive patients to determine eligibility for treatment. (Exh. 1, Miller000435).

**ANSWER: Admitted that primary care physicians at IDOC facilities had responsibility for appropriate screening and initial work-ups for hepatitis C positive patients. Disputed insofar as other doctors, including Dr. Chan, also determined eligibility for treatment of hepatitis C patients. (*See e.g.* Plaintiff's Statement of Undisputed Material Facts (Doc. 294), ¶¶ 22, 24, 67-68, 73-75, 81-89).[1]**

3. At all times relevant, the decision to treat and refer a patient to the UIC Liver Telemedicine Clinic was the sole responsibility of the IDOC providers at each IDOC facility. (Exh. 1, Miller000435).

**ANSWER: Disputed. Dr. Chan also made decisions regarding treatment and referrals of patients to the UIC Liver Telemedicine Clinic. (*See e.g.* Doc. 294, ¶¶ 155-161, 171-173, 175-176).**

---

[1] All additional material facts necessary to respond to Dr. Chan's motion are contained in Mr. Miller's Rule 56.1 Statement in his Memorandum in Support of Motion for Summary Judgment (Doc. 294). Rather than repeating those facts here, Mr. Miller will cite to that document where relevant to this response.

4. At all times relevant, the UIC specialists determined the specific regimen for patients found ready for hepatitis C treatment. (Exh. 1, Miller000435).

**ANSWER: Admitted.**

5. At all times relevant, various physicians worked in the UIC Liver Telemedicine Clinic, including non-defendants Dr. Mahesh Patel and Dr. Jeremy Young. (Exh. 3, Chan Dep. at 20-21).

**ANSWER: Admitted.**

6. Dr. Patel is board-certified in Internal Medicine and Infectious Diseases. (https://hospital.uillinois.edu/find-a-doctor/mahesh-c-patel).

**ANSWER: Admitted.**

7. Dr. Young is board-certified in Internal Medicine and Infectious Diseases. (https://wexnermedical.osu.edu/find-a-doctor/jeremy-young-md-17295).

**ANSWER: Admitted.**

8. At all times relevant, Juliana Chan also worked in the UIC Liver Telemedicine Clinic. (Exh. 3, Chan Dep. at 18-21).

**ANSWER: Admitted.**

9. Chan is a clinical pharmacist; she is not a physician. (Exh. 3, Chan Dep. at 9, 217).

**ANSWER: Admitted that Dr. Chan is a Doctor of Pharmacy and is not a Medical Doctor.**

10. Over the years, IDOC had a series of guidelines related to the treatment of hepatitis C patients. (Exh. 3, Chan Dep. at 59).

**ANSWER: Admitted.**

11. Chan testified that her personal involvement in the guidelines was limited to updating the guidelines when new medications were approved. (Exh. 3, Chan Dep. at 57-58, 61-62).

**ANSWER: Admitted that Dr. Chan gave the referenced testimony. Disputed as to the alleged facts stated in the testimony. Dr. Chan participated in creating, revising and changing the substantive terms of the IDOC HCV Guidelines on numerous occasions. (*See e.g.* Doc. 294, ¶¶ 73-75, 81-89).**

12. Chan testified that who to treat in the UIC Liver Telemedicine Clinic was outside her purview. (Exh. 3, Chan Dep. at 58).

**ANSWER: Admitted that Dr. Chan gave the referenced testimony. Disputed as to the alleged facts stated in the testimony. (*See e.g.* Doc. 294, ¶¶ 22, 24, 67-68, 73-75, 81-89).**

13. Chan testified that IDOC did not discuss with her who to treat or who would be eligible to treat in the UIC Liver Telemedicine Clinic. (Exh. 3, Chan Dep. at 58).

**ANSWER: Admitted that Dr. Chan gave the referenced testimony. Disputed as to the alleged facts stated in the testimony. (*See e.g.* Doc. 294, ¶¶ 155-161, 171-173, 175-176).**

**1. The Initial Work-Up.**

14. Per the January 2019 Hepatitis C Guideline, the initial work-up process included ruling out absolute exclusion criteria for hepatitis C treatment.

Per the January 2019 Hepatitis C Guideline, absolute exclusion criteria included:

…

(ii) Inadequate LOS – TWELVE (12) months from arrival to parent facility if tested positive on screen.

(v) Unstable medical and psychiatric conditions (ie, have suicidal or homicidal ideations, elevated A1c, abnormal TSH levels).

…

(Exh. 1, Miller000436).

**ANSWER: Admitted.**

15. Per the January 2019 Hepatitis C Guideline, the initial work-up process also included obtaining the following laboratory tests and imaging: Fibroscan [footnote omitted], HCV genotype, and ANA. (Exh. 1, Miller000436-38).

**ANSWER: Admitted that the document included the referenced work-up steps but disputed in part on the ground that as written the work-up steps, at least as to the Fibroscan requirement, did not apply to patients who had an absolute exclusion such as elevated A1c. (Doc. 294, ¶ 96). Admitted that a Fibroscan is correctly defined in the reference cited in Dr. Chan's footnote.**

16. Per the January 2019 Hepatitis C Guideline, if a FibroScan result is F3 and F4 [footnote omitted] then the initial work-up process also included obtaining an ultrasound of the liver to rule out hepatocellular carcinoma and splenomegaly. (Exh. 1, Miller000436).

**ANSWER: Admitted that the 2019 IDOC HCV Guideline contains the referenced provisions and admitted that the article cited in Dr. Chan's footnote contains the referenced definitions of fibrosis score levels.**

17. Per the January 2019 Hepatitis C Guideline, if the ultrasound of the liver result showed splenomegaly then the initial work-up process also included obtaining an

esophagogastroduodenoscopy ("EGD") to rule out esophageal and gastric varices. (Exh. 1, Miller000436).

**ANSWER: Admitted.**

18. Per the January 2019 Hepatitis C Guideline, for candidates with FibroScan results of 2 or greater, the initial work-up process also included vaccination against hepatitis A and B where clinically appropriate. (Exh. 1, Miller0000437).

**ANSWER: Admitted to the extent this paragraph refers to patients who do not have an absolute exclusion.**

19. If the hepatitis A antibody is not detected then candidates were to be vaccinated. (Exh. 1, Miller0000437).

**ANSWER: Admitted.**

20. If hepatitis B immunity is not detected then candidates were to be vaccinated. (Exh. 1, Miller0000437).

**ANSWER: Admitted.**

21. The January 2019 Hepatitis C Guideline states that primary care physicians at IDOC facilities must confirm that candidates do not have acute or chronic HBV or are immune because there are documented cases of hepatitis B virus reactivation which lead to death after initiating direct-acting antiviral hepatitis C therapy. (Exh. 1, Miller0000437).

**ANSWER: Admitted.**

**2. The Referral Process.**

22. Per the January 2019 Hepatitis C Guideline, once the initial work-up process was completed, the referral process required IDOC providers to forward to the UIC Liver Telemedicine Clinic the following: a) all lab work collected; b) completed "Review of System

Check List;" c) completed "UIC IDOC Telemedicine Clinic Hepatitis Risk Factor" form; and d) completed Appointment & Registration Form and fax with the required medical records to the UIC Liver Telemedicine Clinic. (Exh. 1, Miller000438).

**ANSWER: Admitted that the process included sending the referenced documents but disputed that the Guidelines called for sending any records concerning patients with an absolute exclusion.**

23. Chan testified that prior to the January 2019 Hepatitis C Guideline, IDOC providers did not always forward the required documents for a referral to the UIC Liver Telemedicine Clinic. (Exh. 3, Chan Dep. at 169-170).

**ANSWER: Admitted.**

24. Chan testified that this caused appointments to be filled by patients who could not be treated yet. (Exh. 3, Chan Dep. at 169-170).

**ANSWER: Admitted.**

25. Chan explained that the January 2019 Hepatitis C Guideline "more directly laid out [to IDOC providers that] 'when you refer, you have to provide all these things to us.'" (Exh. 3, Chan Dep. at 170).

**ANSWER: Admitted.**

**B. Plaintiff's pre-incarceration relevant medical history.**

26. Prior to the period of incarceration that underlies this case, Plaintiff had type 2 diabetes and hepatitis C. (Exh. 4, Pl. Dep. at 46, 54).

