**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JIMMIE DALE MILLER, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 3:20-cv-00446-NJR |
| WEXFORD HEALTH SOURCE, INC.; LOUIS SHICKER, former Medical Director of Illinois Department of Corrections, individually; STEVE MEEKS, Medical Director of Illinois Department of Corrections, individually; MICHAEL DEMPSEY, former Interim Medical Director of Illinois Department of Corrections, individually; DR. DINA PAUL, individually; DR. LYNN PITTMAN, individually; DR. JULIANA CHAN, individually; LORI CUNNINGHAM, individually; and THOMAS WELSH, individually, | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO MOTION**
**FOR SUMMARY JUDGMENT OF DEFENDANTS WEXFORD AND DR. DINA PAUL**

**RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

1. Plaintiff Jimmie Dale Miller ("Plaintiff") was incarcerated in the Illinois Department of Corrections ("IDOC") at Lawrence Correctional Center ("Lawrence") from February 2019 to June 22, 2020. [Plaintiff's Amended Complaint, Doc. 108, ¶8].

**RESPONSE: Admitted.**

2. The claims in this case arise out of Plaintiff's time in Lawrence. [Deposition of Plaintiff Jimmie Dale Miller, attached hereto as Exhibit A, 7:4-11].

**RESPONSE: Plaintiff admits that he was denied HCV treatment on the basis of the A1C exclusion during the period he was incarcerated at the Lawrence Correctional Center but disputes that all conduct subjecting Defendants to liability occurred during that period. (*See e.g.* Plaintiff's Rule 56.1 Statement of Undisputed Material Facts (Doc. 294), ¶¶ 6-8, 13, 68-69, 71-94).[1]**

3. Wexford Health Sources, Inc. ("Wexford") is the medical vendor contracted to provide medical services in IDOC. [Deposition of Dr. Shicker, attached hereto as Exhibit F, 18:19-20].

**RESPONSE: Admitted.**

4. Dr. Lynn Pittman is a physician and was employed by Wexford Health Sources, Inc. ("Wexford") as the Medical Director at Lawrence from February 1, 2019, through July 19, 2020. [Deposition of Dr. Lynn Pittman, attached hereto as Exhibit B, 6:19-8:14].

**RESPONSE: Admitted.**

5. Dr. Dina Paul is a physician employed by Wexford. [Deposition of Dr. Dina Paul, attached hereto as Exhibit C, 17:7-17].

**RESPONSE: Admitted.**

6. Dr. Fisher is a physician employed by Wexford as the Assistant Chief Medical Officer and Corporate Director for Quality and Pharmacy. [Deposition of Dr. Neal Fisher, attached hereto as Exhibit D, 19:1-4].

**RESPONSE: Admitted.**

---

1 All additional material facts necessary to respond to Defendants' motion are contained in Plaintiff's Rule 56.1 Statement in his Memorandum in Support of Motion for Summary Judgment (Doc. 294). Rather than repeating those facts here, Plaintiff will cite to that document where relevant to this response.

7. Dr. Roderick Matticks is a physician and served as a Regional Medical Director for Wexford in Illinois in 2019 and 2020. [Deposition of Dr. Roderick Matticks, attached hereto as Exhibit E, 6:11-17; 8:16-24].

**RESPONSE: Admitted.**

8. Dr. Louis Shicker is a physician who was the Medical Director for the Illinois Department of Corrections from November 2009 to 2016. [Ex. F, Dep. of Dr. Schicker, 10:12-21; 12:11-17].

**RESPONSE: Admitted.**

9. Dr. Steve Meeks is a physician who served as Chief of Health Services (Medical Director) for IDOC from November 1, 2016, to March 27, 2020. [Deposition of Dr. Meeks, attached hereto as Exhibit G, 7:7-22; 10:12-18; 13:3-8].

**RESPONSE: Admitted.**

10. The IDOC Medical Director's duties included overseeing the contract with the vendor contracted to provide medical services for IDOC and creating policies related to healthcare services. [Ex. F, Dep. of Dr. Shicker, 15:21-16].

**RESPONSE: Admitted.**

11. Dr. Juliana Chan is a Doctor of Pharmacy employed at the University of Illinois – Chicago ("UIC") and working in the IDOC telemedicine clinic. [Deposition of Dr. Chan, attached hereto as Exhibit H, 8:3-15, 9:2-10:18; 18:17-22]

**RESPONSE: Admitted.**

12. Dr. Mahesh Patel is an infectious disease specialist at UIC. [Deposition of Dr. Patel, attached hereto as Exhibit I, 7:22-8:19].

**RESPONSE: Admitted.**

13. Dr. Patel has worked at UIC since 2010 and sees patients incarcerated in IDOC through the UIC Hepatitis C telemedicine clinic. [Ex. I, Dep. of Dr. Patel, 9:4-10:12].

**RESPONSE: Admitted.**

## IDOC HEPATITIS C GUIDELINES

14. Hepatitis C is a viral infection that causes inflammation to the liver and can lead to fibrosis of the liver and potentially cirrhosis (scarring of the liver). [Ex. F, Dep. of Dr. Shicker, 22:1-4]; [Ex. G, Dep. of Dr. Meeks, 42:11-15; 44:18-21]; [Ex. H, Dep. of Dr. Chan, 29:23-24].

**RESPONSE: Admitted.**

15. In 2010, the IDOC implemented a telemedicine program at UIC for treatment of inmates with hepatitis C. [Ex. F, Dep. of Dr. Shicker, 28:10-15; 16-23] [Ex. H, Dep. of Dr. Chan, 18:17-22; 25:23-2].

**RESPONSE: Admitted.**

16. The UIC telemedicine program evaluates patients with hepatitis C using infectious disease specialists. [Ex. F, Dep. of Dr. Shicker, 41:16-22]; [Ex. E, Dep. of Dr. Matticks, 17:6-13].

**RESPONSE: Admitted.**

17. Dr. Shicker worked with the infectious disease experts at UIC to develop guidelines for provision of hepatitis C treatment for IDOC inmates. [Ex. F, Dep. of Dr. Shicker, 31:24-32:21; 40:20-23; 61:5-14]; [Ex. G, Dep. of Dr. Meeks, 26:1-5].

**RESPONSE: Admitted.**

18. The guidelines for treatment of IDOC inmates with hepatitis C are IDOC guidelines, not prepared by Wexford. [Ex. F, Dep. of Dr. Shicker, 36:3-20]; [Ex. C, Dep. of Dr. Paul, 37:8-11]; [Ex. D, Dep. of Dr. Fisher, 155:3-16; 211:3-17].

