047272/21061/JNR/JCS

# UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JIMMIE DALE MILLER,<br><br>Plaintiff,<br><br>v.<br><br>WEXFORD HEALTH SOURCES, INC., DIRECTOR CENTRAL MANAGEMENT SERVICES, LAURA PITTMAN, DINA PAUL, LORIE CUNNINGHAM, MR. WELLS, JANE DOE #1, JANE DOE #2, JANE DOE #3, JANE DOE #4, JANE DOE #5, NURSE FUSON, NURSE SWINSON, NURSE FOSTER, C/O WILSON, ROB JEFFRIES, STEVE MEEKS, DR. JULIANA CHAN, AND UNIVERSITY OF ILLINOIS CHICAGO,<br><br>Defendants. | No. 20-cv-446<br><br>Nancy J. Rosenstengel |

## RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

NOW COME the Defendants, DR. DINA PAUL, and WEXFORD HEALTH SOURCES, INC., by and through their attorneys, CASSIDAY SCHADE LLP, and hereby submit their Response to Plaintiff's Motion for Summary Judgment, stating as follows:

## INTRODUCTION

Plaintiff asks this Court to find, as a matter of law, that Wexford Health Sources, Inc. and a physician employed by Wexford, Dr. Dina Paul, were deliberately indifferent to his need for treatment for Hepatitis C in violation of his Eighth Amendment rights. Wexford is a contractual vendor to the Illinois Department of Corrections, where Plaintiff was incarcerated. It is undisputed that providing Hepatitis C treatment is expressly excluded from Wexford's IDOC contract, as IDOC has a separate agreement with the University of Illinois – Chicago ("UIC") for infectious disease specialists from UIC to provide the treatment and associated guidelines related

to Hepatitis C and an inmate's eligibility for treatment. Plaintiff complains that pursuant to the IDOC Hepatitis C Guidelines, he was excluded from Hepatitis C treatment due to uncontrolled diabetes. It is undisputed that those guidelines were established by IDOC in consultation with UIC and without involvement by Wexford. Plaintiff fails in his extensive efforts to contort the facts in a way that makes Wexford or Dr. Paul responsible for his Hepatitis C treatment. A finding otherwise would make the voluntary undertaking of services as a vendor to the State an unknowable business venture, as failing to provide un-contracted-for services could result in civil liability and punitive damages. While Plaintiff's claim suffers many defects, as to Wexford and Dr. Paul, this alone is sufficient to deny Plaintiff's Motion and, as requested in Defendants' separate Motion for Summary Judgment, enter judgment in favor of Wexford and Dr. Paul.

## RESPONSE TO PLAINTIFF'S STATEMENT OF FACTS

### Parties and Witnesses

#### Plaintiff

1. At the times alleged in the First Amended Complaint, Plaintiff was incarcerated at correction facilities operated and managed by the Illinois Department of Corrections ("IDOC"). (Wexford/Paul Answer to First Amended Complaint ("Wexford/Paul Answer"), Doc. 143, ¶ 1; IDOC Defendants' Answer to First Amended Complaint ("IDOC Answer"), Doc. 141, ¶ 1).

**RESPONSE: Objection. Paragraph 1 misstates the scope of this case as to "facilities." It is material and admitted that Plaintiff was incarcerated in the Illinois Department of Corrections, but the claims in this case are limited to his incarceration in Lawrence Correctional Center. Plaintiff has filed separate claims regarding his treatment while in Stateville in [*Miller v. Wexford Health Sources, et al,* 1:17cv5609, N.D. IL (Summary Judgment in favor of Defendants and appeal dismissed by Seventh Circuit in case No. 24-1769, dated 8/14/24)]; and Pinckneyville [*Miller v. Rauner, et al,* 3:17cv859, S.D. IL**

**(Summary Judgment in favor of Defendants affirmed by Seventh Circuit in case No. 20-3533, dated 9/22/22)]. These cases have both been fully adjudicated and Plaintiff is barred from relitigating his care at those facilities in this case.**

> 2. On or about June 16, 2016, Plaintiff was incarcerated at the IDOC Stateville Correctional Center ("Stateville CC"). Plaintiff was transferred to the IDOC Pinckneyville Correctional Center ("Pinckneyville CC") on or about September 1, 2016. Plaintiff was transferred to the IDOC Lawrence Correctional Center ("Lawrence CC") in or about February 2019. Plaintiff was released from Lawrence CC, and from IDOC custody, on or about June 22, 2020. (Wexford/Paul Answer, Doc. 143, ¶ 8; IDOC Answer, Doc. 141, ¶ 8; Ex. 1, Miller Dep., at 7, 19).[2]

**RESPONSE: Objection: compound. Paragraph 1 misstates the scope of this case as to "facilities." It is material and admitted that Plaintiff was incarcerated in the Illinois Department of Corrections, but the claims in this case are limited to his incarceration in Lawrence Correctional Center. Plaintiff has filed separate claims regarding his treatment while in Stateville in [*Miller v. Wexford Health Sources, et al,* 1:17cv5609, N.D. IL (Summary Judgment in favor of Defendants and appeal dismissed by Seventh Circuit in case No. 24-1769, dated 8/14/24)]; and Pinckneyville [*Miller v. Rauner, et al,* 3:17cv859, S.D. IL (Summary Judgment in favor of Defendants affirmed by Seventh Circuit in case No. 20-3533, dated 9/22/22)]. These cases have both been fully adjudicated and Plaintiff is barred from relitigating his care at those facilities in this case. Plaintiff's time in Stateville and Pinckneyville is irrelevant to this claim and therefore immaterial and undisputed. It is material and admitted that Plaintiff was in Lawrence Correctional Center from February 2019 until June 2020, when he was released from IDOC custody.**

**Defendant Wexford**

3. Defendant Wexford Health Sources, Inc. ("Wexford") is a third-party contractor retained by IDOC to provide medical and health services to the state corrections institutions and facilities within the State of Illinois, including Stateville CC, Pinckneyville CC and Lawrence CC. (Wexford/Paul Answer, Doc. 143, ¶9; Ex. 16, Plaintiff's Deposition Exhibit ("PX") 51, Wexford/IDOC Contract (excerpt)).

**RESPONSE: Objection: compound. See response to Paragraph 1, the care in Pinckneyville and Stateville are admitted but immaterial. It is material and admitted that the IDOC contracts with Wexford to provide certain medical and mental health services in Illinois prisons, the scope of which is contained within the contract. [See Plaintiff's Ex. 16, Wexford IDOC Contract, at Doc. 295-16].**

4. Defendant Wexford employs doctors, nurses and other medical personnel who provide medical and health services to inmates at IDOC facilities. (Wexford/Paul Answer, Doc. 143, ¶ 9). Wexford medical personnel attended IDOC Health Services Quarterly meetings. (Ex. 2, Matticks Dep., at 22-23).

**RESPONSE: Objection: compound. It is material and admitted that Wexford employs doctors, nurses and other personnel to provide certain medical and mental health services in Illinois prisons within the scope of its contract with IDOC. It is admitted but immaterial that some Wexford personnel attend quarterly meetings with the IDOC Office of Health Service.**

5. Wexford maintained a Medical Advisory Committee made up of senior members of its medical management team, including corporate medical directors and regional medical directors, which established policies and procedures as references for Wexford medical providers to follow with respect to specific disease categories. (Ex. 2, Matticks Dep., at 11-12, 15-16; Ex. 3, Matticks (*Barrow*) Dep., at 45). Ex. 4, Fisher Dep., at 31-32). The Medical Advisory Committee reviews current literature and available information in creating Wexford's medical guidelines. (Ex. 2, Matticks Dep., at 11-12). Most of the drafting of the Wexford policies and procedures is done by Wexford corporate level physicians. (Ex. 2, Matticks Dep., at 15-16).

**RESPONSE: Objections: Compound, not in compliance with Local Rule 56.1(a), which requires each fact be set forth in a separately numbered paragraph. It is admitted but immaterial that Wexford maintains a Medical Advisory Committee. It is disputed and immaterial that the Medical Advisory Committee establishes "policies and procedures." The Medical Advisory Committee does not establish "policies and procedures" it establishes various guidelines which, as is clear from the face of the documents, are solely "intended to serve as a reference tool for clinicians practicing medicine in the jails and prisons served by Wexford." [Plaintiff's Ex. 4 [Doc. 295-4], Fisher Dep, 63:8-19]. Wexford's Medical Advisory Committee is further immaterial to Plaintiff's claim as Plaintiff's claims relates to treatment for hepatitis C, the care of which is expressly carved out of Wexford's IDOC Contract and the relevant guidelines were not developed by Wexford, but by IDOC in conjunction with University of Illinois at Chicago. [Plaintiff's Ex. 4 [Doc. 295-4], Fisher Dep, 84:3-85:8; 200:22-201:9; 210:14-22; 215:1-13] [See Plaintiff's Ex. 16, Wexford IDOC Contract, at Doc. 295-16, p. 100-101, Bates 265-266].**

6. Wexford's practices vary under different contracts if there are things a specific state requires them to do. (Ex. 4, Fisher Dep., at 26). Under most of Wexford's contracts, it has agreed to follow guidelines that its client has provided. (Ex. 4, Fisher Dep., at 200-01; Ex. 5, Fisher (*Nance*) Testimony, at 265-66; Ex. 6, Paul Dep., at 22-23; Ex. 7, Fisher (*Stafford*) Dep., at 92). Application of the Wexford client's treatment protocols is typically not up for negotiation. (Ex. 7, Fisher (*Stafford*) Dep., at 168-69). Dr. Fisher testified that (as of 2018) Wexford had no business outside of corrections clients. (*Id*. at 92-93). Dr. Fisher testified that if Wexford wants to obtain a corrections contract it needs to agree to what the client is asking for. (*Id*. at 168-69).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). It is unclear what fact Plaintiff is trying to establish. It is admitted and material that Wexford provides services in correctional settings pursuant to contracts. However, Wexford has certain obligations under each of those contracts. Specific to the IDOC contract, the Contract provides it is a duty and obligation of the State of Illinois to "provide internal policies, procedures, and rules and any updates that govern all operations of the IDOC Correctional Centers." [See Plaintiff's Ex. 16, Wexford IDOC Contract, at Doc. 295-16, p. 4, Bates 3]. The Contract further obligates Wexford to "comply with all current and future State, Federal and local laws and regulations, court orders, Executive Orders, Administrative Directives, center directives, professional licensing standard, and the policies and procedures of IDOC, the Center, and HFS, as necessary." [See Plaintiff's Ex. 16, Wexford IDOC Contract, at Doc. 295-16, p. 19, Bates 18]. Wexford is, therefore, contractually obligated to comply with Administrative Directives and other IDOC policies and procedures. [Id.]; [Plaintiff's Ex. 4 [Doc. 295-4], Fisher Dep, 81:22-82:10]. With respect to the medical condition relevant for this case, Wexford's IDOC contract expressly provides the treatment for hepatitis C and the relevant guidelines are handled by the**

**University of Illinois at Chicago ("UIC"). [Plaintiff's Ex. 4 [Doc. 295-4], Fisher Dep, 84:3-85:8; 200:22-201:9; 210:14-22; 215:1-13] [See Plaintiff's Ex. 16, Wexford IDOC Contract, at Doc. 295-16, p. 100-101, Bates 265-266].**

7. Wexford's policy governing its medical providers was that they were required to follow the IDOC-provided guidelines (Ex. 2, Matticks Dep., at 42) "absent a medical contraindication." (Ex. 5, Fisher (*Nance*) Testimony, at 267).

**RESPONSE: Disputed and immaterial that Wexford's has a relevant "policy governing its medical providers." Wexford is contractually obligated to follow IDOC's Administrative Directives and other policies and procedures, with specific contractual provisions for hepatitis C treatment to be provided by UIC pursuant to guidelines developed by UIC and IDOC. [See Response to Paragraph 6 above].**

8. If there is a conflict between the Wexford policies and procedures and the IDOC policies and procedures, Wexford deems that the IDOC policies and procedures control. (Ex. 3, Matticks (*Barrow*) Dep., at 47; Ex. 2, Matticks Dep., at 19; Ex. 17, PX52, Wexford Illinois Medical Guidelines, at Preface (filed under seal)).

**RESPONSE: Disputed and immaterial as to Wexford having relevant "policies and procedures." Wexford is contractually obligated to follow IDOC's Administrative Directives and other policies and procedures, with specific contractual provisions for hepatitis C treatment to be provided by UIC pursuant to guidelines developed by UIC and IDOC. [See Response to Paragraph 6 above].**

9. Any substantive change to the Wexford Medical Guidelines must be approved by the Wexford Medical Advisory Committee. (Ex. 4, Fisher Dep., at 35, 186-87, 189-90).

**RESPONSE: Admitted but immaterial. Wexford Medical Guidelines for Illinois include no provisions related to hepatitis C because Wexford's contract with IDOC expressly provides for hepatitis C treatment to be provided by UIC. [See Response to Paragraph 6 above].**

**Defendant Dr. Paul**

10. Defendant Dr. Dina Paul ("Dr. Paul") is a doctor employed by Defendant Wexford as Chronic Disease and Case Management Director. Dr. Paul conducts chronic care telemedicine patient visits and medical record reviews for IDOC inmates, including inmates diagnosed with Hepatitis C Virus ("HCV"). (Wexford/Paul Answer, ECF 143, ¶ 13; Ex. 18, PX62, Dr. Paul CV, at 1; Ex. 6, Paul Dep., at 9).

**RESPONSE: Admitted.**

11. On average, Dr. Paul directs the care of 3,000 to 4,000 correctional HCV patients per year. (Ex. 18, PX62, at 1; Ex. 6, Paul Dep., at 19-20). Dr. Paul is the only doctor at the Wexford corporate office that directs the care of HCV patients. (Ex. 6, Paul Dep., at 20). Dr. Paul is the primary Wexford resource for HCV. (Ex. 2, Matticks Dep., at 16-17).

**RESPONSE: Admitted in part, and immaterial in part. Dr. Paul clarified that by "direct the care" she is referring to "I review the cases; I review their labs; I recommend certain studies based on national guidelines." [Plaintiff's Ex. 6 [Doc. 295-6], Paul Dep, 19:16-21]. Moreover, this is across all Wexford contracts and not limited to Illinois, with the extent of her interaction varying by state or site. [Plaintiff's Ex. 6 [Doc. 295-6], Paul Dep, 19:22-20:1]. Dr. Paul's testimony was that "I'm the only corporate physician that reviews hep C patients." [Plaintiff's Ex. 6 [Doc. 295-6], Paul Dep, 20:3-14].**

12. Dr. Paul gave depositions in the lawsuit entitled *Jimmie Miller v. John Baldwin, et al.*, No. 3:17-cv-00859 (S.D. Ill.) ("*Miller I*") on February 10, 2020 (Ex. 8, PX63), and the lawsuit entitled *Michael Insco v. Wexford Health Sources, Inc.*, *et al.*, No. 2:19-cv-00612 (S.D. W.V.) ("*Insco*") on May 12, 2021 (Ex. 9, PX64), and acknowledged giving truthful answers in those depositions. (Ex. 6, Paul Dep., at 10-12). Dr. Paul also gave a deposition in the lawsuit entitled *James Handy v. Wexford Health Sources, Inc., et al.*, No. 2:20-cv-02280 (C.D. Ill.) ("*Handy*") on May 10, 2022 (Ex. 10).

**RESPONSE: Admitted and immaterial.**

13. Dr. Paul has developed and implemented guidelines, policies, and procedures for Wexford clients concerning chronic medical conditions in the correctional setting, including HCV. (Ex. 18, PX62, at 1; Ex. 6, Paul Dep., at 12-13). Dr. Paul has given presentations at the IDOC Health Services Quarterly Meetings. (Ex. 6, Paul Dep., at 24-27). Dr. Paul is an expert at managing and treating patients with HCV. (Ex. 8, Paul (*Miller I*) Dep., at 19-20).

**RESPONSE: Admitted in part and disputed in part. It is disputed that Dr. Paul had developed or implemented guidelines, policies or procedures with respect to HCV applicable to Illinois. Dr. Paul had no input into the IDOC Hepatitis C Guidelines. [Plaintiff's Ex. 6 [Doc. 295-6], Paul Dep, 31:8-11]. Dr. Paul testified the development of guidelines, policies and procedures varies by state and Wexford would provide these for states not otherwise working with experts. [Plaintiff's Ex. 6 [Doc. 295-6], Paul Dep, 12:19-13:14]. It is admitted and immaterial that Dr. Paul testified she considers herself an expert in treatment of hepatitis C.**

14. Dr. Paul is a member of the Wexford Medical Advisory Committee. (Ex. 6, Paul Dep., at 21-22).

**RESPONSE: Admitted and immaterial.**

**Wexford Medical Witnesses**

15. Dr. Roderick Matticks ("Dr. Matticks") is the Wexford Regional Medical Director for Illinois. (Ex. 2, Matticks Dep., at 6). Dr. Matticks gave depositions in *Miller I* and the lawsuit entitled *Ronald Barrow v. Wexford Health Sources, Inc*., *et al.*, No. 3:14-cv-941 (S.D. Ill.) ("*Barrow*") as Wexford's corporate representative and provided truthful answers in those depositions. (Ex. 2, Matticks Dep., at 8; Ex. 11, Matticks (*Miller I*) Dep., at 9; Ex. 3, Matticks (*Barrow*) Dep., at 11).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). It is admitted and material that Dr. Matticks is a Wexford Regional Medical Director for Illinois. It is disputed to the extent use of the word "the" implies there is only one, as the state is divided into regions, with different regional medical directors. [Plaintiff's Ex. 2 [Doc. 295-2], Matticks Dep, 9:19-11:2].**

16. Dr. Matticks' responsibilities include training of staff and oversight of clinical activities at each IDOC site in his region. (Ex. 11, Matticks (*Miller I*) Dep., at 10-11). Dr. Matticks is a member of the Wexford Medical Advisory Committee. (Ex. 2, Matticks Dep., at 9-11).