**ANSWER: Admitted.**

27. On February 25, 2015, Plaintiff had an office visit at Heartland Health Outreach in Chicago, Illinois ("Heartland") on a referral for treatment for hepatitis C. The provider charted that Plaintiff was diagnosed in November 2014. (Exh. 5, JDM 001099-001106).

**ANSWER: Admitted that the cited record contains that reference.**

28. On March 25, 2015, Plaintiff had an office visit at Heartland. His APRI [footnote omitted] score was 0.825 (Exh. 5, JDM 001053-58).

**ANSWER: Admitted that the cited record contains that reference. Admitted that APRI is correctly defined in the reference cited in Dr. Chan's footnote.**

29. On June 8, 2015, Plaintiff had a FibroScan, which appears to have been interpreted to show stage 2 fibrosis (F2). (Exh. 5, JDM 001107-10).

**ANSWER: Admitted that the cited record contains that reference.**

30. On June 25, 2015, Plaintiff had an office visit at Heartland. He complained of pain on his left side. (Exh. 5, JDM 001059-63).

**ANSWER: Admitted that the cited record contains that reference.**

**C. Plaintiff's post-incarceration relevant medical history.**

**1. Pinckneyville Correctional Center.**

31. Plaintiff entered IDOC custody on June 16, 2016, and he was sent to NRC of Stateville Correctional Center. (Doc. 108 ¶ 8).

**ANSWER: Admitted.**

32. On or about September 1, 2016, Plaintiff transferred to Pinckneyville Correctional Center. (Doc. 108 ¶ 8).

**ANSWER: Admitted.**

33. On September 21, 2016, Plaintiff was seen in the hepatitis C chronic clinic. His APRI score was 0.71. (Exh. 6, JDM 001615).

**ANSWER: Admitted that the cited record contains that reference.**

34. On April 30, 2017, Plaintiff was seen in the hepatitis C chronic clinic. His APRI score was 0.8. (Exh. 6, JDM 001623).

**ANSWER: Admitted that the cited record contains that reference.**

35. On August 26, 2017, Plaintiff was seen in the hepatitis C chronic clinic. His APRI score was 0.517. (Exh. 6, JDM 001628).

**ANSWER: Admitted that the cited record contains that reference.**

36. The provider charted that Plaintiff was not a candidate for treatment. (Exh. 6, JDM 001628).

**ANSWER: Admitted that the cited record contains that reference.**

37. On August 23, 2018, Plaintiff was seen in the hepatitis C chronic clinic. His APRI score was 0.4. (Exh. 6, JDM 001328).

**ANSWER: Admitted that the cited record contains that reference.**

38. The provider charted that Plaintiff was not a candidate for treatment. (Exh. 6, JDM 001328).

**ANSWER: Admitted that the cited record contains that reference.**

39. On December 28, 2018, Plaintiff was seen in the hepatitis C chronic clinic. His APRI score was 0.3. (Exh. 6, JDM 001331).

**ANSWER: Admitted that the cited record contains that reference.**

40. The provider charted that Plaintiff was not a candidate for treatment. (Exh. 6, JDM 001331).

**ANSWER: Admitted that the cited record contains that reference.**

**2. Lawrence Correctional Center.**

41. Plaintiff was incarcerated at Lawrence from February 2019 to June 22, 2020. (Doc. 108 ¶ 8).

**ANSWER: Admitted.**

42. On Intake Chart Review at Lawrence, a nurse identified that Plaintiff had hepatitis C and diabetes, and scheduled him to be seen in the diabetes chronic clinic in April 2019, and in the hepatitis C chronic clinic in June 2019. (Exh. 6, JDM 001211).

**ANSWER: Admitted that the cited record contains that reference.**

43. On February 20, 2019, Plaintiff saw Dr. Lynn Pittman for complaints of blood sugar greater than 300, and pain with weight bearing from a recent fracture of his right ankle. Dr. Pittman's assessment was that Plaintiff had: 1) type 2 diabetes – "uncontrolled," and 2) a right ankle fracture. Dr. Pittman's plan was for Plaintiff to be scheduled in the hepatitis C clinic for evaluation. (Exh. 6, JDM 001213).

**ANSWER: Admitted that the cited record contains that reference.**

44. Dr. Pittman gave Plaintiff a list of foods and drinks to avoid (milk, cheese, chocolate, tea, coffee, pop, Kool-Aid, beef, pork, pasta, potatoes and bread), and a list of foods and drinks to eat and drink. (Exh. 4, Pl. Dep. at 70-71).

**ANSWER: Admitted.**

45. Dr. Pittman also recommended that he purchase Vitamin C from commissary, and take it twice daily. (Pl. Dep at 71).

**ANSWER: Admitted that Dr. Pittman recommended that Mr. Miller purchase Vitamin C from the commissary. The cited testimony does not support the statement that Dr. Pittman recommended Mr. Miller take it twice daily. (Miller Dep., at 71).**

46. Plaintiff understood that A1C is a measure of blood sugar control. (Exh. 4, Pl. Dep. at 80).

**ANSWER: Admitted.**

47. Dr. Pittman talked to Plaintiff about using insulin to lower his A1C. (Exh. 4, Pl. Dep. at 83).

**ANSWER: Admitted.**

48. Plaintiff admits that he refused insulin on multiple occasions. (Exh. 4, Pl. Dep. at 83).

**ANSWER: Admitted.**

49. On February 22, 2019, Plaintiff refused regular insulin. (Exh. 6, JDM 001484).

**ANSWER: Admitted that the cited record contains that reference.**

50. On March 5 2019 and March 8, 2019, Plaintiff refused to have his blood sugar checked, and morning insulin. (Exh. 6, JDM 001488-89).

**ANSWER: Admitted that the cited record contains that reference.**

51. On March 5, 2019, Plaintiff refused regular insulin. (Exh. 6, JDM 001490).

**ANSWER: Admitted that the cited record contains that reference.**

52. On March 28, 2019, Plaintiff's blood sugar was 350 (Reference Range: 65-110), and his A1C was 9.8 (Reference Rane: <5.7). (Exh. 6, JDM 001441-43).

**ANSWER: Admitted that the cited record contains that reference.**

53. On April 22, 2019, Plaintiff was seen in diabetes chronic clinic. (Exh. 6, JDM 001333-34).

**ANSWER: Admitted that the cited record contains that reference.**

54. On April 23, 2019, Plaintiff's blood sugar was 403, and was given an injection of 10 units of regular insulin. (Exh. 6, JDM 001222).

**ANSWER: Admitted that the cited record contains that reference.**

55. On May 10, 2019, Plaintiff had high blood sugar. (Exh. 6, JDM 001223).

**ANSWER: Admitted that the cited record contains that reference.**

56. On May 12, 2019, Plaintiff had high blood sugar. (Exh. 6, JDM 001223).

**ANSWER: Admitted that the cited record contains that reference.**

57. Dr. Pittman gave a telephone order to give Plaintiff 70/30 insulin and regular insulin, and recheck his blood sugar in one hour. (Exh. 6, JDM 001223).

**ANSWER: Admitted that the cited record contains that reference.**

58. On May 12, 2019, when a nurse was checking Plaintiff's blood sugar, Plaintiff told the nurse: "This is a waste of my time." Plaintiff's blood sugar was 588. Plaintiff accepted the previously ordered insulin but refused any further treatment. (Exh. 6, JDM 001223, 001492).

**ANSWER: Admitted that the cited record contains that reference.**

59. On May 13, 2019, Plaintiff saw Dr. Pittman with complaints of fatigue and malaise with blood sugar of 300-500. Plaintiff admitted to only one insulin injection daily. Dr. Pittman's assessment included type 2 diabetes – "uncontrolled." (Exh. 6, JDM 001222).

**ANSWER: Admitted that the cited record contains that reference.**

60. On May 17, 2019, Plaintiff saw Dr. Pittman. Dr. Pittman charted that Plaintiff's blood sugar had improved. Dr. Pittman's assessment and plan was for Plaintiff to continue 70/30 insulin twice a day, and Metformin 850 mg twice a day. Plaintiff was also to increase his exercise to 4 days a week. (Exh. 6, JDM 001226).