**RESPONSE: Admitted.**

19. The IDOC Hepatitis C Guidelines were revised over time. [Ex. F, Dep. of Dr. Shicker, 33:15-21; 34:6-16]; [Ex. H, Dep. of Dr. Chan, 61:13-62:21].

**RESPONSE: Admitted.**

20. IDOC worked with the infectious disease specialists at UIC on the revisions to the hepatitis C guidelines. [Ex. F, Dep. of Dr. Shicker, 69:5-70:6]; [Ex. G, Dep. of Dr. Meeks, 26:9-17; 27:11-20]; [Ex. H, Dep. of Dr. Chan, 65:21-67:2; 71:4-18; 72:12-23] [Ex. D, Dep. of Dr. Fisher, 115:2-24].

**RESPONSE: Admitted.**

21. The contract between Wexford and the IDOC expressly provides that treatment of patients with hepatitis C is done by UIC through an interagency agreement. [Ex. G, Dep. of Dr. Fisher, 84:3-85:8].

**RESPONSE: The stated fact is not supported by the cited reference. Plaintiff admits that the contract between IDOC and Wexford includes Exhibit XIII which describes a program under which UIC provides medical services to IDOC HCV patients through what it describes as a "Medical Program Agreement." (Doc. 299-23, at Page 38 of 40).**

22. Wexford has no policy separate from the IDOC Hepatitis C Guideline for care and treatment of hepatitis C in Illinois because use of the IDOC Hepatitis C Guideline is set by contract. [Ex. D, Dep. of Dr. Fisher, 200:22-201:9; 210:14-22; 215:1-13]; [Wexford Responses

to Request for Admission, attached hereto as Exhibit O, p. 2]; [Wexford – IDOC Contract, excerpts attached hereto as Exhibit P, p. 38-40, Bates 265-267].

**RESPONSE: The stated fact is not supported by the cited references to Exhibits D and O. Plaintiff admits that Wexford does not have any medical guidelines for Illinois related to HCV and that it instead applies the IDOC HCV Guidelines. See Doc. 294, ¶¶ 125-130).**

23. The 340B program is a drug-pricing program through the federal government where a qualifying entity, typically a hospital, university or rural healthcare center, gets a discount on hepatitis C medications. [Ex. C, Dep. of Dr. Paul, 218:17-219:24].

**RESPONSE: Admitted.**

24. Part of the reason for implementing the telemedicine clinic with UIC is to receive the 340B pricing through UIC. [Ex. F, Dep. of Dr. Shicker, 31:24-32:21].

**RESPONSE: Admitted.**

25. Under the 340B pricing program, the hepatitis C medications have to come from a UIC pharmacy. [Ex. F, Dep. of Dr. Shicker, 47:19-48:2].

**RESPONSE: Admitted.**

26. The 340B program provides a reduction in the cost of the hepatitis C treatment for IDOC. [Ex. F, Dep. of Dr. Shicker, 83:14-84:14].

**RESPONSE: Admitted.**

27. In order to meet the criteria for the 340B pricing, IDOC had to have an affiliation with UIC, with the UIC physicians being the ones prescribing the medicine, seeing the patients, and the medication had to come from the UIC pharmacy. [Ex. F, Dep. of Dr. Shicker, 84:16-85:4]; [Ex. C, Dep. of Dr. Paul, 220:1-12].

**RESPONSE: Admitted.**

28. Under the 340B agreement, no other providers other than those at UIC can provide hepatitis C treatment. [Ex. C, Dep. of Dr. Paul, 179:4-11].

**RESPONSE: Admitted.**

29. In the UIC telemedicine clinic, patients were seen by infectious disease specialists from UIC. [Ex. F, Dep. of Dr. Shicker, 31:8-23; 45:23-46:2].

**RESPONSE: Admitted.**

30. The UIC specialists made decisions regarding whether a patient was eligible for hepatitis C treatment based on the IDOC hepatitis C guidelines. [Ex. F, Dep. of Dr. Shicker, 46:3-9]; [Ex. H, Dep. of Dr. Chan, 150:9-24].

**RESPONSE: Admitted.**

31. The role of Wexford staff in treating inmates with hepatitis C was to gather information and refer individuals to UIC in accordance with the IDOC Hepatitis C Guidelines. [Ex. E, Dep. of Dr. Matticks, 17:6-19:12; 40:3-41:2].

**RESPONSE: Admitted that Wexford medical providers completed work-up of HCV patients for referral to UIC and were required by Wexford to follow the IDOC HCV Guidelines in that process. Disputed that ¶31 is a full recitation of Wexford's responsibilities in the process of screening and referring IDOC patients for HCV treatment. Under Wexford's contract with IDOC, and under the January 2019 IDOC HCV Guidelines, it was the responsibility of Wexford clinicians to determine whether a patient is eligible for HCV treatment, and Wexford contractually agreed to follow the IDOC Guidelines in making that determination. (Doc. 294, ¶ 98; Ex. 4, Fisher Dep., at 214-15; Ex. 39, PX20, at 000435).**

32. Wexford staff were required to follow the IDOC Hepatitis C guideline in screening patients and making referrals to UIC. [Ex. C, Dep. of Dr. Paul, 175:12-20]; [Ex. F, Dep. of Dr. Shicker, 50:14-51:1] [Ex. I, Dep. of Dr. Patel, 68:7-9].

**RESPONSE: Admitted that Wexford clinicians were required by Wexford corporate policy to follow the IDOC HCV Guidelines in conducting screening and making referrals of patients to UIC.**

33. While Plaintiff was in Lawrence, the applicable version of the IDOC Hepatitis C Guideline was dated January 2019. [Plaintiff's Amended Complaint, Doc. 108, ¶8] with [Ex. H, Dep. of Dr. Chan, 167:12-168:3; 243:16-20]; [2019 IDOC Hepatitis C Guidelines, attached hereto as Exhibit J].

**RESPONSE: Admitted.**

34. The face of the 2019 IDOC Hepatitis C Guideline states "the IDOC has an interagency agreement with the University of Illinois, UIC, to direct treatment of hep C patients by telemedicine." [Ex. C, Dep. of Dr. Paul, 178:2-8]; [Ex. J, 2019 IDOC Hepatitis C Guideline].