**RESPONSE: Admitted and immaterial.**

17. Dr. Neil Fisher is Wexford's Assistant Chief Medical Officer and Corporate Medical Director for Clinical and Pharmacy. (Ex. 5, Fisher (*Nance*) Testimony, at 233 (JDM 009238)). Dr. Fisher gave a deposition in the case entitled *Michael Ray Stafford v. Robert E. Carter, Jr., et al.*, No. 1:17-CV-289 (S.D. Ind.) ("*Stafford*") and testified at trial in the case entitled *Ellean Nance v. Wexford Health Sources, Inc.*, No. 3:16-CV-875 (S.D. Ill.) ("*Nance*"). Dr. Fisher gave truthful answers in the *Stafford* and *Nance* cases. (Ex. 4, Fisher Dep., at 12-18). In *Stafford*, Dr. Fisher was presented as an expert witness related to corrections and HCV, and he did research prior to his testimony. (Ex. 4, Fisher Dep., at 122).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). It is admitted and material that Dr. Fisher is the Assistant Chief Medical Officer and Corporate Medical Director for Clinical and Pharmacy. The remainder of the paragraph is admitted but immaterial.**

18. Dr. Fisher has knowledge about HCV and has written articles and given lectures about taking care of patients with HCV in a correctional setting. (Ex. 4, Fisher Dep., at 50; Ex. 5, Fisher (*Nance*) Testimony, at 332 (JDM 009237)). In November 2017, Dr. Fisher gave a presentation to the National Commission on Correctional Healthcare ("NCCHC") concerning HCV. (Ex. 7, Fisher (*Stafford*) Dep., at 20, 29).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted but immaterial.**

19. Dr. Fisher has knowledge regarding the development of protocols for the treatment of HCV. (Ex. 5, Fisher Dep., at 50-51).

**RESPONSE: Objection: not supported by the record citation, as Plaintiff's Exhibit 5 is not Dr. Fisher's deposition.**

20. Dr. Fisher is a member of the Wexford Medical Advisory Committee. (Ex. 5, Fisher Dep., at 25).

**RESPONSE: Objection: not supported by the record citation, as Plaintiff's Exhibit 5 is not Dr. Fisher's deposition.**

**Defendant Dr. Chan**

21. Defendant Dr. Juliana Chan ("Dr. Chan") is a Doctor of Pharmacy employed by non-party University of Illinois at Chicago ("UIC") as a Clinical Associate Professor of Medicine. (Chan Answer to First Amended Complaint ("Chan Answer"), Doc. 135, ¶15; Ex. 19, PX1, Chan CV, at 1; Ex. 12, Chan Dep., at 7-9).

**RESPONSE: Admitted.**

22. In 2002, Dr. Chan established the first pharmacist-managed clinic for HCV at UIC. (Ex. 12, Chan Dep., at 15). In 2010, Dr. Chan was part of the team at UIC that started a telemedicine HCV program for IDOC inmates. (Ex. 12, Chan Dep., at 18; Ex. 15, Shicker Dep., at 28). The intent of the IDOC telemedicine program was to provide patient-specific care and recommendations for each IDOC inmate. (Ex. 12, Chan Dep., at 45).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). The first two sentences are admitted. The third paragraph is not supported by the cited record, as it is incomplete and the result is a mischaracterization of the testimony. Dr. Chan agreed with the statement that "the intent was to provide patient-specific care and advice and recommendations for each IDOC inmate that was part of the program." [Plaintiff's Ex. 12 [Doc. 295-12], Chan Dep, 45:10-15]. Plaintiff left off the qualifying statement "that was part of the program," thereby implying it the service was intended for every IDOC inmate, which is not accurate.**

23. Dr. Chan attended IDOC Health Services Quarterly meetings. (Ex. 2, Matticks Dep., at 29).

**RESPONSE: Admitted and immaterial.**

**Dr. Patel**

24. Dr. Mahesh Patel ("Dr. Patel") is an infectious disease doctor employed by UIC who worked with Dr. Chan on the UIC telemedicine team for IDOC HCV patients. (Ex. 13, Patel Dep., at 8-9).[3]

**RESPONSE: Admitted.**

**IDOC Medical Directors**

25. Dr. Steve Meeks ("Dr. Meeks") was the Chief of Medical Services ("Medical Director") for IDOC from November 1, 2016 to March 27, 2020. (Ex. 14, Meeks Dep., at 10; IDOC Answer, Doc. 141, ¶ 10; Ex. 20, PX40, Meeks Declaration, ¶1). As Medical Director of IDOC, Dr. Meeks was responsible for overseeing all health-related services for the IDOC, contract monitoring of contracted vendors, and updating policies and procedures. (Ex. 20, PX40, ¶2; Ex. 14, Meeks Dep., at 52-53). Dr. Meeks was succeeded as IDOC Medical Director by Dr. Steven Bowman. (Ex. 14, Meeks Dep., at 36).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted.**

26. Dr. Louis Shicker ("Dr. Shicker") was the Medical Director for IDOC from 2009 until June 15, 2016. (IDOC Answer, Doc. 141, ¶ 12).

**RESPONSE: Admitted.**

## Additional Material Facts

**The Chronic Care Clinics**

27. Individuals in the IDOC chronic care clinics that Dr. Paul runs are under her medical care as the chronic disease physician for Wexford. Those patients should receive "community standard of care." (Ex. 9, Paul (*Insco*) Dep., at 24-25).

**RESPONSE: Not supported by the record citation. Plaintiff cites testimony from the *Insco* case, filed in the Southern District of West Virginia, and relate solely to the provision of care in West Virginia. [Plaintiff's Ex. 9 [Doc. 295-9], Paul (*Insco*) Dep, 14:6-9]. Dr. Paul provided no testimony in the *Insco* deposition that related to IDOC and Plaintiff's reference to IDOC misrepresents the testimony. The arrangement with respect to treatment of hepatitis C in West Virginia has no bearing on Plaintiff's claims.**

28. Dr. Paul testified that "[i]t's my job to follow the national guidelines of medical care" and "I have a responsibility to provide medical care to the best of my ability with the most updated national guidelines. That's my job, and it should mimic the standard of care in the community." (Ex. 9, Paul (*Insco*) Dep., at 80-81).

**RESPONSE: Plaintiff cites testimony from the *Insco* case, filed in the Southern District of West Virginia, and relate solely to the provision of care in West Virginia. [Plaintiff's Ex. 9 [Doc. 295-9], Paul (*Insco*) Dep, 14:6-9]. Dr. Paul provided no testimony in the *Insco* deposition that related to IDOC and Plaintiff's reference to IDOC misrepresents the testimony. The arrangement with respect to treatment of hepatitis C in West Virginia has no bearing on Plaintiff's claims.**

29. The standard of care should apply even in different environments. (Ex. 7, Fisher (*Stafford*) Dep., at 99). A clinician should treat according to the patient's individual circumstances. (Ex. 7, Fisher (*Stafford*) Dep., at 100).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). The first sentence is not a statement of fact that can be admitted or disputed and it is not supported by the cited record. Dr. Fisher's testimony was:**

> **Q: Do you believe the standard of care for doctors practicing in Indiana prisons is the same or different from the standard of care for doctors practicing within the general population in Indiana?**
> **A: Standard of care is standard of care, and it should apply to different environments. There may be different influences of why the care should be different in a different environment, but the standard is the same. There's things that do influence it.**

**[Plaintiff's Ex. 7 [Doc. 295-7], Fisher (*Stafford*) Dep, 9:19-11:2].**

**Wexford's Illinois Medical Guidelines**

30. The Wexford Medical Advisory Committee reviewed and approved "Medical Guidelines – Region: Illinois" (the "Wexford Illinois Guidelines") to govern Wexford's medical services for IDOC patients. The Wexford Illinois Guidelines do not contain a section concerning HCV. (Ex. 17, PX52, at Table of Contents (filed under seal); Ex. 4, Fisher Dep., at 25-26).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). It is admitted that the Wexford Medical Guidelines – Illinois do not contain a section for HCV. It is disputed that the Medical Guidelines "govern" the Medical services provided to IDOC patients. The Medical Guidelines are a reference tool to aid clinicians. See Paragraph 31 below.**

31. The Preface to the Wexford Illinois Guidelines states: "This manual is intended to serve as a reference tool for clinicians practicing medicine in the jails and prisons served by Wexford Health Sources, Inc. This manual contains clinical pathways, treatment protocols, and algorithms designed to promote a standard level of quality and care at Wexford Health sites." (Ex. 17, PX52, at Preface (filed under seal); Ex. 4, Fisher Dep., at 63).

**RESPONSE: Admitted.**

32. The Preface also states that "if there are any conflicts between these guidelines and client-specific policies, administrative directives or institutional directives, then the respective client-specific policies, administrative directives or institutional directive language is controlling to resolve such conflict." (Ex. 17, PX52, at Preface (filed under seal); Ex. 4, Fisher Dep., at 63-64).

**RESPONSE: Admitted. This is consistent with Wexford's contractual obligation in the state of Illinois. [See Plaintiff's Ex. 16, Wexford IDOC Contract, at Doc. 295-16, p. 19, Bates 18]. Wexford is contractually obligated to comply with Administrative Directives and other IDOC policies and procedures. [Id.]; [Plaintiff's Ex. 4 [Doc. 295-4], Fisher Dep, 81:22-82:10].**

33. The above statement has been part of every Wexford Medical Guideline since the revision date of 8/26/15. (Ex. 4, Fisher Dep., at 64-65).

**RESPONSE: Paragraph 33 is vague as to "the above statement." To the extent this paragraph is limited to the sentence from the Preface to the Medical Guidelines quoted in Paragraph 33, it is admitted and immaterial. To the extent it refers to anything else, it is not supported by the cited record.**

34. The Preface has been agreed upon by the Wexford Medical Advisory Committee. (Ex. 4, Fisher Dep., at 68). Dr. Fisher testified at the *Nance* trial that Wexford tries to instill the philosophy contained in the Preface in its practitioners. (Ex. 4, Fisher Dep., at 68-69; Ex. 5, Fisher (*Nance*) Testimony, at 345 (JDM 009350)). Dr. Fisher testified in his deposition in this case that he does not agree that Wexford's intent is for its practitioners to apply the principles set forth in the Preface. (Ex. 4, Fisher Dep., at 70-71).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). In the referenced testimony, Dr. Fisher testified as follows:**

> **Q: Okay. So let's go back to your testimony in the Nance case. And these are questions by Wexford's doctor [sic]. And the question is starting at line 17.**
>
> > ***"Doctor is the exercise of independent medical judgment by its practitioners something that's important to Wexford?***
> >
> > ***Answer: Absolutely. We are hiring licensed clinicians, licensed in the state to practice medicine. So that's incredibly important. We expect them to bring their clinical skills and expertise.***
> >
> > ***Question: Does Wexford try to instill the philosophy contained within the preface in the practitioners***
> >
> > ***Answer: yes."***
>
> **So do you agree with that? Description of what Wexford tries to do with its clinicians as relates to what's contained in the preface?**
>
> **A: This is within an entire deposition. So there may have been a train of thought. So to separate out one line or two lines, I don't know what the entire train of thought was.**
>
> **Q: Well if you go back to the top of this page it is when you finish reading the preface. And Wexford's council asks: "that's before any of the actual individual diseases or conditions are talked about? Yes." That's the train of thought, right? Do you agree that what's expressed in the preface is something that Wexford wants to instill in its clinicians? . . . Do you agree with that?**
>
> **A: I cannot say every person who has been trained to work at one of our sites by a supervisor has had this preface drilled into them. So, it is – I can't -- I can't speak for every training of every clinician that has occurred in all the years that I've been**

**with Wexford. . . . Some clinicians may have had this. Supervisor clinicians may stress this preface page. Others may not.**

**Q: Wexford's intent is for them to apply the principles that are set forth in this preface. Do you agree with that?**

**A: No. I don't agree with that. It says preface. This manual is intended to serve as a reference to for clinicians practicing medicine in jails and prisons served by Wexford . . . So that tells you what the purpose of this entire guideline manual is. It is a service of reference to it [sic].**

**To the extent Paragraph 34 is intended to assert anything else, it is not supported by the cited record.**

35. The Wexford site medical director decides what constitutes adequate healthcare services under the Illinois/Wexford contract. (Ex. 3, Matticks (*Barrow*) Dep., at 13-14).

**RESPONSE: It is admitted that Dr. Matticks gave that testimony in the *Barrow* case, a case involving treatment of an eye condition. [*See* Plaintiff's Ex. 3 [Doc. 295-3], Matticks (Barrow) Dep, 32:10-15]. With respect to treatment of Hepatitis C in IDOC, Dr. Matticks testified the Wexford's medical personnel role is limited to "gather information and refer that on to UIC as per the IDOC Guidelines." [Plaintiff's Ex. 2 [Doc. 295-2], Matticks Dep, 17:14-18:8].**

**Hepatitis C**

36. HCV is a disease that adversely affects the functioning of the liver. (Ex. 14, Meeks Dep., at 43). While HCV infection can resolve spontaneously from the acute phase in some cases, most persons infected with HCV develop chronic infection. (Ex. 21, PX2, *Hepatitis C*, Chan, J., Disease-a-Month 60 (2014) at 201, 202; Ex. 12, Chan Dep., at 22-24).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Not supported by the cited record. Dr. Meeks testified HCV *can* cause damage to the liver.**

**[Plaintiff's Ex. 14 [Doc. 295-14], Meeks Dep, 43:4-8]. The second sentence is a statement of opinion, not fact and is not material to this case. It is also imprecise and, as stated, not supported by the cited record. Specifically, the cited article states: "Hepatitis C may present as an acute infection, as about 20% will clear the HCV spontaneously and 55–85% of patients progress to chronic disease." [Plaintiff's Ex. 21, [Doc. 295-21, p. 3].**

37. The HCV incident rate among the incarcerated population is much higher than in the general population. (Ex. 21, PX2, at 201; Ex. 12, Chan Dep., at 24; Ex. 9, Paul (*Insco*) Dep., at 76-77). Dr. Paul estimates that at any given time the number of IDOC HCV patients is around 7,000. (Ex. 8, Paul Dep., at 227).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Not supported by the cited record. Dr. Chan testified: Q: "the population of incarcerated individuals had a higher rate of hep C than the general population?" A: "Yeah, I think its hard to say depending on where you are. I mean, there's a reason the range is high. Its just what's been quoted in the literature." [Plaintiff's Ex. 12 [Doc. 295-12], Chan Dep, 24:17-25:3]. As to the second sentence, the referenced statement is not contained in the cited record. Further, the accurate exhibit reference is Exhibit 6, where Dr. Paul testified she was making a guess, but did not know the number of IDOC inmates with chronic hepatitis C. [Plaintiff's Ex. 6 [Doc. 295-6], Paul Dep, 227:6-18]. Dr. Paul's guess is immaterial to Plaintiff's claims.**

38. There are six genotypes of HCV and genotype 1 is the most prevalent in the United States. Categorizing by genotype is a tool used in assessing the most effective treatment protocol for a particular patient and to determine the likelihood of response to antiviral therapy. (Ex. 21, PX2, at 202, 203; Ex. 12, Chan Dep., at 27).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Not supported by the cited record. Further, the statements are immaterial as to Plaintiff's claim against Wexford and Dr. Paul.**

39. Mr. Miller's HCV genotype was determined (after his release from IDOC custody) to be type 1. (Ex. 22, Access Community Health Records (excerpts), at JDM 001943).

**RESPONSE: Objection: lacks foundation, as the cited exhibit is a medical record for which no medical provider testimony was provided. Not supported by cited record; JDM 1943 is not contained within Plaintiff's exhibit 22.**

40. According to a fact sheet prepared by Dr. Shicker and IDOC in connection with testimony before the Hepatitis C Task Force of the Illinois Department of Public Health on September 17, 2014 ("2014 IDOC Fact Sheet"), 80% of people infected with HCV will develop chronic HCV infections. (Ex. 23, Louis Shicker, Medical Director for the Illinois Department of Corrections, *Hepatitis C and the IDOC – Fact Sheet*, Illinois Department of Corrections (Sep. 17, 2014), at JDM 014346; See Ex. 21, PX2, at 202).