**ANSWER: Admitted that the cited record contains that reference.**

61. On May 24, 2019, Plaintiff's blood sugar was 220. (Exh. 6, JDM 001444).

**ANSWER: Admitted that the cited record contains that reference.**

62. On June 4, 2019, Plaintiff's A1C was 13.7. (Exh. 6, JDM 001446).

**ANSWER: Admitted that the cited record contains that reference.**

63. On June 13, 2019, Plaintiff was scheduled for the hepatitis C telemedicine chronic clinic with Dr. Dina Paul but Plaintiff refused to attend telemedicine. (Exh. 6, JDM 001232, 001494).

**ANSWER: Admitted that the cited record contains that reference.**

64. On June 20, 2019, Plaintiff saw Dr. Pittman. Plaintiff claimed he was unaware he was refusing the hepatitis C clinic; he thought he was refusing mental health or tele-psych. (Exh. 6, JDM 001233).

**ANSWER: Admitted that the cited record contains that reference.**

65. Plaintiff's blood sugar was 100-300 but was averaging at 200. Plaintiff was still drinking Kool-Aid. (Exh. 6, JDM 001233).

**ANSWER: Admitted that the cited record contains that reference.**

66. Dr. Pittman's assessment was type 2 diabetes – "uncontrolled." She charted that Plaintiff's A1C had increased from 9.8 to 13.7. (Exh. 6, JDM 001233).

**ANSWER: Admitted that the cited record contains that reference.**

67. On August 8, 2019, Plaintiff was seen in the diabetes chronic clinic. (Exh. 6, JDM 001335-36).

**ANSWER: Admitted that the cited record contains that reference.**

68. On August 8, 2019, Plaintiff refused regular insulin. (Exh. 6, JDM 001497).

**ANSWER: Admitted that the cited record contains that reference.**

69. On August 20, 2019, Plaintiff's blood sugar was 224. (Exh. 6, JDM 001448-49).

**ANSWER: Admitted that the cited record contains that reference.**

70. On August 22, 2019, Plaintiff saw Dr. Paul in the hepatitis C telemedicine chronic clinic. (Exh. 6, JDM 001337).

**ANSWER: Admitted that the cited record contains that reference.**

71. Dr. Paul charted that Plaintiff had a "[h]istory of DM [diabetes] with chronically poor control." She also charted that Plaintiff's APRI score was 0.40, and his A1C was 13.7. (Exh. 6, JDM 001337).

**ANSWER: Admitted that the cited record contains that reference.**

72. Dr. Paul reviewed Plaintiff's labs and found that his APRI score was low and his liver function was intact. (Exh. 6, JDM 001337).

**ANSWER: Admitted that the cited record contains that reference.**

73. Dr. Paul's plan was for Plaintiff to have a FibroScan, and to have labs drawn for hepatitis B surface antigen, hepatitis B surface antibody, and hepatitis A antibody. (Exh. 6, JDM 001337).

**ANSWER: Admitted that the cited record contains that reference.**

74. On August 26, 2019, Plaintiff tested positive for hepatis A antibody, negative for hepatitis B surface antibody, and negative for hepatitis B surface antigen. The lab tests showed that Plaintiff was not considered to have an immunity to the hepatitis B virus. (Exh. 6, JDM 001450).

**ANSWER: Admitted that the cited record contains that reference.**

75. On September 25, 2019, Plaintiff saw Dr. Pittman with a complaint of left flank pain. Dr. Pittman's assessment was lumbar pain, hemorrhoids, essential hypertension, and type 2 diabetes. Dr. Pittman's plan included changing Plaintiff's insulin. (Exh. 6, JDM 001236).

**ANSWER: Admitted that the cited record contains that reference.**

76. No doctor has told Plaintiff that the pain on his left side was attributable to his hepatitis C. (Exh. 4, Pl. Dep. at 153-54).

**ANSWER: Admitted.**

77. On October 2, 2019, October 7, 2019, and October 20, 2019, Plaintiff refused to have his blood sugar checked, and morning insulin. (Exh. 6, JDM 001500-01).

**ANSWER: Admitted that the cited record contains that reference.**

78. On November 7, 2019, Plaintiff had a FibroScan. Plaintiff had a fibrosis score of F3. (Exh. 6, JDM 001419-20).

**ANSWER: Admitted.**

79. On November 20, 2019, Plaintiff's blood sugar was 126. (Exh. 6, JDM 001451-52).

**ANSWER: Admitted that the cited record contains that reference.**

80. On November 25, 2019, Plaintiff's blood sugar was 216. (Exh. 6, JDM 001453).

**ANSWER: Admitted that the cited record contains that reference.**

81. On December 4, 2019, Plaintiff was seen in the diabetes chronic clinic. (Exh. 6, JDM 001338). Plaintiff stated that sometimes he did not take Metformin because he was afraid it would bottom his sugar out. (Exh. 6, JDM 001338-39).

**ANSWER: Admitted that the cited record contains that reference.**

82. On December 5, 2019, Plaintiff's commissary order included: "Chips, SC & O" (3), "Chips, Whole Shabang" (3), "Drink Mix, Green Berry Rush" (3), "Cookies, Duplex" (2), "Cookies, Chocolate Chip" (2), "Candy, Chocolate Bar" (6) "Pastry, Iced Honey Buns" (10), and "Noodles, Beef Ramen" (47). (Exh. 4, Pl. Dep. at 88-89).

**ANSWER: Admitted that the cited record contains that reference.**

83. Plaintiff knew these were foods and drinks that Dr. Pittman said he should avoid. (Exh. 4, Pl. Dep. at 89).

**ANSWER: Admitted.**

84. Plaintiff admitted that even though Dr. Pittman instructed him to avoid eating sweets, pasta, and high sodium foods, he purchased noodles, honey buns, and cookies from commissary. (Exh. 4, Pl. Dep. at 90-91).

**ANSWER: Admitted.**

85. Plaintiff also admitted that even though Dr. Pittman recommended that he take Vitamin C, he never purchased Vitamin C from commissary. (Exh. 4, Pl. Dep. at 90).

**ANSWER: Disputed. Mr. Miller testified that he purchased vitamin C from the commissary but possibly not at Lawrence. (Miller Dep., at 71).**

86. On December 9, 2019, Plaintiff's A1C was 11.1. (Exh. 6, JDM 001454).

**ANSWER: Admitted that the cited record contains that reference.**

87. On December 12, 2019, Staci deWeese, a nurse at Lawrence, sent the following email to Juliana Chan:

Hello Dr. Chan,

I have a question to ask before Dr. Paul makes a referral. We recently have two offenders with F3/F4 fibroscans, however they are both DM with very high A1C. We know that in the past they will not be treated or considered until the A1C is below 7. With that being said do we still need to work them up with the labs and ultrasound and then send you new packet and let you tell us they do not qualify at this time?

Thanks

Nurse deWeese

Lawrence CC

(Exh. 1, Miller000498-99).

**ANSWER: Admitted.**

88. On December 12, 2019, Chan sent the following response to deWeese's email:

Hi Staci.

You can continue to work up the patient but do not send them or the med records until they have normalize their A1c (or other issues).

Thanks!

Juliana

(Exh. 1, Miller000498-99).

**ANSWER: Admitted.**

89. Chan testified that she understood deWeese's email as a "general question referring back to the protocol." (Exh. 3, Chan Dep. at 208).

**ANSWER: Admitted that Dr. Chan gave the referenced testimony.**

90. Regarding her December 12, 2019 email exchange with DeWeese, Chan testified:

… I don't know what patient this is. This is just a general question asked, you know, we have - - hey, we have these two offenders. It was just a hypothetical question of what would you do. So I could have easily said refer back to the protocol and - - that's basically what that means. It's just looking at the protocol and I'm giving them the answer. This is not patient-specific.

…

I would say that that's a generic patient. That could be anyone in the world. That's not - - it's just a general question.

…

It's a hypothetical. I don't relate that to any patient.

…

There's not enough information to say that's a patient. I was just saying if I have this scenario what would you do, and it's just based on what the protocol says. We're just following that. If you give me a specific name and we look up labs, then I can tell you more.

(Exh. 3, Chan Dep. at 211-212).