**RESPONSE: Admitted.**

35. The 2019 IDOC Hepatitis C Guideline included an exclusion for patients with an elevated A1C. [Ex. C, Dep. of Dr. Paul, 88:24-89:15]; [Ex. J, 2019 IDOC Hepatitis C Guidelines].

**RESPONSE: Admitted.**

36. A1C is a marker calculated from a three-month average of a person's blood sugar. [Ex. B, Pittman Dep, 34:24-35:9].

**RESPONSE: Admitted.**

37. The 2019 IDOC Hepatitis C Guideline instructs that patients with an A1C greater than 7 should not be sent to UIC. [Ex. C, Dep. of Dr. Paul, 91:18-24; 188:8-18]; [Ex. J, 2019 IDOC Hepatitis C Guidelines, p. 9] [Ex. H, Dep. of Dr. Chan, 173:13-21; 176:15-177:20].

**RESPONSE: Admitted.**

38. The exclusion based on elevated A1C is not a permanent exclusion because the individual could become eligible if he later reduced his A1C to below 7. [Ex. C, Dep. of Dr. Paul, 209:21-12].

**RESPONSE: Admitted.**

39. Dr. Chan communicated the decision about which patients would be scheduled to see the provider after a referral is made to UIC. [Ex. C, Dep. of Dr. Paul, 104:7-18].

**RESPONSE: Admitted.**

40. Dr. Chan followed the IDOC Hepatitis C Guidelines. [Ex. H, Dep. of Dr. Chan, 106:16-18; 114:23-115:11].

**RESPONSE: Admitted that Dr. Chan utilized the IDOC HCV Guidelines in providing HCV treatment services but disputed to the extent ¶ 40 suggests that Dr. Chan always followed all aspects of the Guidelines. (*See e.g.* Doc. 294, ¶¶ 173-174, 176).**

## PLAINTIFF'S MEDICAL COURSE AT LAWRENCE

41. Dr. Pittman first saw Plaintiff at Lawrence on February 20, 2019. [Ex. B, Dep. of Dr. Pittman, 28:17-18:5].

**RESPONSE: Admitted.**

42. On February 20, 2019, Dr. Pittman noted Plaintiff was positive for hepatitis C and referred him for a hepatitis clinic evaluation by Dr. Paul. [Ex. B, Dep. of Dr. Pittman, 29:6-30:8]; [Medical records, attached hereto as Exhibit L, p. 10, Bates 54].

**RESPONSE: Admitted.**

43. On February 20, 2019, Dr. Pittman noted Plaintiff had uncontrolled Type 2 Diabetes. [Ex. B, Dep. of Dr. Pittman, 29:6-30:8]; [Ex. L, Med. Records, p. 10, Bates 54].

**RESPONSE: Admitted.**

44. On February 20, 2019, Plaintiff's blood sugar was greater than 300. [Ex. B, Dep. of Dr. Pittman, 29:6-30:8].

**RESPONSE: Admitted.**

45. Dr. Pittman explained to Plaintiff that taking insulin as prescribed was an important component of decreasing his A1C. [Ex. A, Dep. of Plaintiff, 83:5-16].

**RESPONSE: Admitted.**

46. On multiple occasions while at Lawrence Plaintiff refused to take his prescribed insulin. [Ex. A, Dep. of Plaintiff, 83:17-19; 87:22-88:4]; [Ex. B, Dep. of Dr. Pittman, 32:16-33:9].

**RESPONSE: Admitted.**

47. Plaintiff refused his insulin and further diabetes monitoring on May 12, 2019. [Ex. A, Dep. of Plaintiff, 85:12-25] [Refusal forms, attached hereto as Exhibit N, Bates 353].

**RESPONSE: Admitted but see continuation of testimony at Exhibit A (Doc. 299-1) at 86:4-87:6 for reason for refusal.**

48. Dr. Pittman advised Plaintiff to avoid foods high in sugar to assist in controlling his A1C. [Ex. A, Dep. of Plaintiff, 69:24-71:11; 88:5-14]; [Ex. B, Dep. of Dr. Pittman, 34:6-18].

**RESPONSE: Admitted.**

49. Plaintiff's commissary records indicate he purchased cookies, honey buns, and ramen noodles on more than one occasion. [Ex. A, Dep. of Plaintiff, 88:5-91:4;] [Commissary records, attached hereto as Exhibit M, Bates 496-500].

**RESPONSE: Admitted.**

50. Dr. Paul saw patients in IDOC via telemedicine in her role of providing the facility-level work up related to hepatitis C for certain IDOC facilities, including Lawrence. [Ex. C, Dep. of Dr. Paul, 97:2-13].

**RESPONSE: Admitted.**

51. Plaintiff saw Dr. Paul via telemedicine for the first time on August 22, 2019. [Ex. A, Dep. of Plaintiff, 78:16-24]; [Ex. C, Dep. of Dr. Paul, 109:16-110:17]; [Compilation of Dr. Paul records, attached hereto as Exhibit K, p. 7, Wexford Bates 459].

**RESPONSE: Admitted.**

52. On August 22, 2019, Plaintiff reported he had been diagnosed with hepatitis C in 2014 when he was not incarcerated. [Ex. C, Dep. of Dr. Paul, 110:22-111:2]; [Ex. K, Dr. Paul records, p. 7, Wexford Bates 459].

**RESPONSE: Admitted.**

53. On August 22, 2019, Dr. Paul noted lab reports from June 4, 2019, which showed Plaintiff had an A1C of 13.7. [Ex. C, Dep. of Dr. Paul, 111:3-6]; [Ex. K, Dr. Paul records, p. 7, Wexford Bates 459].

**RESPONSE: Admitted.**

54. Dr. Paul explained to Plaintiff that he needed to lower his A1C in order to qualify for Hep C treatment while in IDOC. [Ex. A, Dep. of Plaintiff, 80:1-12].

**RESPONSE: Admitted.**

55. Despite Plaintiff's elevated A1C, Dr. Paul continued to do the work-up of Plaintiff and order tests in accordance with the IDOC Hepatitis C Guidelines. [Ex. C, Dep. of Dr. Paul, 194:16-23].

**RESPONSE: Plaintiff admits that Dr. Paul ordered additional tests for Plaintiff but disputes that it was in accordance with the IDOC HCV Guidelines under which he was excluded from HCV treatment. (Doc. 294, ¶¶ 148-149).**

56. On August 22, 2019, Dr. Paul noted lab reports showed Plaintiff's liver function was normal. [Ex. C, Dep. of Dr. Paul, 112:13-24].