**RESPONSE: Disputed and immaterial. The cited article at Plaintiff's Exhibit 21 states: "Hepatitis C may present as an acute infection, as about 20% will clear the HCV spontaneously and 55–85% of patients progress to chronic disease." [Plaintiff's Ex. 21, [Doc. 295-21, p. 3].**

41. Persons infected with chronic HCV suffer from a serious medical condition. They can develop fibrosis, which is scarring of liver tissue that damages the structure of their livers. (Ex. 14, Meeks Dep., at 43; Ex. 7, Fisher (*Stafford*) Dep., at 66).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). The first sentence is a legal conclusion, not a statement of fact. It is admitted and immaterial that individuals with chronic hepatis C can develop fibrosis of the liver.**

42. Such persons are at an increased risk of developing cirrhosis, a life-threatening condition whereby the functioning of the liver is reduced by extensive liver scarring associated with the advanced progression of fibrosis, as well as hepatocellular carcinoma ("HCC"). (Ex. 21, PX 2 at 201, 202; Ex. 12, Chan Dep., at 23, 29; Ex. 23, 2014 IDOC Fact Sheet, at JDM 014346; Ex. 14, Meeks Dep., at 43-44; Ex. 7, Fisher (*Stafford*) Dep., at 67-70; Chan Answer, Doc. 135, ¶ 33).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). It is admitted but immaterial that individuals with chronic hepatitis C can develop cirrhosis and individuals with a certain level of cirrhosis can develop hepatocellular carcinoma. [Plaintiff's Ex. 7 [Doc. 295-7], Fisher Dep, 9:19-11:2].**

43. Persons with HCV may have no symptoms until they are at the end stages of the disease and serious liver complications arise (Ex. 7, Fisher (*Stafford*) Dep., at 71, 116-17), but may have symptoms including fatigue, abdominal pain, and joint pain. (Ex. 7, Fisher (*Stafford*) Dep., at 72-73). HCV can progress without outward signs. (Ex. 7, Fisher (*Stafford*) Dep., at 117).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Immaterial and disputed in part. Dr. Fisher testified the listed symptoms of fatigue, abdominal pain and joint pain were "possible" but the majority of individuals with hepatitis C are asymptomatic. [Plaintiff's Ex. 7 [Doc. 295-7], Fisher (*Stafford*) Dep, 72-73].**

44. There are factors that can increase the rate of progression of fibrosis in HCV patients including insulin resistance (diabetes and prediabetes). (Ex. 4, Fisher Dep., at 120-21; Ex. 7, Fisher (*Stafford*) Dep., at 144-45).

**RESPONSE: Not supported by the cited record. Dr. Fisher's testimony was that there are a number of factors that can affect one's progression of Hepatitis C, including age at infection and one's sex. He also said "there are modifiable factors. Alcohol consumption is a very important part of this disease. Non-alcoholic fatty liver disease, those who are obese progress more quickly. Insulin resistance tends to come with obesity that makes a difference . . ." [Plaintiff's Ex. 7 [Doc. 295-7], Fisher (*Stafford*) Dep, 144-145].**

45. Liver scarring severity is classified by a METAVIR fibrosis score ("Fibrosis Score"), which is measured on a scale of F0 to F4. During the relevant period the Fibrosis Score was commonly determined by a FibroScan which measures the stiffness or scarring of the liver. (Ex. 12, Chan Dep., at 29; Ex. 6, Paul Dep., at 74, 77; Ex. 8, Paul (*Miller I*) Dep., at 33-34).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted.**

46. In a paper authored by Dr. Chan, Fibrosis Scores are described as: F0 = no fibrosis; F1 = mild fibrosis; F2 = moderate fibrosis; F3 = severe fibrosis; and F4 = cirrhosis. (*See* Ex. 21, PX2, at Table 2; Ex. 12, Chan Dep., at 29). Alternative descriptions are: F0 = no fibrosis; F1 = fibrous portal expansion; F2 = rare bridges or septae; F3 = numerous bridges or septae; and F4 = cirrhosis. (*Id*.). Determining the patient's Fibrosis Score is important. (Ex. 7, Fisher (*Stafford*) Dep., at 119).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a).**

47. Cirrhosis is an advanced scarring of the liver that can result from progression of HCV infection. (Ex. 6, Paul Dep., at 73; Ex. 7, Fisher (*Stafford*) Dep., at 114).

**RESPONSE: Admitted but immaterial.**

48. The progression of fibrosis does not occur at the same rate in all persons and the progression is not linear. In addition, the presence of other diseases may affect the rate of progression of fibrosis. (Ex. 21, PX2, at 202; Ex. 12, Chan Dep., at 26; Wexford/Paul Answer, Doc. 143, ¶ 32). For example, the presence of insulin resistance/diabetes is a predictor of accelerated liver fibrosis progression. (Ex. 7, Fisher (*Stafford*) Dep., at 144-45; Ex. 4, Fisher Dep., at 120-21).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Also, duplicative. See Paragraph 44 above and response thereto.**

49. The 2014 IDOC Fact Sheet states that persons with a Fibrosis Score of F3 or above are most in need of treatment and that persons with type 2 diabetes should also be considered secondarily for priority HCV treatment. (Ex. 23, 2014 IDOC Fact Sheet, at JDM 014347).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted but immaterial.**

50. Persons with HCV are at an increased risk of developing liver cancer. (Ex. 21, PX2 at 201, 202; Ex. 12, Chan Dep., at 23, 29; Ex. 23, 2014 IDOC Fact Sheet, at JDM 014346). For persons with HCV who develop cirrhosis, approximately 5% per year will develop HCC. (Ex. 10, Paul (*Handy*) Dep., at 74-75).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). The first statement is incomplete, as the Fact Sheet goes on to say these conditions may take 25-30 years to develop. [Plaintiff's Ex. 23, at JDM 14346]. It is admitted and immaterial that 95% of people who develop cirrhosis will not develop HCC.**

51. According to the 2014 IDOC Fact Sheet, "~25% of those [individuals infected with HCV] will go on to have significant liver disease – ultimately cirrhosis (liver failure) and increased incidence of hepatocellular carcinoma [liver cancer]." Liver transplantation is the principle long term treatment for patients with advanced cases of cirrhosis and/or liver cancer, and according to the 2014 IDOC Fact Sheet "[HCV] is the number one reason for requiring liver transplantation." (Ex. 23, 2014 IDOC Fact Sheet, at JDM 014346).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Immaterial and duplicative. See Paragraph 50 and response thereto.**

52. According to the United States Centers for Disease Control and Prevention, "annual hepatitis C-related mortality in 2013 surpassed the total combined number of deaths from 60 other infectious diseases reported to CDC, including HIV, pneumococcal disease, and tuberculosis."[4]

**RESPONSE: Objection. Lacks foundation. At summary judgment the court must be guided by the substantive evidentiary standards of the case applicable at trial. *See* Fed.R.Civ.P. 56(c) and (e); *Anderson, et. al. v. Liberty Lobby, Inc. and Willis A. Carto,* 477 U.S. 242 (1986). Reference material is not admissible absent the testimony of experts who rely on it and can interpret its meaning. *See* Fed. R. Evid. 803(18). Moreover, this information is wholly immaterial to Plaintiff's claim.**

**HCV Treatment**

53. The goal of HCV treatment is to eradicate the HCV infection to prevent the progression and development of liver complications including cirrhosis, HCC and end-stage liver disease, by achieving a sustained virologic response ("SVR") such that HCV is undetectable at both the end of the treatment and 6 months after the end of the treatment (more recently reduced to 3 months). Achieving SVR is considered to be effectively a cure for HCV. (Ex. 12, Chan Dep., at 30-31; Ex. 21, PX2, at 203, 204).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted and immaterial.**

54. For persons with HCV, benefits associated with achieving SVR include a decrease in liver inflammation, a reduction in the rate of liver fibrosis, a higher than 70% reduction in the risk of liver cancer, a 90% reduction in the risk of liver-related mortality and liver transplantation, as well as a substantially improved quality of life. (See Ex. 7, Fisher (*Stafford*) Dep., at 108; Ex. 24, PX29, 2018 FBOP Guidelines, at 8; Ex. 25, PX31A, 2015 AASLD/IDSA HCV Guidance, at 935).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Lacks foundation. At summary judgment the court must be guided by the substantive evidentiary standards of the case applicable at trial. *See* Fed.R.Civ.P. 56(c) and (e); *Anderson, et. al. v. Liberty Lobby, Inc. and Willis A. Carto,* 477 U.S. 242 (1986). Reference material is not admissible absent the testimony of experts who rely on it and can interpret its meaning. *See* Fed. R. Evid. 803(18). Moreover, this information is wholly immaterial to Plaintiff's claim.**

55. Cirrhotic patients who achieve SVR are not free of liver complications; thus, it is important to initiate HCV treatment early. (Ex. 21, PX2, at 204; Ex. 12, Chan Dep., at 31-32; Ex. 4, Fisher Dep., at 54). HCV treatment does not repair liver scarring. (Ex. 8, Paul (*Miller I*) Dep., at 67).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted that the witnesses gave the cited testimony, but it is immaterial.**

56. Achieving SVR corresponds to long-term clearance of the HC virus in 99% of patients. (Ex. 4, Fisher Dep., at 53). There are clear benefits to treatment even for patients without cirrhosis. (Ex. 4, Fisher Dep., at 55). HCV antiviral drugs do not work as well later in the course of the disease. (Ex. 4, Fisher Dep., at 55).

**RESPONSE: Admitted that Dr. Fisher gave the cited testimony, but it is immaterial.**

57. In the 1990s, the United States Food and Drug Administration ("FDA") approved the use of Ribavirin, an anti-viral drug, for use in combination with interferon to treat HCV. With this drug combination, the standard length of time for treating genotype 1 HCV was 48 weeks. The presence of interferon caused severe side effects in patients, such as depression, flu-like symptoms and anemia. The rate of achieving SVR using Ribavirin and interferon for HCV genotype 1 was 42% to 52%. (*See* Ex. 21, PX2, at 204-07; Ex. 12, Chan Dep., at 32-40; Ex. 4, Fisher Dep., at 132-33).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). It is disputed that the information is found in the cited record from Dr. Fisher's deposition. This information is immaterial to Plaintiff's claim.**

58. Direct acting antiviral drugs ("DAA") were subsequently approved for treatment of HCV, which continued to require administration in combination with interferon, with all the side effects associated with that drug. (*Id.*). DAA treatments without interferon generally involved a course of three to six months, achieved over 90% success rate, and had very few side effects. (Ex. 8, Paul (*Miller I*) Dep., at 13). Patients with cirrhosis have a decreased cure rate from DAA treatment and may need to stay on the treatment for a longer period of time. (Ex. 8, Paul (*Miller I*) Dep., at 65, 66).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). It is unclear what *Id.* Plaintiff is referencing; therefore, the referenced information is not found in the cited record. It is disputed that Dr. Paul's cited testimony referenced DAA treatments without interferon, as the cited testimony refers only to "antivirals." [Plaintiff's Ex. 8 [Doc. 295-8], Paul (*Miller I*) Dep, 13]. The final sentence is admitted but immaterial.**

59. By 2014, the FDA approved DAA treatments that did not require the use of interferon. The rate of SVR achieved with the new DAA drugs was approximately 90% with little to no side effects and with a substantially shortened treatment course. (Ex. 21, PX2, at 205-06 and Table 6; Ex. 12, Chan Dep., at 37-40; Ex. 7, Fisher (*Stafford*) Dep., at 140). Dr. Fisher testified treatment in the correctional setting usually achieves higher cure rates compared to the community because compliance tends not to be an issue. (Ex. 7, Fisher (*Stafford*) Dep., at 140-41).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). The first two sentences are not contained in the cited record. For the final sentence, it is admitted that Dr. Fisher gave that testimony but it is immaterial.**

60. Development of direct-acting agent protocols that did not involve the use of interferon was a very important development in HCV treatment. (Ex. 4, Fisher Dep., at 55-56).

**RESPONSE: Admitted in part. Dr. Fisher did testify to that statement. But it is an incomplete representation. Dr. Fishers complete testimony was: "Yes. That was very important development, but there is also then evolution among the direct-acting antivirals . . . There are patients who literally died related to direct-acting antivirals, especially some of the earlier versions. It was always considered risk benefit analysis. So early versions of direct-acting antivirals and later version, they're very hard to sort of compare to each other." [Plaintiff's Ex. 4 [Doc. 295-4], Fisher Dep, 55-56]. Moreover, this is immaterial.**

**National HCV Guidelines**

61. Throughout the relevant period, the Federal Bureau of Prisons ("FBOP") issued guidelines for the evaluation and management of chronic HCV. (Ex. 6, Paul Dep., at 81-82; Ex. 14, Meeks Dep., at 84-88; Ex. 26, PX28, May 2017 FBOP Guidelines; Ex. 24, PX29, August 2018 FBOP Guidelines). By at least May 2017, the FBOP guidelines listed elevated A1c (diabetes mellitus) as a second-level priority for treatment because it is a condition associated with a more rapid progression of fibrosis. (Ex. 6, Paul Dep., at 83-85; Ex. 24, PX29, at 8-9; Ex. 26, PX28, at 7-8).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted but immaterial.**

62. The May 2017 FBOP guidelines contained the following paragraph explaining the reasons for its priority criteria for HCV treatment:

> Determining whether BOP priority criteria for treatment are met is an important part of the initial evaluation and ongoing management of inmates with chronic HCV infection. Although all patients with chronic HCV infection may benefit from treatment, certain cases are at higher risk for complications or disease progression and require more urgent consideration for treatment. The BOP has established priority criteria to ensure that those with the greatest need are identified and treated first. The BOP Medical Director will provide periodic guidance on specific strategies for implementing these priority levels.

(Ex. 26, PX28, at 7).

**RESPONSE: Objection. Lacks foundation. At summary judgment the court must be guided by the substantive evidentiary standards of the case applicable at trial. *See* Fed.R.Civ.P. 56(c) and (e); *Anderson, et. al. v. Liberty Lobby, Inc. and Willis A. Carto,* 477 U.S. 242 (1986). Reference material is not admissible absent the testimony of experts who rely on it and can interpret its meaning. *See* Fed. R. Evid. 803(18). Moreover, this information is wholly immaterial to Plaintiff's claim as the FBOP Guidelines are not applicable in Illinois.**

63. The August 2018 FBOP guidelines contained the following paragraph explaining the reasons for its priority criteria for HCV treatment:

> All sentenced inmates with chronic HCV infection are eligible for consideration of treatment. Certain cases are at higher risk for complications or disease progression and may require more urgent consideration for treatment. The BOP has established PRIORITY CRITERIA to ensure that inmates with the greatest need are identified and treated first.

(Ex. 24, PX29, at 8).

**RESPONSE: Objection. Lacks foundation. At summary judgment the court must be guided by the substantive evidentiary standards of the case applicable at trial. *See* Fed.R.Civ.P. 56(c) and (e); *Anderson, et. al. v. Liberty Lobby, Inc. and Willis A. Carto,* 477 U.S. 242 (1986). Reference material is not admissible absent the testimony of experts who rely on it and can interpret its meaning. *See* Fed. R. Evid. 803(18). Moreover, this information is wholly immaterial to Plaintiff's claim as the FBOP Guidelines are not applicable in Illinois.**

64. The American Association for the Study of Liver Diseases ("AASLD") and the Infectious Diseases Society of America ("IDSA") also issue guidelines for the testing, managing and treating of HCV. (Ex. 27, PX32, November 2018 AASLD/IDSA Guidelines; Ex. 4, Fisher Dep., at 107-08). Since at least 2018, the AASLD/IDSA guidelines recommend treatment "for all patients with chronic HCV infection, except those with a short life expectancy that cannot be remediated by HCV therapy, liver transplantation, or another directed therapy." (Ex. 27, PX32, at 1; Ex. 7, Fisher (*Stafford*) Dep., at 106).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a).**

65. Dr. Paul testified that when the standards from the FBOP and AASLD/IDSA conflict, "then I make my clinical judgment on what makes the most sense for incarcerated patients." (Ex. 9, Paul (*Insco*) Dep., at 81).

**RESPONSE: It is admitted that Dr. Paul gave that testimony, but the *Insco* case is from West Virginia and arises out of Wexford's contract in West Virginia, where the Illinois Guidelines are not applicable. [Plaintiff's Ex. 9 [Doc. 295-9], Paul (*Insco*) Dep, 14:6-9]. This has no applicability to Plaintiff.**

**IDOC's HCV Treatment Guidelines**

66. Since the 1990s, IDOC has promulgated certain guidelines, policies, procedures and protocols for the screening, monitoring and treatment of IDOC inmates with HCV (the "IDOC HCV Guidelines" or "Guidelines"). (Ex. 15, Shicker Dep., at 22-23).

**RESPONSE: Admitted and immaterial.**

67. Since approximately 2010 or 2011, IDOC has contracted with non-party UIC for UIC's medical professionals, including Dr. Chan, to direct treatment of IDOC inmates with HCV. (Ex. 12, Chan Dep., at 18; Ex. 28, UIC/IDOC Medical Program Agreement (JDM 012796-012833); Ex. 13, Patel Dep., at 12-13). Dr. Chan began working with IDOC to create the IDOC HCV Guidelines in 2010 when the IDOC telemedicine program was initiated. (Ex. 12, Chan Dep., at 120).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted.**

68. UIC medical professionals, including Dr. Chan, took the lead in preparing the IDOC HCV Guidelines. (Ex. 12, Chan Dep., at 60-61; Ex. 14, Meeks Dep., at 26, 28). Dr. Chan participated in drafting and revising the IDOC HCV Guidelines. (Ex. 12, Chan Dep., at 66-67). The UIC team, including Dr. Chan, revised the IDOC HCV Guidelines on various occasions at the request of IDOC to address issues raised in lawsuits concerning inmate access to HCV treatment and on other occasions UIC initiated changes or revisions to the IDOC Guidelines. (Ex. 12, Chan Dep., at 66-69; Ex. 14, Meeks Dep., at 26, 27, 28).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted.**

69. Wexford provides training to Wexford facility medical directors regarding the IDOC HCV guidelines. (Ex. 11, Matticks (*Miller I*) Dep., at 26-27).

**RESPONSE: Admitted.**

70. Dr. Meeks testified that IDOC relied on the expertise of UIC. (Ex. 14, Meeks Dep., at 27).

**RESPONSE: Admitted.**

71. Dr. Chan and UIC reviewed the AASLD and FBOP guidelines as part of revising the IDOC HCV Guidelines. (Ex. 12, Chan Dep., at 71, 73-74).