**ANSWER: Admitted that Dr. Chan gave the cited testimony.**

91. On December 12, 2019, Plaintiff saw Dr. Paul in the hepatitis C telemedicine chronic clinic. (Exh. 6, JDM 001340).

**ANSWER: Admitted.**

92. Dr. Paul charted that Plaintiff complained of trouble controlling his diabetes in prison. She also charted that nursing staff relayed that Plaintiff was frequently non-compliant with getting his NPH scheduled insulin injections. (Exh. 6, JDM 001340).

**ANSWER: Admitted that the cited record contains that reference.**

93. Dr. Paul also charted that Plaintiff's APRI score was 0.46, and his A1C was 11.1. (Exh. 6, JDM 001340).

Dr. Paul also charted the following:

Per the January 25, 2019 IDOC/OHS HCV guidelines, patient's poor diabetic control (above) precludes his review for HCV antiviral therapy. Email correspondence from Dr. Juliana Chan sent today states that patients with HbA1c > 7.0% should not be referred to be seen by UIC Liver Clinic/Telemedicine. These guidelines require HBA1c to be less than 7.0% to be considered for HCV antiviral therapy. The IDOC/OHS HCV guidelines stipulation for HbA1c requirement was detailed to the patient. Follow up per plan.

(Exh. 6, JDM 001340).

**ANSWER: Admitted that the cited record contains that reference.**

94. Dr. Paul's plan was for labs (HCV Genotype, and ANA), a liver and spleen ultrasound, and for Plaintiff to follow-up in the hepatitis C chronic clinic in 6 months. (Exh. 6, JDM 001340).

**ANSWER: Admitted that the cited record contains that reference.**

95. On December 17, 2019, Plaintiff had a hepatitis C genotype test, and an ANA test. (Exh. 6, JDM 001455-1458).

**ANSWER: Admitted that the cited record contains that reference.**

96. On December 29, 2019, Plaintiff refused insulin. (Exh. 6, JDM 001511).

**ANSWER: Admitted that the cited record contains that reference.**

97. On January 3, 2020, Plaintiff's commissary order included: "Noodles, Beef Ramen" (24), "Cookies, Chocolate Chip" (2), "Cookies, Duplex" (2), and "Candy, Peppermints" (1). (Exh. 4, Pl. Dep. at 89).

**ANSWER: Admitted that the cited record contains that reference.**

98. On January 16, 2020, Plaintiff had a liver and spleen ultrasound that showed mild cirrhosis. (Exh. 6, JDM 001421).

**ANSWER: Admitted that the cited record contains that reference.**

99. On January 20, 2020, Plaintiff's blood sugar was 69, and his A1C was 9.0. (Exh. 6, JDM 001459-61).

**ANSWER: Admitted that the cited record contains that reference.**

100. On February 6, 2020, Dr. Paul reviewed Plaintiff's labs and his ultrasound report. (Exh. 2, Wexford Bates #000667).

**ANSWER: Admitted that the cited record contains that reference.**

101. Dr. Paul's plan was for the site to email Chan regarding Plaintiff detailing the information about Plaintiff's prior labs and FibroScan, and asking if she would want Plaintiff formally referred to the UIC Liver Telemedicine Clinic. (Exh. 2, Wexford Bates #000667).

**ANSWER: Admitted that the cited record contains that reference.**

102. Dr. Paul also ordered an esophagogastroduodenoscopy ("EGD") test to screen for varicies. (Exh. 2, Wexford Bates #000667-68).

**ANSWER: Admitted that the cited record contains that reference.**

103. On February 11, 2020, Heather Ellison, a nurse at Lawrence, sent Chan the following email:

Dr. Chan,

I am sending you the information listed in the 'prior studies' section of the progress notes on [redacted] and MILLER K79113 as requested by Dr. Paul. Do you want these pts formally referred to UIC Liver Clinic/Telemedicine to be evaluated for antiviral therapy at this time?

(Exh. 1, Miller000454-55).

**ANSWER: Admitted.**

104. Chan testified that she did not consider Plaintiff's A1C to be "high in terms of needing to be corrected before getting hep C treatment." (Exh. 3, Chan Dep. at 226).

**ANSWER: Admitted that Dr. Chan gave the cited testimony.**

105. Chan explained that Plaintiff's A1C had improved from 13% (6/14/19) to 11% (12/9/19) to 9% (1/20/20). (Exh. 3, Chan Dep. at 226).

**ANSWER: Admitted that Dr. Chan gave the cited testimony.**

106. Chan testified that the trend and Plaintiff's most recent A1C level showed that Plaintiff's A1C was "becoming more under control." (Exh. 3, Chan Dep. at 226).

**ANSWER: Admitted that Dr. Chan gave the cited testimony.**

107. On February 12, 2020, Chan sent the following response to Ellison's email:

Yes please, please send the needed documents to get these patients evaluated.

Can you in the meantime please have the doctors at Lawrence evaluate and treat their Diabetes and get their A1c better controlled, below 8.

Thanks!

Juliana

(Exh. 1, Miller000454-55).

**ANSWER: Admitted.**

108. Chan testified that if IDOC had referred Plaintiff to the UIC Liver Telemedicine Clinic at this time then Plaintiff would have been evaluated. (Exh. 3, Chan Dep. at 229).

**ANSWER: Disputed. Dr. Chan did not testify at the cited reference that Plaintiff would have been "evaluated" if he had been referred to UIC in February 2020. Dr. Chan testified that if Plaintiff had been referred to UIC in February 2020 he "would get treatment."**

109. Chan testified that IDOC never sent the documents for Plaintiff to be referred to the UIC Liver Telemedicine Clinic. (Exh. 3, Chan Dep. at 231).

**ANSWER: Admitted that Dr. Chan gave the cited testimony.**

110. On February 20, 2020, Ellison emailed Dr. Paul, stating that she had ordered for Plaintiff to start the hepatitis B vaccine in November, however he had only received one dose on December 23, 2020; and asking if Dr. Paul wanted to start the vaccine series over. (Exh. 2, Wexford Bates #000564).

**ANSWER: Admitted.**

111. On February 20, 2020, Plaintiff's blood sugar was 128. (Exh. 6, JDM 001462-63).

**ANSWER: Admitted that the cited record contains that reference.**

112. On February 23, 2020, Plaintiff refused to have his blood sugar checked because it hurts his finger. (Exh. 6, JDM 001253).

**ANSWER: Admitted that the cited record contains that reference.**

113. On February 29, 2020, Plaintiff refused to have his blood sugar checked, insulin. (Exh. 6, JDM 001526-27).

**ANSWER: Admitted that the cited record contains that reference.**

114. On March 20, 2020, Plaintiff tested positive for hepatitis B surface antibody, and positive for hepatis C antibody. The lab tests showed that Plaintiff was considered to have an immunity to the hepatitis B virus. (Exh. 6, JDM 001464).

**ANSWER: Admitted that the cited record contains that reference.**

115. On April 6, 2020, Plaintiff was seen in the diabetes chronic clinic. (Exh. 6, JDM 001341).

**ANSWER: Admitted that the cited record contains that reference.**

116. On May 7, 2020, Plaintiff's commissary order included: "Noodles, Chili Ramen" (10), "Chips, Plain Potato" (6), "Pastry, Iced Honey Buns" (10), "Cakes, Swiss Rolls" (2), and "Candy, Peppermints" (1). (Exh. 4, Pl. Dep. at 89-90).

**ANSWER: Admitted that the cited record contains that reference.**

117. On May 27, 2020, Plaintiff's A1C was 10.2. (Exh. 6, JDM 001465-66).

**ANSWER: Admitted that the cited record contains that reference.**

118. On May 28, 2020, Ellison resent her February 11, 2020 email to Chan (without Chan's February 12, 2020 response) with the following additional message:

Just checking on if you want these two offenders referred or not?

(Exh. 1, Miller000456-59).

**ANSWER: Admitted.**

119. Chan testified that she reviewed Plaintiff's laboratory results, and saw that Plaintiff's A1c went back up to 10.2. (Exh. 3, Chan Dep. at 231).