**RESPONSE: Admitted.**

57. On August 22, 2019, Dr. Paul ordered a FibroScan on Plaintiff. [Ex. A, Dep. of Plaintiff, 79:1-12]; [Ex. C, Dep. of Dr. Paul, 117:22-118:2]; [Ex. K, Dr. Paul records, p. 7-8, Wexford Bates 459; Bates IDOC 159].

**RESPONSE: Admitted.**

58. A FibroScan is a specialized type of ultrasound that measures scarring in the liver and rates it on a scale of 0 to 4. [Ex. C, Dep. of Dr. Paul, 77:10-17].

**RESPONSE: Admitted.**

59. A FibroScan score of F3 or F4 would trigger a referral to UIC under the 2019 IDOC Hepatitis C Guidelines. [Ex. C, Dep. of Dr. Paul, 114:22-115:19]; [Ex. J, 2019 IDOC Hepatitis C Guideline].

**RESPONSE: Admitted except disputed that the IDOC HCV Guidelines provided for referral of an F3 patient with an A1c absolute exclusion. (*See e.g.* Doc. 294, ¶ 96).**

60. The FibroScan ordered by Dr. Paul was completed on November 7, 2019, and showed a score of F3. [Ex. C, Dep. of Dr. Paul, 117:23-118:11]; [Ex. K, Dr. Paul records, p. 9, Wexford Bates 459; Bates IDOC 286].

**RESPONSE: Admitted.**

61. AST is a liver enzyme. [Ex. C, Dep. of Dr. Paul, 191:15-21].

**RESPONSE: Admitted.**

62. Labs taken November 25, 2019, show Plaintiff's AST left was 42, which is normal or just slightly above normal. [Ex. C, Dep. of Dr. Paul, 192:4-20].

**RESPONSE: Admitted as to the ranges of AST but the cited reference does not support the alleged fact of Plaintiff's AST level.**

63. Dr. Paul saw Plaintiff again on December 12, 2019. [Ex. C, Dep. of Dr. Paul, 139:19-140:2]; [Ex. K, Dr. Paul records, p. 11, Wexford Bates 462].

**RESPONSE: Admitted.**

64. On December 12, 2019, Plaintiff complained of left-side flank pain, which was not indicative of a liver issue as the liver is on the right side. [Ex. C, Dep. of Dr. Paul, 140:9-23]; [Ex. K, Dr. Paul records, p. 11, Wexford Bates 462].

**RESPONSE: Admitted as to the notation of Plaintiff's complaints and as to Dr. Paul's testimony that left-sided flank pain did not raise any red flags for her as far as liver issues because the liver is on the right side. The cited reference does not otherwise support the alleged fact as stated.**

65. On December 12, 2019, Dr. Paul noted Plaintiff's lab results from December 9, 2019, which showed an A1C of 11.1. [Ex. C, Dep. of Dr. Paul, 141:5-10]; [Ex. K, Dr. Paul records, p. 11, Wexford Bates 462].

**RESPONSE: Admitted.**

66. The 2019 IDOC Hepatitis C Guidelines call for a liver and spleen ultrasound if the patient has an F3 Fibroscan score. [Ex. C, Dep. of Dr. Paul, 142:16-20]; [Ex. J, 2019 IDOC Hepatitis C Guidelines].

**RESPONSE: Admitted.**

67. On December 12, 2019, Dr. Paul ordered additional labs and a liver and spleen ultrasound. [Ex. C, Dep. of Dr. Paul, 142:8-15]; [Ex. K, Dr. Paul records, p. 11, Wexford Bates 462].

**RESPONSE: Admitted.**

68. Dr. Paul noted on December 12, 2019 "Per the January 25, 2019, IDOC guideline, patient's poor diabetic control precludes his review for HCV antiviral therapy." [Ex. C, Dep. of Dr. Paul, 143:23-144:14]; [Ex. K, Dr. Paul records, p. 11, Wexford Bates 462].

**RESPONSE: Admitted.**

69. Dr. Paul asked a nurse to contact UIC with regard to Plaintiff. Specifically, on December 12, 2019, the nurse emailed Dr. Chan, copying Dr. Paul and said:

> Hello Dr. Chan. I have a question to ask before Dr. Paul makes a referral. We recently have two offenders with F3/F4 FibroScans. However, they are both DM with very high A1C. We know in the past, they will not be treated or considered until their A1C is below 7. With that being said, do we still need to work them up with the labs and ultrasound and then send you a new packet and let you tell us they do not qualify at this time?
>
> [Ex. C, Dep. of Dr. Paul, 145:3-147:17]; [Ex. K, Dr. Paul records, p. 12, Bates MILLER000498].

**RESPONSE: Admitted.**

70. Dr. Chan responded to the December 12, 2019, email, based on the 2019 IDOC Hepatitis C Guidelines, stating "You can continue to work up the patient, but do not send them

or the med records until they have normalized their A1C or other issues." [Ex. C, Dep. of Dr. Paul, 145:3-147:17]; [Ex. H, Dep. of Dr. Chan, 208:12-210:7]; [Ex. K, Dr. Paul records, p. 12, Bates MILLER000498].

**RESPONSE: Admitted.**

71. The liver and spleen ultrasound on Plaintiff was completed on January 16, 2020, and the results showed mild cirrhosis with no focal intrahepatic mass lesions. [[Ex. C, Dep. of Dr. Paul, 150:4-23]; [Ex. K, Dr. Paul records, p. 16, Bates IDOC 288].

**RESPONSE: Admitted.**

72. On February 6, 2020, Dr. Paul ordered an EGD on Plaintiff, pursuant to the 2019 IDOC Hepatitis C Guidelines. [Ex. C, Dep. of Dr. Paul, 154:6-21]; [Ex. K, Dr. Paul records, p. 23, Bates Wexford 453].

**RESPONSE: Admitted.**

73. Dr. Paul again asked a nurse to email Dr. Chan. The nurse sent an email on February 11, 2020, stating "Dr. Chan, I'm sending you the information listed in the prior studies section of the progress notes on [redacted] and Miller, as requested by Dr. Paul. Do you want these patients formally referred to UIC liver clinic telemedicine to be evaluated for antiviral therapy at this time?" [Ex. C, Dep. of Dr. Paul, 158:7-159:6]; [Ex. K, Dr. Paul records, p. 20-21, Bates Wexford 450-51].