**RESPONSE: Admitted but deny it is a complete statement of what Dr. Chan testified was reviewed.**

72. Dr. Paul reviewed the IDOC HCV Guidelines each time they were issued or revised. (Ex. 6, Paul Dep., at 36, 37; Ex. 10, Paul (*Handy*) Dep., at 11-12).

**RESPONSE: Admitted.**

**A1c as Exclusion Criteria in IDOC HCV Guidelines Prior to 2017**

73. Dr. Chan participated in creating the March 2014 IDOC HCV Guidelines. (Ex. 29, PX16; Ex. 12, Chan Dep., at 131-33). The March 2014 IDOC HCV Guidelines listed "Uncontrolled diabetes (Hgb A1c > 7.5)" as an "Absolute Exclusion Criteria for Hepatitis C Treatment" and as a "contraindication" to HCV treatment for genotypes 1, 3, 4, 5 and 6 but not for genotype 2. (Ex. 29, PX16, at 2; Ex. 12, Chan Dep., at 134-35).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted.**

74. Elevated A1c is not a contraindication to HCV treatment, only to HCV treatment with interferon. (Ex. 12, Chan Dep., at 138-39; Ex. 6, Paul Dep., at 39-41, 47; Ex. 15, Shicker Dep., at 64-65).

**RESPONSE: Objection. Paragraph 74 is a statement of opinion. Dr. Chan's actual testimony was "it really depends on how uncontrolled their A1C is. So if it's high it looks like they are going to have complications associated with the diabetes, they should have their diabetes treated first before their liver disease." [Plaintiff's Ex. 12 [Doc. 295-12], 139:5-12]. The second half of the statement is not contained within Dr. Paul's cited testimony.**

75. Dr. Chan disagreed with the statement that A1c above 7.5 was a contraindication to HCV treatment in March 2014 but she did not express that to IDOC when she reviewed the March 2014 version of the IDOC HCV Guidelines. (Ex. 12, Chan Dep., at 141-42).

**RESPONSE: Admitted that Dr. Chan testified that at the time of her deposition in 2023, she did not agree that A1C above 7.5 was a contraindication to HCV therapy. Her testimony is taken out of context. [Plaintiff's Ex. 12, [Doc. 295-12], 141-142].**

76. The March 2015 IDOC HCV Guidelines list "Uncontrolled diabetes (A1c > 7.5)" as an "Absolute Exclusion Criteria" and a "Contraindication" *only* for "patients receiving pegylated interferon (Genotypes 2-6)." Uncontrolled diabetes and/or elevated A1c are not listed as exclusion criteria or contraindications for genotype 1. (Ex. 30, PX17, at 2; Ex. 12, Chan Dep., at 143-45).

**RESPONSE: Admitted. Immaterial.**

77. A Wexford clinician conducting HCV screening would not know whether a patient would or could receive interferon treatment to determine whether to exclude the patient from HCV treatment. (Ex. 6, Paul Dep., at 47-49).

**RESPONSE: Admitted. Immaterial.**

78. Dr. Chan worked with IDOC and Dr. Patel regarding contraindications in the IDOC HCV Guidelines. (Ex. 12, Chan Dep., at 146-47).

**RESPONSE: This is admitted as to the March 2015 guidelines, which were the subject of Dr. Chan's cited testimony.**

79. Medical studies conducted prior to the relevant period suggested that HCV patients who also had type 2 diabetes were at risk for worse outcomes from their HCV than patients who did not have type 2 diabetes, including reduced rate of SVR, progression to fibrosis and cirrhosis, and higher risk for development of HCC. (See Ex. 31, PX4, at 1; Ex. 6, Paul Dep., at 51-56; Ex. 15, Shicker Dep., at 63; Ex. 32, 33 and 34).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Lacks foundation. At summary judgment the court must be guided by the substantive evidentiary standards of the case applicable at trial. *See* Fed.R.Civ.P. 56(c) and (e); *Anderson, et. al. v. Liberty Lobby, Inc. and Willis A. Carto,* 477 U.S. 242 (1986). Reference material is not admissible absent the testimony of experts who rely on it and can interpret its meaning. *See* Fed. R. Evid. 803(18). As such, there is no foundation for Exhibits 31, 32, 22 and 34. The testimony of the witnesses does not support the stated information. Moreover, this information is wholly immaterial to Plaintiff's claim as to Wexford and Dr. Paul.**

**A1c as Exclusion Criteria in IDOC Guidelines in 2017, 2018 and 2019**

80. Dr. Patel testified that subsequent to 2015 he did not review, respond to or comment on proposed IDOC HCV Guideline revisions. (Ex. 13, Patel Dep., at 18-19, 21-22). Dr. Patel testified that he did not review the 2017 iteration of the IDOC HCV Guidelines. (Ex. 13, Patel Dep., at 49-50). Dr. Patel testified that prior to the January 2019 iteration he had never discussed the IDOC HCV Guidelines with Dr. Chan. (Ex. 13, Patel Dep., at 50-51).

**RESPONSE: Admitted but immaterial.**

81. However, Dr. Chan and Dr. Patel worked on revisions to the IDOC HCV Guidelines in May and June 2017. (Ex. 35, June 22, 2017, email from Dr. Chan to Dr. Patel with Word document attachment ("Chan Email") at JDM 015311; Ex. 36, June 27, 2017, email from Dr. Patel to Dr. Chan with Word document attachment ("Patel Email") at JDM 015309). As part of working on those revisions Dr. Chan consulted the guidelines of the AASLD, IDSA and FBOP. (Ex. 12, Chan Dep., at 147-48).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). The first two sentences lack foundation. The final sentence is admitted as to Dr. Chan's testimony, but immaterial to the claims as to Wexford and Dr. Paul.**

82. The proposed revised guidelines forwarded by Dr. Chan to Dr. Patel included a change under which "elevated A1c" became an across-the-board absolute exclusion criteria for all genotypes without regard to the contemplated drug therapy – whether interferon-based or interferon-free. (Ex. 35, Chan Email Word document attachment, at 3; Ex. 12, Chan Dep., at 152-53).

**RESPONSE: Admitted but immaterial to the claims as to Wexford and Dr. Paul.**

83. The proposed revised guidelines forwarded by Dr. Chan to Dr. Patel included a new statement that they were "in line with the recommendations of ~~AASLD and IDSA~~the Federal Bureau of Prison Clinical Guidance" and cited the May 2017 FBOP guidelines. (Ex. 35, Chan Email Word document attachment, at 1).

**RESPONSE: Objection. Lacks foundation. Admitted as to the contents of the document, but immaterial to the claims as to Wexford and Dr. Paul.**

84. The proposed 2017 modifications removed elevated A1c from the list of contraindications because interferon was no longer part of common HCV treatment protocols. (Ex. 12, Chan Dep., at 155).

**RESPONSE: Admitted in part. Dr. Chan testified that interferon was not used was "in part" the reason the A1C was taken out of the contraindication category. Moreover, this is immaterial to the claims as to Wexford and Dr. Paul.**

85. Dr. Patel made additional modifications to the proposed guidelines received from Dr. Chan, including a comment/question as to whether the absolute exclusions should be "more or less specific", but he did not make any changes to the absolute A1c exclusion. (Ex. 36, Patel Email Word document attachment, at 3). Dr. Patel forwarded his and Dr. Chan's proposed revisions to Dr. Meeks. (Ex. 36, Patel Email).

**RESPONSE: Objection. Lack of foundation as to the emails. Admitted as to the contents of the document, but immaterial to the claims as to Wexford and Dr. Paul.**

86. Dr. Chan created a "Review of Systems Checklist" form to be used in implementing the revised 2017 IDOC Guidelines, which stated that if A1c is greater than 7 percent, "have patient see IDOC Physician before refer to UIC HCV Telemedicine Clinic. Do not send until the labs are within normal range." (Ex. 36, Chan Email Word document attachment, at 10; Ex. 37, PX18, at 000822; Ex. 12, Chan Dep., at 176-78).

**RESPONSE: Admitted.**

87. This was the first time the IDOC Guidelines contained a Review of Systems Checklist that referenced A1c. (*See* Ex. 4, Paul Dep., at 49-51, 58-59).

**RESPONSE: Admitted but immaterial.**

88. Dr. Chan created the Review of Systems Checklist to inform IDOC providers what IDOC was directing them to do in the Guidelines. (Ex. 12, Chan Dep., at 178-79).

**RESPONSE: Admitted.**

89. Dr. Chan inserted the A1c level of 7 percent in the Review of Systems Checklist, whereas the text of the Guidelines did not define "elevated A1c." (Ex. 12, Chan Dep., at 178).

**RESPONSE: Admitted but immaterial.**

90. Under the revised guidelines provided to IDOC by Dr. Chan and Dr. Patel, IDOC inmates with elevated A1c would be absolutely excluded from receiving HCV treatment even if they had Fibrosis Scores of F3 or F4 and/or had cirrhosis. (Ex. 12, Chan Dep., at 156-57; Ex. 6, Paul Dep., at 64-66).

**RESPONSE: Objection. This mischaracterizes the testimony, as the exclusion is no longer applicable when the A1C is controlled. [Plaintiff's Ex. 12 [Doc. 295-12], Chan Dep, 158:13-20].**

91. IDOC implemented the revised guidelines in or about December 2017. (Ex. 37, PX18; Ex. 12, Chan Dep., at 147; Ex. 14, Meeks Dep., at 70-71). Dr. Paul reviewed the December IDOC HCV Guidelines at the time they were implemented. (Ex. 6, Paul Dep., at 60).

**RESPONSE: Admitted and immaterial.**

92. The October 2018 IDOC HCV Guidelines maintained the absolute exclusion from treatment for inmates with elevated A1c and retained the Review of Systems Checklist instruction not to refer inmates with A1c above 7. (Ex. 38, PX19, at Bates 000829, 000836; Ex. 12, Chan Dep., at 164-65).

**RESPONSE: Admitted and immaterial.**

93. The October 2018 IDOC HCV Guidelines included "confirmed cirrhosis or have clinical findings with cirrhosis" as priority level 1 for treatment, and Fibrosis Score of F3 or F4 as priority level 2. (Ex. 38, PX19, at Bates 000830-31).

**RESPONSE: Objection. Lacks foundation. Admitted as to the contents of the document.**

94. The January 2019 IDOC HCV Guidelines maintained the absolute exclusion from treatment for inmates with elevated A1c and the Review of Systems Checklist instruction not to refer inmates with A1c above 7. (Ex. 39, PX20, at 000436, 000443; Ex. 12, Chan Dep., at 166, 173-74; Ex. 14, Meeks Dep., at 101-02).

**RESPONSE: Admitted.**

95. The January 2019 Guidelines also listed inmates with cirrhosis or clinical findings with cirrhosis as priority level 1, and inmates with Fibrosis Scores of F3 and F4 as priority level 2. (Ex. 39, PX20, at 000437-38; Ex. 12, Chan Dep., at 175).

**RESPONSE: Admitted.**

96. The absolute exclusion for inmates with elevated A1c would preclude the inmate from obtaining a FibroScan. (Ex. 6, Paul Dep., at 90).

**RESPONSE: Objection. The statement is not supported by the cited record or by the facts in this case. Dr. Paul testified the 2019 Guidelines "would recommend for them to stop at that point (finding of an elevated A1C), based on this page." [Plaintiff's Ex. 6 [Doc. 295-6], Paul Dep, 90:10-23]. However, Dr. Paul ordered the FibroScan for Plaintiff despite his continued elevated A1C. [Plaintiff's Ex. 6 [Doc. 295-6], Paul Dep, 117:2-118:2; 194:16-23].**

97. The January 2019 IDOC HCV Guidelines provide that "the primary care physicians at the IDOC sites are responsible for appropriate screening and initial workup for all hepatitis C-positive patients to determine eligibility of treatment." (Ex. 39, PX20, at 000435; Ex. 4, Fisher Dep., at 160-61).

**RESPONSE: Admitted.**

98. Under Wexford's contract with IDOC, and under the January 2019 IDOC HCV Guidelines, it was the responsibility of Wexford clinicians to determine whether a patient is eligible for HCV treatment, and Wexford contractually agreed to follow the IDOC Guidelines in making that determination. (Ex. 4, Fisher Dep., at 214-15; Ex. 39, PX20, at 000435).

**RESPONSE: Admitted.**

99. Dr. Paul reviewed the IDOC HCV Guidelines each time they were promulgated. (Ex. 6, Paul Dep., at 35-37; Ex. 8, Paul (*Miller I*) Dep., at 47; Ex. 10, Paul (*Handy*) Dep., at 11-12). Dr. Paul regularly reviewed the then-existing guidelines from AASLD/IDSA and FBOP in evaluating the IDOC HCV Guidelines. (Ex. 6, Paul Dep., at 61-62). Dr. Paul believes that if a Wexford client's HCV guidelines varied from those organizational guidelines, she would be able to spot the differences or inconsistencies. (Ex. 6, Paul Dep., at 62-63).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). The first and third sentences are admitted. The second sentence is not supported by the cited record to the extent it states Dr. Paul was "evaluating" the IDOC HCV Guidelines. Dr. Paul's testimony was:**

> **Q: So for the purpose of this December 2017 guideline, did you do any review of the then-existing guidelines from AASLD and IDSA or the Federal Bureau of Prisons as part of reviewing or evaluating this IDOC Guideline?**
> **A: Not specific to this guideline, but those were sources that we would – that I would review regularly.**

**[Plaintiff's Ex. 6 [Doc. 295-6], Paul Dep, 61:15-24].**

**Knowledge Concerning the Increased Risk to HCV Patients with Diabetes**

100. In September 2014, Dr. Shicker gave a presentation at the quarterly meeting stating that "DM (insulin resistant)" was a "high priority" for HCV treatment according to AASLD/IDSA standards. (Ex. 40, September 2014 Meeting Outline, at 7th unnumbered page).

**RESPONSE: Objection. Document lacks foundation. Moreover, it is immaterial to the claim as to Wexford and Dr. Paul.**

101. Medical literature suggested that diabetes is a co-morbidity indicating that treatment should be provided earlier rather than later, and that treating HCV can help diabetes. (Ex. 15, Shicker Dep., at 80-81; Ex. 31, PX4, *Diabetes and hepatitis C: a two-way association*, Hammerstad, S., *et al.*, Frontiers in Endocrinology, Sep. 2015; Ex. 32, 33 and 34).

**RESPONSE: Objection. Statement is not support by the cited record. Dr. Shicker's testimony, given on April 28, 2023, specifically referred to literature for the "past several years." [Plaintiff's Ex. 15 [Doc. 295-15], Shicker Dep, 80-81]. Lacks foundation. At summary judgment the court must be guided by the substantive evidentiary standards of the case applicable at trial. *See* Fed.R.Civ.P. 56(c) and (e); *Anderson, et. al. v. Liberty Lobby, Inc. and Willis A. Carto,* 477 U.S. 242 (1986). Exhibits 31, 32, 22 and 34 are not admissible absent the testimony of experts who rely on it and can interpret its meaning. *See* Fed. R. Evid. 803(18). Moreover, it is immaterial to Plaintiff's claim as to Wexford and Dr. Paul.**

102. The 2017 and 2018 FBOP Guidelines identified diabetes mellitus (elevated A1c) as a second-level priority for HCV treatment because it is a condition associated with more rapid progression of fibrosis. (Ex. 26, PX28, at 7-8; Ex. 6, Paul Dep., at 83-84; Ex. 24, PX29, at 8-9; Ex. 15, Meeks Dep., at 85-90).

**RESPONSE: Objection. Lack of foundation. Neither witness in the cited testimony could provide the foundation for the FBOP Guidelines. Moreover, Dr. Meeks testified the FBOP Guidelines do not address the level of control of the diabetes mellitus, meaning the consideration for treatment could assume the individual's diabetes was controlled.**

**[Plaintiff's Ex. 14 [Doc. 295-14], Meeks Dep, 90:11-91:7]. Moreover, it is immaterial to Plaintiff's claim as to Wexford and Dr. Paul.**

103. The FBOP priority is consistent with medical literature suggesting that HCV patients with diabetes are at risk for worse outcomes, including more rapid progression of fibrosis. (Ex. 6, Paul Dep., at 84-85). The absolute exclusion for elevated A1c contained in the January 2019 IDOC HCV Guidelines is inconsistent with the then-existing FBOP Guidelines. (Ex. 6, Paul Dep., at 85). Dr. Paul regularly reviewed medical literature concerning HCV and would have been familiar with the concept of worse HCV outcomes for diabetic patients at the time it was being discussed in the literature. (Ex. 6, Paul Dep., at 51-56).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Disputed in part. Dr. Meeks testified the FBOP Guidelines are not inconsistent with IDOC Guidelines because the FBOP Guidelines do not address the level of control of the diabetes mellitus. The consideration for treatment under the FBOP Guidelines could assume the individual's diabetes was controlled, while the exclusions in the IDOC Guidelines are only if the diabetes is uncontrolled. [Plaintiff's Ex. 14 [Doc. 295-14], Meeks Dep, 90:11-91:7]. The final sentence mischaracterizes Dr. Paul's testimony, as the cited testimony relates to an article from 2015 she had not read and she testified she was familiar with the concepts "today" (the date of deposition was May 17, 2023), but was not in the 2014-2015 timeframe. [Plaintiff's Ex. 6 [Doc. 295-6], Paul Dep, 51-56]. Moreover, it is immaterial to Plaintiff's claim as to Wexford and Dr. Paul.**

**The Monitor**

104. In 2019, IDOC entered into a Consent Decree in the case entitled *Don Lippert, et al. v. John Baldwin, et al.*, No. 10-cv-4603 (N.D. Ill.) ("*Lippert*") – a putative class action in which IDOC inmates alleged they had been denied their constitutional right to adequate medical care – and the court entered the Consent Decree on May 5, 2019. (Ex. 41, Consent Decree (*Lippert* Doc. 1238), at 1). The Consent Decree provided for appointment of a monitor to, among other things, evaluate IDOC's compliance with the Consent Decree. (Ex. 41, Consent Decree (*Lippert* Doc. 1238), at 19-20). On March 29, 2019, the court in *Lippert* appointed Dr. Jack Raba ("Monitor" or "Dr. Raba") "as Monitor to perform the duties and have the rights and responsibilities set forth in the Consent Decree." (Ex. 42, Order (*Lippert* Doc 1108); Ex. 14, Meeks Dep., at 34-35).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Further, the monitoring and associated monitoring reports under *Lippert* are inadmissible. *See Diaz v. Chandler*, 2016 U.S. Dist. LEXIS 35450 (N.D. Ill. Mar. 18, 2016). The Seventh Circuit favorably cited *Diaz* in *Wilson v. Wexford Health Sources, Inc*, 932 F.3d 513, 522 (7th Cir. 2019), when it noted that numerous plaintiffs had attempted to introduce the 2014 *Lippert* report but it had "been excluded each time as inadmissible hearsay." *See also Gaston v. Ghosh*, 2017 U.S. Dist. LEXIS 195234 (N.D. Ill. 2017).**

105. Dr. Meeks interacted with Dr. Raba toward the end of his tenure as IDOC Medical Director, concerning recommended changes to the IDOC health services program for IDOC inmates. (Ex. 14, Meeks Dep., at 35-36, 39).