**ANSWER: Admitted that Dr. Chan gave the cited testimony.**

120. On May 28, 2020, Chan sent the following response to Ellison's email:

Hello Heather,

[redacted]

As for Mr. Miller, Jimmy, please have his A1c in the 7 to low 8's before sending him to UIC Liver telemed.

Thanks!

Juliana

(Exh. 1, Miller000456-59).

**ANSWER: Admitted.**

121. Chan testified that her response was based on the January 2019 Hepatitis C Guideline. Exh. 3, Chan Dep. at 238).

**ANSWER: Admitted that Dr. Chan gave the cited testimony.**

122. Chan could not testify that that if Plaintiff would had been evaluated by the UIC Liver Telemedicine Clinic at this time, then Plaintiff would have been treated. (Exh. 3, Chan Dep. at 239).

**ANSWER: Admitted that Dr. Chan testified at the cited reference that she did not know if Plaintiff would have been treated if he had been referred to UIC in May 2020.**

123. She explained that "… It would depend on the entire patient information that we would get when we would see him. And then his out date, if he is leaving and doesn't have enough time, he would not be receiving therapy. …." (Exh. 3, Chan Dep. at 239).

**ANSWER: Admitted that Dr. Chan gave the cited testimony.**

124. Chan testified that a patient needs at least three months to complete the entire course of treatment. (Exh. 3, Chan Dep. at 246).

**ANSWER: Admitted that Dr. Chan gave the cited testimony.**

125. Chan testified that if the UIC Liver Telemedicine Clinic first evaluated Plaintiff in May 2020, then it would not have provided treatment to Plaintiff because Plaintiff would not have been able to complete treatment before his out date in June 2020. (Exh. 3, Chan Dep. at 246).

**ANSWER: Admitted that Dr. Chan gave the cited testimony.**

126. On June 2, 2020, Plaintiff's commissary order included: "Chips, SC & O" (6), "Noodles, Beef Ramen" (15), "Pastry, Iced Honey Buns" (10), and "Cakes, Swiss Rolls" (2). (Pl's Dep. at 90).

**ANSWER: Admitted that the cited record contains that reference.**

127. On June 11, 2020, Plaintiff's commissary order included: "Chips, Plain Potato" (6) and "Pastry, Iced Honey Buns" (9). (Pl's Dep. at 90).

**ANSWER: Admitted that the cited record contains that reference.**

128. On June 18, 2020, Plaintiff saw Dr. Paul in the hepatitis C telemedicine chronic clinic. (Exh. 2, Wexford Bates #000464).

**ANSWER: Admitted.**

129. Dr. Paul charted that Plaintiff would not respond to her questions or gave one word answers. (Exh. 2, Wexford Bates #000464).

**ANSWER: Admitted that the cited record contains that reference.**

130. Dr. Paul charted that an EGD had been ordered per "IDOC/OHS guidelines" on February 6, 2020 but had not been done due to COVID-19 precautions. (Exh. 2, Wexford Bates #000464).

**ANSWER: Admitted that the cited record contains that reference.**

131. Dr. Chan testified that per the January 2019 Hepatitis C Guideline, if a EGD was deemed appropriate for Plaintiff, then she would have expected that result to be among the required medical records and other documents forwarded to UIC Liver Telemedicine Clinic as part of the referral process. (Exh. 3, Chan Dep. at 243).

**ANSWER: Admitted that Dr. Chan gave the cited testimony.**

132. Dr. Paul also charted that Plaintiff's APRI score was 0.45, and his A1C was 10.2. (Exh. 2, Wexford Bates #000464).

**ANSWER: Admitted that the cited record contains that reference.**

133. Plaintiff was released from prison on June 22, 2020. (Doc. 108 ¶ 8).

**ANSWER: Admitted.**

**D. Plaintiff's post-incarceration relevant medical history.**

134. On October 13, 2020, Plaintiff initiated hepatitis C treatment at Access Community Health Network Brandon Primary Care in Chicago, IL. (Exh., 7, JDM 002029-46).

**ANSWER: Admitted that the cited record contains that reference.**

135. Plaintiff signed a "Hepatitis C Patient Commitment Letter" wherein Plaintiff committed to attending all his scheduled medical appointments and to obtain refill prescriptions every 14-28 days from the start of the medical regimen until its completion. (Exh. 7, JDM 002516).

**ANSWER: Admitted that the cited record contains that reference.**

136. On December 23, 2020, Plaintiff had an ultrasound of his abdomen and an ultrasound elastography of his abdomen. The ultrasound findings correlated with "mild to moderate fibrosis (METAVIR F2-F3)." (Exh. 7, JDM 002546-47).

**ANSWER: Admitted that the cited record contains that reference.**

137. Plaintiff completed 12 weeks of Epclusa in February 2021. (Exh. 7, JDM 002334).

**ANSWER: Admitted that the cited record contains that reference.**

138. On May 10, 2021, Plaintiff was advised that he was cured from hepatitis C. (Exh. 7, JDM 002360).

**ANSWER: Admitted that the cited record contains that reference.**

139. Plaintiff has not been on insulin or Metformin since he was released from prison [footnote omitted]. (Exh. 4, Pl. Dep. at 107-08).

**ANSWER: Admitted. Further admitted that the description of the substance of the referenced order (Doc. 176) contained in Dr. Chan's footnote is generally accurate but**

**disputed that it reflects a fact material to any issue on Mr. Miller's and Dr. Chan's motions for summary judgment.**

140. No doctor has told Plaintiff that his hepatitis C worsened while he was in Lawrence between February 2019 and June 2020. (Exh. 4, Pl. Dep. at 116).

**ANSWER: Admitted.**

## ARGUMENT

### A. Applicable Standards

The summary judgment standard is simple and well-known. In sum, on summary judgment the moving party must show the Court what evidence it has that would convince a trier of fact to accept its version of events. *Gekas v. Vasiliades*, 814 F.3d 890, 896 (7th Cir. 2016). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). The Court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

The standard under § 1983 is equally well-known. (*See* Doc. 294, at 44-46). The Eighth Amendment prohibits deliberate indifference to prisoners' serious medical needs because it constitutes an "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). "A successful deliberate indifference claim is comprised of both an objective and subjective element." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). "First, an inmate must demonstrate that, objectively, the deprivation was 'sufficiently serious; that is, it must result in the denial of the minimal civilized measure of life's necessities.'" *Id.* quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "In the medical care context this objective element is satisfied when an inmate demonstrates that his medical need itself was sufficiently serious." *Id.* "A medical need is

considered sufficiently serious if the inmate's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Id*. quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). "[A] medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated." *Id*. quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

"Second, an inmate must establish that prison officials acted with a 'sufficiently culpable state of mind' to support liability under § 1983." *Id*. quoting *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). "Although negligence or inadvertence will not support a deliberate indifference claim, an inmate need not establish that prison officials actually intended harm to befall him from failure to provide adequate care. 'It is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk.'" *Id*. quoting *Greeno*, 414 F.3d at 653. "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id*. quoting *Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008).

Inmate medical care decisions must be fact-based for the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm and the efficacy of available treatments. *Roe*, 631 F.3d at 859. "[T]he Eighth Amendment 'protects [an inmate] not only from deliberate indifference to his or her *current* serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to *future* health.'" *Id.* at 857 quoting *Board v. Farnham*, 394 F.3d 469, 479 (7th Cir. 2005).

Dr. Chan attempts to raise the bar for a successful § 1983 claim by citing *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985) for the proposition that the infliction of suffering on prisoners can only violate the Eighth Amendment if the infliction is deliberate or reckless in the criminal sense, and that negligence, gross negligence, or even recklessness, as used in tort cases, is not enough. (Doc. 292, at 20). However, "[i]t is enough to show that the defendants knew of substantial risk of harm to the inmate and disregarded the risk." *Roe*, 631 F.3d at 857. Similarly, Dr. Chan cites *Greeno* for the proposition that "a plaintiff must demonstrate that a prison official was 'aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists;' that official actually drew the inference, and then disregarded this risk" (Doc. 292, at 20). But *Greeno* goes on to state that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Greeno*, 414 F.3d at 653. Here, at a minimum, the risk associated with Mr. Miller's progressing HCV is sufficiently obvious that a factfinder may conclude that Dr. Chan knew of the substantial risk of serious harm, particularly given her extensive HCV knowledge, experience and training.