**RESPONSE: Admitted.**

74. Plaintiff's lab results from January 20, 2020, showed an A1C of 9. [Ex. H, Dep. of Dr. Chan, 225:21-24].

**RESPONSE: Admitted.**

75. Dr. Chan responded and said "Yes, please. Please send the needed documents to get these patients evaluated. Can you in the meantime please have their doctors at Lawrence evaluate and treat their diabetes and get their A1C better controlled, below 8." [Ex. C, Dep. of Dr. Paul, 160:22-161:6]; [Ex. K, Dr. Paul records, p. 1, Bates MILLER000454].

**RESPONSE: Admitted.**

76. The nurse again emailed Dr. Chan on May 28, 2020, saying "just checking on if you want these two offenders referred or not." [Ex. C, Dep. of Dr. Paul, 164:24-17]; [Ex. K, Dr. Paul records, p. 20-21, Bates Wexford 450-51].

**RESPONSE: Admitted.**

77. Dr. Chan responded to the May 28, 2020, email, stating in relevant part, "as for Mr. Miller, Jimmie, please have his A1C in the 7 to low 8s before sending him to the UIC liver telemed." [Ex. C, Dep. of Dr. Paul, 165:19-166:10]; [Ex. K, Dr. Paul records, p. 20-21, Bates Wexford 450-51].

**RESPONSE: Admitted.**

78. Plaintiff's A1C was 10.2 on May 27, 2020. [Ex. C, Dep. of Dr. Paul, 207:5-8]; [Ex. H, Dep. of Dr. Chan, 231:4-17]; [Ex. K, Dr. Paul records, p. 24, Bates Wexford 464].

**RESPONSE: Admitted.**

79. Dr. Paul saw Plaintiff again on June 18, 2020, at which time she noted "attempts to discuss follow-up after prison were unsuccessful." [Ex. C, Dep. of Dr. Paul, 170:13-24]; [Ex. K, Dr. Paul records, p. 24, Bates Wexford 464].

**RESPONSE: Admitted.**

80. Plaintiff was released from IDOC on June 22, 2020. [Ex. A, Dep. of Plaintiff, 7:4-11].

**RESPONSE: Admitted.**

81. Plaintiff has no evidence that his hepatitis C worsened between February 2019 and June 2020. [Ex. A, Deposition of Plaintiff, 115:10-116:13].

**RESPONSE: Disputed. Without knowing what Defendants mean by the term "worsened" it is undisputed that HCV is a progressive disease and thus by definition "worsens" (as that term is commonly used) over the course of time. (Doc. 294, ¶ 36). Persons infected with chronic HCV can develop fibrosis, which is scarring of liver tissue that damages the structure of their livers. (Doc. 294, ¶ 41). Such persons are at an increased risk of developing cirrhosis, a life-threatening condition whereby the functioning of the liver is reduced by extensive liver scarring associated with the advanced progression of fibrosis, as well as hepatocellular carcinoma. (Doc. 294, ¶ 42). The progression of fibrosis does not occur at the same rate in all persons and the progression is not linear. (Doc. 294, ¶ 48). Patients with diabetes are at risk for accelerated liver fibrosis progression. (Doc. 294, ¶¶ 44, 48). Persons with HCV may have no symptoms until they are at the end stages of the disease and serious liver complications arise. (Doc. 294, ¶ 43).**

82. Since his release from IDOC, Plaintiff successfully completed hepatitis C treatment. [Ex. A, Dep. of Plaintiff, 113:7-114:8].

**RESPONSE: Admitted.**

## ARGUMENT

### A. Wexford's Contractual Agreement to Follow the IDOC Guidelines Does Not Relieve Wexford and Dr. Paul from § 1983 Liability

Defendants first argue that contractual medical vendors cannot be liable under § 1983 for a policy the vendor did not draft and was contractually obligated to follow (Doc. 299, at 17),

citing *Baston v. Indiana State of*, No. 3:18-CV-791-JD-MGG, 2021 U.S. Dist. LEXIS 32876 (N.D. Ind. Feb. 23, 2021) and cases "collected" therein. That is a misstatement of the law. In *Baston*, the court noted that Wexford "cannot be held liable based on the [DOC] policy itself" because it was not involved in drafting the policy and was contractually required to follow it. *Id*. at *10. But the court expressly stated that "Wexford, however, could be liable based on a custom of blindly following HCSD 3.09 without consideration of an inmate's individual circumstances" citing *Roe v. Elyea*, 631 F.3d 843, 860 (7th Cir. 2011) ("With respect to an individual case, however, prison officials still must make a determination that application of the protocols result in adequate medical care."). *Baston* did not involve an absolute exclusion criteria and there was no evidence that the plaintiff was suffering from acute liver disease or cirrhosis or exhibited other circumstances warranting treatment outside the DOC policy terms. *Baston*, at *11. *Baston* does not support the defendants' assertion that a prison medical provider can escape § 1983 liability by contractually agreeing to provide constitutionally deficient care. Nor does *Stafford v. Carter*, No. 1:17-cv-00289-JMS-MJD, 2018 U.S. Dist. LEXIS 155866 (S.D. Ind. Sept. 13, 2018), the case principally relied on in *Baston*. In *Stafford* the court held that the DOC defendants "cannot avoid liability by pointing the finger at Wexford as the direct healthcare provider" because the DOC defendants crafted the policy at issue "and [made] its application mandatory on Wexford." *Id*. at *46. Wexford's own liability for providing deficient care pursuant to the policy was not at issue because Wexford settled prior to the summary judgment stage. *Id*. at *9.

The fundamental flaw in the Defendants' argument is the premise that "the sole policy at issue is an IDOC policy." (Doc. 299, at 16). On the contrary, the issue is Wexford's corporate policy to accept its clients' treatment policies and guidelines instead of following national

standards or Wexford's own guidelines. (Doc. 294, ¶ 6). Wexford's policy was that its medical employees were required to follow the IDOC guidelines, including the IDOC HCV Guidelines, even though Wexford's medical management knew that the standard of care should be the same for IDOC inmates as in the community and that a clinician should treat according to the patient's individual circumstances. (Doc. 294, ¶¶ 7-8, 27-29). Wexford maintained a Medical Advisory Committee made up of senior members of its medical management team, including corporate medical directors and regional medical directors. (Doc. 294, ¶ 5). At least two members of the Medical Advisory Committee, Dr. Paul and Dr. Fisher, are experts in HCV treatment and have developed policies and guidelines for the treatment of HCV. (Doc. 294, ¶¶ 11, 13-14, 17-20). The Medical Advisory Committee reviewed current literature and available information in creating Wexford's medical guidelines and any substantive change to Wexford's policies was required to be approved by the Medical Advisory Committee. (Doc. 294, ¶¶ 5, 9, 125-127).