**RESPONSE: Admitted but immaterial and inadmissible.**

106. On July 14, 2020, Dr. Raba communicated to IDOC that he would like to contact UIC "to start a discussion about Hepatitis C treatment." (Ex. 43, July 14 email from Dr. Raba to Kelly Presley (IDOC)).

**RESPONSE: Objection. Inadmissible hearsay and lacks foundation. Further, this email post-dates Plaintiff's release from IDOC and the end date for his claims, and is therefore immaterial to Plaintiff's claim.**

107. Dr. Raba was concerned about the number of patients receiving HCV treatment. (Ex. 14, Meeks Dep., at 62). In a Monitor's Report dated August 6, 2020, Dr. Raba reported to the court in *Lippert* that:

> In June 2019 a quality improvement audit found that 1785 patients were being followed in the IDOC hepatitis C clinic; 22 (1.2%) were undergoing treatment, 40 (2.2%) had completed treatment, and 337 (18.9%) were deemed ineligible for treatment. A December 2019 follow up audit found 1712 patients were being followed in hepatitis C clinic. Only 12 (0.7%) were undergoing treatment; 89 (5.2%) were awaiting treatment; 46 (2.6%) had completed treatment; and 347 (20.3%) were denied treatment based on not qualifying. Ninety seven percent of 1656 patients with hepatitis C were not on treatment. There was no discussion in the analysis of results of the audit about these extremely low rates of treatment.

(Ex. 44, August 6, 2020 Health Care Monitor 2nd Report (*Lippert* Doc. 1335) (excerpt), at 125 (JDM 011571)).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). The cited report is hearsay and lacks foundation. Further, the monitoring and associated monitoring reports under *Lippert* are inadmissible. *See Diaz v. Chandler*, 2016 U.S. Dist. LEXIS 35450 (N.D. Ill. Mar. 18, 2016). The Seventh Circuit favorably cited *Diaz* in *Wilson v. Wexford Health Sources, Inc*, 932 F.3d 513, 522 (7th Cir. 2019), when it noted that numerous plaintiffs had attempted to introduce the 2014 *Lippert* report but it had "been excluded each time as inadmissible hearsay." *See also Gaston v. Ghosh*, 2017 U.S. Dist. LEXIS 195234 (N.D. Ill. 2017). Finally, this email post-dates Plaintiff's release from IDOC on June 22, 2020 (See Paragraph 2 above).**

108. In August and September 2020, Dr. Chan and Dr. Patel drafted proposed changes to the January 2019 IDOC HCV Guidelines, including changes to the A1c element of the January 2019 IDOC HCV Guidelines, in response to Dr. Raba's requests. (Ex. 12, Chan Dep., at 181-83, 185, 186-89; Ex. 45, Emails between Dr. Raba, Dr. Chan and Dr. Patel).

**RESPONSE: Objection: Further, the monitoring and associated monitoring reports under *Lippert* are inadmissible. See response to Paragraph 107 above. Finally, this email post-dates Plaintiff's release from IDOC on June 22, 2020 (See Paragraph 2 above).**

109. Dr. Raba had requested that A1c not be included in the list of absolute exclusions. (Ex. 12, Chan Dep., at 193-95).

**RESPONSE: Objection: The monitoring and associated monitoring reports under *Lippert* are inadmissible. See response to Paragraph 107 above. Finally, this email post-dates Plaintiff's release from IDOC on June 22, 2020 (See Paragraph 2 above).**

110. On September 29, 2020, Dr. Raba sent an email to Dr. Chan and Dr. Patel stating:

> Thank you for sharing with us the revised September 2020 Hepatitis C Guidelines which will help streamline the access to treatment for Hep C patients housed in the IDOC. We have noted a few additional, relatively minor, modifications that would clarify some aspects of the Guidelines. Once you have a chance to review the attached recommended changes, we will schedule a follow-up call to discuss these recommended changes.

(Ex. 46, September 29, 2020, email from Dr. Raba to Dr. Chan and Dr. Patel, with attachment (JDM 015378)).

**RESPONSE: Objection: Hearsay and lacks foundation. Further, the monitoring and associated monitoring reports under *Lippert* are inadmissible. See response to Paragraph 107 above. Finally, this email post-dates Plaintiff's release from IDOC on June 22, 2020 (See Paragraph 2 above).**

111. Dr. Raba included a memo of proposed additional modifications which included the statements that:

- Pursuant to a recent conference call with OHS/Monitors, UIC Telehealth (Dr. M. Patel, Juliana Chan) modified the January 2019 HCV Guidelines for referral of HCV patients in the IDOC to UIC Telehealth program.
- The revised guidelines (September 2020) replaced or eliminated a number of exclusion criteria that were deemed to be clinically needless barriers (active alcoholism within past months, active IVDU within past 6 months, active illicit drug use within past 6 months, unable to commit to alcohol/drug abstinence long term, others) to the access to HCV treatment for the IDOC incarcerated population.

(Ex. 46, September 29, 2020, email attachment, at JDM 015392).

**RESPONSE: Objection: hearsay and lacks foundation. Further, the monitoring and associated monitoring reports under *Lippert* are inadmissible. See response to Paragraph 107 above. Finally, this email post-dates Plaintiff's release from IDOC on June 22, 2020 (See Paragraph 2 above).**

112. IDOC issued the revised Guidelines in January 2021 and reissued them in March after Wexford corrected certain mistakes. (Ex. 4, Fisher Dep., at 100-03). The March 2021 IDOC HCV Guidelines removed "elevated A1c" as an example of unstable medical conditions that was an absolute exclusion criteria. (Ex. 47, PX21, at 3; Ex. 12, Chan Dep., at 192-93; Ex. 6, Paul Dep., at 100).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). As to the first sentence, that Wexford "corrected certain mistakes" is not supported by the cited record. The second sentence is admitted but immaterial.**

113. The March 2021 IDOC HCV Guidelines changed the A1c "abnormal values" figure in the Review of Systems Checklist from 7 percent to 10.5 percent and removed the statement "do not send pt until the labs are in the normal range." (Ex. 47, PX21, at 10; Ex. 12, Chan Dep., at 199-201).

**RESPONSE: Admitted but immaterial and post-dates Plaintiff's release from IDOC on June 22, 2020,**

114. There is nothing in the March 2021 IDOC HCV Guidelines that requires elevated A1c to be addressed and corrected before an inmate is referred for HCV treatment. (Ex. 12, Chan Dep., at 201-02).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Disputed in part. With respect to A1C greater than 10.5, the 2021 Guidelines state "if yes, please have patient see IDOC Physician before refer to UIC HCV Telemedicine Clinic." [Plaintiff's Ex. 47 [Doc. 296-22], at 10].**

**Medical Basis for A1c Absolute Exclusion**

115. The IDOC HCV Guidelines purport to be based upon and "follow the latest recommendations" regarding HCV treatment as promulgated by AASLD, IDSA and the FBOP. (*See e.g.* Ex. 39, PX20, at 000435).

**RESPONSE: Objection. Duplicative of previous paragraphs and lacks foundation. Admitted as to the face of the document.**

116. There is no medical reason that a person with elevated A1c cannot or should not receive appropriate DAA drug therapy for HCV infection. (Ex. 12, Chan Dep., at 54, 119; Ex. 6, Paul Dep., at 68; Ex. 15, Shicker Dep., at 89).

**RESPONSE: Objection. This is a statement of opinion, not fact. Disputed. Dr. Patel testified, "the morbidity from uncontrolled diabetes is more important to address in the short-term than chronic hepatitis C, given that chronic hepatitis C is an illness that takes about 20 years to manifest, if it does at all." [Plaintiff's Ex. 13 [Doc. 295-13], Dep. of Patel, 30:24-31:16]. According to Dr. Patel, it is important to ensure there are no interruptions in a patients' hepatitis C treatment and potential complications with uncontrolled diabetes could result in patients having to miss doses of treatment, which would be problematic. [Plaintiff's Ex. 13 [Doc. 295-13], Dep. of Patel, 32:6-33:2]. Dr. Shicker testified that people who have uncontrolled diabetes are often noncompliant with their diabetes treatment, causing concern for their ability or willingness to maintain strict compliance necessary for hepatitis C treatment. [Plaintiff's Ex. 15 [Doc. 295-15], Dep. of Dr. Shicker, 56:23-58:3]. Dr. Chan expressed concerns about the systemic problems and overall health risks associated with chronically elevated A1Cs and indicated the focus should be on getting the blood sugar under control to protect against those risks before adding the hepatitis C treatment. [Plaintiff's Ex. 12 [Doc. 295-12], Dep. of Dr. Chan, p 139:19-140:17].**

117. Dr. Paul testified that there is no medical reason that patients with elevated A1c or uncontrolled diabetes could not receive interferon-free HCV treatment, and that interferon-free treatments were available as early as 2014. (Ex. 6, Paul Dep., at 40-41, 68; Ex. 8, Paul (*Miller I*) Dep., at 70). Using elevated A1c as an exclusionary factor for HCV treatment is not medically based. (Ex. 6, Paul Dep., at 70). Dr. Paul testified that HCV antiviral drug therapy can be used on patients with "uncontrolled diabetes." (Ex. 8, Paul (*Miller I*) Dep., at 70).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a) and duplicative of other paragraphs. The two sentences are not supported by the cited records. The third sentence omits the clarifying statement "now it can."**

118. Dr. Shicker testified that the IDOC HCV Guidelines should be evidence-based and that he does not know of "any kind of evidence-based scientific reason" that elevated A1c should be an exclusion for HCV treatment. (Ex. 15, Shicker Dep., at 61, 89). Dr. Shicker testified that the IDOC HCV Guidelines were patient-specific "except for those exclusion criteria." (Ex. 15, Shicker Dep., at 66-67).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Disputed in part. Dr. Shicker testified to possible reasons for the exclusion. [Plaintiff's Ex. 15 [Doc. 295-15], Dep. of Dr. Shicker, 89:2-90:5; 56:23-58:3].**

119. Dr. Meeks testified that medical care for IDOC patients should be evidence-based, and patient centered. (Ex. 14, Meeks Dep., at 57). Dr. Meeks does not have the expertise to determine whether there was a medical reason for designating elevated A1c as an absolute exclusion criteria for HCV treatment. He relied on the expertise of UIC. (Ex. 14, Meeks Dep., at 66-67, 79).

**RESPONSE: Admitted.**

120. Dr. Meeks did not know the reason for including elevated A1c as an absolute exclusion criteria for HCV treatment. (Ex. 14, Meeks Dep., at 73). Dr. Meeks assumed the absolute exclusion for elevated A1c was based on a medical reason because he did not think an expert would insert that exclusion in the guidelines for no reason. (Ex. 14, Meeks Dep., at 95-96, 111-12).

**RESPONSE: Admitted.**

121. If Dr. Meeks knew there was no medical reason that a patient with elevated A1c could not safely receive interferon-free HCV treatment he would not want elevated A1c to be an exclusion criteria in the IDOC HCV Guidelines. (Ex. 14, Meeks Dep., at 114-15).

**RESPONSE: Objection, Dr. Meeks was asked to assume a hypothetic about which he previously testified he lacked expertise. See Paragraphs 119 and 120 above. Further, this is immaterial to the claims as to Wexford and Dr. Paul.**

122. Dr. Chan knew that there is no medical reason that patients with elevated A1c or uncontrolled diabetes could not receive interferon-free HCV treatment during the relevant period, and that interferon-free treatments were available as early as 2014. (Ex. 12, Chan Dep., at 54, 119, 135). The need to treat a patient's elevated A1c is not a contraindication to interferon-free HCV treatment. (Ex. 12, Chan Dep., at 139, 142; Ex. 13, Patel Dep., at 33).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Disputed in part. Dr. Chan testified about the systemic problems and overall health risks associated with chronically elevated A1Cs and indicated the focus should be on getting the blood sugar under control to protect against those risks before adding the hepatitis C treatment. [Plaintiff's Ex. 12 [Doc. 295-12], Dep. of Dr. Chan, p 139:19-140:17].**

123. Dr. Chan believes the cost-benefit of providing HCV treatment weighs against providing treatment to inmates with "uncontrolled diabetes" because they will not survive anyway, and she considers A1c of 10 or greater to be uncontrolled diabetes. She considers A1c of 9 to be "fine" for receiving HCV treatment. (Ex. 12, Chan Dep., at 118-19).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted that it appears Dr. Chan gave this testimony, but Plaintiff's counsel cut off her answer, so it is unclear. [Plaintiff's Ex. 12 [Doc. 295-12], Dep. of Dr. Chan, p 118-119]. See response to Paragraph 122 above. Further, this is immaterial to the claim as to Wexford and Dr. Paul.**

124. All defendants knew, throughout the times at issue, that there was no medical reason that patients with elevated A1c 48or uncontrolled diabetes could not receive HCV treatment. (Ex. 6, Paul Dep., at 68; Ex. 4, Fisher Dep., at 118-20; Ex. 12, Chan Dep., at 54, 119, 135).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a) and duplicative of earlier statements. Disputed. See response to Paragraph 116.**

**Wexford's Global Medical Guidelines**

125. Wexford has Global Medical Guidelines that they use for some clients. (Ex. 4, Fisher Dep., at 26; Ex. 6, Paul Dep., at 28-29; Ex. 48, Wexford Response to Request for Admissions). Dr. Paul has participated in writing portions of the Wexford Global Medical Guidelines. (Ex. 6, Paul Dep., at 30). The Wexford Global Medical Guidelines are based on the current national guidelines for a particular disease. (Ex. 6, Paul Dep., at 33).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted and immaterial as the Wexford Global Medical Guidelines are not applicable to Illinois and the Wexford Medical Guidelines – Illinois do not contain provisions related to Hepatitis C. [See Paragraph 30 above]. The treatment of Hepatitis C is expressly carved out of Wexford's IDOC contact and the relevant guidelines were not developed by Wexford, but by IDOC in conjunction with University of Illinois at Chicago. [Plaintiff's Ex. 4 [Doc. 295-4], Fisher Dep, 84:3-85:8; 200:22-201:9; 210:14-22; 215:1-13] [See Plaintiff's Ex. 16, Wexford IDOC Contract, at Doc. 295-16, p. 100-101, Bates 265-266].**

126. The Wexford Global Medical Guidelines included HCV treatment guidelines. (Ex. 4, Fisher Dep., at 184). Dr. Fisher and Dr. Paul participated in drafting the HCV section of the Wexford Global Medical Procedures. (*Id*. at 186-87). The Wexford Medical Advisory Committee approved the HCV section of the Wexford Global Medical Procedures. (*Id*. at 187-88).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted and immaterial as the Wexford Global Medical Guidelines are not applicable to Illinois and the Wexford Medical Guidelines – Illinois do not contain provisions related to Hepatitis C. (See Paragraph 30 above). The treatment of Hepatitis C is expressly carved out of Wexford's IDOC contact and the relevant guidelines were not developed by Wexford, but by IDOC in conjunction with University of Illinois at Chicago. [Plaintiff's Ex. 4 [Doc. 295-4], Fisher Dep, 84:3-85:8; 200:22-201:9; 210:14-22; 215:1-13] [See Plaintiff's Ex. 16, Wexford IDOC Contract, at Doc. 295-16, p. 100-101, Bates 265-266].**

127. Wexford utilized the FBOP and AASLD guidelines as well as the applicable standard of care in promulgating its treatment policies. (Ex. 7, Fisher (*Stafford*) Dep., at 92).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted and immaterial. The *Stafford* case is from Indiana. [See Plaintiff's Ex. 7]. The Wexford Global Medical Guidelines are not applicable to Illinois and the Wexford Medical Guidelines – Illinois do not contain provisions related to Hepatitis C. (See Paragraph 30 above). The treatment of Hepatitis C is expressly carved out of Wexford's IDOC contact and the relevant guidelines were not developed by Wexford, but by IDOC in conjunction with University of Illinois at Chicago. [Plaintiff's Ex. 4 [Doc. 295-4], Fisher Dep, 84:3-85:8; 200:22-201:9; 210:14-22; 215:1-13] [See Plaintiff's Ex. 16, Wexford IDOC Contract, at Doc. 295-16, p. 100-101, Bates 265-266].**

128. Wexford did not include any exclusion for patients with elevated A1c or diabetes in the HCV section of the Wexford Global Medical Guidelines. (*See e.g.* Ex. 49, Wexford Global HCV Guidelines (2019) (filed under seal); Ex. 4, Fisher Dep., at 191-92).