Dr. Chan argues that inmates are not entitled to demand specific treatment or the best possible care and that mere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient to sustain a § 1983 claim (Doc. 292, at 20), citing *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) and *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). But that is not what the facts establish in this case. For example, *Forbes* involved preventative therapy for tuberculosis, and the plaintiff's complaint was that he received treatment less frequently than he believed necessary even though medical experts believed the lower frequency was effective. *Forbes*, 112 F.3d at 267. A doctor choosing an easier and less efficacious treatment can demonstrate

deliberate indifference rather than an exercise of professional judgment. *Estelle*, 429 U.S. at 104 n.10; *Roe*, 631 F.3d at 861. In this case, Dr. Chan's deliberate indifference entirely precluded Mr. Miller from receiving treatment for his HCV. The issue is not whether he received the best treatment, but why he was denied *any treatment at all*. Viewed under the proper constitutional standard, the facts in this case clearly compel a finding of Dr. Chan's liability under § 1983.

Dr. Chan does not appear to contest that HCV constitutes a serious medical condition or that Mr. Miller has met the objective element of his deliberate indifference claim. Nor could she credibly do so. It is beyond question that chronic HCV, particularly at the stage of progression suffered by Mr. Miller, is a serious medical need under established § 1983 law. (*See* Doc. 294, ¶¶ 41-44, 48; *Stafford v. Carter*, No. 1:17-cv-00289-JMS-MJD, 2018 U.S. Dist. LEXIS 155866 *35, 2018 WL 4361639 (S.D. Ind. Sept. 13, 2018); *Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1299 (N.D. Fla. 2017); *Parks v. Blanchette*, 144 F. Supp. 3d 282, 314 (D. Conn. 2015); *Hilton v. Wright*, 928 F. Supp. 2d 530, 547-48 (N.D. N.Y. 2013).

Dr. Chan instead disputes the subjective element – denying that she had the requisite culpable state of mind to show deliberate indifference. She bases her argument on a series of factual claims that are all belied by the record: that she is only a pharmacist and is not involved in deciding which patients receive treatment; that she was not involved in crafting the A1c absolute exclusion in the IDOC HCV Guidelines; that Mr. Miller was denied HCV treatment for reasons other than his elevated A1c; that Mr. Miller should have lowered his A1c if he wanted to get HCV treatment; that IDOC providers neglected to send the proper paperwork; that she did not know that denial of HCV treatment posed a risk to Mr. Miller and other IDOC patients; *etc*. None of those facts is true or is supported by any evidence. The record establishes instead that Dr. Chan was directly

responsible for the "absolute exclusion" that precluded Mr. Miller from receiving HCV treatment based on his A1c, and that the *only* reason he was denied treatment was his elevated A1c.

**B. The Evidence Establishes Dr. Chan's Deliberate Indifference**

**1. Dr. Chan Was Responsible for the A1c Absolute Exclusion**

Dr. Chan seeks to avoid § 1983 liability by disavowing any involvement in creating or implementing the A1c absolute exclusion that precluded Mr. Miller from receiving HCV treatment. (Doc. 292, at 26). On the contrary, the evidence shows that Dr. Chan was directly and principally involved in adding that absolute exclusion to the Guidelines. UIC medical professionals, including Dr. Chan, took the lead in preparing the IDOC HCV Guidelines, and Dr. Chan participated in drafting and revising the Guidelines. (Doc. 294, ¶ 68). As early as 2014, Dr. Chan participated in creating Guidelines that listed "Uncontrolled diabetes (Hgb A1c > 7.5)" as an "Absolute Exclusion Criteria for Hepatitis C Treatment" and as a "contraindication" to HCV treatment for some but not all genotypes. Even then, Dr. Chan knew that elevated A1c was not a contraindication to HCV treatment, only to HCV treatment with interferon, and she disagreed with the statement that A1c above 7.5 was a contraindication to HCV treatment but she did not express that to IDOC. (Doc. 294, ¶¶ 73-75).

Dr. Chan worked with Dr. Patel on revisions to the IDOC HCV Guidelines in May and June 2017, during which Dr. Chan consulted the guidelines of the AASLD, IDSA, and FBOP. (Doc. 294, ¶ 81). Dr. Chan forwarded proposed revisions to the Guidelines under which elevated A1c became an absolute exclusion without regard to the contemplated drug therapy. These proposed revisions removed elevated A1c from the list of contraindications, because interferon was no longer part of common HCV treatments, but instead made it a blanket exclusion. (Doc. 294, ¶¶ 82, 84). Dr. Chan created a "Review of Systems Checklist" form to be used to implement

the revised 2017 IDOC Guidelines, which stated that if A1c is greater than 7 percent, "have patient see IDOC Physician before refer to UIC HCV Telemedicine Clinic. Do not send until the labs are within normal range." (Doc. 294, ¶ 86). This was the first time the IDOC Guidelines contained a Review of Systems Checklist that referenced A1c. (Doc. 294., ¶ 87). Dr. Chan created the Review of Systems Checklist to inform IDOC providers what IDOC was directing them to do in the Guidelines. (Doc. 294, ¶ 87). Dr. Chan thus added restrictions on HCV treatment to the revised guidelines even though she had known since at least 2014 that A1c at any level, including above 7 percent, was not a contraindication to HCV treatment. (Doc. 294, ¶¶ 74-75).

The proposed revised guidelines that Dr. Chan forwarded to Dr. Patel also included a new statement that they were "in line with" recommendations of the FBOP, however the new A1c absolute exclusion Dr. Chan proposed was, in fact, directly contrary to the FBOP guidelines that made diabetes a second-level *priority* for HCV treatment. (Doc. 294, ¶¶ 61-63, 83). Under Dr. Chan's proposed new guidelines, IDOC inmates with elevated A1c, such as Mr. Miller, would be absolutely excluded from receiving HCV treatment even if they had Fibrosis Scores of F3 or F4 and/or had cirrhosis. The exclusion would also prevent inmates with elevated A1c from even receiving a FibroScan. (Doc. 294, ¶¶ 90, 96). IDOC implemented Dr. Chan's changes in December 2017 and the changes, including the A1c absolute exclusion, carried forward to the 2019 IDOC HCV Guidelines. (Doc. 294, ¶¶ 91, 94). Dr. Chan thus was directly responsible for the A1c exclusion that precluded Mr. Miller from receiving HCV treatment.

**2. Dr. Chan Determined Whether IDOC Patients Were Referred for Treatment**

Dr. Chan next argues that she was not deliberately indifferent to Mr. Miller's medical needs because he was not her patient, and it was up to IDOC providers to determine whether to refer him to UIC for HCV treatment. (Doc. 292, at 22-24). Again, the facts instead establish that Dr. Chan

was actively involved in ensuring that the A1c absolute exclusion was enforced, thereby denying inmates HCV treatment based on their A1c level, including those inmates with documented severe fibrosis. (*See* Doc. 294, ¶¶ 155-161, 163, 171-176). As examples, Dr. Chan received an email on behalf of Dr. Paul stating that Lawrence CC had "two offenders with F3/F4 fibroscans, however they are both DM with very high A1c. . . . We know that in the past they will not be treated or considered until the A1c is below 7. . . . do we still need to work them up with the labs and ultrasound and send you [a] new packet and let you tell us they do not qualify at this time." (Doc. 294, ¶ 176). Mr. Miller was one of those inmates. Dr. Chan knew that Fibrosis scores of F3/F4 indicate advancing liver disease (Dr. Chan deems F4 as cirrhosis in her own published paper) and that there was no medical reason that UIC could not treat HCV at the same time the IDOC medical provider was treating elevated A1c. (Doc. 294, ¶ 161). Nevertheless, Dr. Chan responded to this email with "[y]ou can continue to work up the patient but do not send them or the med records until they have normalize[d] their A1c." (Doc. 294, ¶¶ 157, 169). Dr. Paul did not refer Mr. Miller for the HCV treatment he required because of this instruction from Dr. Chan. (Doc. 294, ¶¶ 159, 163). In February 2020, Dr. Chan instructed Lawrence CC to "send the needed documents" for Mr. Miller and another patient even though their A1c was 9.0 (above the absolute exclusion limit) but also told Lawrence CC to "get their A1c better controlled, below 8." (Doc. 294, ¶173). Dr. Chan again in May 2020 instructed Lawrence CC not to refer Mr. Miller because his A1c at that time was 10.2. (Doc. 294, ¶ 176). Thus, Dr. Chan was directly involved in making individual patient decisions concerning referral to UIC, including whether and when to enforce or ignore the terms of the IDOC HCV Guidelines. (*See* Doc. 294, ¶ 175).