Accepting the defendants' contractual argument would eviscerate the settled law subjecting private companies to § 1983 liability. *See Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 378-79 (7th Cir. 2017) ("[A] private corporation that has contracted to provide essential government services is subject to at least the same rules that apply to public entities."). An institutional decision to "do nothing" – or to contract away the ability to do anything – where inaction is likely to result in the violation of the constitutional rights of inmates with serious medical conditions can constitute deliberate indifference subjecting the institution to § 1983 liability. *See Glisson*, 849 F.3d at 382; *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (where municipality has "actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction"); *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) ("[i]naction, too, can give rise to liability in some instances

if it reflects 'a conscious decision not to take action'") (quoting *Glisson*); *Cohn v. Wexford Health Sources, Inc.*, No. 3:19-CV-00376-NJR, 2022 U.S. Dist. LEXIS 127089 *6, 2022 WL 2802304 (S.D. Ill. July 18, 2022) ("There is a disputed fact as to whether Wexford made a conscious policy choice not to implement a policy which resulted in Cohn's disruption of desperately needed medication.") (citing *Dean*).

Dr. Paul, a member of Wexford's Medical Advisory Committee, is likewise not excused from her constitutional obligations by Wexford' corporate policy to defer to IDOC's HCV Guidelines (thus ignoring Wexford's own guidelines). Dr. Paul, through her education, training and experience, had knowledge of the serious risk that HCV poses to the patient's health, and of the importance, benefits and efficacy of available treatment options. (*See* Doc. 294, ¶¶ 10-11, 13-14, 37, 45, 47, 50, 55, 58, 103). When a person accepts employment with a private entity that contracts with the state, she understands that she is accepting the responsibility to perform her duties in conformity with the Constitution. *Rodriquez v. Plymouth ambulance Serv.*, 577 F.3d 816, 827 (7th Cir. 2009).

### B. Defendants Did Not Defer to an Appropriate Medical Policy Formulated by Experts at UIC

Defendants next seek to avoid liability by arguing they merely deferred to medical experts at UIC as to the "rationale" for the A1c exclusion and that their "reliance on the expertise of the specialists precludes a claim of deliberate indifference unless the advice of the specialists was blatantly inappropriate" (Doc. 299, at 17), citing *Donald v. Wexford*, 982 F.3d 451, 463 (7th Cir. 2020) ("Perhaps Donald could survive summary judgment if he had evidence that Dr. Osmundson knew that the advice he received from Drs. Crow, Sicher, or Pike was 'blatantly inappropriate' and carried it out anyway.")). But there is no evidence that either Wexford or Dr. Paul *in fact* relied on UIC's supposed conclusion that the absolute exclusion for elevated A1c was reasonable or

medically sound. Dr. Paul did not testify that she relied on UIC's expertise regarding the exclusion (as Defendants suggest), she testified only that UIC wrote the policy. (Defense Ex. C, at 189-90, Doc. 299-5). She elsewhere testified in unequivocal terms that there is no medical reason that patients with elevated A1c or uncontrolled diabetes could not receive interferon-free HCV treatment and that using elevated A1c as an exclusionary factor for HCV treatment is not medically based. (Doc. 294, ¶117). Dr. Fisher did not testify that Wexford relied on UIC's expertise in accepting the A1c exclusion (as Defendants suggest), he testified only that the IDOC Guidelines assign HCV treatment responsibility to UIC and HCV screening and work-up responsibility to Wexford. (Defense Ex. D, at 158-59, Doc. 299-7).

Defendants' reliance argument is facially baseless and contrary to the undisputed evidence: (a) Dr. Paul and Dr. Fisher are experts in HCV; (b) they are familiar with the FBOP and AASLD HCV guidelines (which do not include any exclusion for A1c); (c) the FBOP guidelines include elevated A1c/diabetes as a priority treatment criteria because it is associated with more rapid progression of fibrosis; and (d) they wrote Wexford's own HCV treatment guidelines (which did not include any exclusion related to A1c). (*See* Doc. 294, ¶¶ 13, 17, 18, 99, 102, 103, 117, 125 – 128). Wexford and Dr. Paul did not rely on UIC's expertise or otherwise believe (or have reason to believe) that the A1c exclusion was appropriate or reasonable.

### C. There is No Evidence that the A1c Exclusion Has a Plausible Medical Basis

Defendants make a half-hearted argument that that there could be some reasoned basis for addressing elevated A1c before starting HCV treatment, but it again is contrary to the evidence. They cite Dr. Chan's "concerns about the systemic problems and overall health risks associated with chronically elevated A1c" (Doc. 299, at 20), but ignore her express testimony that there is no medical reason not to provide HCV treatment to a patient with elevated A1c. (Doc. 294, ¶ 116).

They cite Dr. Shicker's concern that patients with uncontrolled diabetes may be noncompliant with their medications and therefore be less willing or able to comply with HCV treatment (Doc. 294, at 19), but ignore his express testimony that the HCV guidelines should be evidence-based and that he does not know of "any kind of evidence-based scientific reason" that elevated A1c should be an exclusion for HCV treatment. Dr. Shicker further testified that the IDOC HCV Guidelines were patient-specific "except for those exclusion criteria." (Doc. 294, ¶ 118). They also ignore Dr. Fisher's testimony that compliance tends not to be an issue in the correctional setting, leading to higher cure rates as compared to the community at large. (Doc. 294, ¶ 65).

Defendants next cite Dr. Patel's concern that chronic elevated A1c could lead to hospitalization in some patients that might cause an interruption in HCV treatment (Doc. 299, at 19), but offer nothing from his testimony to support an absolute A1c exclusion based on that speculative concern. Dr. Patel does not claim that UIC inserted the A1c exclusion because of that concern, and in fact disavows any involvement in instigating the exclusion (contrary to the evidence of his direct involvement). (*See* Doc. 294, ¶¶ 80-90). Defendants make no effort to reconcile Dr. Patel's supposed concern about treatment interruption with the fact that UIC's own guidelines for HCV treatment of IDOC patients do not include any exclusion or restriction based on A1c status (such an exclusion also being absent from the AASLD, FBOP and Wexford global guidelines). Nor do defendants explain how the speculative concerns of Dr. Shicker and Dr. Patel would justify an absolute exclusion where the law clearly requires that inmate medical care decisions must be fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm and the efficacy of available treatments. *Roe*, 631 F.3d at 859.