**RESPONSE: Admitted but immaterial. The Wexford Global Medical Guidelines are not applicable to Illinois and the Wexford Medical Guidelines – Illinois do not contain provisions related to Hepatitis C. (See Paragraph 30 above). The treatment of Hepatitis C is expressly carved out of Wexford's IDOC contact and the relevant guidelines were not developed by Wexford, but by IDOC in conjunction with University of Illinois at Chicago. [Plaintiff's Ex. 4 [Doc. 295-4], Fisher Dep, 84:3-85:8; 200:22-201:9; 210:14-22; 215:1-13] [See Plaintiff's Ex. 16, Wexford IDOC Contract, at Doc. 295-16, p. 100-101, Bates 265-266].**

129. In the event of a conflict between Wexford's Global Medical Guidelines and the guidelines provided by IDOC, Wexford follows IDOC's guidelines. (Ex. 2, Matticks Dep., at 19; Ex. 7, Fisher (*Stafford*) Dep., at 92).

**RESPONSE: Admitted. Wexford's IDOC Contract obligates Wexford to "comply with all current and future State, Federal and local laws and regulations, court orders, Executive Orders, Administrative Directives, center directives, professional licensing standard, and the policies and procedures of IDOC, the Center, and HFS, as necessary." [See Plaintiff's Ex. 16, Wexford IDOC Contract, at Doc. 295-16, p. 19, Bates 18]. Wexford is, therefore, contractually obligated to comply with Administrative Directives and other IDOC policies and procedures. [Id.]; [Plaintiff's Ex. 4 [Doc. 295-4], Fisher Dep, 81:22-82:10]. With respect to the medical condition relevant for this case, Wexford's IDOC contract expressly provides the treatment for hepatitis C and the relevant guidelines are handled by the University of Illinois at Chicago. [Plaintiff's Ex. 4 [Doc. 295-4], Fisher Dep, 84:3-85:8; 200:22-201:9; 210:14-22; 215:1-13] [See Plaintiff's Ex. 16, Wexford IDOC Contract, at Doc. 295-16, p. 100-101, Bates 265-266].**

130. Dr. Paul understood that she was required to follow the IDOC HCV Guidelines because IDOC was Wexford's client. (Ex. 8, Paul (*Miller I*) Dep., at 47).

**RESPONSE: Admitted. See response to Paragraph 129 above.**

**UIC's HCV Telemedicine Guidelines**

131. UIC adopted and maintained its own "Hepatitis C (HCV) Illinois Department of Corrections Telemedicine Guideline" for treatment of IDOC patients, with versions created in 2016, 2019 and 2021. (Exs. 50, 51 and 52, PX12, 12A and 13; Ex. 12, Chan Dep., at 74-80, 99, 108).

**RESPONSE: Admitted but immaterial to the claim as to Wexford and Dr. Paul.**

132. Dr. Patel testified that he did not prepare the 2016 or 2019 UIC Guidelines and only saw them in passing prior to becoming the director of the telemedicine program in August 2019. (Ex. 13, Patel Dep., at 33-36). Dr. Chan testified that she did not know of the existence of the 2016 UIC Guidelines until she was asked to update them in 2019. (Ex. 12, Chan Dep., at 79-80).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted but immaterial to the claim as to Wexford and Dr. Paul.**

133. However, Dr. Patel emailed a copy of the 2016 UIC Guidelines to Dr. Meeks, with a cc to Dr. Chan, on December 3, 2016, with a note stating, "as promised during our recent conversation." (Ex. 53, Patel email to Meeks, JDM 015331 (attachment not bate stamped)).

**RESPONSE: Objection. Document lack foundation. Admitted but immaterial to the claim as to Wexford and Dr. Paul.**

134. UIC did not include any exclusion for patients with elevated A1c or diabetes in the UIC Guidelines. (*See* Ex. 50, PX12; Ex. 51, PX12A; Ex. 52, PX13; Ex. 12, Chan Dep., at 89-90, 97; Ex. 13, Patel Dep., at 42-43).

**RESPONSE: Admitted but immaterial to the claim as to Wexford and Dr. Paul.**

135. Dr. Chan participated in creating/revising of the 2019 UIC HCV Guidelines. (Ex. 12, Chan Dep., at 99-100). The UIC guidelines contained a priority list for HCV treatment in which the highest priority included inmates with "confirmed cirrhosis or have clinical findings with cirrhosis." (Ex. 50, PX12; Ex. 51, PX12A; Ex. 52, PX13; Ex. 12, Chan Dep., at 92-94, 99-100). The 2019 UIC Guidelines contained a level 2 priority category for inmates with Fibrosis Scores of F3 or F4. (Ex. 51, PX12A; Ex. 12, Chan Dep., at 101).

**RESPONSE: Admitted but immaterial to the claim as to Wexford and Dr. Paul.**

136. Dr. Chan did not follow the UIC Guidelines in providing HCV treatment to IDOC inmates, but instead applied the IDOC HCV Guidelines including the absolute exclusion for elevated A1c. (Ex. 12, Chan Dep., at 106).

**RESPONSE: Admitted but immaterial to the claim as to Wexford and Dr. Paul.**

137. Dr. Paul and Wexford did not follow the Wexford Global Medical Guidelines in providing HCV treatment to IDOC inmates, but instead applied the IDOC HCV Guidelines including the absolute exclusion for elevated A1c. (See Ex. 10, Paul (*Handy*) Dep., at 10-11, 85).

**RESPONSE: Objection, Plaintiff cites to the deposition of *Handy,* in which Dr. Paul was specifically asked about the time period of 2006 – 2011, which predates the relevant time in this case by seven years. [See Plaintiff's Ex. 10, [Doc. 295-10], Paul (Handy) Dep., at 10]. Further, it is admitted that Wexford's Global Medical Guidelines are inapplicable in Illinois because the care of Hepatitis C is expressly carved out of Wexford's IDOC Contract and the relevant guidelines were not developed by Wexford, but by IDOC in conjunction with University of Illinois at Chicago. [Plaintiff's Ex. 4 [Doc. 295-4], Fisher**

**Dep, 84:3-85:8; 200:22-201:9; 210:14-22; 215:1-13] [See Plaintiff's Ex. 16, Wexford IDOC Contract, at Doc. 295-16, p. 100-101, Bates 265-266].**

> 138. Wexford followed the guidelines provided by its clients without regard to whether those medical guidelines met the applicable standard of medical care. (Ex. 7, Fisher (*Stafford*) Dep., at 92). Dr. Paul testified that the IDOC HCV Guidelines "was rigid for us." (Ex. 10, Paul (*Handy*) Dep., at 67-68). Dr. Paul testified that in ordering specific tests for inmates, she was following the IDOC HCV Guidelines and Dr. Chan's directives rather than her own clinical judgment. (Ex. 10, Paul (*Handy*) Dep., at 73, 81).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Disputed. The first sentence is not supported by the cited record as it wholly misrepresents Dr. Fisher's testimony. Dr. Fisher testified: "We have a variety of different contracts. Each of our contracts handles Hepatitis C a little bit differently. We are there to guide our client, but it is our client's decision how they wish to treat it within a specific contract." [Plaintiff's Ex. 7 [Doc. 295-7], Fisher (*Stafford*) Dep, 92]. The *Stafford* case arose out of Wexford's contract with Indiana. [See Ex. 7]. Illinois decided to handle Hepatitis C under a separate agreement with UIC, utilizing the infectious disease specialists at UIC. [See Paragraphs 6 and 66-71 above]. Dr. Paul's testimony is taken out of context. She explains that it is rigid for Wexford because the Hepatitis C care is provided by UIC. Specifically, she testified "[b]ut in general, this guideline had to be followed, and the only people that could make a decision on treatment was on UIC, treatment, not treatment, seeing patients, not seeing patients, and the selection of medications." [Plaintiff's Ex. 10 [Doc. 295-10], Paul (*Handy*) Dep, 92].**

139. Wexford does not have a way of determining how many IDOC patients were denied HCV treatment because of the A1c exclusion. (Ex. 4, Fisher Dep., at 217-18; Ex. 6, Paul Dep., at 226).

**RESPONSE: Admitted but immaterial.**

**Plaintiff's HCV and Diabetes**

140. Plaintiff was diagnosed with HCV in 2014 and thus was HCV positive upon his incarceration with IDOC in June 2016. (Ex. 1, Miller Dep., at 54-55). Plaintiff underwent a FibroScan on June 11, 2015, upon referral from his primary care physician at that time. (Ex. 1, Miller Dep., at 55-56; Ex. 55, PX85, FibroScan Report (JDM 003903 and Miller RRCC (NR) 0038)). Plaintiff's Fibrosis Score at that time, one year before his June 2016 incarceration with IDOC, was F2 – described in the report as moderate liver scarring. (Ex. 55, PX85, Fibroscan Report).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). It is admitted that Plaintiff self-reported diagnosis with Hepatitis C in 2014 and failed to get treatment prior to his incarceration. [Plaintiff's Ex. 1 [Doc. 295-1], Plaintiff's Dep, 56]. Exhibit 55 lacks foundation.**

141. Plaintiff's HCV positive status was documented by IDOC upon his incarceration. (*See* Ex. 56, Miller HCV Clinic Notes).

**RESPONSE: Objection, lacks foundation. It is admitted but immaterial that Plaintiff's Hepatitis C was documented in 2016. Plaintiff has a separate lawsuit related to his care at Pinckneyville, see response to Paragraph 1.**

142. Plaintiff's HCV positive status and his requests for Fibrosis Score testing and HCV treatment were further documented repeatedly in his inmate medical file and in grievance forms. (*See e.g.* Ex. 54).

**RESPONSE: Objection. Exhibit 54 lacks foundation and appears to be two unrelated records from separate facilities combined. The first portion of Exhibit 54 is dated in August 2018, and the time relevant to this case begins when Plaintiff transferred to Lawrence in February 2019. See response to Paragraph 2 above. Further, Exhibit 54 does not support the statement for which it is cited, as it does not contain any portion of Plaintiff's medical file.**

143. Defendants Wexford and Paul also received copies of Plaintiff's 2015 FibroScan report in or around May 2019 as part of discovery in a civil rights lawsuit Plaintiff filed against Defendant Wexford and others (*Miller I*). (Ex. 57, PX86, *Miller I* Wexford Supplemental Disclosures, at 3; Ex. 6, Paul Dep., at 130-32).

**RESPONSE: Objection. The statement is not supported by the cited records. Exhibit 57 is a supplemental disclosure that indicates counsel for Wexford obtained a copy of the 2015 FibroScan pursuant to subpoena in Plaintiff's prior lawsuit related to treatment of his Hepatitis C while in Pinckneyville. The discovery disclosure document does not support that proposition that Wexford or Dr. Paul received the documents. In the cited testimony, Dr. Paul testified she did not remember previously seeing the 2015 FibroScan. [Plaintiff's Ex. 6 [Doc. 295-6], Paul Dep, 131:11-133:9].**

144. Plaintiff had likewise been diagnosed with type 2 diabetes prior to his incarceration with IDOC in June 2016. (Ex. 1, Miller Dep., at 46-47). Plaintiff's Type 2 Diabetes was documented by IDOC upon his incarceration. (*See* Ex. 54).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). It is admitted that Plaintiff had been diagnosed with type 2 diabetes prior to his incarceration. Exhibit 54 lacks foundation and does not support the statemen for which it is cited.**

145. Plaintiff's type 2 diabetes diagnosis and his requests for effective diabetes treatment were further documented repeatedly in his inmate medical file and in grievance forms. (*See* Ex. 54).

**RESPONSE: Objection. Exhibit 54 lacks foundation and appears to be two unrelated records from separate facilities combined. The first portion of Exhibit 54 is dated in August 2018, and the time relevant to this case begins when Plaintiff transferred to Lawrence in February 2019. See response to Paragraph 2 above. Further, Exhibit 54 does not support the statement for which it is cited, as it does not contain any portion of Plaintiff's medical file.**

146. In February 2019 Plaintiff was transferred from Pinckneyville CC to Lawrence CC. On February 20, 2019, the Wexford Medical Director at Lawrence CC, Dr. Lynn Pittman, conducted a medical examination of Plaintiff. (Ex. 1, Miller Dep., at 56-57).

**RESPONSE: Admitted.**

147. Dr. Pittman referred Plaintiff to be seen by Dr. Paul *via* telemedicine. (Ex. 1, Miller Dep., at 58, 60).

**RESPONSE: Admitted.**

**Denial of HCV Treatment to Plaintiff**

148. On August 22, 2019, Plaintiff had a telemedicine appointment with Dr. Paul concerning his HCV. At that time, Dr. Paul referred Plaintiff for a FibroScan. (Ex. 1, Miller Dep., at 78-79; Ex. 6, Paul Dep., at 109-114; Ex. 58, PX66, Progress Note). As the "Rationale for Referral" Dr. Paul stated: "REQUIRED IDOC/OHS HCV GUIDELINES." (Ex. 59, PX67, Fibroscan Order).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted.**

149. The IDOC HCV Guidelines provided that patients with confirmed HCV should have a FibroScan "unless they have absolute exclusion criteria." (Ex. 8, Paul (*Miller I*) Dep., at 35, 48).

**RESPONSE: Admitted in part but immaterial. The testing and work-up for referral is within the scope of what Wexford providers can do. [See Paragraph 97 above]. It is true the IDOC Hepatitis C guidelines did not require a FibroScan for those with absolute exclusion criteria, but it does not prohibit it.**

150. Blood work taken on June 4, 2019, showed Plaintiff's A1c level to be 13.7%. (Ex. 58, PX66, Progress Note). Defendant Paul documented in her notes on August 22, 2019, that:

> Above labs were reviewed which showed low APRI and intact liver function. Fibroscan testing is indicated. If the fibroscan fibrosis score meets IDOC/OHS HCV guideline treatment criteria, the patient will be referred to be seen by UIC Liver Clinic/Telemedicine to be evaluated for HCV therapy.

(*Id.*).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted.**

151. Dr. Paul told Plaintiff that in order to be even considered for HCV treatment his A1c had to be lowered. (Ex. 1, Miller Dep., at 70, 79-80; Ex. 8, Paul (*Miller I*) Dep., at 72, 73). Dr. Paul disagreed with the absolute exclusion criteria for elevated A1c. (Ex. 8, Paul (*Miller I*) Dep., at 73, 91-92, 93-94). There is no evidence that Dr. Paul told Plaintiff that the criteria that excluded him from HCV treatment was not medically based. In August 2019, Plaintiff was pursuing a lawsuit (*Miller I*) related to denial of medical care while at Pinckneyville CC, in which he sought a judgment compelling IDOC and Wexford "to immediately treat Plaintiff for Hepatitis C." (Ex. 70, Nineth Amended Complaint (*Miller I* Doc. 183), at 13).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). The first two sentences are admitted, but incomplete as Dr. Paul also testified the determination regarding the exclusionary factors were made by infectious disease doctors or hepatologists who specialize in this area. [Plaintiff's Ex. 8 [Doc. 295-8], Paul (*Miller I*) Dep, 91-92]. The third sentence is not a statement of fact, but argument and not supported by any cited record. The final sentence is wholly immaterial except to support that any allegation that relates to Plaintiff's incarceration at Pinckneyville was fully resolved by the Court and barred by *res judicata*.**

152. Dr. Paul testified that if Plaintiff's Fibrosis Score was F3 or above he would be eligible for referral to HCV treatment. (Ex. 6, Paul Dep., at 115).

**RESPONSE: Admitted as to the cited testimony, but Dr. Paul also informed Mr. Miller he would have to get his A1C lowered to be eligible for treatment. [See Paragraph 151 above].**

153. Plaintiff's FibroScan revealed a Fibrosis Score of F3 – reflecting severe fibrosis. (Ex. 60, PX 68, Fibroscan Report; Ex. 6, Paul Dep., at 118, Ex. 8, Paul (*Miller I*) Dep., at 44, 63-64). Plaintiff's FibroScan revealed that his Fibrosis Score had progressed from an F2 to an F3 within approximately four years. (Ex. 4, Paul Dep., at 133-34; Ex. 55, PX85, Fibroscan Report; Ex. 60, PX68, Fibroscan Report). HCV can advance significantly in that period. (Ex. 8, Paul (*Miller I*) Dep., at 43).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Further, the progression in four years is immaterial to this claim. This case is limited to Plaintiff's time at Lawrence, beginning in February 2019. [See Responses to Paragraphs 1 and 2 above]. Plaintiff is comparing the tests from May 2015, which predates Plaintiff's incarceration in IDOC by a year [See Paragraph 2] to November 2019. [See Plaintiff's Ex. 6 [Doc. 295-6], Paul Dep, 133]. Whether or not the fibrosis had worsened at some point prior to 2019 has no relevance to this claim.**

154. Blood work taken on December 9, 2019, showed Plaintiff's A1c level to be 11.1%, which was lower than his level in June 2019. (Ex. 61, PX71, Progress Note).