### 3. Mr. Miller Was Denied Treatment Because of His Elevated A1c

Dr. Chan next argues that the denial of HCV treatment for Mr. Miller was caused by reasons outside her control and unrelated to the absolute A1c exclusion she had inserted into the IDOC Guidelines. (Doc. 292, at 22-26). The evidence establishes otherwise. The reason Dr. Chan instructed Dr. Paul not to refer Mr. Miller for HCV treatment was his elevated A1c and the absolute exclusion in the January 2019 IDOC HCV Guidelines. (Doc. 294, ¶ 179). The reason Dr. Paul did not refer Mr. Miller for HCV treatment was the A1c absolute exclusion and Dr. Chan's instruction not to refer him until his A1c was normalized. (Doc. 294, ¶¶ 163, 178). Dr. Paul understood Wexford's corporate policy required her to follow the Guidelines and Dr. Chan's instructions. (Doc. 294, ¶ 179). Dr. Paul noted on the day Mr. Miller was released from IDOC custody that "[p]atient met HCV treatment criteria per the IDOC/OHS HCV guidelines, but treatment was not initiated due to his poorly controlled diabetes." (Doc. 294, ¶ 177). If Mr. Miller had been referred to UIC in December 2019 or January 2020, he would have been able to complete HCV treatment before his release in June 2020. (Doc. 294, ¶ 162). Dr. Chan testified that if Mr. Miller had been referred to UIC in February 2020 he "would get treatment." (*See* Response to Dr. Chan's Statement of Fact No. 108, above). The A1c exclusion, for which Dr. Chan is responsible, undeniably prevented Mr. Miller from receiving treatment.

### 4. Dr. Chan Had Knowledge of the Risk Caused by Denying HCV Treatment

Dr. Chan next argues she was not deliberately indifferent because she did not know that denying HCV treatment to Mr. Miller due to his elevated A1c involved a substantial risk of harm. That argument is neither plausible nor evidence based. Of course, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Greeno*, 414 F.3d at 653. That principle is particularly relevant here, where Dr. Chan had far more

knowledge about HCV than even an experienced IDOC physician. Dr. Chan is a Doctor of Pharmacy and a Clinical Associate Professor of Medicine at UIC. (Doc. 294, ¶ 21). She established the first pharmacist-managed clinic for HCV at UIC and was part of the team at UIC that started a telemedicine HCV program for IDOC inmates. (Doc. 294, ¶ 22). Dr. Chan knew that HCV is a disease that adversely affects the functioning of the liver, and that persons infected with chronic HCV are at an increased risk of developing cirrhosis, a life-threatening condition whereby the functioning of the liver is reduced by extensive liver scarring associated with the advanced progression of fibrosis, as well as liver cancer. (Doc. 294, ¶¶ 36, 42, 50). Dr. Chan knew that the presence of other diseases may affect the rate of progression of fibrosis. (Doc. 294, ¶ 48). She knew that cirrhotic patients who achieve sustained virological response are not free of liver complications. (Doc. 294, ¶ 55). Dr. Chan knew that Fibrosis Scores of F3 and F4 are indicia of advancing liver disease. (Doc. 294, ¶ 161).

Dr. Chan participated in drafting and revising the IDOC HCV Guidelines and reviewed the AASLD and FBOP guidelines as part of revising the IDOC guidelines. (Doc. 294, ¶¶ 68, 71). The FBOP guidelines identified elevated A1c as a second-level priority for HCV treatment because it is a condition associated with more rapid progression of fibrosis. (Doc. 294, ¶ 102). The FBOP priority is consistent with medical literature suggesting that HCV patients with diabetes are at risk for worse outcomes, including more rapid progression of fibrosis. (Doc. 294, ¶ 103). Dr. Chan knew that elevated A1c was not a contraindication of HCV treatment and that there was no medical reason that a patient with elevated A1c could not receive HCV treatment. (Doc. 294, ¶¶ 74, 116, 122, 161). UIC's own HCV Guidelines for IDOC patients did not include any exclusion for elevated A1c. (Doc. 294, ¶¶ 131, 134). In sum, Dr. Chan's entire practice is centered around knowing the risks of HCV and the development, efficacy and contraindications of HCV treatment.

Her claim that she did not know the risks of harm engendered by the A1c absolute exclusion are baseless.

Dr. Chan makes virtually no effort to medically justify the A1c absolute exclusion, referring only to "court-appointed monitors" supposedly "[recognizing] that there can be circumstances where controlling A1c may be more pressing than treating for hepatitis C." (Doc. 292, at 28). That argument, again, is belied by the evidence. Dr. Chan cites her own deposition testimony concerning her recollection of a telephone conference involving the *Lippert* Monitor but ignores her testimony that the Monitor requested that A1c not be included in the list of absolute exclusions and that the Monitor's comments caused the removal of the statement "do not send [patient] until the labs are in the normal range" from the revised guidelines. (Doc. 294, ¶¶ 109, 113-114). Further, email communications involving Dr. Chan (not produced by Dr. Chan and obtained by subpoena after her deposition) suggest that the Monitor did *not* agree that A1c should be a consideration in limiting HCV treatment or should be addressed before HCV treatment, but instead viewed the A1c exclusion as one of "a number of exclusion criteria that were deemed to be clinically needless barriers" to access to HCV treatment. (*See* Doc. 294, ¶¶ 110-111). There is no evidence in the record suggesting that the absolute A1c exclusion has any reasonable basis, or that Dr. Chan did or could believe it had any reasonable basis. It was, in fact, "blatantly inappropriate."

**C. Mr. Miller Has Established All Elements of His § 1983 Claim**

Dr. Chan next argues that Mr. Miller must present "verifying medical evidence" that a delay in treatment detrimentally affected him and that in the absence of such evidence she escapes liability for her actions. (Doc. 292, at 28). This argument also fails.

As a preliminary matter, Mr. Miller's § 1983 claim against Dr. Chan is not for "delay" in providing him HCV treatment, it is for wholly *denying* him treatment. "An actionable deliberate-

indifference claim does not require proof that the plaintiff suffered an actual injury. Instead, it is enough that the defendant's actions exposed the plaintiff to a 'substantial risk of serious harm.'" *Green v. Obsu*, No. ELH-19-2068, 2021 U.S. Dist. LEXIS 9593 *26, 2021 WL 165135 (D. Md. Jan. 19, 2021), citing *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017). Deliberate indifference can arise in a variety of contexts, first and foremost of which "is a prison official's decision to ignore a request for medical treatment. . . . If a *risk* from a particular course of medical treatment (*or lack thereof*) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (emphasis added). Other contexts include persisting in a course of treatment known to be ineffective or choosing an easier and less efficacious treatment without exercising professional judgment. *Id*. at 729-30, citing *Estelle*, 429 U.S. at 104 n.10 and *Kelley v. McGinnis,* 899 F.2d 612, 616-17 (7th Cir. 1990). "Yet another type of evidence that can support an inference of deliberate indifference is an *inexplicable delay* in treatment which serves no penological interest. . . ." *Id*. at 730-31 (emphasis added). It is only in this delay scenario that courts, in some circumstances, have engrafted a requirement of showing "that the delay exacerbated the injury or unnecessarily prolonged pain." *Id*.

Even if such an element were applicable to a case such as this, where the defendant refuses to provide any treatment, Dr. Chan does not articulate any standard of evidence she proposes is necessary concerning the nature or degree of any "detriment" to Mr. Miller to sustain a § 1983 claim. A wholesale requirement of showing exacerbation or quantifiable detriment in cases where the defendant wholly denied medical treatment would be inconsistent with established Eighth Amendment law. A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain *if not treated*. *Roe*, 631 F.3d at 857; *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010).