Finally, Defendants try to manufacture a plausible basis for the A1c exclusion by asserting that the *Lippert* Monitor "agreed that an elevated A1c should be addressed prior to the liver disease." (Doc. 299, at 20). Defendants cite Dr. Chan's testimony concerning her recollection of a telephone conference involving the *Lippert* Monitor but ignore her testimony that the Monitor requested that A1c not be included in the list of absolute exclusions and that the Monitor's comments caused the removal of the statement "do not send [patient] until the labs are in the normal range" from the revised guidelines. (Doc. 294, ¶¶ 109, 113-114). Further, email communications involving Dr. Chan (not produced by Dr. Chan and obtained by subpoena after her deposition) suggest that the Monitor did *not* agree that A1c should be a consideration in limiting HCV treatment or should be addressed before HCV treatment, but instead viewed the A1c exclusion as one of "a number of exclusion criteria that were deemed to be clinically needless barriers" to access to HCV treatment. (*See* Doc. 294, ¶¶ 110-111). There is no evidence in the record suggesting that the absolute A1c exclusion has any reasonable basis, or that Wexford or Dr. Paul could have believed it had any reasonable basis. It was, in fact, "blatantly inappropriate."

**D. The Evidence Establishes Dr. Paul's Deliberate Indifference**

In addition to the matters addressed above, Dr. Paul argues that she was not deliberately indifferent because she continued to order tests as prelude to HCV treatment even though the absolute A1c exclusion precluded Plaintiff from receiving treatment; and she asked Dr. Chan whether she should refer Plaintiff considering his A1c level. (Doc. 299, at 21-22). On the contrary, given her position and expertise her actions with respect to Plaintiff establish that she was deliberately indifferent as contemplated under § 1983. Dr. Paul, through her education, training and experience, had knowledge of the serious risk that HCV poses to the patient's

health, and of the importance, benefits and efficacy of available treatment options. (*See* Doc. 294, ¶¶ 10-11, 13-14, 37, 45, 47, 50, 55, 58, 103). As Wexford's Chronic Disease and Case Management Director, Dr. Paul directs the care of 3,000 to 4,000 HCV patients per year. (Doc. 294, ¶¶ 10-11). Dr. Paul describes herself as an expert at managing and treating patients with HCV and is Wexford's primary resource for HCV. (Doc. 294, ¶P 11, 13). Dr. Paul has developed and implemented guidelines, policies and procedures for Wexford clients concerning HCV in the correctional setting. (Doc. 294, ¶ 13). Dr. Paul knew there was no medical reason to exclude IDOC patients with elevated A1c or "uncontrolled diabetes" from HCV treatment and that the A1c absolute exclusion in the IDOC HCV Guidelines was contrary to guidance propounded by the FBOP. (Doc. 294, ¶¶ 61-63, 117, 124). Dr. Paul had knowledge that excluding diabetic patients from HCV treatment exacerbated their health risks and that diabetic patients were at risk for worse outcomes from their HCV, as confirmed by the FBOP guidelines and medical literature. (*See* Doc. 294, ¶¶ 61-63, 79, 100-103).

IDOC patients in the HCV chronic care clinic are under Dr. Paul's medical care and should receive "community standard of care." (Doc. 294, ¶ 27). Dr. Paul testified that "[i]t's my job to follow the national guidelines of medical care" and "I have a responsibility to provide medical care to the best of my ability with the most updated national guidelines. That's my job, and it should mimic the standard of care in the community." (Doc. 294, ¶ 28). If standards conflict "then I make my clinical judgment on what makes the most sense for incarcerated patients." (Doc. 294, ¶ 65). Unlike when balancing differences between FBOP and AASLD/IDSA guidelines, Dr. Paul treated the IDOC HCV Guidelines as "rigid" and followed those guidelines and Dr. Chan's instructions instead of following her own clinical judgment.

(Doc. 294, ¶ 138). Dr. Paul also ignored Wexford's own HCV guidelines, which did not exclude patients from treatment on the basis of A1c. (Doc. 294, ¶137).

Further, while in the position of Plaintiff's treating doctor Dr. Paul testified as Wexford's expert witness in *Miller I* – a lawsuit in which Plaintiff sought to compel IDOC to provide HCV treatment – and claimed Plaintiff had received "adequate community standard treatment" while an IDOC inmate, even though she knew he had a Fibrosis Score of F3 and clinical indications of cirrhosis and was being denied HCV treatment based on an exclusionary criterion that she (and everyone but Plaintiff) knew was medically baseless. (*See* Doc. 294, ¶¶ 171, 180-187). Plaintiff never received HCV treatment while an inmate of IDOC and Dr. Paul documented that the only reason he was denied treatment was the baseless absolute A1c exclusion in the IDOC HCV Guidelines. (Doc. 294, ¶ 177). Dr. Paul's conduct constituted deliberate indifference. *See Roe*, 631 F.3d at 860 (prison medical providers must determine that application of a protocol results in adequate medical care in the individual case); *Johnson v. Wright*, 412 F.3d 398, 406 (2nd Cir. 2005) (reflexively applying a DOC guideline when on notice that the medically appropriate decision is to depart from the guideline can constitute deliberate indifference). Dr. Paul was Plaintiff's treating doctor. (Doc. 294, ¶¶ 10, 27). When a person accepts employment with a private entity that contracts with the state, she understands that she is accepting the responsibility to perform her duties in conformity with the Constitution. *Rodriquez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 827 (7th Cir. 2009). Dr. Paul did not meet that constitutional standard.

### E. Defendants Do Not Escape § 1983 Liability Merely Because Plaintiff Could Not or Would Not Overcome a Constitutionally and Medically Baseless Barrier to Treatment

Defendants next argue that they cannot be liable because Plaintiff was informed that he would be denied HCV treatment based on his elevated A1c and yet he did not successfully lower

his A1c. Defendants couch the argument in terms of a willful refusal by Plaintiff to meet the A1c standard – by his diet choices and his refusal on occasion to take his prescribed insulin. (Doc. 299, at 22). In Defendants' words Plaintiff "cannot refuse the treatment necessary to make him eligible for hepatitis C treatment then claim the hepatitis C treatment was wrongfully withheld." (Doc. 299, at 23). That red herring argument entirely misses the point. First, Defendants offer no evidence that any of the conduct of Plaintiff in fact caused his A1c to remain above their artificial cut-off – that is, they do not attempt to show that if Plaintiff had eaten properly and not missed any insulin injections, his A1c would have been below 7%. Second, the denial of HCV treatment was wrongful *precisely because* it was premised on an unconstitutional A1c exclusion. The only reason lowering Plaintiff's A1c was "necessary to make him eligible for hepatitis C treatment" is because the Defendants, among others, *made* it a (medically baseless) requirement. Defendants' argument is no different than if the guidelines provided that to be eligible for HCV treatment the inmate must make five straight free throws at the prison gym. If Plaintiff refused to practice his free throws, or refused to even make the attempt to qualify, Defendants would argue that the denial of treatment was the Plaintiff's fault. But it is the imposing of the artificial and non-medical barrier that makes the denial of treatment unconstitutional and subjects the Defendants to § 1983 liability. They do not escape that liability merely because Plaintiff did not or could not meet their terms.