**RESPONSE: Objection, lacks foundation. Admitted.**

155. On December 12, 2019, Plaintiff had a telehealth visit with Dr. Paul. (Ex. 61, PX71, Progress Note; Ex. 6, Paul Dep., at 139-40). On December 12, 2019, Dr. Paul consulted with Dr. Chan concerning referral of IDOC patients with F3 and F4 Fibrosis Scores and high A1c to Dr. Chan for HCV treatment. (Ex. 12, Chan Dep., at 207-09).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted.**

156. Nurse Staci DeWeese, at the direction of Dr. Paul, wrote in an email to Dr. Chan:

> Hello Dr. Chan,
>
> I have a question to ask before Dr. Paul makes a referral. We recently have two offenders with F3/F4 fibroscans, however they are both DM with very high A1C. We know that in the past they will not be treated or considered until the A1C is below 7. With that being said do we still need to work them up with the labs and ultrasound and then send you new packet and let you tell us they do not qualify at this time?

(Ex. 62, PX72, at MILLER000498; Ex. 12, Chan Dep., at 207-08; Ex. 6, Paul Dep., at 145-47).

**RESPONSE: Admitted.**

157. Dr. Chan responded that Dr. Paul should not refer those patients:

> Hi Staci.
>
> You can continue to work up the patient but do not send them or the med records until they have normalize[d] their A1c (or other issues).

(Ex. 62, PX72, at MILLER000498; Ex. 12, Chan Dep., at 208).

**RESPONSE: Admitted.**

158. Dr. Paul documented in her notes on December 12, 2019, that:

> Per the January 25, 2019 IDOC/OHS HCV guidelines, patient's poor diabetic control . . . precludes his review for HCV antiviral therapy. Email correspondence from Dr. Juliana Chan sent today states that patients with HbA1c >7.0% should not be referred to be seen by UIC Liver Clinic/Telemedicine. These guidelines require HbA1c to be less than 7.0% to be considered for HCV antiviral therapy.

(Ex. 61, PX71; Ex. 6, Paul Dep., at 143-44).

**RESPONSE: Admitted.**

159. Dr. Paul understood that Dr. Chan's direction not to send the subject inmates to UIC was based on the A1c exclusion in the January 2019 IDOC HCV Guidelines. (Ex. 6, Paul Dep., at 147-48). Dr. Paul understood that Wexford's policy was that she was required to follow Dr. Chan's instructions and the IDOC HCV Guidelines. (Ex. 6, Paul Dep., at 147-48, 179; Ex. 8, Paul (*Miller I*) Dep., at 73; *see* Ex. 2, Matticks Dep., at 42).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted as to the first sentence. Disputed as to the referenced requirement being based on "Wexford's policy." The care of Hepatitis C is expressly carved out of Wexford's IDOC Contract and provided by University of Illinois at Chicago. [Plaintiff's Ex. 4 [Doc. 295-4], Fisher Dep, 84:3-85:8; 200:22-201:9; 210:14-22; 215:1-13] [See Plaintiff's Ex. 16, Wexford IDOC Contract, at Doc. 295-16, p. 100-101, Bates 265-266].**

160. Dr. Chan instructed Dr. Paul not to refer the unnamed F3 and F4 patients (one of which was Plaintiff) because of the absolute exclusion criteria in the January 2019 IDOC HCV Guidelines. (Ex. 12, Chan Dep., at 209-10).

**RESPONSE: Admitted.**

161. Dr. Chan knew that Fibrosis Scores of F3 and F4 are indicia of advancing liver disease. (Ex. 12, Chan Dep., at 217). Dr. Chan knew there was no medical reason that UIC could not provide HCV treatment to the referenced inmates at the same time the IDOC medical provider was providing treatment for their elevated A1c. (Ex. 12, Chan Dep., at 220-21).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). As to the first sentence, the statement is irrelevant because Plaintiff did not have an F4 fibrosis score. Moreover, the remainder is not applicable as Plaintiff was refusing treatment for his uncontrolled diabetes. [Plaintiff's Ex. 1 [Doc. 295-1], Plaintiff Dep, 83, 87-88].**

162. If Plaintiff had been referred to UIC in December 2019 or January 2020, he would have been able to complete HCV treatment before his release in June 2020. (Ex. 12, Chan Dep., at 246-47; Ex. 6, Paul Dep., at 184-85).

**RESPONSE: Objection, not supported by the cited record to the extent this is attributed to Dr. Paul. The testimony relates not to whether Plaintiff would have been able to complete the HCV treatment, but whether there was sufficient time to complete the treatment between December 2019 and June 2020. Further, the question posed to Dr. Paul was whether there was sufficient time between December 2019 and Plaintiff's projected out date in October 2020. Dr Paul's testimony does not address Plaintiff's actual release date of June 2020. [Plaintiff's Ex. 6 [Doc. 295-6], Paul Dep, 184-185].**

163. Dr. Paul did not refer Plaintiff to UIC because of the IDOC Guidelines, and because of the Wexford corporate policy that required her to follow the IDOC Guidelines. (Ex. 6, Paul Dep., at 147-48).

**RESPONSE: Admitted as to the cited testimony, but incomplete as the care of Hepatitis C is expressly carved out of Wexford's IDOC Contract to be provided by UIC and the IDOC contract mandated use of the IDOC Hepatitis C Guidelines prepared in conjunction with UIC. [Plaintiff's Ex. 4 [Doc. 295-4], Fisher Dep, 84:3-85:8; 200:22-201:9; 210:14-22; 215:1-13] [See Plaintiff's Ex. 16, Wexford IDOC Contract, at Doc. 295-16, p. 100-101, Bates 265-266].**

164. Dr. Paul informed Plaintiff that he could not receive HCV treatment because his A1c level was too high. (Ex. 61, PX71; Ex. 6, Paul Dep., at 144). There is no evidence that Dr. Paul informed Plaintiff that the A1c exclusion was without a medical basis or that medical literature and FBOP guidelines suggested he should be given priority for treatment.

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). The first sentence is admitted. The second sentence includes no citation to the record and is argument, not a statement of fact and should be stricken.**

165. Dr. Paul did, however, refer Plaintiff for a liver/spleen ultrasound to look for advanced liver disease. (Ex. 63, PX73, Ultrasound Order; Ex. 6, Paul Dep., at 142-43). Plaintiff underwent a liver/spleen ultrasound on January 16, 2020. The "findings" of the ultrasound report state: "The liver demonstrates mild heterogeneous echotexture and mild nodular contour. This is consistent with mild cirrhosis." (Ex. 64, PX74, Ultrasound Report; Ex. 6, Paul Dep., at 150-51).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted.**

166. Dr. Paul testified that "you have cirrhosis or you don't. Mild cirrhosis is cirrhosis." (Ex. 6, Paul Dep., at 197).

**RESPONSE: Admitted but immaterial.**

167. Upon review of the liver/spleen ultrasound report, Dr. Paul referred Plaintiff for an EGD endoscopic screening for the presence of esophageal varices. As the "Rationale for Referral" Defendant Paul stated: "HCV. CIRRHOSIS." (Ex. 65, PX78, EGD Order; Ex. 6, Paul Dep., at 75, 154-55).

**RESPONSE: Admitted.**

168. According to the AASLD, "the rupture of esophageal varices (EVs) remains a common and severe complication of cirrhosis with a mortality rate still reaching 20%. Screening for EVs is crucial because it provides the ability to reduce the risk of a first bleeding episode."[5]

**RESPONSE: Objection. Lacks foundation. At summary judgment the court must be guided by the substantive evidentiary standards of the case applicable at trial. *See***

**Fed.R.Civ.P. 56(c) and (e); *Anderson, et. al. v. Liberty Lobby, Inc. and Willis A. Carto,* 477 U.S. 242 (1986). Reference material is not admissible absent the testimony of experts who rely on it and can interpret its meaning. *See* Fed. R. Evid. 803(18).**

169. Wexford approved the referral through its Utilization Management process. The authorization form stated: "EGD screen for varices approved by Dr. Paul. Patient with HCV Cirrhosis. Required per IDOC/OHS HCV guidelines." (Ex. 66, PX80; Ex. 6, Paul Dep., at 157).

**RESPONSE: Admitted.**

170. The standard of care is to obtain an EGD if a patient has cirrhosis. (Ex. 6, Paul Dep., at 195). There is no evidence that the EGD was performed before Plaintiff was released in June 2020.

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted as to the first sentence. Dr. Paul ordered the EGD on February 6, 2020, and testified they "take a long time even in the outside world." [Plaintiff's Ex. 6 [Doc. 295-6], Paul Dep, 154, 199]. Dr. Paul also testified she recalled "having everything delayed because of COVID" during that time. [Plaintiff's Ex. 6 [Doc. 295-6], Paul Dep, 153].**

171. On February 6, 2020, Dr. Paul prepared an Offender Outpatient Progress Note for Plaintiff, which listed his F3 Fibrosis Score and the ultrasound finding of "mild cirrhosis." Under "Plans" Dr. Paul entered:

> Site to email Dr. Juliana Chan regarding this patient – detailing to her the information listed in the 'prior studies' section of this progress note. Ask if she would want this patient formally referred to UIC Liver Clinic/Telemedicine to be evaluated for HCV antiviral therapy at this time. Cc Dr. Paul on the email correspondence.

(Ex. 67, PX81, Progress Note, at Bates #000452; Ex. 6 Paul Dep., at 166-68).

**RESPONSE: Admitted.**

172. On February 11, 2020, at Dr. Paul's instruction, Nurse Heather Ellison emailed Dr. Chan with the lab results for Plaintiff and the other inmate referenced in the December 19, 2019, email exchange, including the liver/spleen ultrasound report for Plaintiff, and asked "[d]o you want these pts formally referred to UIC Liver Clinic/Telemedicine to be evaluated for antirviral therapy at this time?" (Ex. 67, PX81, at Bates #000451; Ex. 6, Paul Dep., at 158-60). The most recent A1c results for both inmates were 9%. (Ex. 67, PX81, at Bates #000451).

**RESPONSE: Admitted.**

173. On February 12, 2020, Dr. Chan responded "[y]es please, please send the needed documents to get these patients evaluated. Can you in the meantime please have the doctors at Lawrence evaluate and treat their Diabetes and get their A1c better controlled, below 8." (Ex. 68, PX26, at JDM 003124). Dr. Chan's instruction was not in conformance with the January 2019 IDOC Guidelines. (Ex. 12, Chan Dep., at 299).

**RESPONSE: Admitted.**

174. Dr. Paul did not take steps to refer Plaintiff for HCV treatment and testified "that's not a doctor thing to do." (Ex. 6, Paul Dep., at 161-62, 165).

**RESPONSE: Disputed. Dr. Paul instructed the nurse to contact Dr. Chan to ask if Plaintiff could be referred. [See Paragraph 172]. Dr. Paul testified the nurse would have been the one to then send the records in response to Dr. Chan's email. [Plaintiff's Ex. 6 [Doc. 295-6], Paul Dep, 162].**

175. Dr. Chan chose whether to follow the absolute exclusions in the IDOC HCV Guidelines in individual cases, including the length-of-stay exclusion. (Ex. 10, Paul (*Handy*) Dep., at 39-40, 42, 56-58, 88). Dr. Paul requested exceptions to the absolute exclusion criteria from Dr. Chan for some patients. (Ex. 10, Paul (*Handy*) Dep., at 56-57, 67, 87-88). There is no evidence that Dr. Paul requested an exception to the A1c absolute exclusion criteria for Plaintiff.

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). As to the first sentence, disputed. The cited testimony says only that Dr. Chan made exceptions in some circumstances. [Plaintiff's Ex. 10 [Doc. 295-6], Paul (*Handy*) Dep, 39-40, 42, 56-58, 88]. The second sentence is admitted. The final sentence is disputed, as Dr. Paul reached out to Dr. Chan twice to see if an exception would be made for Plaintiff. [See Paragraphs 156 and 172 above].**

176. On May 28, 2020, Nurse Ellison emailed Dr. Chan asking, "if you want these two offenders referred or not?" (Ex. 67, PX81, at 000450). Dr. Chan responded that they should refer the other inmate (whose A1c was 8.5) but instructed as to Plaintiff "please have his A1c in the 7 to low 8's before sending him to UIC Liver telemed." (*Id.*). Dr. Chan testified that lab results showed that Plaintiff's A1c was measured at 10.2 on May 27, 2020. (Ex. 12, Chan Dep., at 230-31).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted.**

177. Dr. Paul conducted a telehealth HCV chronic care clinic appointment with Plaintiff on June 18, 2020. Dr. Paul had not seen Plaintiff since December 12, 2019. (Ex. 6, Paul Dep., at 170). Dr. Paul prepared an Offender Outpatient Progress Note for the June 18, 2020 appointment, which stated:

> Patient met HCV treatment criteria per the IDOC/OHS HCV guidelines, but treatment was not initiated due to his poorly controlled diabetes.

(Ex. 69, PX83, Progress Note; Ex. 6, Paul Dep., at 171).

**RESPONSE: Admitted.**

178. The reason Dr. Paul did not refer Plaintiff for HCV treatment was the A1c absolute exclusion and Dr. Chan's instruction not to refer him until his A1c was normalized. (Ex. 6, Paul Dep., at 169-70).

**RESPONSE: Admitted.**

179. Dr. Paul understood that Wexford's corporate policy required her to follow the January 2019 IDOC HCV Guideline. (Ex. 6, Paul Dep., at 175). The reason Dr. Chan instructed Dr. Paul not to refer Plaintiff for HCV treatment was his elevated A1c and the absolute exclusion in the January 2019 IDOC HCV Guidelines. (Ex. 12, Chan Dep., at 237-40; Ex. 6, Paul Dep., at 188).

**RESPONSE: Duplicative. See Responses to Paragraph 159 above.**

**Plaintiff's Complaints**

180. Plaintiff informed all of the Defendants with whom he interacted that he was being denied treatment for his HCV because of his A1c. (*See e.g.* Ex. 54, Grievance Records).

**RESPONSE: Objection. Not supported by the cited record. See response to Paragraph 142 above.**

**Dr. Paul's Testimony in Miller I**

181. In August 2017, while Plaintiff was located at the Pinckneyville CC, Plaintiff filed the *Miller I* lawsuit in this Court against Dr. Shicker, Dr. Meeks and Wexford, as well as other individuals who are not defendants in this case, regarding lack of proper medical care. One of Plaintiff's claims was that he was being wrongfully denied treatment for HCV. (Ex. 1, Miller Dep., at 31; Ex. 70, Ninth Complaint (*Miller I* Doc. 183), ¶¶ 24, 27 and at p. 13).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted but immaterial for any purpose in this case except to demonstrate Plaintiff is barred from relitigating any issues arising out of Pinckneyville.**

182. Dr. Paul was not named as a defendant in *Miller I.* (Ex. 6, Paul Dep., at 127). In November 2019, while Plaintiff and Dr. Paul had a doctor-patient relationship, representatives of Wexford's legal or risk management department contacted Dr. Paul and requested or instructed her to act as Wexford's expert witness in *Miller I* "to testify regarding a lack of merit to Plaintiff's allegations." (Ex. 6, Paul Dep., at 121-24; Ex. 71, PX69, *Miller I* Wexford Third Supplemental Disclosures, at 3).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). It is admitted that Dr. Paul was not personally named as a defendant in Plaintiff's prior case, however, Wexford was. [See Plaintiff's Ex. 71]. Dr. Paul did not author the referenced disclosures and testified she had not seen them before the were produced by Plaintiff the day to her deposition in the present case. [Plaintiff's Ex. 6 [Doc. 295-6], Paul Dep, 122-123].**

183. Plaintiff did not consent to Dr. Paul – his treating doctor – testifying against him as a retained expert in a case to which she was not a party. Plaintiff did not consent to Dr. Paul communicating with Wexford's lawyers regarding his medical care. (Ex. 6, Paul Dep., at 129-30).

**RESPONSE: Objection. Disputed. Dr. Paul was not a "retained" expert. She was listed under a Rule 26 Supplemental Initial Disclosure under "Names of persons with knowledge of the incidents." [See Plaintiff's Ex. 71, p. 4-5]. She was testifying as an employee of Defendant Wexford Health Sources.**

184. On or about February 4, 2020, Dr. Paul received notice to give a deposition on February 10, 2020, as Wexford's expert witness in the *Miller I* lawsuit. (Ex. 72, PX75; Ex. 6, Paul Dep., at 151-52).

**RESPONSE: Objection. Not supported by the cited record. The deposition notice at Ex. 72 makes no reference to Dr. Paul as an expert.**

185. On February 5, 2020, Dr. Paul received the report of Plaintiff's liver/spleen ultrasound showing cirrhosis. (Ex. 73, PX77; Ex. 6, Paul Dep., at 153-54).

**RESPONSE: Admitted.**

186. On February 6, 2020, Dr. Paul directed the Lawrence CC to contact and provide Dr. Chan with Plaintiff's lab results, and to "ask if she would want this patient formally referred to UIC Liver Clinic/Telemedicine to be evaluated for HCV antiviral therapy at this time." (Ex. 67, PX81, at Bates #000452; Ex. 6, Paul Dep., at 158-60).

**RESPONSE: Admitted.**

187. On February 10, 2020, Dr. Paul gave a deposition in the *Miller I* lawsuit in which she testified that Plaintiff had received "adequate community standard treatment while he's been an inmate in the Illinois Department of Corrections." (Ex. 8, Paul (*Miller I*) Dep., at 96).