"[T]he Eighth Amendment 'protects [an inmate] not only from deliberate indifference to his or her *current* serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to *future* health." *Roe*, 631 F.3d at 857, quoting *Board v. Farnham*, 394 F.3d 469, 479 (7th Cir. 2005) (emphasis added). It is beyond question under established § 1983 law that chronic HCV, particularly at the stage of progression suffered by Plaintiff, is a serious medical need that poses an unreasonable risk of serious damage to future health if not treated. (*See* Doc. 294 ¶¶ 41-44, 48; *Stafford*, 2018 U.S. Dist. LEXIS 155866, at *35; *Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1299 (N.D. Fla. 2017); *Parks v. Blanchette*, 144 F. Supp. 3d 282, 314 (D. Conn. 2015); *Hilton v. Wright*, 928 F. Supp. 2d 530, 547-48 (N.D. N.Y. 2013). HCV is a progressive disease and thus by definition worsens over the course of time. (Doc. 294, ¶ 36). Persons infected with chronic HCV can develop fibrosis, which is scarring of liver tissue that damages the structure of their livers. (Doc. 294, ¶ 41). Such persons are at an increased risk of developing cirrhosis, a life-threatening condition whereby the functioning of the liver is reduced by extensive liver scarring associated with the advanced progression of fibrosis, as well as hepatocellular carcinoma. (Doc. 294, ¶ 42). The progression of fibrosis does not occur at the same rate in all persons and the progression is not linear. (Doc. 294, ¶ 48). Patients with diabetes are at risk for accelerated liver fibrosis progression. (Doc. 294, ¶¶ 44, 48). Persons with HCV may have no symptoms until they are at the end stages of the disease and serious liver complications arise. (Doc. 294, ¶ 43).

None of the cases on which Dr. Chan relies are supportive of her argument. Most significantly, none of those cases involves a defendant medical provider's implementation or enforcement of a policy barring treatment for a progressive disease based on an arbitrary and medically baseless exclusion. More specifically, in *Langston v. Peters*, 100 F.3d 1235, 1240 (7th

Cir. 1996), the court upheld summary judgment for the defendants on numerous grounds, one of which was that the plaintiff did not produce evidence that the one-hour delay in providing medical treatment after an assault caused any additional injury.

In *Whitehead v. Mahone*, No. 10-1027, 2011 U.S. Dist. LEXIS 83584 *7-8, 2011 WL 3241352 (C.D. Ill. July 29, 2011), the defendant doctor secured Wexford's authorization for a liver biopsy and consulted with Dr. Paul concerning the results. Although the biopsy result (Fibrosis Score) is not reflected in the opinion, Dr. Paul assessed that no treatment was required at that time. *Id*. at *8. The court noted "[i]t can be safely assumed – and it appears to be uncontested by the parties – that hepatitis C constitutes a serious medical need," *Id*. at 13-14, but held that the defendant doctor did not disregard an excessive risk to the plaintiff's health in not instituting treatment at that time because he secured a referral for liver biopsy and followed the guidance of Dr. Paul. *Id*. at *19. At the time of the events in *Whitehead*, interferon-free DAA treatments were not available.

In *Crouthers v. Zunker*, No. 07-cv-655-bbc, 2008 U.S. Dist. LEXIS 98658 *2, 2008 WL 5146682 (W.D. Wis. Dec. 5, 2008), the court held that the defendant doctor was not deliberately indifferent by following the DOC procedures which dictated monitoring rather than treatment for patients with the plaintiff's existing lab values. The court noted (in 2008) that HCV "can sometimes be eradicated through use of ribavirin pills and interferon injections. However, many people infected with hepatitis C are not given these treatments because of their potentially debilitating side effects." *Id*. at *3-4. In granting summary judgment for the defendant, the court wrote:

> Plaintiff has adduced no evidence that the treatment outlined in the Department of Corrections' policy is "so blatantly inappropriate as to evidence intentional mistreatment." The policy recommends that patients whose liver enzyme levels are relatively low not be considered for aggressive treatment because treatment for

> hepatitis C is not always successful and has the potential for debilitating side effects. Only inmates whose liver enzyme levels are sufficiently elevated as to suggest liver damage are further evaluated for treatment.

*Id*. at *12.

In *Niksich v. Corizon Inc.*, No. 2:16-cv-00206-JMS-DLP, 2019 U.S. Dist. LEXIS 78987 *, 2019 WL 2076244 (S.D. Ind. May 10, 2019), the court explained the reasoning behind granting summary judgment for the defendant doctors as follows:

> Mr. Niksich had Hepatitis C for twenty-four years when he came under the care of Dr. Loveridge in September 2014. For nearly all of that time, there was not a reliably effective cure for Hepatitis C. Only six months later, after receiving concerning lab results, Dr. Loveridge began the process that ultimately led to Mr. Niksich receiving a "state of the art" cure for his Hepatitis C, and he received it "early" given how new the medications were. The only involvement of another defendant was that of Dr. Byrd, who, days after Mr. Niksich became his patient, informed Mr. Niksich that he was approved for Hepatitis C treatment, ordered the medications, and provided them to Mr. Niksich shortly thereafter. After taking the medications, Mr. Niksich was cured of Hepatitis C.

Id. at *29-30.

Dr. Chan's authorities offer no support for her argument that Mr. Miller must establish some undefined "exacerbation" of his HCV during the period he was at Lawrence CC and being denied HCV treatment because of her deliberate indifference. Mr. Miller has established every element of his § 1983 claim.

**D. Mr. Miller's Conduct Is Irrelevant**

Finally, Dr. Chan argues that it was Mr. Miller's own fault that he was denied HCV treatment and that she is therefore relieved of § 1983 liability for her deliberate indifference. She argues Mr. Miller did not successfully lower his A1c – and thereby meet her arbitrary and medically baseless qualification standard – because of his diet choices and his refusal on occasion to take his prescribed insulin. (Doc. 292, at 30-31). That red herring argument entirely misses the point. First, Dr. Chan offers no evidence that any of Mr. Miller's conduct in fact caused his A1c

to remain above her artificial cut-off – that is, she does not attempt to show that if Mr. Miller had eaten properly and not missed any insulin injections, his A1c would have been below 7. Second, the denial of HCV treatment was wrongful *precisely because* it was premised on an unconstitutional A1c exclusion. The only reason lowering Mr. Miller's A1c was necessary to make him eligible for HCV treatment is because Dr. Chan *made* it a (medically baseless) requirement. Accepting Dr. Chan's argument would mean that she, or any prison medical official, could impose virtually any barrier to medical treatment and, if the plaintiff did not or could not meet the arbitrary requirement, avoid § 1983 liability for refusing to provide constitutionally mandated medical care on the ground it was "plaintiff's own fault." That is not the law. It is the imposing of the artificial and non-medical barrier that makes the denial of treatment unconstitutional and subjects Dr. Chan § 1983 liability. She does not escape that liability merely because Mr. Miller did not or could not meet her arbitrary and medically baseless terms.

## CONCLUSION

Deliberate indifference to serious medical needs of prisoners is a violation of the Eighth Amendment subjecting defendants to liability under § 1983. Based on the undisputed facts, Mr. Miller has established as a matter of law that Defendant Dr. Chan was deliberately indifferent to his medical needs, because she intentionally and unconstitutionally deprived him of treatment for HCV. The Court therefore should deny Dr. Chan's motion for summary judgment and should grant Mr. Miller's motion for summary judgment on the issue of liability.

Respectfully submitted,

JIMMIE DALE MILLER

By: /s/Sean M. Sullivan
Sean M. Sullivan

Sean M. Sullivan
Adrian D. Riordan
MOHAN GROBLE SCOLARO, P.C.
55 West Monroe Street
Suite 1600
Chicago, IL 60603
Phone: (312) 422-9999
Fax: (312) 422-5371
ssullivan@daleymohan.com
ariordan@mohangroble.com

**CERTIFICATE OF SERVICE**

I, Sean M. Sullivan, an attorney, certify that I caused a true copy of the foregoing **Plaintiff's Response to Dr. Juliana Chan's Motion for Summary Judgment** to be served upon the attorneys of record via the Court's ECF filing system on October 24, 2024.

/s/ Sean M. Sullivan
Sean M. Sullivan