### F. Plaintiff Has Established All Elements of Liability Under § 1983

Finally, Defendants argue they should escape liability because Plaintiff "has no evidence that his condition worsened during the 16 months he was in Lawrence" or that his post-IDOC treatment "was less successful due to its timing." (Doc. 299, at 24). This argument is also without merit. First, Defendants cite two cases in support of the suggestion that Plaintiff must

identify and quantify an identifiable progression or "worsening" of his disease or outcome to establish § 1983 liability, neither of which has anything to do with prison medical treatment, let alone treatment for a progressive disease such as HCV. In *Berman v. Young*, 291 F.3d 976 (7th Cir. 2002), the court held that the plaintiffs – parents and a child who was removed by the defendant department of family services from her parents' home and placed with her defendant grandparents – did not establish a causal connection between the emotional troubles and developmental delays the child suffered on the one hand and her placement with her grandparents or the DFS failure to properly investigate the grandparents' criminal background on the other hand. In *Smith v. Buss*, 515 Fed. Appx. 599 (7th Cir. 2013), the plaintiff prisoner alleged that the defendant guards had told the prison population that he was a "snitch" and that, as a result, he was assaulted by another prisoner seventeen months later. In addition to the numerous proper reasons the district court entered summary judgment for defendants, the Seventh Circuit added that "there is no admissible evidence to back Smith's speculation that Hunter was out to get him because of the 'snitch' label." Defendants cite no authority for the proposition that a plaintiff seeking recovery for an unconstitutional denial of medical care must come forward with evidence of the progression of his disease as a prerequisite to establishing § 1983 liability.

Second, Defendants do not articulate any standard of evidence they propose is necessary concerning the nature or degree of the "worsening" of Plaintiff's HCV or outcome to sustain a § 1983 claim. The facts show that Plaintiff progressed from F2 before entering IDOC to F3 with cirrhosis in November 2019. Generally, "[a]n actionable deliberate-indifference claim does not require proof that the plaintiff suffered an actual injury. Instead, it is enough that the defendant's actions exposed the plaintiff to a 'substantial risk of serious harm.'" *Green v. Obsu*, No. ELH-19-2068, 2021 U.S. Dist. LEXIS 9593 *26, 2021 WL 165135 (D. Md. Jan. 19, 2021), citing

*Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017) (denying Wexford motion to dismiss § 1983 claim).

Notably, Defendants do not suggest whether their proposed "worsening" requirement is part of the objective § 1983 element (related to the seriousness of the plaintiff's medical need) or the subjective element (related to the defendant's culpable state of mind). A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *Roe*, 631 F.3d at 857; *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). "[T]he Eighth Amendment 'protects [an inmate] not only from deliberate indifference to his or her *current* serious health problems, but also from deliberate indifference to conditions posing an unreasonable risk of serious damage to *future* health." *Roe*, 631 F.3d at 857, quoting *Board v. Farnham*, 394 F.3d 469, 479 (7th Cir. 2005). It is beyond question that chronic HCV, particularly at the stage of progression suffered by Plaintiff, is a serious medical need under established § 1983 law. (*See* Doc. 294 ¶¶ 41-44, 48; *Stafford*, 2018 U.S. Dist. LEXIS 155866, at *35; *Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1299 (N.D. Fla. 2017); *Parks v. Blanchette*, 144 F. Supp. 3d 282, 314 (D. Conn. 2015); *Hilton v. Wright*, 928 F. Supp. 2d 530, 547-48 (N.D. N.Y. 2013). A requirement of showing a "worsening" of the plaintiff's condition (as a prerequisite to liability as opposed to measuring damages) is inconsistent with that objective standard and Defendants, on the face of their motion, do not appear to contest the "serious medical need" element of Plaintiff's deliberate indifference claim.

Nor would such a "worsening" requirement fit with the subjective element, which focuses on the culpable state of mind of the defendant. *Roe*, 631 F.2d at 862-63 (the failure to consider an individual inmate's condition in making treatment decisions is precisely the kind of

conduct that constitutes a substantial departure from accepted professional judgment, practice or standards such as to demonstrate that the person responsible did not base the decision on such judgment). In short, the degree to which a plaintiff's condition or outcome worsened because of the denial of treatment, although it may have relevance to a damage calculation, is not an element of § 1983 liability for deliberate indifference.

## CONCLUSION

Deliberate indifference to serious medical needs of prisoners is a violation of the Eighth Amendment subjecting defendants to liability under § 1983. Under the law discussed above, and based on the undisputed facts, Plaintiff has established as a matter of law that Defendants Dr. Paul and Wexford were deliberately indifferent to Plaintiff's medical needs, because they intentionally and unconstitutionally deprived him of treatment for HCV. The Court therefore should deny Wexford and Dr. Paul's motion for summary judgment and should grant Plaintiff's motion for summary judgment on the issue of liability.

Respectfully submitted,

JIMMIE DALE MILLER

By: /s/ Sean M. Sullivan
Sean M. Sullivan

Sean M. Sullivan
Adrian Riordan
MOHAN GROBLE SCOLARO, P.C.
55 West Monroe Street
Suite 1600
Chicago, IL 60603
Phone: (312) 422-9999
Fax: (312) 422-5371
ssullivan@daleymohan.com
ariordan@mohangroble.com

**CERTIFICATE OF SERVICE**

I, Sean M. Sullivan, an attorney, certify that I caused a true copy of the foregoing **Plaintiff's Response to Motion for Summary Judgment of Defendants Wexford and Dr. Dina Paul** to be served upon the attorneys of record via the Court's ECF filing system on October 24, 2024.

/s/ Sean M. Sullivan
Sean M. Sullivan