**RESPONSE: Admitted and immaterial.**

**Plaintiff's HCV Treatment After Release**

188. Plaintiff started treatment for his HCV approximately four months after he was released from IDOC and achieved SVR in May 2021. (Ex. 1, Miller Dep., at 113-14; Ex.22, Access Health Records (excerpt).

**RESPONSE: Objection: compound not in compliance with Local Rule 56.1(a). Admitted as to Plaintiff's testimony that he started Hepatitis C treatment after release. The cited medical record lacks foundation, as no witness has authenticated or provided foundation to interpret it. However, it is admitted that, on the face of the record, an entry on May 10, 2021, states "Hepatitis C virus infection cured after antiviral drug therapy." [Plaintiff's Ex. 22, Bates JDM 2356].**

189. Plaintiff experienced pain prior to and while he was incarcerated at Lawrence CC, and the pain went away after he was treated for his HCV. (Ex. 1, Miller Dep., at 128-30).

**RESPONSE: Objection that this is not a statement of fact with sufficient particularity that it can be admitted or disputed.**

190. Plaintiff submitted grievances in which he noted that he was being denied HCV treatment. *See Miller v. Baldwin*, No. 3:17-cv-00859-NJR-DGW, 2028 U.S. Dist. LEXIS 215088 *9 (S.D. Ill. July 13, 2018) ("Miller filed a grievance on May 7, 2017 that specifically lists complaints about his medical treatment …[.] It also states complaints regarding ongoing deliberate indifference to his Hepatitis C, Diabetes, eye glasses and mental health treatment."); Ex. 54, Grievance Records).

**RESPONSE: Objection, lacks foundation and is immaterial to the present claim. As is clear from the stated fact, the grievance referred to was from 2017, which predates the time relevant to this case by two years. Further, the cited case was fully resolved and has preclusive effect as to any claim related to the cited grievances. See response to Paragraphs 1 and 2 above.**

191. The cost of HCV treatment when DAA drugs first came out was $90,000 to $100,000 for a course of treatment, although the cost to IDOC was roughly 25% lower by working with UIC. (Ex. 15, Shicker Dep., at 83-84).

**RESPONSE: Admitted but immaterial.**

**DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS**

Defendants incorporate their Statement of Facts from the Memorandum in Support of their Motion for Summary Judgment, filed at Docket No. 299.

**ARGUMENT**

**A. Summary Judgment Standard**

When a motion for summary judgment is filed by a party that will bear the ultimate burden of proof at trial, the motion must be supported by evidence that, if not controverted, would entitle the party to a directed verdict at trial. *Colotex Corp. v. Catrett*, 477 .S. 317, 331 (1986). A court may only consider admissible evidence in assessing a motion for summary judgment. *Parker v. Four Seasons Hotels*, 845 F.3d 807, 812 n. 3 (7th Cir. 2017). The evidence ruled upon at the summary judgment stage must be competent evidence of a type otherwise admissible at trial. *Gunville v. Walker,* 583 F.3d 979, 985 (7th Cir. 2009) (citing *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.32 560, 562 (7th Cir. 1996)). In determining whether there are any genuine issues of material fact, the court must draw all inferences in the light most favorable to the non-movant. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002).

**B. Plaintiff's Claim of Deliberate Indifference Fails**

**i. Deliberate Indifference Standard**

To establish a violation of the Eighth Amendment to the Constitution of the United States, plaintiff has the burden of proving defendants acted with a culpable mental state. *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015). The required showing for deliberate indifference is "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006), quoting *Duane v. Lane*, 959 F.2d

673, 677 (7th Cir.1992). Plaintiff must show defendants knew of a serious risk to the plaintiff's health and consciously disregarded that risk. *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006).

Deliberate indifference has an objective and a subjective element: the inmate must have an objectively serious medical condition, and the defendant must be subjectively aware of and consciously disregard the inmate's medical need. *Farmer v. Brennan*, 511 U.S. 825, 837, (1994); *Petties v. Carter,* 2016 U.S. App. LEXIS 15524 * 6-7 (7th Cir. Aug. 23, 2016). A medical need is objectively serious when "the inmate's condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would perceive the need for a doctor's attention." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (quoting *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)). With respect to the subjective component of the deliberate indifference test, a plaintiff must establish that the defendant in question was aware of and consciously disregarded his medical need. *See Farmer*, 511 U.S. at 837; *Estelle*, 429 U.S. at 103-04. "This subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). In other words, "[d]eliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (internal citations omitted).

**ii. Neither Wexford nor its employees can be liable for Plaintiff's alleged injuries**

While Plaintiff puts Wexford last in his Motion, it is Wexford's relationship with IDOC that is the crux of the issue as to both Wexford and Dr. Paul. In his Complaint, Plaintiff alleged Wexford and its medical professionals "directed and/or participated in drafting, revising, implementing and/or enforcing" the IDOC Hepatitis C Guidelines under which he was

unlawfully denied treatment. [Doc. 108, Am. Comp., ¶42]. In the present Motion, Plaintiff wholly changes course, acknowledging that Wexford played no role in developing the IDOC Hepatitis C Guidelines. [See Plaintiff's Statement of Facts ("PSOF") ¶66-71]. Instead, Plaintiff now argues that, by following the IDOC Guidelines, Wexford "abdicated its responsibility for the medical care of incarcerated patients for the sake of obtaining and keeping its valuable contracts with IDOC and other correctional institutions." This argument is the complete opposite of the law.

Plaintiff's right of action for this suit is pursuant to 42 U.S.C. §1983, which provides a means by which liability may be imposed against persons "who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws. . ." 42 U.S.C.S. § 1983. As a threshold matter, only a "state actor" can be acting under color of law for the purpose of § 1983 and, absent a sufficient relationship with a state entity, such claim cannot extend to a private company or individual. *L.P. v. Marian Catholic High School*, 852 F.3d 690, 696 (7th Cir. 2017).

It is the State of Illinois that bears the obligation to provide medical care to those incarcerated in IDOC. *West v. Atkins,* 487 U.S. 42, 56 (1988). While the State may, through contracts, delegate that function or portions thereof, the duty remains the State's. *Id.* The Seventh Circuit has recognized "[a] business like Wexford that contracts to provide medical care to prisoners undertakes 'freely, and for consideration, responsibility *for a specific portion* of the state's overall [constitutional] obligation to provide medical care for incarcerated persons, and thus acts under color of state law for purposes of § 1983. *Shields v. Illinois Department of*

*Corrections*, 746 F.3d 782, 797 (7th Cir. 2014) (internal citations omitted) (emphasis added). Private entities, such as Wexford, are state actors only to the extent of those duties voluntarily assumed by them under that contract. *West,* 487 U.S. at 56.

Wexford is a private company that contracts with the State for the provision of certain medical care in IDOC facilities. [Additional Material Fact, ("AMF") incorporated herein from Defendants' Motion for Summary Judgment, [Doc. 299] ¶22]. While the State has delegated the provision of primary care services to Wexford, it has excluded from that delegation treatment for Hepatitis C. [AMF [Doc. 299], ¶22-28]; [See Plaintiff's Ex. 16, Wexford IDOC Contract, at Doc. 295-16, p. 100-101, Bates 265-266]. Instead, the State has delegated Hepatitis C treatment and the creation of the associated Hepatitis C Guidelines that outline eligibility for treatment to UIC. [AMF, [Doc. 299] ¶21-22]; [See Plaintiff's Ex. 16, Wexford IDOC Contract, at Doc. 295-16, p. 100-101, Bates 265-266].

The Seventh Circuit has held that private companies that act under color of law can be liable pursuant to *Monell*, 436 U.S. at 691-92[1]. To establish municipal liability under *Monell*, a plaintiff must prove, among other things, an unconstitutional policy of the defendant. *Id.* Here, Plaintiff faults Wexford with instructing its providers to follow the IDOC Hepatitis C Guidelines, attributing this to "Wexford policy" and the Wexford Medical Advisory Committee. Such interpretation wholly ignores that, under the express language of the Contract, the State of Illinois has the duty and obligation to "provide internal policies, procedures, and rules and any updates that govern all operations of the IDOC Correctional Centers." [See Plaintiff's Ex. 16, Wexford IDOC Contract, at Doc. 295-16, p. 4, Bates 3]. The Contract further obligates Wexford to "comply with all current and future State, Federal and local laws and regulations,

[1] A complete discussion of the *Monell* requirements and Plaintiff's failure to meet the required elements is in Defendant' Motion at Doc. 299 and not repeated herein, but equally applicable.

court orders, Executive Orders, Administrative Directives, center directives, professional licensing standard, and the policies and procedures of IDOC, the Center, and HFS, as necessary." [See Plaintiff's Ex. 16, Wexford IDOC Contract, at Doc. 295-16, p. 19, Bates 18]. Applying Plaintiff's logic, the IDOC Contract is unconstitutional.

Plaintiff's argument is a gross contortion of constitutional and civil rights law. Wexford and its employees have no responsibility to Plaintiff but through those duties Wexford contractually assumed on behalf of the State of Illinois. *West,* 487 U.S. at 56. And it is only pursuant to that Contract that Wexford can be considered at state actor under § 1983. *Id.* Wexford did not take on the State's obligation as to treatment of Hepatitis C and cannot be liable if the State otherwise failed to provide it. *See Jones v. Strow*, No. 19-cv-4013-MMM, 2019 U.S. Dist. LEXIS 186990, at *7 (C.D. Ill. Oct. 29, 2019) ("If IDOC has not engaged Wexford to provide these services, Wexford can hardly be found liable for the failing to provide them.") No basis exists for a *Monell* theory of liability in which a contractual vendor implicitly accepts a constitutional duty to provide a type of service it did not contract to provide and that its client delegated to another entity. A finding otherwise would make the voluntary undertaking of services as a vendor to the State an unknowable business venture, as failing to provide un-contracted-for services could result in civil liability and punitive damages. Plaintiff's Motion must be denied.

**ii. Dr. Paul was not deliberately indifferent to Plaintiff's condition**

Dr. Paul is a physician employed by Wexford. (PSOF, ¶10). As a threshold matter, Dr. Paul's obligations to Plaintiff flow only through Wexford's State of Illinois Contract. She has no obligations to Plaintiff beyond those voluntarily assumed by Wexford. As such, pursuant to the

express terms of the Contract, Dr. Paul had no authority to provide treatment for Hepatitis C and was obligated by Contract to apply IDOC Hepatitis C Guidelines. *See discussion Supra*.

Dr. Paul was the Wexford physician conducting the workup on patients from Lawrence to identify those who should be referred to UIC for evaluation by the UIC telehealth clinic. [AMF, [Doc. 299], ¶50-51]. Plaintiff works very hard to try to paint a picture of Dr. Paul as someone who, despite extensive knowledge of Hepatitis C, chose to ignore Plaintiff's condition. The facts show the opposite. Despite Plaintiff's elevated A1C, which would exclude him from treatment under IDOC's Hepatitis C Guidelines, Dr. Paul ordered the FibroScan ultrasound to identify any scarring of his liver, continued to monitor labs for liver function and changes in his A1C, and ordered a liver and spleen ultrasound. [AMF, [Doc. 299], ¶52-67]. Dr. Paul ensured Plaintiff had the necessary tests required by UIC for evaluation for treatment so that, had his A1C improved, he could be referred for treatment. Nothing about Dr. Paul's handing of Plaintiff's care was anything close to approaching "a total unconcern for [Plaintiff's] welfare" necessary for a finding of deliberate indifference. *Duane*, 959 F.2d 673, 677 (7th Cir.1992).

Plaintiff argues Dr. Paul blindly followed the IDOC Hepatitis C Guidelines and, by doing so, abandoned her medical judgment[2]. However, as the Northern District recently noted in response to a similar allegation against another Wexford provider, "there is no evidence that would permit a finding that [the Wexford provider] had the ability to ignore or bypass IDOC's guidelines and order hepatitis C antiviral treatment outside of the guidelines' parameters." *Morissette v. Wexford Health Sources, Inc.,* No. 19 C 4945, 2023 U.S. Dist. LEXIS 26798, at *8 (N.D. Ill. Feb. 17, 2023). No jury could find Dr. Paul was deliberately indifferent to Plaintiff's medical needs.

[2] Further discussion of why Plaintiff's claim against Dr. Paul fails is contained in her own Motion for Summary Judgment, incorporated herein by reference, if necessary.

Plaintiff's discussion of Dr. Paul's testimony in his prior case is a red herring. Dr. Paul testified as an employee of Wexford, who was a Defendant in that case. She explained it is very common for medical providers in corrections to be sued and have to continue to treat the person suing them. [Plaintiff's Ex. 6 [Doc. 295-6], Paul Dep, 216]. She testified the fact that an incarcerated patient filed a lawsuit against her or Wexford would have no bearing on her treatment of that person. *Id*. And she testified it did not impact her care of Plaintiff. *Id.* at 217. Her testimony is supported by the extensive workup she completed despite Plaintiff's continued ineligibility under the IDOC Guidelines. Plaintiff's argument simply calls to the Court's attention that he has now had multiple bites at the lawsuit apple and failed. [See Responses to PSOF, ¶1-2].

Plaintiff seems to chide Dr. Paul for informing Plaintiff that he would need to get his diabetes under control in order to qualify for Hepatitis C treatment under the IDOC Guidelines. However, based on his then pending other lawsuit, Plaintiff already knew that. Yet, all the while Plaintiff was ignoring the advice of his providers, buying sweets from the commissary and refusing his insulin injections. [AMF, [Doc. 299], ¶45-49]. Compliance with his insulin could have controlled his A1C. [AMF, [Doc. 299], ¶45]. Plaintiff refused. A cynical interpretation might be that Plaintiff was refusing insulin in order to remain ineligible for Hepatitis C treatment to bolster the claims in his then pending other lawsuit or in preparation for this one. Regardless, refusing necessary treatment defeats a claim of deliberate indifference. *Pinkston v. Madry*, 440 F.3d 879, 892 (7th Cir. 2006) (affirming summary judgment on deliberate indifference claim where inmate refused to cooperate with medical staff or accept the medical care provided to him). He cannot refuse the treatment necessary to make him eligible for hepatitis C treatment then claim the hepatitis C treatment was wrongfully withheld.

Absent from Plaintiff's argument is what action Dr. Paul should have taken. Plaintiff does not seem to say Dr. Paul could have simply referred Plaintiff to UIC. As Plaintiff notes, Dr. Paul had nurses reach out to UIC twice, asking if he could be referred, while continuing to order the necessary testing. [AMF, [Doc. 299], ¶69, 73]. The responses said to get his A1C normalized or below 8. [AMF, [Doc. 299], ¶70, 75]. At no time while Plaintiff was at Lawrence was his A1C in the 8s. [AMF [Doc. 299], ¶77-78]. There is no reason to believe Plaintiff would have been treated had Dr. Paul completed the official referral. Nor did Dr. Paul have authority under Wexford's IDOC Contract to prescribe the Hepatitis C treatment herself. [AMF [Doc. 299], ¶25-28]. Nothing in these facts supports a finding that Dr. Paul was deliberately indifferent to Plaintiff's medical need.

**iii. Plaintiff's Cannot Show Deliberate Indifference as a Matter of Law**

Deliberate indifference requires a prison official to act with a "sufficiently culpable state of mind." *See Farmer*, 511 U.S. at 834. Therefore, a prison official cannot be liable under the Eighth Amendment "unless he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer,* 511 U.S. at 847. Plaintiff bears the burden of proof on this issue. However, because it is a subjective standard, at a minimum, it represents a jury question whether Defendants appreciated a risk to Plaintiff and knowingly disregarded it, provided there is even sufficient evidence to create a triable issue. *Riccardo v. Rausch*, 375 F.3d 521, 526 (7th Cir. 2004); *Harris v. Allen*, 2013 WL 1689280 (S.D. Ill. 2013) (summary judgment is inappropriate when issues go to state of mind). As such, summary judgment in favor of Plaintiff is inappropriate as to any claim of deliberate indifference.

## CONCLUSION

Plaintiff seeks to impose liability on Wexford and its providers for failing to provide treatment expressly excluded under Wexford's IDOC contract. Such argument has no basis any law – contractual or constitutional. Plaintiff cannot establish deliberate indifference as to either Wexford or Dr. Paul and his Motion must be denied.

WHEREFORE, for the above reasons, Defendants, DR. DINA PAUL, and WEXFORD HEALTH SOURCES, INC., respectfully requests this Honorable Court grant their Motion for Summary Judgment and grant such further relief as deemed appropriate.

Respectfully Submitted,

CASSIDAY SCHADE LLP

By: /s/ Joy C. Syrcle
One of the Attorneys for Defendants, DR. DINA PAUL, and WEXFORD HEALTH SOURCES, INC.

Joy C. Syrcle
6302066
CASSIDAY SCHADE LLP
2040 West Iles Avenue, Suite B
Springfield, IL 62704
(217) 572-1714
(217) 572-1613 (Fax)
jsyrcle@cassiday.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 24, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. The electronic case filing system sent a "Notice of E-Filing" to the following:

Keith B. Hill
Ryan Kemper
Heyl, Royster, Voelker & Allen, PC
105 West Vandalia
Suite 100
P.O. Box 467
Edwardsville, IL 62025
(618) 656-4646
(618) 656-7940 (Fax)
khill@heylroyster.com

Tara M. Barnett
Christine G. McClimans
Assistant Attorney General
201 West Pointe Dr. Suite 7
Swansea IL 62226
tara.barnett@ilag.gov

Sean M. Sullivan
Ah Hil Kim
Daley Mohan & Groble
55 W Monroe Suite 1600
Chicago IL 60603
(312) 422-5536
ssullivan@daleymohan.com

/s/ Joy C. Syrcle

12057837